# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, | : |
| | : |
| | : |
| Plaintiff, | : |
| | : |
| | : |
| | : |
| v. | :   Civil Action No._____ |
| | : |
| | : |
| | :   **JURY TRIAL DEMANDED** |
| BRANDEIS UNIVERSITY, | : |
| | : |
| Defendant. | : |
| | : |

## COMPLAINT

Plaintiff John Doe (hereinafter "John"),[1] by and through his undersigned attorneys, files this Complaint and in support thereof alleges as follows:

## I.     NATURE OF THE ACTION

1.     This case arises out of actions taken by Defendant Brandeis University ("Brandeis" or "the University") concerning false allegations of sexual misconduct made against John, a male student at Brandeis with an unblemished academic and disciplinary record, by his ex-boyfriend – another male student at Brandeis – referred to herein by the pseudonym, "J.C."

---

[1]     Contemporaneously with this Complaint, Plaintiff has filed a Motion for Permission to Proceed under Pseudonym.

2.      John and J.C. met in August 2011 on the first day of Orientation of their freshman year at Brandeis.  At the time, John was "in the closet."  J.C. was openly gay and sexually experienced.

3.      Their attraction to each other was immediate and mutual.  Within weeks, the two became sexually intimate, "came out" to family and friends as a couple, and began a 21-month sexually active, exclusive dating relationship.

4.      In July 2013, however, J.C. broke up with John because J.C. said he wanted a "more forceful" partner who "could stand up to him more."  The two remained friends for several months after the breakup, but the friendship deteriorated.

5.      Then, in January 2014, six months after the breakup and more than two years after their first sexual contact, J.C. filed with the University a two-sentence, 29-word Community Standards Report ("Report"), stating in full:  "Starting in the month of September, 2011, the Alleged Violator of Policy [John] had numerous inappropriate, nonconsensual sexual interactions with me.  These interactions continued to occur until around May 2013."

6.      The University immediately placed John on "emergency suspension," requiring him to remain sequestered in a campus facility, and banning him from his residence, classes, University paid job, University community advisor position, and elected position on a University Board.

7.      Two days later, the University notified John that J.C.s' two-sentence, non-specific accusation spanning nearly two years of their relationship related to six alleged violations of Brandeis's "Rights and Responsibilities" Handbook ("R&R Handbook"):  sexual misconduct, lack of consent to sexual activity, taking sexual advantage of incapacitation, sexual harassment, causing physical harm to another, and invasion of personal privacy.

8.      On that same day, the University told John that it would press J.C.'s charges *and* would adjudicate the case through the University's new "Special Examiner's Process" for sexual assault and sexual harassment cases – as opposed to the University's long-established Student Conduct "Hearing Process."

9.      John was stunned by the accusation and charges, and the University's precipitous response.  Not once during the 21 months they were together did J.C. complain to John that he was performing any sexual act without J.C.'s consent, or was invading his privacy.

10.     Nor was there a trace of physical or other corroborating evidence that John ever physically harmed or sexually harassed J.C.  There were no medical or hospital records, 911 calls, reports to Campus Police or law enforcement, reports of witnesses to any incidents, or complaints by J.C. to friends, relatives, or Brandeis administrators during the 21 months of the relationship.

11.     During the next three months, John participated in the Special Examiner's Process under protest, both because he had a contractual right to have his case adjudicated through the University's Hearing Process, and because the Special Examiner's Process lacked the most basic elements of fairness and due process.

12.     The contrast between the Hearing Process and the Special Examiner's Process is stark.  In the Hearing Process, the parties participate in a hearing before an impartial four-member tribunal.  Both the accused and the accuser have the right to present evidence and witnesses and to question each other and each other's witnesses.  There is a full and equal opportunity for both parties to hear the evidence and present their respective claims and defenses.

13.     In the Special Examiner's Process, the hearing is eliminated altogether.  In its place, the University has created a secret, inquisitorial process, in which a single individual hired by the University – the "Special Examiner" – conducts a closed-door investigation of the charges.

14.     The accused never has the opportunity to confront the accuser, question the witnesses, or present a defense at a hearing.  Because there is no hearing, the accused never knows what the accuser (or the accuser's witnesses) actually have said, but only knows what the Special Examiner chooses to tell him.  In John's case, he was not told orally or in writing the factual bases for the charges against him at any time before or during the three months of the Special Examiner's investigation; instead, he had to try to piece together what in particular he was accused of doing from the questions posed to him by the Special Examiner.

15.     At the conclusion of the investigation, the Special Examiner prepares a Report, which includes the Examiner's findings of fact, conclusions as to credibility of the parties and witnesses, and recommended judgment.  At the time of John's case, the accused was not permitted to read the Report but could only "listen" to a "summary" of the Report prepared by the single University administrator chosen as the final "decision maker."

16.     In John's case, the Special Examiner (an outside lawyer hired by the University), after conducting separate, secret interviews of the parties and witnesses, found John responsible for all six charges.

17.     It was only then – after the Special Examiner had concluded the investigation and found John responsible for the charges – that John finally learned what specific conduct he was alleged to have engaged in as the basis for the charges and findings.

18.     The accusations were frivolous on their face, but the Special Examiner's findings were even more disturbing.  They were based on notions of what constitutes sexual misconduct and invasion of privacy that bordered on the absurd and defied common sense.

19.     For example, the Special Examiner found that, on those occasions when John awakened J.C. in the morning with a kiss, but J.C. told him to "stop" so that he could go back to sleep, John had committed a sexual assault because sleep is a "state of incapacitation," and thus the wake-up kiss was unwanted sexual conduct and taking sexual advantage of incapacitation.

20.     The Special Examiner also found that, on those occasions when John looked at J.C.'s naked body when the two shared the dorm's same-sex communal bathrooms, that act was an invasion of personal privacy, despite the fact that the two were in an intimate relationship, routinely used communal facilities together, and J.C. engaged in the same conduct.

21.     The Special Examiner also found that, when John made the "first move" on J.C. while the two were in their pre-dating "flirting" stage by placing J.C.'s hand on John's crotch over his clothing, that act was a sexual assault because J.C. had not explicitly consented to the act.  The Special Examiner made this finding despite the fact that the very next day the two became sexually intimate and began a 21-month, sexually active dating relationship.

22.     Thereafter, Lisa Boes, the University's Dean of Academic Services who was chosen as the University's final "decision maker" on the case, refused to consider John's additional evidence, including an affidavit, documents and list of witnesses, and accepted the findings of the Special Examiner uncritically with no written explanation.

23.     John was sanctioned by the University with a Disciplinary Warning.

24.    A Disciplinary Warning requires the student to undergo education training to address the infraction.  Much more importantly, the Disciplinary Warning means that the student's education record will reflect that the student was found responsible for the charges.

25.    In John's case, his education record will permanently reflect that he was found responsible for sexual misconduct toward another student involving lack of consent to sexual activity, taking sexual advantage of the student's incapacitation, sexually harassing and physically harming the student, and invading the student's personal privacy.

26.    Brandeis has effectively labeled John as a predatory sexual offender.

27.    The adverse mark on John's permanent education record, stigmatizing him as a sexual offender, jeopardizes, if not shatters, his goal of attending law school and pursuing a career in public service and politics.  John's ill-deserved disciplinary record will be a lifetime liability.

28.    The Special Examiner's findings were arbitrary, capricious, and irrational.  J.C.'s charges lacked a shred of evidentiary support; the Special Examiner ignored John's witnesses, social media documentation, and the circumstances of a 21-month consensual sexual relationship indicating that John and J.C had a normal, healthy relationship that eventually ran its course.

29.    The Special Examiner's Process as conceived by the University and as implemented in John's case was also deeply flawed because it applied inequitable standards of sexual conduct and inequitable processes that favored J.C. and discriminated against John in violation of Title IX of the Educational Amendments of 1972.

30.    The Department of Education, Office of Civil Rights ("OCR"), the federal agency charged with regulating Title IX, has opened an investigation of Brandeis's handling of John's case in response to John's complaint filed with the agency.  Upon information and belief, this is

only the second case that the OCR has investigated on behalf of an accused student regarding possible violations by a college or university of principles of equity and fairness in connection with the investigation and adjudication of alleged sexual misconduct.

31.     Not content with the sanction in John's case, J.C. has revealed the University's confidential findings to third parties, and defamed John by repeatedly making statements orally and in writing to University administrators, students, and the press that John subjected J.C. to "multiple forms of rape."   That statement is patently false because J.C. specifically told the Special Examiner he had not been raped, which J.C. defined as penetration without consent.

32.     Brandeis is aware of J.C.'s defamatory actions and has aided and abetted them. Upon information and belief, Brandeis "leaked" the Special Examiner's findings to John's then-current and prospective employers, or has failed to adequately safeguard the confidentiality of the findings as it is required to do under federal law.  These violations directly resulted in John's being let go from his internship position working for a high-ranking elected official, the withdrawal of employment references, and the withdrawal of employment offers.

