The Washington Post

Education

# Behind a sexual misconduct case at Brandeis University: questions on all sides

By Nick Anderson   August 20, 2014

They dated for most of their first two years at Brandeis University, a relationship that began as one of the gay students was coming out. They broke up last summer. Six months later, one accused the other of sexual misconduct.

(Related: [Men punished in sexual misconduct cases on colleges campuses are fighting back](#))

There was no police report and no criminal charge. But Brandeis paid an outside lawyer to delve into these and other questions, according to an internal document obtained by The Washington Post:

●Did one student stare too much at the other in the bathroom?

●Did he engage in sexual contact with his then-boyfriend — kissing and more — while the boyfriend was asleep and therefore unable to consent?

●Did he stop when the boyfriend woke up and told him to stop?

The case at the well-regarded private university in Waltham, Mass., adds to the national debate about how universities respond to reports of campus sex assault and whether they are ensuring fair treatment for accusers and accused.

The outcome in this instance upset both sides. Brandeis found that the accused student had broken its rules against sexual misconduct and invasion of personal privacy. It gave him a disciplinary warning and ordered him to complete an educational program in sex assault prevention.

Both students are now rising seniors at a university with about 5,800 students as of last fall, most of them undergraduates. The accuser — call him Student A — posted a document summarizing the conclusion of the case on his Facebook page and was identified in June in some published reports.

The other — Student B — does not want to be identified and still hopes to clear his record. Student B, however, provided The Washington Post with several documents in the case file. He also signed a statement waiving his

federal privacy rights if Brandeis chose to comment on the case.

Student A spoke with The Post but did not sign a privacy-rights waiver.

Brandeis declined to comment on the case, citing federal privacy law.

Advertisement

**To Student A,** the case was all about campus safety. In retrospect, he viewed their relationship as "pretty abusive" and said he realized months after breaking up that he wanted to file a report.

"It took a while for me to come to terms with all that had happened and all that he had done," he said. "It was not just one assault. There were multiple instances." For instance, he said, he sometimes was awoken by aggressive and unwanted sexual activity when he and Student B were sharing a bed. He said Student B would not stop when asked. He also accused Student B of forcing them to engage in oral sex, touching him sexually without consent and not giving him personal space in the bathroom.

Student A said he considered going to the police but decided not to because he believed that the odds would be stacked against him in a criminal case. He said he believed that lodging an internal complaint at the school would accomplish his objective: "I wanted to stop him from doing anything else to other people at Brandeis."

**To Student B,** the case was a wholly unwarranted review of mundane events in a long-term relationship that he recalled as "healthy and loving and everything." But the relationship, which began in October 2011, the fall of their freshman year, had run its course by summer 2013. They had broken up that July and, he said, maintained cordial contact for months after that. Then, in January, he was told that a misconduct complaint had been filed against him.

It left him in shock. His life on campus, which he described as busy and active, was interrupted by an emergency suspension, which was subsequently lifted. It took weeks, he said, to learn what the specific charges were. Then he

was interviewed by an attorney who had been named as a "special examiner." The attorney grilled him repeatedly on his recollection of various incidents that Student A had described. Student B denied wrongdoing in all cases.

For example, he said that he sometimes would kiss his then-boyfriend in bed while the boyfriend was still asleep. He said he was bewildered that this could be somehow construed as wrongly taking advantage of someone's incapacitation. "Why someone would be found responsible for nonconsensual behavior for a kiss from a boyfriend in the morning was beyond me," he said. He was equally incredulous when questions were raised about whether he had violated the boyfriend's bathroom privacy.

Advertisement

**To Brandeis,** the case is part of a series of issues that it has had to address related to sexual violence reports, campus safety and compliance with the federal anti-discrimination law known as Title IX. But this is now standard practice among universities.

University spokeswoman Ellen de Graffenreid said that Andrew Flagel, the senior vice president for students and enrollment at Brandeis, recently estimated that he spent a third or more of his time on such issues during the past academic year. In 2013, she said, five students were found to have violated the university's sexual conduct rules. Two were expelled, two suspended and one placed on probation and enrolled in an educational program.

This year, she said, one case related to those rules has been completed as of August. (That is the one involving Student A and Student B.) Three others were in progress.

The spokeswoman said that, in general, the university believes it has imposed "reasonable" sanctions in cases that have arisen, with punishment tailored to the gravity of offenses.

Sexual misconduct, she said, "cannot and will not be tolerated at Brandeis."

**In the end,** Student A and Student B departed from the process disillusioned.

Student A said he is outraged that the university did not expel his ex-boyfriend. "I feel like they think, 'He's a gay man. He's not going to hurt anybody,'" he said. "It'd be a very different case if, say, I were a female complainant."

Student B said he is incensed that his life was turned upside down with what he believes was flagrant disregard for his due-process rights. And he worries about how the sanctions might affect his future. "It should not be on my record," he said. "I didn't do anything that was even remotely close to what I was found responsible for."

---

Nick Anderson covers higher education for The Washington Post. He has been a writer and editor at The Post since 2005.