# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, | : |
| | : |
| Plaintiff, | : **Motion for Leave to File** |
| | : **Granted on 5/28/2015** |
| v. | : |
| | : Civil Action No.1:15-cv-11557-MLW |
| BRANDEIS UNIVERSITY, | : |
| | : |
| Defendant. | : |

## JOHN DOE'S REPLY BRIEF IN FURTHER SUPPORT OF MOTION FOR PERMISSION TO PROCEED UNDER A PSEUDONYM

### I.   INTRODUCTION

In its Opposition to John Doe's Motion to Proceed Under Pseudonym ("Opposition" or "Opp."), Brandeis argues that the Motion should be denied because (1) John has already revealed his identity to certain news outlets, and (2) John has failed to establish exceptional circumstances that would justify proceeding under a pseudonym.  Brandeis's argument is wrong and should be rejected because:  (1) news outlets that have published stories about this matter have uniformly protected John's anonymity; (2) John's outreach to media reporters has been extremely limited and has only occurred in response to J.C.'s unrelenting social media and press campaign that has falsely characterized John as a "rapist," an "attacker," and a "sexual assailant," characterizations that Brandeis has repeatedly failed to correct; (3) Brandeis's interests will not be harmed by protecting John's anonymity; and (4) the public's interests in the issues raised by this case can be fully protected without requiring disclosure of John's identity.

With respect to Brandeis's "media" argument, Brandeis ignores the incontrovertible fact that John spoke to four media outlets – the campus newspaper, The Boston Globe, The Washington Post, and WBUR radio – only after his ex-boyfriend accuser went viral on social

media and was interviewed in The Huffington Post, in which he called himself a victim of "multiple forms of rape"; continually referred to John as "my attacker" and a "sexual assailant"; stated he had been "left attacked and powerless"; and claimed Brandeis had given John a "freebie" sanction for "rape."  Even though Brandeis acknowledged to The Huffington Post that J.C.'s account of his story had "factual errors," Brandeis would not correct the factual record, citing "student privacy laws" as the reason for its silence.  Brandeis allowed J.C. to publicly vent highly inflammatory and derogatory accusations that Brandeis *knew* had never been made in the disciplinary proceeding and as to which there had been no findings – *i.e.*, there had been no accusations and no findings of "attacks" or "rape."  In fact, J.C. explicitly told the Special Examiner that John had never "raped" him, which J.C. defined to the Special Examiner as penetration without consent.  John spoke to the media solely to present a balanced and truthful account of his relationship with J.C., what J.C.'s claims actually were, and what had actually happened in the disciplinary proceeding.  He was forced to defend himself to certain media outlets *only after* Brandeis failed to ensure the confidentiality of the disciplinary proceeding as required under federal law, including under the Family Educational Rights and Privacy Act and Title IX regulations.  Furthermore, John agreed to speak to the reporters only on the condition of strict anonymity.  In spite of J.C.'s public accusations and mischaracterizations, John's identity has not been disclosed publicly, either by J.C., who has always referred to John as "my attacker," or by the reporters with whom J.C. and John have spoken.  Every filing in this case will be accessible to the public; only the identity of John and J.C. would be shielded from the public.

With respect to Brandeis's "exceptional circumstances" argument, John's case meets that standard in multiple ways.  He alleged in his Complaint, and further alleges in his Affidavit filed as Exhibit 1 with this Reply Brief, that he has already suffered retaliatory harm from the leaking

of his name and the disciplinary findings to certain Brandeis students and two of John's part-time employers. He has been taunted as a "rapist" by J.C.'s allies; was fired by his political internship employer, who told him they had been "made aware" by "several sources" of his situation at Brandeis; has lost promised permanent employment and employment referrals; has suffered panic attacks leading to suicidal ideation on two occasions; and accelerated his graduation date because his situation on campus had become untenable. Brandeis's deeply flawed disciplinary process turned benign, everyday occurrences in a nearly two-year consensual sexual relationship – wake-up kisses in the morning, looking at his then-boyfriend's private parts in communal same-sex bathrooms, making the "first move" during the flirtation stage leading to a 21-month dating relationship – into highly charged, reprehensible sexual crimes. When John's identity was leaked to certain students and employers and they heard the predatory sexual labels given to him by Brandeis – sexual misconduct, sexual harassment, taking sexual advantage of someone's incapacitation, lack of consent to sexual activity, invasion of personal privacy – they dropped him on the spot and ostracized him. John does not "fear" stigmatization – he has suffered it – and having his name revealed in this action will not be merely "embarrassing," as Brandeis claims. If his identity is revealed publicly through this action, his name will be associated with heinous sexual misconduct and spread on the internet with irretrievable consequences to his reputation, privacy, and well-being.