33.     Brandeis's and J.C.'s egregious conduct has caused John severe emotional distress, including panic attacks leading to suicidal ideation on at least two occasions, loss of weight and appetite, a complete inability to sleep through the night, anxiety and depression requiring psychological counseling.  He has been subjected to hateful comments by other students accusing him of rape, including on the "Speak Out! Brandeis" web page that the University sponsors and condones.

34.     John found the environment on campus so hostile and toxic that he accelerated his graduation date to leave as soon as he could a campus and University he had previously loved but which has betrayed his trust.

35.     Brandeis allowed a malicious ex-lover to hijack the University's disciplinary processes for his own illegitimate purposes, and aided and abetted his abuse of process.  The University accepted *carte blanche* the Special Examiner's findings, even though they could not be squared with the evidence, and elevated benign, unremarkable, everyday occurrences in a nearly two-year consensual relationship into sexual and physical assault.  By implementing this deeply flawed Process, and permitting it to play out unchecked in John's case, the University has set a dangerous precedent that hurts all real victims of sexual and physical violence.

36.     The Special Examiner's Process provides no checks or balances on the authority of a single individual – the "Special Examiner" – to conduct an inquisitorial, secret investigation and then to pass judgment on the accused as the single fact-finder and *de facto* adjudicator.  The Process has no safeguards to prevent the Special Examiner from conducting a biased, incomplete, or incompetent investigation – as happened in John's case – and vests in one person the conflicting roles of investigator, prosecutor, and judge.

37.     Justice Brandeis would be appalled.

38.     For these reasons, John brings this action to obtain equitable and declaratory relief and legal damages based on causes of action for violations of Title IX of the Education Amendments of 1972, breach of contract, breach of the covenant of good faith and fair dealing, estoppel and reliance, defamation, invasion of privacy, and intentional and negligent infliction of emotional distress.

## II.    PARTIES

39.     Plaintiff John Doe is a natural person who resides in California.  John was a student at Brandeis University, who graduated with high honors on February 1, 2015.

40.     Defendant Brandeis University ("Brandeis" or "the University") is a private, coeducational research university with a principal address of 415 South Street, Waltham, Massachusetts 02545.  Brandeis was founded in 1948 by the Jewish community as a non-sectarian institution "open to all . . . with a commitment to making a positive impact on the world."  ("School Mission and Unique Qualities," U.S. News & World Report, National Rankings.  http://colleges.usnews.rankingsand reviews.com/best-colleges/brandeis-university-2133) (last visited 3/03/2015).  Named for Louis Brandeis, the first Jewish justice of the United States Supreme Court, Brandeis encourages its 3,500 undergraduate students to focus on community service, consistent with the University's "commitment to Social Justice."  (*Id*.)

41.     Brandeis is among the nation's leading universities, ranking 35 in U.S. News & World Report's 2015 National Universities list.  (*Id*.).

42.     At all times material hereto, Brandeis acted by and through its agents, servants, employees, and representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of Brandeis's business, mission and/or affairs.

## III.    JURISDICTION AND VENUE

43.     For diversity purposes, John is a citizen of the state of California and Brandeis is a citizen of the Commonwealth of Massachusetts.

44.     This Court has original diversity jurisdiction over this claim pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

45.     This Court also has original jurisdiction under Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, *et seq.* and 28 U.S.C. § 1331, and jurisdiction over related state common law and statutory claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.C. § 1367.

46.     Venue is proper in the Eastern Division of the District of Massachusetts pursuant to 12 U.S.C. § 1391(b)(2) and District of Massachusetts Local Rule 40.1(D) because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in the District of Massachusetts and because the Defendants reside in Middlesex County.

## IV.     FACTUAL BACKGROUND

### A.     The Relationship Between John and J.C.

47.     John and J.C. met in August 2011, when they began their freshmen year at Brandeis. John was 17 years old. J.C. was 18 years old. At the time, John was "in the closet," and had never engaged in sexual activity with another man. J.C. was openly gay and had significantly more sexual experience than John.

48.     Their attraction to each other was immediate and mutual. The two became close friends. J.C. knew John was gay, and they began to flirt with each other.

49.     When the two discussed that John was sexually attracted to J.C. but was torn about whether to act on it, J.C. responded that he, J.C., would never make the first move on a straight guy. That was a clear signal to John that he would have to initiate any sexual activity. John did so while the two watched a movie in a friend's dorm room and cuddled against each other by placing J.C.'s hand on John's crotch over his clothing. The very next day, the two became sexually intimate.

50.     In October 2011, John "came out of the closet" to his parents, and he and J.C. revealed to their Brandeis friends that they were boyfriends.

51.     Between September 2011 and July 2013, a period of 21 months, John and J.C. were involved in an intimate, sexually active, and, insofar as John is aware, exclusive, dating relationship (the "Relationship").

52.     Always at J.C.'s insistence, John and J.C. slept together in the same bed.  Often, one awakened the other in the morning with a kiss.

53.     They showered together, shared the dorm's same-sex communal bathrooms, and observed each other naked.

54.     John and J.C. were happy in the Relationship.

55.     Not once during the entire Relationship did J.C. ever complain to John, or to any of their friends or relatives, law enforcement, University Campus Police, or any Brandeis administrator that John was performing any sexual act without J.C.'s consent or was invading his privacy.  In fact, on occasion, J.C. had stated he wished John would surprise him more and reciprocate sexual acts more than he did.

56.     Before the Relationship, J.C. told John that J.C.'s mother had a history of alcohol abuse, had neglected J.C. and his siblings, and had attempted suicide, which led to J.C.'s removal from her custody and placement in foster care.

57.     In light of his family history, J.C. did not drink alcohol during the entire Relationship and insisted that John not drink alcohol as well.

58.     John respected and supported J.C.'s sober lifestyle.

59.     In July 2013, J.C. broke up with John because J.C. felt they had lost a connection and because John was not strong-willed enough.  In J.C.'s words, J.C. wanted a "more forceful" partner who "could stand up to him more."

### B.  **J.C. Falsely Accuses John of Sexual Misconduct.**

60.     After the Relationship ended, the two remained friends for approximately four months.  They had dinner with friends, and had coffee together.  They collaborated on a campus LGBT project, and exchanged friendly email messages.

61.     In November 2013, J.C. and John had several dissonant social interactions.  Each said mean things about the other to third parties, and each had his feelings hurt.  Their friendship deteriorated.  John also was put off because J.C. had started drinking alcohol, which John perceived as being hypocritical given J.C.'s insistence during the Relationship that John not have alcohol.

62.     J.C. observed that a gay male student seemed to be attracted to John.  J.C. was attracted to the student as well.  When J.C. sent that student a Facebook "friend request," the student declined the invitation.  The very next day after this rebuff, J.C. made the false accusation against John that is the basis for this lawsuit.

63.     On January 14, 2014, more than six months after their Relationship ended, and more than two years after their first sexual encounter, J.C. filed a Report with the University, stating in full: "Starting in the month of September, 2011, the Alleged Violator of Policy [John] had numerous inappropriate, nonconsensual sexual interactions with me.  These interactions continued to occur until around May 2013."

64.     Brandeis's Dean of Students, Jamele Adams, immediately placed John on "emergency suspension," banning him from his residence, classes, two paid campus jobs, and high-ranking elected position in student government, and requiring John to remain sequestered in a campus facility.  On information and belief, at the time Adams took these actions, he had no knowledge of any facts underlying J.C.'s non-specific, two-sentence allegation, and had no information suggesting John was a danger to J.C. or the Brandeis community.

65.     Two days later, the University notified John that J.C's accusations related to six alleged violations of Brandeis's R&R Handbook:  Sections 2.1.d (causing physical harm); 2.1.e (invasion of personal privacy); 3.1 (sexual misconduct); 3.2 (taking advantage of incapacitation); 3.3 (lack of consent); and 7.2 (sexual harassment).

66.     At the same time, the University informed John that John's case would be adjudicated through the University's new Special Examiner's Process, rather than the University's long-established Student Conduct Hearing Process.

### C.     The University Subjects John to the Special Examiner's Process in Lieu of the Hearing Process.

#### 1.     The  Hearing Process.

67.     Prior to entering Brandeis as a freshman in 2011, John received from Brandeis a copy of the University's 2011-12 R&R Handbook.  As a condition of enrollment, the University required John to agree in writing to be bound by the rules and regulations set forth in the R&R Handbook.  (Excerpts of the 2011-12 R&R Handbook are attached hereto as Exhibit "A".)