**II.     FACTS**

In support of this Reply Brief, John has prepared an Affidavit (Exhibit 1 hereto) with Exhibits (Exhibits A through P to Affidavit) recounting the events leading to his contacts with four media reporters and the reputational harm he has suffered due to Brandeis's intentional or reckless failure to maintain the confidentiality of the disciplinary proceeding as required under federal law. As stated in his Affidavit, on May 30, 2014, J.C. and John received separate letters

from Lisa Boes, Brandeis's Dean of Academic Services, notifying them of the final outcome of the disciplinary proceeding that is the subject matter of John's Complaint against Brandeis in this case. (Aff. ¶ 1). In the final outcome letter, Brandeis informed John that the University found him responsible for all six charges and would issue him a disciplinary warning. Additionally, John had to complete an educational plan developed with Sheila McMahon, the Sexual Assault Services and Prevention Specialist. (Aff. ¶ 2).

Although at that time Brandeis's Rights and Responsibilities Handbook had no policy requiring parties to maintain the confidentiality of disciplinary proceedings, the final outcome letter cautioned J.C. that "the protection of [John's] rights under the Family Educational and Privacy Rights Act . . . have to be carefully honored." (Aff. ¶ 3; *see also* Ex. A to Aff.). Nevertheless, on June 4, 2014, J.C. posted the final outcome letter to his Facebook page, with annotations, and encouraged others to share it. (Aff. ¶ 4). (A redacted copy of the post is attached as Ex. A to Aff.) Although J.C. blacked out John's name in the post, he did not black out his (J.C.'s) first name. (J.C.'s first name is blacked out in Ex. A.) His post was "shared" upwards of 100 times, and many students began commenting on it. In the post, J.C. stated that he was a victim of "multiple forms of rape" and twice characterized John as his "attacker." (Aff. ¶¶ 5-6; Ex. A).

On June 7, 2014, J.C. posted again on his Facebook page concerning the final outcome letter. (Aff. ¶ 7). (A redacted copy of the post is attached as Ex. B to Aff.) In this post, J.C. repeatedly characterized John (without using John's name) as his "attacker," referred to him as a "sexual assailant," stated that over the past six months J.C. had been "left attacked and powerless," and that Brandeis had given John a "freebie" for "rape." (Aff. ¶ 8; Ex. B).

4

On June 11, 2014, The Huffington Post published a story entitled "Brandeis University Punishes Sexual Assault with Sensitivity Training." (Aff. ¶ 9). (A redacted copy of the article is attached as Ex. C to Aff.). J.C. was quoted extensively in the article and identified himself. John's name was not revealed in the article. J.C. posted the article on his Facebook page where it was shared by many Brandeis students. (Aff. ¶ 10). As reported in the article, J.C. provided The Huffington Post with "university documents," which included the final outcome letter. The Huffington Post reported that John had been found responsible for the list of charges in the final outcome letter (without using John's name), and quoted J.C. as stating that the sanction given to John was "just a slap on the wrist." (Aff. ¶ 11; Ex. C at 1). The article referred to John as J.C.'s "attacker" three times, including stating that Brandeis's Dean of Students and Associate Dean of Student Life told J.C. that he should expect to see his "attacker" around campus and that he should report his "attacker" if he violated restrictions placed on him. (Aff. ¶ 12, Ex. C at 2).

Brandeis's Senior Vice President for Communications, Ellen de Graffenreid, was quoted in the article as stating that there were "factual errors in the information" provided by J.C. to The Huffington Post. (Aff. ¶ 13; Ex. C at 2). The article stated that Ms. de Graffenreid "would not elaborate on which parts of [J.C.'s] account were inaccurate or which parts differed from the University's version of events, instead repeatedly citing the Family Educational Rights and Privacy Act." (*Id*.). In fact, Brandeis knew that J.C.'s public accusations of "rape" and "attacks" had never been made in the disciplinary proceeding and there had been no findings of responsibility for those acts. (Aff. ¶ 14). Brandeis knew that J.C. explicitly told the Special Examiner that John had never "raped" him, which J.C. defined to the Special Examiner as penetration without consent. (*Id*.). Brandeis also knew J.C. and interview witnesses with whom J.C. spoke told the Special Examiner that J.C. broke up with John because John "did not stand up

5

enough for his beliefs, and was not strong-willed or forceful enough" – traits completely inconsistent with J.C's. repeated public characterization of John as "my attacker." (Aff. ¶ 15).

On June 12, 2014, the University Herald published an article entitled "Brandeis University Student Says School Hit Sexual Assault Assailant with 'Slap on the Wrist'." (Aff. ¶ 16). (A redacted copy of the article is attached as Ex. D to Aff.) The article quoted J.C.'s statements from The Huffington Post and identified J.C. by name. John's name was not revealed. The article referred to John as J.C.'s "assailant" in the headline and twice more in the text, and called him J.C.'s "attacker." (Aff. ¶¶ 17-18; Ex. D at 1, 2).