68.     In the 2011-12 R&R Handbook, a student accused of violating a standard of behavior or University policy may be subject to disciplinary action only after the Department of Student Rights and Community Standards makes a "careful evaluation" of the "facts" alleged by the accuser and the "credibility" of the accuser and determines that there is "sufficient evidence" to refer the matter to the Student Conduct Board for a hearing.  (*See* Ex. A, Sections 18-23, at 21-31).

69.     The  Hearing Process reflects Brandeis's long-standing "philosophy of peer judgment" through student-conducted hearings – students hear and decide the cases before them, with panels consisting of 2 students and 2 faculty members for academic violations, and 3

students and 1 faculty member for all other violations.  (Ex. A, Section 20.2, at 25; Section 23.B, at 30).

70.     In the 2011-12 R&R Handbook, the Hearing Process applies to all violations referred to it, including allegations involving sexual misconduct.  (Ex. A, Sections 2 & 3, at 3-6; Section 20.2, at 25).

71.     Pursuant to the Hearing Process, the accused must be "inform[ed] . . . of the details of the charges" and "receive written charges" as many as 32 days before the hearing.  (Ex. A, Sections 19.1 & 19.6, at 22-23).  In addition, the hearing administrator "shall be available prior to the hearing at the request of the accused student to provide information regarding the alleged violation . . . ."  (*Id*., Section 19.6, at 23).

72.     The accused student and the accuser "may present evidence and introduce witnesses during the hearing" and "shall have the right to view and question all evidence and reports presented to the Board during the hearing."  (Ex A, Sections 19.9 & 19.11, at 23-24).

73.     "The accused student and the accuser shall have the right to question all witnesses appearing before the Board . . . ."  (Ex. A, Sections 19.11, at 24).  The accused and accuser may ask questions of each other, and may recall or re-question each other after witnesses have testified.  (*Id*., Section 23, at 30-31).  Board members may question both the accused and accuser and all witnesses.  (*Id*., Section 23, at 30).

74.     At the hearing, the accuser is required to prove his or her allegations by "clear and convincing evidence."  (Ex A, Section 19.13, at 24).

75.     A written Hearing Report summarizing the evidence presented at the hearing and decision rendered by the Board is prepared, and the parties have access to it as an "education

record" pursuant to the federal Family Educational Rights and Privacy Act ("FERPA"), and

Section 17.4 of the 2011-12 R&R Handbook.  (Ex. A, Section 17.4, at 20).

**2.**     **The Special Examiner's Process.**

76.      In the 2012-13 R&R Handbook, the University unilaterally supplanted the

Hearing Process with the Special Examiner's Process for allegations involving sexual

misconduct and sexual harassment.  (Excerpts from the 2012-13 R&R Handbook are attached

hereto as Exhibit "B.")  (*See* Ex. B, Section 3.0, at 6; Section 7.0, at 11; Section 22.6, at 35).

77.      All other student conduct allegations remain subject to the Hearing Process,

including allegations pertaining to physical harm to others and invasion of personal privacy.

(Ex. B, Sections 2.1, 2.3, at 4; Sections 18-22.5, at 24-35).

78.      In the Special Examiner's Process, the hearing is entirely eliminated.  In its place,

a single individual hired by the University – the "Special Examiner" – conducts a closed-door

investigation.  The Special Examiner separately interviews the parties and witnesses, and

considers documents and other physical evidence.  The Special Examiner chooses which, if any,

witnesses to interview, what questions to ask of everyone involved, and determines what

information the accused receives during the process.  (Ex. B, Section 22.6, at 37-38, "Fact-

Finding Phase").

79.      After completing the investigation, the Special Examiner prepares a written report

summarizing disputed and undisputed facts.  In the 2012-13 R&R Handbook, the Special

Examiner's Report "*may* offer conclusions or recommendations as to the credibility of testimony

or potential outcomes."  (Ex. B, Section 22.6, at 38, "Special Examiner's Report") (emphasis

added).

80.      In the 2013-14 R&R Handbook, under which John's case was investigated and

adjudicated, the University expands the Special Examiner's role beyond factual *investigator* to

15

fact-*finder* and *adjudicator* (*i.e.,* judge):  the Special Examiner's Report *must* offer the Examiner's "conclusions" about "the credibility of testimony" and the Examiner's "finding" about "whether the Accused is responsible or not responsible for any or all charges."  (Excerpts from the 2013-14 R&R Handbook are attached hereto as Exhibit "C.")  (*See* Ex. C, Section 22.6, at 45, "Special Examiner's Report").

81.     The Special Examiner uses the preponderance of the evidence standard "in evaluating the responsibility of the accused."  (Ex. C, Section 22.6, at 43, "Standard of Evaluation").

82.     In the 2013-14 R&R Handbook, after the Special Examiner's Report is completed, the parties are not shown a copy of the Report.  Instead, the University's "final decision maker" (*i.e*., the Dean of students or other designated administrator) prepares a "Summary" of the Special Examiner's "findings" and the parties "listen" to the Summary in separate meetings.  The parties have several days to offer new information or witnesses and the final decision maker determines whether to provide the new evidence to the Special Examiner. (Ex. C, Section 22.6, at 45-46, "Discussion Phase").

83.     Thereafter, a Panel of three University administrators or faculty reads the Special Examiner's Report and votes on whether to recommend to the final decision maker to accept it. The final decision maker considers whether to accept or not accept the Panel's vote and "renders the final decision as to any outcomes."  (Ex. C, Section 22.6, at 46, "Deliberations Phase").

84.     Both the accuser and accused may appeal the Panel's decision to an Appeals Board of three voting faculty members, based on "fraud, denial of rights under this process, procedural error, or the claim of new evidence . . . ."  (Ex. C, Section 22.6, at 46-47, "Appeals

Procedures"). The final decision maker retains ultimate discretion whether to reverse, amend or uphold the original final decision. (*Id*. at 47).

85. In the 2013-14 R&R Handbook, University officials are obligated to conduct a preliminary "careful evaluation" of the facts and to assess the "credibility" of the accuser before referring a case to the Special Examiner's Process. (Ex. C, Section 18, at 27).

**D.** **The Special Examiner's Closed-Door Investigation and Judgment of John's Case.**

86. Immediately after receiving notice of the charges against him on January 14, 2014, and for weeks thereafter, John repeatedly asked University officials to inform him of the factual bases for J.C.'s charges against him. He had not been provided with anything more than J.C.'s two-sentence, 29-word accusation. John had no idea what he was alleged to have done wrong during his nearly two-year Relationship with J.C.

87. The University refused his requests.

88. The first time John learned any facts underlying J.C.'s accusation was when the Special Examiner interviewed John for the first time on February 6, 2014, and began to ask him questions about particular incidents occurring over the course of the two-year Relationship and during the "flirting" period before the Relationship began. John surmised these incidents had been brought up by J.C. during J.C.'s first and second interviews with the Special Examiner, conducted on January 27, 2014 and February 3, 2014.

89. For John's case, the University hired an outside lawyer to serve as Special Examiner.

90. During the next two-and-a-half months, the Special Examiner conducted three additional interviews with John and two additional interviews with J.C. The Special Examiner

also interviewed two University administrators, one of which was a witness identified by John, two additional witnesses whom John identified, and four witnesses identified by J.C.

91.     During this entire process, John received nothing orally or in writing stating what it was in particular that J.C. accused him of doing.  Instead, John had to piece those accusations together based on the questions the Special Examiner asked him during his interviews.

92.     The questions centered on mundane, everyday routines, or isolated occurrences over a two-year period.  For example, the Special Examiner asked John questions about John's and J.C.'s use of the dorm's communal bathrooms.  The Special Examiner asked John about "wake up morning kisses," and whether John had "slept on the floor" during a visit he and J.C. had made to J.C.'s father's house.  John was forced to try to recollect events over the course of the two-year Relationship that were not imprinted in John's memory because they were unremarkable.

93.     John was not told what J.C.'s witnesses said in their interviews.

94.     After completing the investigation, the Special Examiner passed judgment on John, concluding he was responsible for all six charges.   At no point in the process was John allowed to confront his accuser or witnesses, or even to know exactly what it is that his accuser or witnesses said against him.

E.     **The University Finally Presents John With a Verbal "Summary" of the Particular Accusations Against Him and the Basis for the Special Examiner's "Findings" of Responsibility.**

95.     On April 24, 2014, Lisa Boes, the University's Dean of Academic Services (the administrator chosen to serve as the final decision maker in John's case, who had no experience or training with respect to the University's sexual misconduct policies) met with John and read to him the "Summary" she had prepared of the "findings" of the Special Examiner's Report.

96.     John requested but was not given a copy of the Special Examiner's Report at that time or at any time while his case was being adjudicated.   The University provided John with the full Report only *after* his case had been decided and closed by the University.  The University did provide John with a copy of the written Summary two days after Ms. Boes' recited the Summary to him.

97.     The verbal Summary, followed by the written Summary, outlined for John without factual detail what specific conduct he was alleged to have engaged in as the basis for the six violations charged against him.