On June 17, 2014, an editor from the Brandeis campus newspaper, The Justice, approached John for comment on the paper's upcoming story about J.C. John did not seek out or reveal himself to The Justice. The Justice knew that John was the accused student only because John had asked a mutual friend of J.C.'s and his to be a witness on his behalf to provide background on his relationship with J.C. The friend also happened to be an editor at The Justice. (Aff. ¶ 19). The editor explained to John that The Justice had reached out to J.C. after seeing his Facebook post. The editor told John that if he did not speak to them they could only write the article from J.C.'s perspective. (Aff. ¶ 20). Brandeis incorrectly states in its Opposition that John spoke with The Justice "for the express purpose of generating publicity about the underlying disciplinary proceedings." (Opp. at 6). John only commented because The Justice told him they were running the story and that if John wanted a more balanced view presented he should comment. John agreed to speak with The Justice only on the condition of strict anonymity. The Justice agreed to not disclose his identity. (Aff. ¶¶ 21-22).

In order to provide The Justice with an objective basis to write a fair, balanced piece, John provided them with the Community Standards Report, the Summary of the Special

6

Examiner's Report, and his Response to the Summary. John signed a FERPA waiver authorizing Brandeis to speak with The Justice so that Brandeis could explain J.C.'s actual claims and the Special Examiner's actual findings. The waiver was not a general waiver. It authorized Brandeis to speak only with The Justice. (Aff. ¶ 23). John provided the documents only after J.C. posted twice on his Facebook page that he was the survivor of "multiple forms of rape," represented on his Facebook page that John was found responsible for "rape," and characterized John as his "attacker," and only after Brandeis's Senior Vice President for Communications told The Huffington Post that J.C.'s account of his story had "factual errors" but the University would not divulge which parts of his account were inaccurate. (Aff. ¶ 24). For John to simply deny rape and deny that he had ever attacked J.C. would have been fruitless given the Facebook postings and media coverage. Therefore, John shared documents that would objectively show the accusations and characterizations that J.C. was now using never appeared in the documents. (Aff. ¶ 25). John did not "instigate[ ] considerable publicity," as Brandeis claims. (Opp. at 1). John provided documents and responded to requests for comment from The Justice (and three additional news outlets described below) only to defend himself against J.C.'s inflammatory and damaging public accusations and mischaracterizations. As detailed below, all of John's contacts with the media were made strictly on the condition of anonymity. (Aff. ¶ 26).

On June 24, 2014, The Justice published their story about the disciplinary proceeding, entitled "University's Handling of Sexual Assault Case Proves Unsystematic, Hindrance to Students Involved." (Aff. ¶ 27). (A redacted copy of the article is attached as Ex. E to Aff.) The article identified J.C. by name and quoted him, including quoting his June 7, 2014 Facebook post calling John his "attacker" and stating that John had gotten a "freebie" for "rape." (Aff. ¶ 28; Ex. E at 1). The article noted that J.C. shared the final outcome letter with The Justice and that many

students had reposted the letter.  The article stated that "the accused student . . . has asked to remain anonymous."  (Aff. ¶¶ 28-29; Ex. E at 1).  Identified only as the "accused," John was quoted as stating that "I stand by my conduct and believe that it was always consensual."  John also stated that "I was found responsible for these instances with little regard for any fairness during the process."  (Aff. ¶ 30; Ex. E at 4).  The article noted that The Justice had sought comment on the case from Brandeis, but Lisa Boes and Ellen de Graffenreid declined to comment "due to federal privacy laws."  (Aff. ¶ 31; Ex. E at 2, 4).

      Beginning in June 2014, John noticed that some students at Brandeis were avoiding him and ignoring him when he greeted them.  Some individuals deleted John from their Facebook accounts.  (Aff. ¶ 32).  Throughout the month of June, many Brandeis students posted regularly on Facebook about the "injustice" that J.C. had endured, and some students called for John's expulsion (without identifying John by name).  One student posted that she knew who J.C.'s "attacker" was and would be willing to tell other Brandeis students.  (Aff. ¶ 33).  Another student commented that John deserved to be raped so that he knew what it was like.  (*Id*.).