98.     The accusations of sexual misconduct were incredible to John.  Even more disconcerting were the findings of the Special Examiner, which were based on notions of what constitutes sexual misconduct that border on the ludicrous, and were arbitrary and capricious.

99.     The Special Examiner analyzed each alleged incident in isolation, ignoring the context of a long-term consensual relationship and misapplying the University's definition of consent and sexual harassment.  In the absence of any objective, verifiable evidence that any of the alleged incidents occurred, the Special Examiner used manipulative interrogation techniques to create bogus "inconsistencies" in John's recollection of events, and accorded John's witnesses and documentary evidence no weight in the decision-making process.

100.    Three of J.C.'s accusations concerned conduct occurring more than two years before, while J.C. and John were "flirting" and just before they "came out" to their friends as a couple.

101.    First, J.C. accused John of "walking" with J.C. in a way that required J.C. to accidentally touch John "on the butt."  According to J.C., this "unwanted touching" constituted sexual misconduct and lack of consent.

102.     Second, J.C. accused John of "the Movie Incident," in which John made the first move on J.C. by placing J.C.'s hand on John's crotch while watching a movie in a friend's dorm room.  According to J.C., this constituted sexual misconduct because John had not obtained J.C.'s explicit consent.

103.     Third, J.C. accused John of "Post-Movie" sexual misconduct on the basis that before they began dating John tried to kiss J.C., was naked in his room, and put J.C.'s hand on John's groin.

104.     The Special Examiner found the evidence was insufficient to indicate that the walking and post-movie incidents occurred.

105.     However, the Special Examiner found John responsible for sexual misconduct and lack of consent with respect to "the Movie Incident," crediting J.C.'s story that he "froze" and submitted to the sexual contact without giving consent.

106.     The Special Examiner failed to consider the undisputed facts that the two had been "flirting"; J.C. had indicated to John just prior to the contact that John would have to make the first move sexually; they were cuddling against each other watching the movie; and within a day of the incident the two began a *21-month dating relationship*.  It defies reason for the Special Examiner to have concluded that John's "first move" leading to a 21-month consensual relationship was a sexual assault.

107.     The Special Examiner also misapplied the University's definition of "consent" which in all of its R&R Handbooks from 2011 through 2014 permits consent to be "communicated verbally or *through actions* . . . ."  (*See* Ex. A, Section 3.3, at 5; Exs. B & C, Sections 3.3, at 6) (emphasis added).  The Special Examiner effectively required a verbal "yes" by ignoring the actions surrounding the act indicating consent.

108.     Next, J.C. accused John of engaging in nonconsensual sexual conduct on several occasions while J.C. was sleeping, such as rubbing up against him or kissing, which awakened J.C.  This alleged misconduct occurred during the sexually-active "dating" phase of the Relationship.  When the Special Examiner initially questioned John about these "sleeping" incidents, John denied rubbing against J.C. in his sleep but acknowledged he would sometimes wake J.C. up by kissing him.

109.     The Special Examiner concluded that the "wake up kiss" was unwanted sexual activity because sleep is a "state of incapacitation," and because John's accounts were "inconsistent," *i.e.*, in his initial interview John said that J.C. would never tell him to "stop" kissing him, but in a subsequent interview John clarified that, when the wake-up kiss was too early in the morning (8:00 a.m. instead of 10:00 a.m.), J.C. would tell John to "stop" so that he could go back to sleep, and John would stop kissing J.C.

110.     The Special Examiner concluded that John had been "inconsistent" by not telling the Examiner about the "stop" occasions in the first interview.  On this basis, the Special Examiner found that those "wake up kisses" constituted sexual misconduct, taking sexual advantage of incapacitation, and lack of consent to sexual activity.

111.     The absurdity of this finding is best summed up by the observation that under the Special Examiner's reasoning sexual misconduct among couples is an everyday occurrence.  In addition to throwing common sense out the window, the Special Examiner failed to consider the undisputed facts that the two slept together at J.C.'s insistence throughout the Relationship, during which they regularly engaged in consensual sexual contact, including mutual "wake up" kisses.

112.     Next, the Special Examiner found John responsible for sexual misconduct and lack of consent based on J.C.'s accusation that John had tried to perform oral sex on J.C. when the two were in bed while visiting J.C.'s father's home.  J.C. alleged he objected to the sexual contact and asked John whether he realized this was sexual assault.  J.C. claimed John was upset and moved to the floor.

113.     When initially questioned by the Special Examiner, John denied that anything unusual had occurred during the visit.  When prompted by the Special Examiner in a subsequent interview whether he had slept on the floor during the visit, John recalled that he had done so due to discomfort sleeping in a twin bed with J.C. (which John explained was a common occurrence during their nearly two years together).

114.     The Special Examiner concluded that John's accounts of the visit were "inconsistent" because he had not acknowledged sleeping on the floor in his first interview, even though the Special Examiner had not asked John whether he slept on the floor until the second interview.  On this basis, the Special Examiner found that unwanted sexual conduct had occurred.

115.     The Special Examiner's conclusion was based on nothing more than a manufactured, set-up "inconsistency" elicited through a patently unfair interrogation process.  Additionally, the Special Examiner ignored the undisputed fact that J.C. continued to engage with John sexually during the months following the visit until the end of the Relationship.

116.     Next, the Special Examiner found John responsible for invading J.C.'s privacy by looking at J.C.'s private parts when the two were using the University's same-sex communal bathrooms.

22

117.    John had been questioned by the Special Examiner during interviews about "bathroom incidents" and had responded that he and J.C. were in a same-sex relationship and used same-sex communal bathrooms, during which they both looked at each other's private parts as a joke.  The Special Examiner found that John's response indicated he did not effectively distinguish between a joke and inappropriate behavior that invades another's personal privacy.  On this basis, the Special Examiner found John responsible for invasion of personal privacy.

118.    The Special Examiner's finding was patently arbitrary and unfair.  The Special Examiner failed to consider the undisputed facts that the two were in a consensual same-sex relationship for nearly two years; they regularly and routinely used communal, same-sex dorm bathrooms together during which they inevitably viewed each other's bodies; and J.C. always had the option of using the bathroom alone.

119.    Finally, the Special Examiner found John responsible for physical harm and sexual harassment by pressuring J.C. to engage in unwanted sexual activity during the Relationship.  The Special Examiner based this conclusion in part on John's admission that he would get "sulky" after J.C. declined to engage in sexual activity.  The Special Examiner found that John's admission of "sulkiness" corroborated J.C.'s sexual harassment allegation.

120.    This conclusion defies common sense, as "sulky" behavior is not uncommon between sexual partners trying to balance often differing needs.  If "sulky" behavior constitutes sexual harassment, then the logical extension of the Special Examiner's reasoning is that sexual harassment is a common occurrence in normal, everyday relationships.

121.    The Special Examiner also misapplied the University's definition of "sexual harassment," which in all of the University's R&R Handbooks from 2011-2014 requires "persistent" behavior that "create[s] an intimidating, hostile or offensive environment in which to

23

work, study, or live . . . ." (Ex. A, Section, 7, at 10; Ex. B, Section 7, at 12; Ex. C, Section 7, at 13). It was arbitrary and capricious for the Special Examiner to conclude that occasional "sulking" constitutes intimidating, hostile or offensive conduct that could be deemed to sexually harass.

122. The Special Examiner also found sexual harassment on the basis of J.C.'s behavior after he broke up with John, *i.e.*, J.C. began drinking alcohol and sought counseling from a mental health professional. The Special Examiner relied on a single, hearsay research study reporting significantly increased rates of alcohol use among women (not men) after recent occurrences of sexual assault as "probative" that J.C. had experienced unwanted sexual conduct.

123. The Special Examiner ignored the information supplied by one of John's witnesses that J.C. began drinking at his grandmother's funeral, and the undisputed fact that J.C. grew up in a severely dysfunctional, alcoholic family, suggesting that J.C.'s resort to alcohol was triggered by *family* history and events, not by unwanted sexual activity with John.

124. The Special Examiner also ignored John's three witnesses – including two students and the executive assistant to a University administrator – who reported to the Special Examiner that J.C. and John seemed happy and comfortable together during the Relationship and during the post-breakup period before J.C. filed his accusation. The Special Examiner ignored the 32 pages of social media documentation that John and a witness provided, including photographs and Facebook postings, showing the gregarious couple surrounded by friends and indicating a normal, happy dating Relationship.

125. Instead, the Special Examiner relied on a handful of hearsay research studies reporting that individuals under-report intimate partner violence to friends and family and do not perceive unwanted sexual contact with their partner as coercion. Exclusively on the basis of

these research studies, the Special Examiner concluded that the testimony of John's witnesses and the documentary evidence should be accorded no weight in determining John's guilt or innocence on the sexual harassment charge.