      In the wake of these events, on or about June 11, 2014, John's mother contacted The Los Angeles Times, Nick Anderson of The Washington Post, and Matt Rocheleau of The Boston Globe about her son's case.  She was upset over how Brandeis had handled the aftermath of the disciplinary proceeding and J.C.'s social media and press campaign against John.  She sent Nick Anderson and Matt Rocheleau the same printed materials that John had provided to The Justice.  (Aff. ¶ 34).  To put John's mother's actions in context, she and John's father sent an email to Brandeis's Dean of Students on April 27, 2014, imploring Brandeis to step in to protect their son from what they regarded as J.C.'s obsessive, almost stalking-like behavior.  When Brandeis did nothing to address John's parents' concerns, even after J.C.'s behavior escalated, John's mother

felt that the University had abandoned its responsibilities to him as a student, and had forced her to go outside the University to try to clear her son's name. (Aff. ¶ 35). Nick Anderson reached out to John's mother and said he would be interested in writing about the case. John spoke to him several times throughout the summer and agreed to comment on the case only on the condition of strict anonymity. (Aff. ¶ 36).

On June 17, 2014, Mr. Rocheleau of The Boston Globe spoke to John's attorney at that time, Matthew Kane, saying that he wanted to do a story on accused students fighting back and that he would grant John anonymity. Mr. Kane and John spoke to Mr. Rocheleau and answered his questions. John signed a FERPA waiver authorizing Brandeis to speak with Mr. Rocheleau to clarify the actual claims and findings in the Special Examiner's Process. (Aff. ¶ 37). On June 27, 2014, Mr. Rocheleau published his article, "Students Accused of Sexual Assault Fighting Back," in The Boston Globe. (A copy of the article is attached as Ex. F to Aff.) Consistent with his agreement concerning anonymity, Mr. Rocheleau did not identify either J.C. or John by name, instead referring to them as "the accuser" and "the accused." He stated that J.C. "has called for administrators to issue a sharper punishment, ideally expulsion." (Aff. ¶¶ 38-39; Ex. F at 4). John was quoted as having denied the allegations, and as stating that "he and his ex-boyfriend had a typical romantic relationship," shared "many intimate moments but never had non-consensual sex," and "even maintained amicable ties for a while after it ended." (Aff. ¶ 40; Ex. F at 4). The article noted that "Brandeis officials declined to speak about the case, citing student privacy laws." (Aff. ¶ 41; Ex. F at 4).

On August 20, 2014, Mr. Anderson published two articles in The Washington Post, "Behind a Sexual Misconduct Case at Brandeis University: Questions on All Sides" (attached as Ex. G to Aff.), and "Men Punished in Sexual Misconduct Cases Are Fighting Back" (attached as

9

Ex. H to Aff.).  John signed a FERPA waiver authorizing Brandeis to speak with Mr. Anderson to explain J.C.'s actual claims and the Special Examiner's actual findings.  (Aff. ¶ 42).  In both articles, consistent with John's condition of anonymity, Mr. Anderson did not identify either J.C. or John by name, instead referring to them variously as "the accuser – Student A," "the other – Student B," "the ex-boyfriend," or "the disciplined student."  (Aff. ¶ 43).  Mr. Anderson noted that Student B "does not want to be identified and still hopes to clear his name."  (Aff. ¶ 44; Ex. G at 2).  Mr. Anderson recounted J.C.'s accusations in the context of a nearly two-year dating relationship, a break-up, and allegations six months later of sexual misconduct.  As reported by Mr. Anderson, with no police report and no criminal charge, Brandeis paid an outside lawyer to delve into such questions as:  "Did one student stare too much at the other in the bathroom?  Did he engage in sexual contact with his then-boyfriend – kissing and more – while the boyfriend was asleep and therefore unable to consent?  Did he stop when the boyfriend woke up and told him to stop?"  (Aff. ¶ 45; Ex. G at 1, 2).  In both articles, Mr. Anderson framed the Brandeis case within the greater "national debate" about "how universities respond to reports of campus sexual assault and whether they are assuring fair treatment for accusers and accused," and whether accused students are themselves victims of "unfair student disciplinary systems and publicity that threatens to shatter their reputations."  (Aff. ¶ 46; Ex. G at 2; Ex. H at 1).  In both articles, Mr. Anderson noted that Brandeis declined to comment on the case, "citing federal privacy laws."  (Aff. ¶ 47; Ex. G at 3; Ex. H at 8).

In its Opposition, Brandeis states that John "revealed his identity to a reporter from WBUR, Fred Thys."  (Opp. at 2).  That is incorrect.  (Aff. ¶ 48).  On July 9, 2014, Fred Thys "tweeted" at John.  That is the first contact John had with Mr. Thys.  (Aff. ¶ 49).  John privately messaged Mr. Thys on Twitter and Facebook, and sent him an email asking him to immediately

delete the public tweet he had sent because John was concerned it would reveal his identity and link him to the accusations J.C. was making publicly about his "attacker." Mr. Thys agreed to do so. (*Id.*). Mr. Thys explained to John that he had spoken to J.C., who had given him John's name. Thus, J.C. revealed John's identity to Mr. Thys. (Aff. ¶ 50). John never would have been in contact with him otherwise and, if anything, his initial emails to Mr. Thys were hostile. John actually threatened to sue Mr. Thys for defamation if he printed John's name. (Aff. ¶ 51). Mr. Thys stated he would be running with J.C.'s side of the story if John did not comment. John told him that he would speak to him on condition that he had to grant John anonymity. Mr. Thys subsequently agreed to that condition. (Aff. ¶ 52).