126.    With respect to the finding of physical harm, the Special Examiner improperly equated unwanted sexual contact with physical harm, even though the R&R Handbooks from 2011-2014 make clear that physical harm requires a battery distinct from sexual battery, in the form of "hitting, pushing, or physical altercations/violence of any kind." (Ex. A, Section 2, at 3; Ex. B, Section 2, at 4; Ex. C, Section 2, at 4). The Special Examiner's Report did not find or even remotely suggest that any physical battery or violence had ever happened.

127.    John was stunned by the Special Examiner's findings. He immediately requested that Lisa Boes furnish him with a copy of the Special Examiner's Report; he repeated that request in the days and weeks that followed, to no avail.

128.    As he repeatedly told University officials, all of the University's R&R Handbooks from 2011 through 2014 obligate the University to provide a student with the student's "education records" in compliance with FERPA (Family Educational Rights and Privacy Act). Disciplinary records unquestionably are a part of a student's education record. (*See* Ex. A, Section 17.4, at 20; Ex. B, Section 17.4, at 23; Ex. C, Section 17.4, at 26).

129.    Nonetheless, the University refused to provide the Report.

130.    On May 2, 2014, John responded to the Summary of the Special Examiner's Report, setting forth in detail facts and witnesses – and supplying additional facts, witnesses and his sworn affidavit – demonstrating that the accusations against him were frivolous and not supported by any objective or credible evidence; and that the Special Examiner's findings, as

25

summarized by the University, were arbitrary, capricious, and irrational, and were not supported by a preponderance of the evidence.

   **F.**  **The University's Decision and Sanction.**

   131. On May 30, 2014, Ms. Boes notified John that, on the basis of her review of the Special Examiner's Report and John's response, she found John responsible for all six of the violations for which he had been charged.  Therefore, John would have to appeal if he wished to contest her decision.

   132. Ms. Boes's decision contained no analysis of the Special Examiner's Report or John's response to it.  She refused to refer any of John's additional facts, witnesses, or affidavit to the Special Examiner for further consideration.

   133. John again asked the University for a copy of the Special Examiner's Report for purposes of his appeal.  John also asked for all of the notes of interviews taken by the Special Examiner and the University's Observer, who attended all of the interviews conducted by the Special Examiner.

   134. John needed the full Report and underlying interview notes in order to be apprised of all of the facts contained in the Report, including exactly what it is that J.C. said about him, what J.C.'s witnesses said, the weight that the Special Examiner gave to the parties' and witnesses' interview statements, and a full understanding of the factual and legal bases for the Special Examiner's findings.  The Summary given to John lacked this information.

   135. Ms. Boes, as well as Steven Locke, David Bunis, and Andrew Flagel, the University's General Counsel,  Chief Legal Officer, and Senior Vice President of Students and Enrollment, respectively, communicated to John the University's refusal to provide the Special Examiner's Report or the Special Examiner's and Observer's interview notes.

136.     Accordingly, John was forced to appeal the Special Examiner's decision without having the Special Examiner's Report or interview notes.  Based on the University's Summary, John appealed on grounds of procedural errors, denial of rights, and fraudulent conduct on the part of the University and J.C.

137.     On June 20, 2014, the Appeals Board rejected John's appeal, and on June 24, 2014, Ms. Boes notified John of the final, adverse outcome against him.

138.     At the conclusion of these proceedings, John was sanctioned by the University with a Disciplinary Warning.

139.     A Disciplinary Warning requires the student to receive sensitivity training, but much more importantly, the student's permanent education record will reflect that the student was found responsible for the charges.

140.     In John's case, his education record will permanently state that he was found responsible for sexual misconduct toward another student involving lack of consent and taking sexual advantage of the student's incapacitation, physically harming the student, sexually harassing the student, and invading the student's personal privacy.

141.     Brandeis effectively has branded John as a predatory sexual offender on his permanent education record.

142.     John had worked hard at Brandeis to have a strong GPA to get into law school, and was politically active on campus and in Massachusetts as part of his commitment to public issues and political discourse, values central to Brandeis's educational mission.

143.     John will now have to disclose, and defend himself against, his deeply blemished University record and reputation to every law school and professional graduate school to which

he applies, to his political colleagues, to prospective employers and, should he run for public office, to the electorate.

### G. Brandeis Committed Numerous Material Breaches of Its Contractual Obligations to John.

144. In the course of the Special Examiner's Process, Brandeis committed numerous material breaches of its contractual obligations to John.

145. The University's obligations are explicitly set forth in the University's contract with John, and are further informed by Massachusetts case law infusing every contract with a "reasonable expectations" requirement and mandating that college and university disciplinary proceedings cannot be "arbitrary or capricious."  Brandeis breached both its express contractual obligations and the obligation imposed by law to be fair as set forth below without limitation.

146. First, John was contractually entitled to a hearing before the Student Conduct Board.  The Special Examiner's Process should never have been initiated.

147. As a condition of his matriculation at Brandeis, John agreed in writing to be bound by the rules and regulations in the 2011-12 R&R Handbook.

148. Nowhere in that Handbook does Brandeis reserve the right to eliminate the Hearing Process for sexual misconduct allegations.  The Handbook states that it "contains *the* procedures the University employs when a member of the community believes that a student has violated campus policy.  *This process* . . . is ultimately *a* Brandeis-grown and nurtured *one* that is constantly evaluated and *tweaked* by the community every year."  (Ex. A, at 1).

149. A student might reasonably expect that Brandeis could "tweak" its disciplinary process.  But, "tweaking" cannot reasonably be read to permit the elimination of that process and the introduction of an entirely new process.  This is especially so since all of the alleged inappropriate encounters took place between September 2011 and May 2013, when the 2011-12

28

and 2012-13 R&R Handbooks were in effect, but Brandeis used procedures in the 2013-14 R&R Handbook that post-dated the R&R Handbook procedures he agreed to.

150.    Even if Brandeis is contractually permitted to change its disciplinary process, it is not permitted under Massachusetts law to replace it with one that lacks fundamental fairness and that is arbitrary and capricious.

151.    <u>Second</u>, the University never should have adjudicated J.C.'s threadbare accusation.  In every R&R Handbook issued by the University from 2011-2014, when the University receives a written report of an alleged student conduct violation, the University "*shall*" make a "careful evaluation of the facts" and the "credibility" of the accuser to determine as a threshold matter whether there is "sufficient evidence of a violation" to proceed.  The University has discretion to not refer the matter to adjudication based on its preliminary evaluation.  (Ex. A, Section 18, at 21; Ex. B, Section 18, at 24; Ex. C, Section 18, at 27) (emphasis added).

152.    In John's case, the University failed to conduct the required "careful evaluation of the facts."  Had the University conducted even the most cursory fact evaluation, it would have known that J.C. and John had been in a consensual sexual relationship for 21 months, that J.C.'s report likely had been prompted by their breakup, and that the matter did not warrant referral to adjudication.

153.    <u>Third</u>, Brandeis refused to provide John with a copy of the Special Examiner's Report, even though the Report is an "education record" to which John is entitled under every version of the R&R Handbook issued by the University from 2011-2014 and under federal law. (Ex. A, Section 17.4, at 20; Ex. B, Section 17.4, at 23; Ex. C, Section 17.4, at 26).

154.    John was found responsible for six student conduct violations and was never allowed to read the Report that explained why he was being held responsible.  The University forced him to respond to a second-hand Summary of the Report. The Summary gave only an overview of the Examiner's findings as interpreted by and filtered through someone other than the Special Examiner.

155.    Without an opportunity to read the Special Examiner's Report, responding to the Summary was a meaningless exercise.

156.    The University finally gave John a copy of the Special Examiner's Report in July 2014, *after* Brandeis had denied his appeal and the case was closed, and long past the 45 days FERPA allows Brandeis to furnish the Report.

157.    The University *still* refuses to provide John with the interview notes taken by the Special Examiner and the University's Observer, even though they clearly are subject to FERPA.

158.    <u>Fourth</u>, J.C.'s Report was not submitted in a timely manner, as required by the University.  In every version of the R&R Handbook issued by the University from 2011-2014, the University requires that "written reports of violations or complaints *shall* be submitted to the DSRCS [Department of Student Rights and Community Standards] from the Accuser *in a timely manner*"; the lack of timeliness is grounds for the University to refuse to refer the matter for adjudication.  (Ex. A, Section 18.0, at 21; Ex. B, Sections 18.0 & 22.6, at 24, 35; Ex. C, Sections 18.0 & 22.6, at 27, 42) (emphasis added).

159.    J.C. submitted his Report in January 2014, eight months after the end of any alleged misconduct (May 2013) and over two years after the first incident of alleged sexual misconduct (September 2011).  It was undisputed that after the last alleged incident, J.C.

continued to engage with John sexually (May 2013-July 2013) and socially (August 2013-January 8, 2014).