When John returned to campus at the beginning of the 2014-15 academic year, he was shunned and given glaring looks by some students who apparently knew that he was the accused student. Students posted about J.C.'s "attacker" regularly on Facebook (without using John's actual name), and John was overall unwelcomed at university functions, social gatherings, and parties. (Aff. ¶ 53).

In early September 2014, John informed Mr. Rocheleau, The Washington Post, The Justice, and Mr. Thys that the Department of Education, Office for Civil Rights ("OCR"), was investigating Brandeis because of a complaint John had filed with the OCR, and John provided them with the OCR letter. (Aff. ¶ 54). On September 4, 2014, The Boston Globe, The Justice, and Mr. Thys ran stories about OCR's investigation of Brandeis. (The Thys story is attached as Ex. B to Schaller Aff. in Support of Brandeis Opp.). The Justice printed a follow-up article on the investigation on September 27, 2014 (Ex. D to Schaller Aff.). (Aff. ¶ 55). All three news outlets continued to maintain John's anonymity. The Justice's September 27, 2014 article

specifically stated that "[t]he accused student has asked to remain anonymous."  (Aff. ¶ 56; Ex. D to Schaller Aff. at 1).[1]

On September 4, 2014, J.C. criticized The Justice article on his Facebook page for unfairly allowing his "attacker" to remain anonymous while publishing his name.  He used the term "my attacker" five times in his post, and also referred to John as a "sexual assailant."  (Aff. ¶ 57).  (A redacted copy of the post is attached as Ex. I to Aff.)  J.C. had previously given his consent to The Justice to use his name in the June articles, but after the September 4th article he did not want his name published.  The Justice re-posted the article on or about September 29, 2014, removing J.C.'s name.  (Aff. ¶ 58).

On September 8, 2014, J.C. posted on his Facebook page a photograph of himself wearing a poster board with a handwritten notation that he had been sexually assaulted, accompanied by a text post stating he would wear the poster board around campus every day until he graduated, whether or not his "attacker" was expelled.  He did not reveal John's name.  (Aff. ¶ 59).  (A redacted copy of the text post is attached as Ex. J to Aff.).  On or about September 9, 2014, Mr. Thys told John that J.C. told him John had anally penetrated J.C. while he was sleeping.  Mr. Thys told John that documents J.C. had given him did not corroborate that allegation and he would not be running that story.  During the same time period, several students

---

[1] Brandeis misrepresents the reason and import of the OCR's administrative closing of its investigation into John's complaint.  Brandeis incorrectly states that OCR administratively closed John's complaint with OCR "in part because it could not obtain sufficient evidence to support Plaintiff's allegations."  (Opp. at 2 n.1; Aff. ¶ 75).  In fact, OCR's Case Processing Manual, Section 110(b), provides that OCR will close a complaint when "the same allegations have been filed by the complainant against the same recipient with state or federal court."  That is what happened in John's case.  (Aff. ¶ 75).  Section 110(b) of the Manual provides an exception to closing a complaint "[w]here OCR has obtained sufficient evidence to support a finding" against the educational institution.  It is John's understanding that exception did not apply in John's case because the OCR's investigation was only in its very early stage at the time John filed his Complaint in this action.  (Aff. ¶ 76).  It is John's understanding that OCR had not yet reviewed any materials relating to John's case or anyone else's disciplinary proceedings in the relevant time frame because those documents had only recently been gathered for on-site inspection and OCR had not had a chance to review them.  (Aff. ¶ 77).

told John that J.C. told some students John got him drunk and anally raped him, even though J.C. expressly told the Special Examiner both that John had never raped him and that J.C. never drank alcohol during the entire relationship. (Aff. ¶ 60). On September 11, 2014, J.C. led a protest outside the Rose Art Museum at Brandeis. J.C. carried a sign stating that he was the victim of sexual assault. Over 50 Brandeis students joined the protest. (Aff. ¶ 61).