160.     The long lapse of time was prejudicial to John as he struggled to remember details of common, everyday, unremarkable events occurring as many as two years before the allegations were filed.

161.     Fifth, John was denied his contractual right to a hearing on the charges of physical harm and invasion of personal privacy.  In every version of the R&R Handbook issued by the University form 2011-2014, the University is obligated to adjudicate alleged violations of physical harm and invasion of personal privacy by the Hearing Process pursuant to a clear and convincing standard.   (See Ex. A, Sections 2, 3, 18.0, at 3-6, 21; Ex. B, Sections 3.0, 7.0, 22.6, at 6, 11, 35; Ex. C, Sections 3.0, 7.0, 22.6, at 6, 12, 42).

162.     Sixth, the University violated its own procedures requiring a three-member Panel of University faculty or administrators to review the Special Examiner's findings and recommend to the final decision maker whether to accept or reject the findings.  (Ex. C, Section 22.6, at 46, "Deliberations Phase").  Instead, the University allowed the final decision maker to be the sole reviewer of the Special Examiner's findings, thereby eliminating a layer of independent oversight that might have reversed the Special Examiner's arbitrary findings.

163.     Seventh, the University subjected John to "emergency suspension" immediately upon receipt of J.C.'s Report, even though there was not the slightest indication that John was a danger to J.C. or the Brandeis community.

164.     Every version of the R&R Handbook issued by the University from 2011-2014 permits the University to impose an "emergency suspension" only when the University has reason to believe that the accused presents an "imminent danger" to the "safety or well-being of

31

the University community."  (Ex. A, Sections 22.1 & 22.2, at 28; Ex. B, Sections 22.1 & 22.2, at 34; Ex. C, Sections 22.1 & 22.2, at 40).

165.    After lifting the "emergency suspension," the University continued to breach its contract with John by imposing additional interim sanctions against him, including removing him from his paid University job and high-ranking elected position in student government. These sanctions breached all of the R&R Handbooks issued by the University during John's time at Brandeis, because they were not remotely related to J.C.'s safety or that of the University community.  (*Id.*)

166.    Eighth, accepting for the sake of argument that the preponderance of the evidence standard in the 2013-14 R&R Handbook applied to John's case, the University failed to base its findings of responsibility on that standard.  Instead, the University's final decision maker and Appeals Board rubber-stamped the Special Examiner's findings, which were patently arbitrary, capricious, and irrational, and were not supported by any objective, verifiable, or credible evidence, as explained in detail in Section IV, D., E., F., *supra*.

167.    Ninth, upon information and belief, Brandeis has violated its contractual obligation and its duties under FERPA to maintain confidentiality about John's education record by allowing J.C. to disclose the findings to third parties and by allowing persons within the administration to "leak" information about the Special Examiner's findings to persons outside of the inner-circle of administrators responsible for handling John's case, or by not adequately safeguarding the disciplinary record from being disclosed to third parties.  (Ex. C, Sections 17.4, 19.5, 19.6.j., 22.6, at 26, 30, 32, 47 ("Records Retention")).  As more fully explained below, any such "leaks" are also defamatory.

H.     **Brandeis Subjected John to a Fundamentally Unfair Disciplinary Process Lacking the Most Basic Elements of Due Process.**

168.    In addition to these contractual breaches, the Special Examiner's Process lacks the most essential elements of due process to safeguard the rights of the accused, and is systemically inequitable.  Although the accuser knows his or her story before the investigation even begins, the accused is left in the dark concerning the facts, never knowing what the accuser and witnesses actually have said except as filtered through the Special Examiner.  The accused is subjected to a secret investigation process that in John's case was handled by the Special Examiner like a police interrogation of a suspect rather than an independent, impartial investigation.

169.    Instead of proceeding to a hearing at which *both* sides hear *all* of the evidence and have an *equal* opportunity to present their claims and defenses before an impartial tribunal, the Special Examiner's Process effectively ends with the interrogation, completely short circuiting due process by allowing the Interrogator to decide issues of credibility and serve as the *de facto* judge.

170.    In John's case, the University compounded the systemic lack of due process by failing to follow its own procedures, allowing the final decision maker to adopt the Special Examiner's findings unilaterally without independent Panel review.  The final decision maker, who had no training or experience in sexual misconduct disciplinary proceedings, completely deferred to the Special Examiner.

171.    Despite the fact that John meticulously documented for the University's final decision maker and Appeals Board these contractual breaches, as well as the fundamental unfairness of the process and irrationality and capriciousness of the Special Examiner's findings, they did nothing to correct this flawed and unfair process and outcome.

33

172.    David Bunis, the University's Chief Legal Officer, privately told John that it is unlikely the Special Examiner's findings were supported by the preponderance of the evidence standard.  Even though the University's Chief Legal Officer surely was in a position of authority to take corrective action, he did not do so.

173.    John recently learned that the faculty member who served as Chair of the Appeals Board that decided John's appeal also served as a member of a University Task Force Subcommittee on Sexual Violence that was headed by J.C.'s faculty Advisor through the Special Examiner's Process.  The Task Force Subcommittee met throughout John's case and issued its Report on June 27, 2014 – seven days after the Appeals Board issued its June 20, 2014 ruling denying John's appeal.

174.    While the Task Force Report does not mention John's case by name, it pointedly refers to "cases known to a committee member" that involve claims and defenses raised by John. Likewise, the Appeals Board ruling in John's case, although it does not explicitly mention the Task Force Report, refers to at least one of the recommendations contained in the Report.

175.    The Chair's service as a committee member on a Task Force on Sexual Violence headed by J.C.'s advisor – occurring at the same time as the Chair's service on John's Appeals Board – created an impermissible conflict of interest on the part of the Chair, and deprived John of his right to have his appeal heard by an unbiased, impartial Board.

176.    Upon information and belief, the Chair of the Appeals Board and J.C.'s Advisor discussed John's case before John's appeal was decided, coloring the Chair's judgment in John's case.

177.    Since John's case, the University has changed several (but not all) of its deeply flawed procedures in the Special Examiner's Process.

178.    In the 2014-15 R&R Handbook, the University must not only conduct a preliminary fact evaluation of the accuser's report, but also must refer the accuser to a "care team" for evaluation of "students of concern" in order for the University to make "deliberate decisions about appropriate, individualized courses of action . . . ."  (*See* Exhibit D, 2014-15 R&R Handbook attached hereto, Section 17, at 33).

179.    The University now requires the accuser to list specific dates, times, locations, and alleged conduct in the Report.  (Ex. D, Section 17, at 33).

180.    The University now provides the Special Examiner's Report to the accused and the accuser at the completion of the investigation to allow them to challenge the Report, acknowledging its obligation to supply the parties with "timely information."  (Ex. D, Section 22, at 55-56).

181.    Now, the University has an extensive written policy requiring the parties to maintain the confidentiality of the proceedings by limiting their disclosures to those persons with a need to know.  (Ex. D, Section 17, at 34-35).

182.    The Process now involves a Co-Examiner (a member of the faculty or staff) who contributes to the investigation by asking interview questions and advising the Special Examiner in the preparation of the Special Examiner's Report.  (Ex. D, Section 22, at 52).

183.    John did not have the benefit of any of these subsequent remedial measures by the University.

**I.      Brandeis Has Aided and Abetted J.C.'s Defamatory Conduct and Upon Information and Belief Has Defamed John in its Own Right.**

184.    Not content with the sanction in John's case, J.C. has filed additional, frivolous Reports in an attempt to get the University to expel John or to impose onerous restrictions on John's movements, and has defamed John to University officials, students, and the media.

185.    Brandeis has known of these false and defamatory actions by J.C., and has aided and abetted them.

186.    Upon information and belief, Brandeis administrators "leaked" information about the Special Examiner's findings to John's internship employer and prospective employers, or recklessly failed to exercise adequate safeguards to keep the information strictly confidential.  As a direct result, John was let go from his internship, which has also withdrawn promised references for a paying job, and another prospective employer with ties to Brandeis has withdrawn its job offer.  John has been severely harmed in his prospects for other future permanent employment.

187.    J.C.'s escalating and unchecked campaign to defame and harass John included filing three additional Reports with the University with claims of stalking, sexual harassment, retaliation and intimidation based on John's alleged violations of a No Contact Order entered after J.C.'s initial Report.  None of these claims was found to be credible, and none of them should have been accepted for adjudication in the first place.

188.    On three separate occasions in March 2014, J.C. sent letters to multiple University administrators – including the Title IX Coordinator, General Counsel, Senior Vice President for Students and Enrollment, Chief Legal Officer, Director of Public Safety, and Vice President for Human Resources – referring to John as his "attacker" and calling John a threat to the safety and well being of the entire campus.

189.    In June 2014, J.C. posted the University's decision letter regarding John's finding of responsibility on J.C.'s Facebook page, and encouraged others to share it.  Although J.C. blacked out John's name, upon information and belief, J.C. identified John by name to people off-line.