On September 20, 2014, while John was attending the Massachusetts National Organization for Women Gala, a Brandeis student came up to him with a group of other students and asked him loudly and publicly in front of the then-Democratic nominee for Massachusetts Attorney General (now the Attorney General), "How's your Title IX complaint going, rapist?" Many Massachusetts Democratic party operatives were in attendance. (Aff. ¶ 62). On September 26, 2014, Mr. Thys published an article about the disciplinary proceeding, entitled "Brandeis Case Reveals Complexity of Disciplining Students for Sexual Assault." (A copy of the article is attached as Ex. K to Aff.). Mr. Thys did not reveal the identities of either J.C. or John, referring to them as "the Junior" and "the ex-boyfriend." (Aff. ¶ 63; Ex. K).

In its Opposition, Brandeis claims that John has not presented any credible evidence that he will suffer retaliatory harm if required to use his real name. (Opp. at 5). That is not correct. On October 15, 2014, John received a call from the Finance Director for John's internship employer, a highly-ranked public official. The Finance Director told John that she had been "made aware" of his situation at Brandeis from "several sources" and that he was fired. Just weeks earlier, she had praised John's work and told John she would get him a job after the internship was completed and when John graduated. That promise for future employment was withdrawn. (Aff. ¶¶ 64-65; *see also* Compl. ¶¶ 199-200). John worked during the summer of 2014 with one of Boston's premier consulting firms on research and media projects. John was

13

told by a firm Vice President that if Brandeis retained the firm's services he would hire John for the Fall semester as a paid intern and indicated he would offer him permanent employment once he graduated from Brandeis. The firm was retained by Brandeis, but the Vice President did not offer John the internship and stopped replying to his emails. (Aff. ¶ 66; *see also* Compl. ¶¶ 32, 186 (withdrawal of employment offer by prospective employer with ties to Brandeis)).

As alleged in the Complaint, upon information and belief, Brandeis leaked John's name and disciplinary findings to both of these employers, and/or recklessly or intentionally failed to adequately safeguard his privacy and the confidentiality of the disciplinary findings as it is required to do under federal law. (Aff. ¶ 67; Compl. ¶¶ 32, 186). Thus, John has in fact already suffered retaliatory harm from his name being associated with J.C.'s accusations and the unauthorized leaking of the disciplinary findings to employers effectively labeling him as a sexual predator. (Aff. ¶ 68). John does not merely "fear" stigmatization, as Brandeis claims. (Opp. at 1, 4). John has suffered actual retaliation due to the stigma associated with the sexual misconduct findings against him. (*Id.*).

In addition to these current and prospective job losses, John has been forced to abandon the prospect of entering politics or seeking government jobs. John was offered a job as a legislative aide, but had to turn it down due to the stain on his permanent education record. (Aff. ¶ 69). John's law school plans are on hold while he tries to clear his name through this lawsuit. Because law school applications typically require applicants to disclose disciplinary findings, he is concerned that if he applies to law schools now he will be blackballed. (Aff. ¶ 70; *see also* Exs. L-P to Aff. ("Character and Fitness" portions of law school applications from schools in John's home state of California – UCLA, USC, and Stanford – as well as Harvard and Boston

University, requiring disclosure of the applicant's disciplinary record and an explanatory statement)).

John has also suffered retaliatory mental harm created by J.C.'s unchecked public accusations and apparent leaking of his name to certain students. John accelerated his graduation date because his situation on campus became untenable. (Aff. ¶ 71; Compl. ¶¶ 33, 34, 205). If John's name is revealed in this action, the impact will be far more than merely "potentially embarrassing," as Brandeis claims. (Opp. at 4). Brandeis's deeply flawed disciplinary process turned benign, everyday occurrences in a nearly two-year consensual sexual relationship into highly charged, reprehensible sexual crimes. When John's name was leaked to certain students and employers and they heard the predatory sexual labels given to him by Brandeis – sexual misconduct, sexual harassment, taking sexual advantage of someone's incapacitation, lack of consent to sexual activity, invasion of personal privacy – they dropped him on the spot and ostracized him. (Aff. ¶ 72).

Although John's identity is known to certain individuals within the Brandeis community, employers with Brandeis ties, and the media contacts listed in John's Affidavit, John's name has never been publicly revealed. John has already suffered from the adverse impact that disclosure of his identity has had in this small pool of individuals who know his identity. (Aff. ¶ 73). If John's identity is revealed publicly through this action, his name will be associated with heinous sexual crimes and spread on the internet with irretrievable consequences to his reputation, privacy, and well-being. (Aff. ¶ 74).

### III. ARGUMENT

In its Opposition, Brandeis argues that John's Motion should be denied because: (1) John has revealed his identity to third parties in the media; (2) John seeks to proceed anonymously merely because he might be "embarrassed" and to avoid "potential stigmatization"; (3) this case

15

presents issues of considerable public interest; and (4) Brandeis will be prejudiced if John proceeds pseudonymously. None of these arguments has merit.