190.    J.C. added commentary to the posted letter accusing John of "multiple forms of rape" and characterized John as his "attacker."  Upon information and belief, J.C. told individuals off-line that John was a threat to sexually assault other Brandeis students.

191.    These accusations were false and malicious.  As John learned when he finally received the full Special Examiner's Report in July 2014 , J.C. specifically told the Special Examiner that John had never "raped" him (which J.C. defined as anal penetration without consent), and nowhere in the Special Examiner's Report is there an allegation or a finding that John ever "attacked" J.C.

192.    In June 2014, J.C. took his story (and confidential documents from the disciplinary proceeding) to a national publication.  J.C. revealed his name, but did not reveal John's name.

193.    In the article, J.C. repeatedly referred to John as his "attacker," and stated the only punishment John received was a "warning," a false statement given the fact that John's punishment is a permanent notation on his education record labeling him as a sexual offender.  A University spokeswoman publicly stated that there were "factual errors in the information" J.C. provided to the publication.

194.    On or about September 9, 2014, a reporter for NPR station WBUR informed John that J.C. told the reporter John had anally raped J.C. – even though J.C. told the Special Examiner John had never "raped" him (*i.e.*, John had never anally penetrated him without consent).

195.    Andrew Flagel told John that he, too, had been informed by the same WBUR reporter of J.C.s' anal-rape accusation.

196.    Upon information and belief, J.C. also told Brandeis students that John got J.C. drunk and anally raped him, a palpably false statement since J.C. never drank during the entirety of the Relationship and, of course, J.C. explicitly stated that John had never raped him.

197.    As a result of J.C.'s and Brandeis's conduct, other students have publicly taunted and accused John of rape; one student loudly did so in front of the Massachusetts Attorney General-Elect and about eight other students at a political function.

198.    Brandeis's outrageous endorsement and perpetuation of J.C.'s defamatory statements, and Brandeis's independent defamatory conduct, have ruined John's reputation in the Brandeis community and have severely harmed his current and prospective employment prospects, particularly in the Boston area.

199.    In October 2014, John received a call from his internship employer for a highly-ranked public official, informing John that the employer had been "made aware" of his situation at Brandeis with J.C. from "several sources" and that John was fired.

200.    That same internship employer had promised to find John a permanent job after he graduated.  That promise has been withdrawn.

201.    Another prospective employer, which has ties to Brandeis, stopped responding to John's emails after promising to hire him for the Fall semester.

202.    In the wake of these events, John asked the University to re-open his appeal, on grounds that J.C.'s outrageous and defamatory post-appeal conduct called into question J.C.'s veracity with respect to J.C.'s initial Report, and because John had gathered new evidence and witnesses after receiving the full Special Examiner's Report that contradicted certain of J.C.'s allegations and findings by the Special Examiner, including witnesses who would testify that J.C.

began drinking for reasons unrelated to John and that J.C. humorously recounted the "Movie Incident" to mutual friends throughout the Relationship.

203.     Two University administrators voiced their belief the case should be re-opened, but Andrew Flagel denied the request.

204.     With that recourse shut down, John filed a complaint with the Department of Education, Office of Civil Rights ("OCR"), alleging *inter alia* that Brandeis wrongly disciplined him, violated Title IX's mandate that both parties involved in sexual misconduct proceedings be treated fairly, and failed to equitably consider John's claim that, if what John did violated the University's sexual misconduct policies, then J.C. (who engaged in the exact same conduct) was equally culpable of sexual misconduct toward John.

205.     John accelerated his graduation date to February 1, 2015, because his situation on campus had become untenable.

### COUNT I
**(Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*.)**

206.     The foregoing allegations are incorporated herein by reference.

207.     Title IX of the Education Act Amendment of 1972, 20 U.S.C. § 1681(a) (1988) ("Title IX"), provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

208.     Title IX is enforceable through an implied right of action affording an individual discriminated against due to his or her gender pecuniary damages and equitable relief.

209.     Brandeis receives federal funding in various forms, including, but not limited to, grants and federal student loans provided to Brandeis by its students or given to Brandeis by the federal government directly.

210.    Brandeis has discriminated against John, on the basis of his sex, through its discriminatory, inequitable implementation of Brandeis's Special Examiner's Process against John, which subjected John to different rules of sexual behavior than his accuser.

211.    The Department of Education, Office of Civil Rights ("OCR"), has made clear that Title IX applies to University sexual misconduct proceedings involving same-sex couples.

212.    John filed a complaint with the OCR about the University's Title IX violations in his case, and on August 19, 2014, the OCR accepted John's complaint for investigation.  Upon information and belief, this is only the second case that the OCR has investigated on behalf of an accused student.

213.    The OCR has made clear that "Title IX protects all students from sexual violence, regardless of the sex of the alleged perpetrator or complainant, including when they are members of the same sex."  (*Questions and Answer on Title IX and Sexual Violence* (Apr. 29, 2014), available at http://www2ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.).

214.    In such proceedings, the University must provide a fair and equitable process for both the complainant and the accused, and must "***accord[] due process to both parties involved***."  (*Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*," at 22 (Jan. 2001) (emphasis added), available at http://www2ed.gov/about/offices/list/ocr/docs/shguide.pdf).

215.    A university violates Title IX regulations when it "subject[s] students to separate or different rules or behavior, sanctions, or other treatment . . . ."  (*Id*. at 4).

216.    Throughout the Special Examiner's Process, John described how J.C. engaged in the *exact same sexual behavior* that J.C. accused John of and that Brandeis concluded violates its standards of acceptable sexual behavior.

217.    The two were involved in a 21-month sexual relationship, during which J.C. kissed John awake in the morning, looked at his naked body in the bathroom, and initiated sexual activity without first obtaining John's verbal consent.

218.    Accordingly, if Brandeis were to find that John was responsible for sexual misconduct, then J.C. should have been found responsible as well; conversely, if J.C. was not found to have engaged in sexual misconduct, the same finding should have been made with respect to John.

219.    Instead, the University applied the Special Examiner's arbitrary and capricious findings to John only, subjecting him to different rules of behavior than it applied to J.C.

220.    Brandeis further violated Title IX by failing to accord John the opportunity to present a defense at a hearing before an impartial tribunal – as set forth above.  Instead, John was subjected to a secret interrogation process, in which he never even heard his accuser or witnesses, much less questioned them.

221.    Brandeis's Special Examiner's Process is fundamentally at odds with OCR's Title IX guidelines, including those in the Dear Colleague Letter, which notes that "schools generally conduct investigations ***and hearings*** to determine whether sexual harassment or violence occurred."  (Dear Colleague Letter (Apr. 4, 2011), at 10, available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf) (emphasis added).

222.    The Dear Colleague Letter provides that, "[t]hroughout a school's Title IX investigation, including at any hearing, the parties must have an equal opportunity to present relevant witnesses and other evidence.  The complainant and the alleged perpetrator must be afforded similar and timely access to any information that will be used at the hearing."  (*Id*. at 11).

223.    Brandeis further violated John's rights under Title IX by holding meetings with J.C. privately, including at least one meeting where J.C. was accompanied by his attorney, but Brandeis did not provide an equal opportunity for John to meet with University officials to plead his case and never permitted him to have his attorney involved in any aspect of the process.

224.    Although the Dear Colleague Letter counsels colleges to use the preponderance of the evidence standard in sexual misconduct disciplinary proceedings, in John's case, even this lowest standard of proof was not followed by the Special Examiner, and the University took no corrective action.  Given the lack of due process safeguards, Brandeis should have used the "clear and convincing" standard of proof to mitigate at least to some extent the lack of due process.

225.    The outcome of the Special Examiner's Process against John was clearly erroneous, arbitrary and capricious; the University was on notice of, and was deliberately indifferent to, the serious procedural irregularities and lack of due process that infused the proceedings; the University selectively enforced its standards of sexual behavior to John's detriment; and the University's conduct was so severe, pervasive, and objectively offensive that it denied John equal access to education that Title IX is designed to protect.

226.    John was discriminated against by Brandeis in violation of Title IX and, as a result, John has been seriously and irreparably damaged.

227.    As a direct, proximate, and foreseeable consequence of Brandeis's aforementioned conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed.  He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation,

past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

228.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT II
### (Breach of Contract)

229.    The foregoing allegations are incorporated herein by reference.

230.    At all times relevant hereto, a contractual relationship exists between Brandeis and John through Brandeis's 2011-12 R&R Handbook, or alternatively, through subsequent R&R Handbooks.

231.    Brandeis is required to act in accordance with the R&R Handbooks in adjudicating reports of alleged violations of student conduct standards.