**First**, as demonstrated in John's Affidavit and the Fact section, *supra*, John agreed to speak to four media reporters about the underlying disciplinary proceeding and to give his side of the story about his relationship with J.C. solely as a ***defensive*** measure. Brandeis publicly stated that J.C.'s publicized version of events had "factual errors," but did nothing to correct the publicly-disseminated misinformation, or to protect John's identity among Brandeis students and with his part-time employers, despite its obligation under student privacy laws to protect the privacy of its students and the confidentiality of its disciplinary processes.[2] Betrayed by his own University, John had no choice but to defend himself. When John spoke to the media, he did so under strict conditions of anonymity, and the media respected those conditions. Even J.C., who publicly identified himself on social media and to the press, never revealed John's identity.[3]

---

[2] *See* U.S. Dep't of Educ. Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (2001) at 18, http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf ("[A] school should be aware of the confidentiality concerns of an accused . . . student. Publicized accusations of sexual harassment, if ultimately found to be false, may nevertheless irreparably damage the reputation of the accused."). John's Complaint alleges he was falsely accused of sexual misconduct and seeks vindication of his reputation and expungement of the University's findings from his permanent education record.

[3] To the extent that Brandeis suggests John waived his privacy rights by filing a complaint with the OCR (*see* Opp. at 6 and cases cited therein), Brandeis is wrong. *See* The Privacy Act of 1974, 5 U.S.C.S. § 522a; The Freedom of Information Act, 5 U.S.C.S. § 552; U.S. Dep't of Educ., Office for Civil Rights, *OCR Complaint Processing Procedures*, at Additional Information: Investigatory Use of Personal Information, http://www2.ed.gov/about/offices/list/ocr/ complaints-how.html (last updated Feb. 19, 2015) (hereinafter "OCR Compl. Processing Proc."): "OCR does not reveal the name or other identifying information about an individual (including individuals who file complaints or speak to OCR) unless (1) such information would assist in the completion of an investigation or in enforcement activities against an institution that violates the laws, or (2) unless such information is required to be disclosed under the FOIA or the Privacy Act." (OCR Compl. Processing Proc, "Additional Information: Investigatory Use of Personal Information"). The OCR retains the right to release certain information (*e.g.*, the name of the school, the date the complaint was filed, the type of complaint that was filed, the date and reasons why a complaint was resolved, dismissed, or closed) to the public. (*Id.*).

**Second**, Brandeis argues that John seeks to proceed pseudonymously only to prevent "potentially embarrassing information" from becoming public and because he "fears stigmatization." (Opp. at 4). That is not the case. John seeks to proceed anonymously to restore his reputation, to expunge his permanent education record of the University's findings in the disciplinary proceeding, and to prevent further retaliation. *See Doe v. Bell Atl. Bus. Sys. Servs.*, 162 F.R.D. 418, 420 (D. Mass. 1995) ("Courts have allowed plaintiffs to proceed anonymously in cases involving social stigmatization, real danger of physical harm, or where the injury litigated against would occur as a result of the disclosure of plaintiff's identity."). Requiring John to litigate under his own name would be contrary to the fundamental purpose of this suit, which is to restore John's reputation and to clear his education record, and it would increase the harm that John has already suffered to his reputation. *See Doe v. Rostker*, 89 F.R.D. 158, 161-62 (N.D. Cal. 1981) (observing that a plaintiff may proceed pseudonymously if use of his or her name would "indelibly connect" the plaintiff to a "stigmatizing" event, regardless of the outcome of the litigation). The "indelible connection" with a "stigmatizing" event – here, the Special Examiner's arbitrary and capricious findings ratified by the University that effectively labeled John as a predatory sexual offender – is precisely the reputational harm that John will suffer if required to use his actual name. In the age of the Internet and Google, John's name would be forever related to J.C.'s false accusations regardless of the ultimate result of the lawsuit. *See EW v. New York Blood Ctr.*, 213 F.R.D. 108, 112-13 (E.D.N.Y. 2003) (finding of "concrete and cognizable interest in proceeding by pseudonym" based in part on "access to court files by those surfing the Internet"). Moreover, John seeks to prevent further retaliation against him by filing under a pseudonym. As set forth in his Affidavit and the Fact section, *supra*, John already has suffered economic and reputational harm when two of his employers took adverse action against

17

him once they became aware of his situation at Brandeis. He has suffered social and reputational harm with a portion of the Brandeis student community who apparently have learned his identity. If forced to proceed under his actual name at the national level, the potential for retaliation and reputational harm increases exponentially.