232.    For all the reasons set forth above, Brandeis has materially breached its contracts with John by failing to comply with its obligations, standards, policies, and procedures set forth in the R&R Handbooks in the course of the Special Examiner's Process against John, and by subjecting him to a blatantly arbitrary and capricious disciplinary proceeding.

233.    As a direct, proximate, and foreseeable consequence of Brandeis's numerous material breaches, John's academic and career prospects, earning potential, and reputation have been severely harmed.  He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.  As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT III
### (Breach of the Covenant of Good Faith and Fair Dealing)

234.     The foregoing allegations are incorporated herein by reference.

235.     Based on the foregoing facts, Brandeis breached and violated the covenant of good faith and fair dealing implied in its contracts with John by, *inter alia*, failing to provide John with a hearing before an impartial tribunal, and instead, subjecting him to an inquisitorial, secret and arbitrary and capricious Special Examiner's Process.

236.     As a direct, proximate, and foreseeable consequence of these breaches, John's academic and career prospects, earning potential, and reputation have been severely harmed.  He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

237.     As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT IV
### (Estoppel and Reliance)

238.     The foregoing allegations are incorporated herein by reference.

239.     Brandeis's various standards, policies and procedures constitute representations and promises that Brandeis expected or should have reasonably expected would induce action or forbearance by John.

240.     Brandeis expected or should have expected John to accept the University's offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises, including that Brandeis would provide John with a fundamentally

fair process in a hearing before his peers, should he be accused of a violation of the R&R

Handbook.

241.    John relied to his detriment on Brandeis's express and implied promises and

representations.

242.    As a direct, proximate, and foreseeable consequence of the above-identified

conduct, John's academic and career prospects, earning potential, and reputation have been

severely harmed.  He has sustained significant damages, including but not limited to, damages to

physical well-being, emotional and psychological damages, damages to reputation, past and

future economic losses, loss of educational and professional opportunities, loss of future career

prospects, and other direct and consequential damages.

243.    As a result of the foregoing, John is entitled to recover damages in an amount to

be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT V
### (Negligence)

244.    The foregoing allegations are incorporated herein by reference.

245.    Brandeis owes duties of care to John.  Such duties include, without limitation, a

duty of reasonable care in investigating and adjudicating the charges against him.

246.    Brandeis breached its duties of care owed to John.

247.    As a direct, proximate, and foreseeable consequence of Brandeis's

aforementioned conduct, John's academic and career prospects, earning potential, and reputation

have been severely harmed.  He has sustained significant damages, including but not limited to,

damages to physical well-being, emotional and psychological damages, damages to reputation,

past and future economic losses, loss of educational and professional opportunities, loss of future

career prospects, and other direct and consequential damages.

248.     As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT VI
### (Defamation)

249.     The foregoing allegations are incorporated herein by reference.

250.     Brandeis has aided and abetted J.C. in defaming John, allowing J.C. to publish statements concerning John to third parties, both orally and in writing, which Brandeis knows are false and malicious.

251.     Upon information and belief, Brandeis has independently defamed John by deliberately, recklessly, or negligently leaking information about the Special Examiner's findings to third parties outside of the University's inner circle of administrators with a need to know John's disciplinary history.

252.     Upon information and belief, University administrators knew that the Special Examiner's findings could not be squared with the evidence, defied common sense, and were arbitrary and capricious, and knew that J.C.'s initial Report, and subsequent Reports and public rants against John, were unreliable.  Nevertheless, the University permitted the Special Examiner's findings to be leaked to third parties.

253.     Brandeis's conduct in defaming John and in aiding and abetting J.C.'s defamatory conduct was done with negligent, reckless, and/or intentional disregard as to their falsity.

254.     Brandeis's conduct has harmed John's reputation in the community, leading directly to the loss of employment, loss of University positions, loss of prospective employment opportunities, and loss of educational and professional opportunities and prospects.

255.     As a direct, proximate, and foreseeable consequence of Brandeis's aforementioned conduct, John's academic and career prospects, earning potential, and reputation

have been severely harmed.  He has sustained significant damages, including but not limited to, damages to reputation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

256.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT VII
### (Invasion of Privacy)

257.    The foregoing allegations are incorporated herein by reference.

258.    Upon information and belief, Brandeis has unreasonably, substantially, and seriously interfered with John's privacy by disclosing facts of a highly personal and intimate nature, including the findings of the Special Examiner, to John's current and prospective employers.

259.    Brandeis has disclosed these facts in bad faith and without any legitimate reason for doing so.

260.    As a direct, proximate, and foreseeable consequence of Brandeis's aforementioned conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed.  He has sustained significant damages, including but not limited to, damages to reputation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

261.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT VIII
### (Intentional Infliction of Emotional Distress)

262. The foregoing allegations are incorporated herein by reference.

263. The actions of Brandeis were willful and intentional.

264. Brandeis knew or should have known that its actions in finding John responsible for J.C.'s patently frivolous charges, in conducting a fundamentally flawed disciplinary process, and in sanctioning John by effectively labeling him as a predatory sexual offender would cause John severe emotional distress.

265. Brandeis's conduct was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

266. Brandeis's conduct was the direct and proximate cause of John's severe emotional distress.  He is deeply depressed and anxious; he has lost weight; he is no longer able to sleep through the night; and he has had serious suicidal ideation.

267. As a direct, proximate, and foreseeable consequence of Brandeis's aforementioned conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed.  He has sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

268. As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT IX
### (Negligent Infliction of Emotional Distress)

269.    The foregoing allegations are incorporated herein by reference.

270.    When Brandeis undertakes to investigate allegations of sexual and other misconduct against one of its students, it owes that student a duty to protect him from foreseeable harm.

271.    By participating in the Special Examiner's Process, under protest, John reasonably relied upon Brandeis's duty to protect him from harm.

272.    For all the reasons set forth above, Brandeis breached its duties of reasonable care.

273.    As a result, John has suffered physical harm, including severe emotional distress. He is deeply depressed and anxious; he has lost weight; he is no longer able to sleep through the night; and he has serious suicidal ideation.

274.    A reasonable person would have suffered severe emotional distress under the same or similar circumstances.

275.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT X
### (Declaratory Judgment)

276.    The foregoing allegations are incorporated herein by reference.

277.    Brandeis has committed numerous violations of it contractual obligations and of federal and state law.

278.    John's educational and career opportunities have been severely damaged. Without appropriate redress, the unfair outcome to Brandeis's deeply flawed process will

continue to label John as a predatory sexual offender, greatly jeopardizing his prospects for law

school and future employment, with no end in sight.

279.    As a result of the foregoing, there exists a justiciable controversy between the

parties with respect to the outcome, permanency, and future handling of John's education record

at Brandeis.

280.    By reason of the foregoing, pursuant to 28 U.S.C. § 2201, John requests a

declaration that:  (a) the findings and sanction against John made by Brandeis pursuant to the

Special Examiner's Process be reversed; (b) John's disciplinary record pursuant to the Special

Examiner's Process be expunged and removed from his education record at Brandeis; (c)

Brandeis shall provide John with a notarized letter confirming that the findings and sanction have

been reversed and expunged from John's education record; (d) Brandeis shall restore John's

reputation to third parties to whom the University has leaked and/or failed to adequately

safeguard the findings of the Special Examiner's Process.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Doe, respectfully requests that this Honorable Court:

(a)    Order Brandeis to reverse and expunge its findings of responsibility and sanction

from John's education record, and to publicly state that Brandeis has reversed and expunged the

findings and sanction;

(b)    Order Brandeis to verify this reversal and expungement of John's education

record by providing John with a notarized letter confirming that the findings and sanction have

been reversed and expunged from John's education record;

(c)    Award John compensatory damages in excess of Seventy-Five Thousand Dollars

($75,000.00), including, without limitation, damages to physical well-being, emotional and

psychological damages, damages to reputation, past and future economic losses, loss of

educational and professional opportunities, loss of future career prospects, and other direct and

consequential damages;

(d)     Award prejudgment interest;

(e)     Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b) (relating to Title

IX), or pursuant to other statute or common law doctrine providing for such award; and

(f)     Grant such other and further relief that the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully submitted,

/s/ *Michael R. Schneider*_____
Michael R. Schneider, Esq.
(Mass. Bar No. 446475)
Good Schneider Cormier
83 Atlantic Avenue
Boston, MA 02110-3711
Tel:  (617) 523-5933
Email:  ms@gscboston.com

/s/ *Patricia M. Hamill*_____
Patricia M. Hamill, Esquire
(PA Attorney I.D. No. 48416)
Jeannette M. Brian, Esquire
(PA Attorney I.D. No. 66169)
Conrad O'Brien PC
1500 Market Street
Centre Square – West Tower, 39th Fl
Philadelphia, Pennsylvania 19102-1921
Telephone:  (215) 864-9600
Facsimile:   (215) 864-9620

*Attorneys for Plaintiff John Doe*

Dated: April 9, 2015