**Third**, although there is a public interest in the *legal issues* raised in John's Complaint, there is a "typically weak public interest in knowing the litigants' identities" due to the "[p]urely legal nature of the issues presented." *Doe v. Del Rio*, 241 F.R.D. 154, 157 (S.D.N.Y. 2006). Given the nature of this case, "[p]arty anonymity [will] not obstruct the public's view of the issues joined or the court's performance in resolving them." *Doe v. Stegall*, 653 F.2d 180, 185 (5th Cir. 1981). John only seeks to protect his identity and the identity of his accuser. All filings submitted to the Court will be available for public review.

**Fourth**, Brandeis fails to provide any facts showing how it will be unfairly disadvantaged in defending this case if John proceeds anonymously. (Opp. at 5). Numerous federal courts have allowed student plaintiffs, like John, to proceed under a pseudonym in cases involving college adjudications of alleged sexual misconduct.[4] Further, unlike other cases where prejudice to the defendant was a concern because the defendant did not know the plaintiff's identity,

---

[4]  *See, e.g.*, *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 764 (E.D. Tenn. 2009) (upholding the magistrate's order granting motion to proceed under pseudonym in a case where plaintiff, a college male was found responsible for sexually assaulting a female classmate); *Doe v. Williams Coll.*, No. 1:2013-cv-11740 (D. Mass. filed July 19, 2013) (allowing accused student to proceed pseudonymously and granting motion for protective order); *Doe v. Columbia Univ.*, No. 14-cv-3573 (S.D.N.Y. filed May 19, 2014) (granting motion to proceed pseudonymously); *Doe v. Washington & Lee Univ.*, No. 6:14-cv-00052-NKM-RSB (W.D. Va. filed Dec. 12, 2014) (granting plaintiff's motion to proceed under pseudonym); *Doe v. George Washington Univ.*, No. 1:11-cv-00696-RLW (D.D.C. filed Apr. 8, 2011) (allowing accused student plaintiff's motion to proceed under pseudonym); *Doe v. Wesleyan Univ.*, No. 3:14-cv-01735-SRU (D. Conn. filed Nov. 20, 2014) (currently proceeding pseudonymously with consent); *Doe v. Univ. of Colo., Boulder*, No. 14-3027 (D. Colo. filed Nov. 7, 2014) (proceeding pseudonymously throughout the case); *Doe v. Swarthmore Coll.*, No. 2:14-cv-00532-SD (E.D. Pa. filed Jan. 23, 2014) (granting plaintiff's motion to proceed under pseudonym which was unopposed by defendant college); *Doe v. Reed Institute*, No. 3:15-cv-617 (D. Or. filed Apr. 14, 2015) (granting plaintiff's unopposed motion to proceed under pseudonym).

Brandeis knows John's actual identity and will be entitled to the same full discovery just as if John was litigating under his own name.  *See, e.g., Roe v. Aware Woman Ctr. For Choice, Inc.*, 253 F.3d 678, 687 (11th Cir. 2001) ("The only justification the defendants offer for stripping Roe of her privacy is the argument that they will not be able to adequately conduct discovery without knowing her true identity. However, that argument is eviscerated by Roe's offer to disclose her name to the defendants for discovery purposes on condition that they do not disclose it to the general public."); *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000) ("The court must also determine the precise prejudice at each stage of the proceedings to the opposing party, and whether proceedings may be structured so as to mitigate that prejudice.").

## IV.   CONCLUSION

For the reasons set forth above and in John's Memorandum of Law, John respectfully requests that this Court grant his Motion for Permission to Proceed Under a Pseudonym.

|  |  |
|---|---|
|  | Respectfully Submitted, |
|  | /s/Michael R. Schneider |
|  | Michael R. Schneider, Esquire |
|  | (Mass. Bar No. 446475) |
|  | Good Schneider Cormier |
|  | 83 Atlantic Avenue |
|  | Boston, MA 02110-3711 |
|  | Tel:  (617) 523-5933 |
|  | ms@gscboston.com |
|  |  |
|  | Patricia M. Hamill, Esquire |
|  | (Pa. I.D. No. 48416, Admitted *Pro Hac Vice*) |
|  | Jeannette M. Brian, Esquire |
|  | (Pa. I.D. No. 66169, Admitted *Pro Hac Vice*) |
|  | Conrad O'Brien PC |
|  | 1500 Market Street |
|  | Centre Square, West Tower, Suite 3900 |
|  | Philadelphia, PA  19102-2100 |
|  | Tel:  (215) 864-9600/ Fax:  (215) 864-9620 |
| Date:  June 2, 2015 | phamill@conradobrien.com |
|  | jbrian@conradobrien.com |
|  |  |
|  | *Attorneys for Plaintiff* |

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent via email to those indicated as non-registered participants on June 2, 2015.

/s/ Michael R. Schneider
Michael R. Schneider, Esquire