# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE,<br><br>                Plaintiff,<br><br>        v.<br><br>BRANDEIS UNIVERSITY,<br><br>                Defendant. | Civil Action No.1:15-cv-11557-MLW |

AFFIDAVIT OF JOHN DOE FOR REPLY BRIEF
IN FURTHER SUPPORT OF MOTION TO PROCEED UNDER PSEUDONYM

I, John Doe, do hereby depose and state under oath as follows:

1.    On May 30, 2014, J.C. and I received separate letters from Lisa Boes, Brandeis's Dean of Academic Services, notifying us of the final outcome of the disciplinary proceeding that is the subject matter of my Complaint against Brandeis in this case.

2.    In the final outcome letter, Brandeis informed me that the University found me responsible for all six charges and would issue me a disciplinary warning. Additionally, I had to complete an educational plan developed with Sheila McMahon, the Sexual Assault Services and Prevention Specialist.

3.    Although at that time Brandeis's Rights and Responsibilities Handbook had no policy requiring parties to maintain the confidentiality of disciplinary proceedings, the final outcome letter cautioned J.C. that the "protection of [my] rights under the Family Educational and Privacy Rights Act . . . have to be carefully honored."  (*See* Ex. A attached hereto).

4.    Nevertheless, on June 4, 2014, J.C. posted the final outcome letter to his Facebook page, with annotations, and encouraged others to share it.  (A redacted copy of the June 4, 2014 post is attached hereto as Ex. A.)

5.    Although J.C. blacked out my name in the post, he did not black out his first name.  (I have blacked out J.C.'s first name in Ex. A.)  His post was "shared" upwards of 100 times, and many students began commenting on it.

6.    In the post, J.C. stated that he was a victim of "multiple forms of rape" and twice characterized me as his "attacker."

7. On June 7, 2014, J.C. posted again on his Facebook page concerning the final outcome letter. (A redacted copy of the June 7, 2014 post is attached hereto as Ex. B.)

8. In this post, J.C. repeatedly characterized me (without using my name) as his "attacker," referred to me as a "sexual assailant," stated that over the past six months he had been "left attacked and powerless," and that Brandeis had given me a "freebie" for "rape."

9. On June 11, 2014, The Huffington Post published a story entitled "Brandeis University Punishes Sexual Assault with Sensitivity Training." (A redacted copy of The Huffington Post's June 11, 2014 article is attached hereto as Ex. C.)

10. J.C. was quoted extensively in the article and identified himself. My name was not revealed in the article. J.C. posted the article on his Facebook page where it was shared by many Brandeis students.

11. As reported in the article, J.C. provided The Huffington Post with "university documents," which included the final outcome letter. The Huffington Post reported that I had been found responsible for the list of charges in the final outcome letter (without using my name), and quoted J.C. as stating that the sanction given to me was "just a slap on the wrist." (Ex. C at 1).

12. The article referred to me as J.C.'s "attacker" three times, including stating that Brandeis's Dean of Students and Associate Dean of Student Life told J.C. that he should expect to see his "attacker" around campus and that he should report his "attacker" if he violated restrictions placed on him. (Ex. C at 2).

13. Brandeis's Senior Vice President for Communications, Ellen de Graffenreid, was quoted in the article as stating that there were "factual errors in the information" provided by J.C. to The Huffington Post. (Ex. C at 2). The article stated that Ms. de Graffenreid "would not elaborate on which parts of [J.C.'s] account were inaccurate or which parts differed from the University's version of events, instead repeatedly citing the Family Educational Rights and Privacy Act." (*Id.*).

14. In fact, Brandeis knew that J.C.'s public accusations of "rape" and "attacks" had never been made in the disciplinary proceeding and there had been no findings of responsibility for those acts. Brandeis knew that J.C. explicitly told the Special Examiner that I had never "raped" him, which J.C. defined to the Special Examiner as penetration without consent.

15. Brandeis also knew J.C. and interview witnesses with whom J.C. spoke told the Special Examiner that J.C. broke up with me because I "did not stand up enough for my beliefs, and was not strong-willed or forceful enough" – traits completely inconsistent with J.C.'s repeated public characterization of me as his "attacker."

2

16. On June 12, 2014, the University Herald published an article entitled "Brandeis University Student Says School Hit Sexual Assault Assailant with 'Slap on the Wrist'." (A redacted copy of the University Herald's June 12, 2014 article is attached hereto as Ex. D.)

17. The article quoted J.C.'s statements from The Huffington Post and identified J.C. by name. My name was not revealed.

18. The article referred to me as J.C.'s "assailant" in the headline and twice more in the text, and called me J.C.'s "attacker." (Ex. D at 1, 2).

19. On June 17, 2014, an editor from the Brandeis campus newspaper, The Justice, approached me for comment on the paper's upcoming story about J.C. I did not seek out or reveal myself to The Justice. The Justice knew that I was the accused student only because I had asked a mutual friend of J.C.'s and mine to be a witness on my behalf to provide background on our relationship. The friend also happened to be an editor at The Justice.

20. The editor explained to me that The Justice had reached out to J.C. after seeing his Facebook post. The editor told me that if I did not speak to them they could only write the article from J.C.'s perspective.

21. Brandeis incorrectly states in its Opposition to Motion for Leave to Proceed Under Pseudonym that I spoke with The Justice "for the express purpose of generating publicity about the underlying disciplinary proceedings." (Opp. at 6).[1] I only commented because The Justice told me they were running the story and that if I wanted a more balanced view presented I should comment.

22. I agreed to speak with The Justice only on the condition of strict anonymity. The Justice agreed to not disclose my identity.

23. In order to provide The Justice with an objective basis to write a fair, balanced piece on what had actually happened in the disciplinary proceeding, I provided them with the Community Standards Report, the Summary of the Special Examiner's Report, and my Response to the Summary. I signed a FERPA waiver authorizing Brandeis to speak with The Justice so that Brandeis could explain to them J.C.'s actual claims and the Special Examiner's actual findings. The waiver was not a general waiver of my privacy rights. It authorized Brandeis to speak only with The Justice.

24. I provided the documents only after J.C. posted twice on his Facebook page that he was the survivor of "multiple forms of rape," represented on his Facebook page that I was found responsible for "rape," and characterized me as his "attacker," and only after Brandeis's Senior Vice President for Communications

---

[1] Hereinafter "Opposition" or Opp."

3

told The Huffington Post that J.C.'s account of his story had "factual errors" but the University would not divulge which parts of his account were inaccurate.

25. For me to simply deny rape and deny that I had ever attacked J.C. would have been fruitless given the Facebook postings and media coverage. Therefore, I shared documents that would objectively show the accusations and characterizations that J.C. was now using never appeared in the documents.

26. I did not "instigate considerable publicity," as Brandeis claims. (Opp. at 1) I provided documents and responded to requests for comment from The Justice (and three additional news outlets described below) only to defend myself against J.C.'s inflammatory and damaging public accusations and mischaracterizations. As detailed below, all of my contacts with the media were made strictly on the condition of anonymity.

27. On June 24, 2014, The Justice published their story about the disciplinary proceeding, entitled "University's Handling of Sexual Assault Case Proves Unsystematic, Hindrance to Students Involved." (A redacted copy of The Justice's June 24, 2014 article is attached hereto as Ex. E.)

28. The article identified J.C. by name and quoted him, including quoting his June 7, 2014 Facebook post calling me his "attacker" and stating that I had gotten a "freebie" for "rape." (Ex. E at 1). The article noted that J.C. shared the final outcome letter with The Justice and that many students had reposted the letter. (*Id*.).

29. The article stated that "the accused student . . . has asked to remain anonymous." (Ex. E at 1).

30. Identified only as the "accused," I was quoted as stating that "I stand by my conduct and believe that it was always consensual." I also stated that "I was found responsible for these instances with little regard for any fairness during the process." (Ex. E at 4).

31. The article noted that The Justice had sought comment on the case from Brandeis, but Lisa Boes and Ellen de Graffenreid declined to comment "due to federal privacy laws." Ms. de Graffenreid could only answer general questions on the process. (Ex. E at 2, 4).

32. Beginning in June 2014, I noticed that some students at Brandeis were avoiding me and ignoring me when I greeted them. Some individuals deleted me from their Facebook accounts.

33. Throughout the month of June, many Brandeis students posted regularly on Facebook about the "injustice" that J.C. had endured, and some students called for my expulsion (without identifying me by name). One student posted on Facebook

4

that she knew who J.C.'s "attacker" was and would be willing to tell other Brandeis students. Another student commented on Facebook that I deserved to be raped so that I knew what it was like.

34. In the wake of these events, on or about June 11, 2014, my mother contacted the Los Angeles Times, Nick Anderson of The Washington Post, and Matt Rocheleau of The Boston Globe about my case. She was upset over how Brandeis had handled the aftermath of the disciplinary proceeding and J.C.'s social media and press campaign against me. She sent Nick Anderson and Matt Rocheleau the same printed materials that I had provided to The Justice.

35. To put my mother's actions in context, she and my father sent an email to Brandeis's Dean of Students on April 27, 2014, imploring Brandeis to step in to protect me from what my parents regarded as J.C.'s obsessive, almost stalking-like behavior. When Brandeis did nothing to address my parents' concerns, even after J.C.'s behavior escalated, my mother felt that the University had abandoned its responsibilities to me as a student, and had forced her to go outside the University to try to clear my name.

36. Nick Anderson reached out to my mother and said he would be interested in writing about my case. I spoke to him several times throughout the summer and agreed to comment on my case only on the condition of strict anonymity.

37. On June 17, 2014, Mr. Rocheleau of The Boston Globe spoke to my attorney at that time, Matthew Kane, saying that he wanted to do a story on accused students fighting back and that he would grant me anonymity. Mr. Kane and I spoke to Mr. Rocheleau and answered his questions. I signed a FERPA waiver authorizing Brandeis to speak with Mr. Rocheleau to clarify the actual claims and findings in the Special Examiner's Process.

38. On June 27, 2014, Mr. Rocheleau published his article, "Students Accused of Sexual Assault Fighting Back," in The Boston Globe. (A copy of The Boston Globe's June 27, 2014 article is attached hereto as Ex. F.)

39. Consistent with our agreement concerning anonymity, Mr. Rocheleau did not identify either J.C. or me by name, instead referring to us as "the accuser" and "the accused." He stated that J.C. "has called for administrators to issue a sharper punishment, ideally expulsion." (Ex. F at 4).

40. I am quoted as having denied the allegations, and as stating that "he and his ex-boyfriend had a typical romantic relationship," shared "many intimate moments but never had non-consensual sex," and "even maintained amicable ties for a while after it ended." (*Id.*).

41. The article noted that "Brandeis officials declined to speak about the case, citing student privacy laws." (*Id.*).

42. On August 20, 2014, Mr. Anderson published two articles in The Washington Post, "Behind a Sexual Misconduct Case at Brandeis University: Questions on All Sides" (attached hereto as Ex. G), and "Men Punished in Sexual Misconduct Cases Are Fighting Back" (attached hereto as Ex. H). I signed a FERPA waiver authorizing Brandeis to speak with Mr. Anderson to explain J.C.'s actual claims and the Special Examiner's actual findings.

43. In both articles, consistent with my condition of anonymity, Mr. Anderson did not identify either J.C. or me by name, instead referring to us variously as "the accuser – Student A," "the other – Student B," "the ex-boyfriend," or "the disciplined student." (Ex. G & Ex. H).

44. Mr. Anderson noted that Student B "does not want to be identified and still hopes to clear his name." (Ex. G at 2).

45. Mr. Anderson recounted J.C.'s accusations in the context of a nearly two-year dating relationship, a break-up, and allegations six months later of sexual misconduct. As reported by Mr. Anderson, with no police report and no criminal charge, Brandeis paid an outside lawyer to delve into such questions as: "Did one student stare too much at the other in the bathroom? Did he engage in sexual contact with his then-boyfriend – kissing and more – while the boyfriend was asleep and therefore unable to consent? Did he stop when the boyfriend woke up and told him to stop?" (Ex. G at 1, 2).

46. In both articles, Mr. Anderson framed the Brandeis case within the greater "national debate" about "how universities respond to reports of campus sexual assault and whether they are assuring fair treatment for accusers and accused," and whether accused students are themselves victims of "unfair student disciplinary systems and publicity that threatens to shatter their reputations." (Ex. G at 2; Ex. H at 1).

47. In both articles, Mr. Anderson noted that Brandeis declined to comment on the case, "citing federal privacy laws." (Ex. G at 3; Ex. H at 8).

48. In its Opposition, Brandeis states that I "revealed [my] identity to a reporter from WBUR, Fred Thys." (Opp. at 2). That is incorrect.

49. On July 9, 2014, Fred Thys "tweeted" at me. That is the first contact I had with Mr. Thys. I privately messaged him on Twitter and Facebook, and sent him an email asking him to immediately delete the public tweet he had sent because I was concerned it would reveal my identity and link me to the accusations J.C. was making publicly about his "attacker." Mr. Thys agreed to do so.

50. Mr. Thys explained to me that he had spoken to J.C., who had given him my name. Thus, J.C. revealed my identity to Mr. Thys.

6

51. I never would have been in contact with him otherwise and, if anything, my initial emails to Mr. Thys were hostile. I actually threatened to sue him for defamation if he printed my name.

52. Mr. Thys stated he would be running with J.C.'s side of the story if I did not comment. I told him that I would speak to him on condition that he had to grant me anonymity. Mr. Thys subsequently agreed to that condition.

53. When I returned to campus at the beginning of the 2014-15 academic year, I was shunned and given glaring looks by some students who apparently knew that I was the accused student. Students posted about J.C.'s "attacker" regularly on Facebook (without using my actual name), and I was overall unwelcomed at university functions, social gatherings, and parties.

54. In early September 2014, I informed Mr. Rocheleau, The Washington Post, The Justice, and Mr. Thys that the Department of Education, Office for Civil Rights ("OCR"), was investigating Brandeis because of a complaint I had filed with the OCR, and I provided them with the OCR letter.

55. On September 4, 2014, The Boston Globe, The Justice, and Mr. Thys ran stories about OCR's investigation of Brandeis. (The Thys story is attached as Ex. B to Schaller Affidavit in Support of Brandeis Opp.) The Justice printed a follow-up article on the investigation on September 27, 2014. (Ex. D to Schaller Affidavit).

56. All three news outlets continued to maintain my anonymity. The Justice's September 27, 2014 article specifically stated that "[t]he accused student has asked to remain anonymous." (Ex. D to Schaller Affidavit at 1).

57. On September 4, 2014, J.C. criticized The Justice article on his Facebook page for unfairly allowing his "attacker" to remain anonymous while publishing his name. He used the term "my attacker" five times in his post, and also referred to me as a "sexual assailant." (A redacted copy of the September 4, 2014 post is attached hereto as Ex. I.)

58. J.C. had previously given his consent to The Justice to use his name in the June articles, but decided after the September 4th article he did not want his name published. The Justice re-posted the article on or about September 29, 2014, removing J.C.'s name.

59. On September 8, 2014, J.C. posted on his Facebook page a photograph of himself wearing a poster board with a handwritten notation that he had been sexually assaulted, accompanied by a text post stating he would wear the poster board around campus every day until he graduated, whether or not his "attacker" was expelled. He did not reveal my name. (A redacted copy of the September 8, 2014 text post is attached hereto as Ex. J.)

7

60. On or about September 9, 2014, Mr. Thys told me that J.C. told him I had anally penetrated J.C. while he was sleeping. Mr. Thys told me that documents J.C. had given him did not corroborate that allegation and he would not be running that story. During the same time period, several students told me that J.C. told some students I got him drunk and anally raped him, even though J.C. expressly told the Special Examiner both that I had never raped him and that he never drank alcohol during our entire relationship.

61. On September 11, 2014, J.C. led a protest outside the Rose Art Museum at Brandeis. J.C. carried a sign stating that he was the victim of sexual assault. Over 50 Brandeis students joined the protest.

62. On September 20, 2014, while I was attending the Massachusetts National Organization for Women Gala, a Brandeis student came up to me with a group of other students and asked me loudly and publicly in front of the then-Democratic nominee for Massachusetts Attorney General (now the Attorney General), "How's your Title IX complaint going, rapist?" Many Massachusetts Democratic party operatives were in attendance.

63. On September 26, 2014, Mr. Thys published an article about the disciplinary proceeding, entitled "Brandeis Case Reveals Complexity of Disciplining Students for Sexual Assault." (A copy of Mr. Thys's September 26, 2014 article is attached hereto as Ex. K.) Mr. Thys did not reveal the identities of either J.C. or me, referring to us throughout the article as "the Junior" and "the ex-boyfriend." (Ex. K).

64. In its Opposition, Brandeis claims that I have not presented any credible evidence that I will suffer retaliatory harm if required to use my real name. (Opp. at 5). That is not correct.

65. On October 15, 2014, I received a call from the Finance Director for my internship employer, a highly-ranked public official. The Finance Director told me that she had been "made aware" of my situation at Brandeis from "several sources" and that I was fired. Just weeks earlier, she had praised my work and told me she would get me a job after the internship was completed and when I graduated. That promise for future employment was withdrawn. I alleged this incident in my Complaint at ¶¶ 199-200.

66. I worked during the summer of 2014 with one of Boston's premier consulting firms on research and media projects. I was told by a firm Vice President that if Brandeis retained the firm's services he would hire me for the Fall semester as a paid intern and indicated he would offer me permanent employment once I graduated from Brandeis. The firm was retained by Brandeis, but the Vice President did not offer me the internship and stopped replying to my emails. I

|     | alleged this incident in the Complaint at ¶¶ 32, 186 (withdrawal of employment offer by prospective employer with ties to Brandeis). |
| --- | --- |
| 67. | As alleged in my Complaint, upon information and belief, Brandeis leaked my name and disciplinary findings to both of these employers, and/or recklessly or intentionally failed to adequately safeguard my privacy and the confidentiality of the disciplinary findings as it is required to do under federal law. (Complaint ¶¶ 32, 186). |
| 68. | Thus, I have in fact already suffered retaliatory harm from my name being associated with J.C.'s accusations and the unauthorized leaking of the disciplinary findings to employers effectively labeling me as a sexual predator. I do not merely "fear" stigmatization, as Brandeis claims. (Opp. at 1, 4). I have suffered actual retaliation in employment due to the stigma associated with the sexual misconduct findings against me. |
| 69. | In addition to these current and prospective job losses, I have been forced to abandon the prospect of entering politics or seeking government jobs. I was offered a job as a legislative aide, but had to turn it down due to the stain on my permanent education record. |
| 70. | My law school plans are on hold while I try to clear my name through this lawsuit. Because law school applications typically require applicants to disclose disciplinary findings, I am concerned that if I apply to law schools now I will be blackballed. (*See* Exs. L-P, attached hereto) ("Character and Fitness" portions of law school applications from schools in my home state of California – UCLA, USC, and Stanford – as well as Harvard and Boston University, requiring disclosure of the applicant's disciplinary record and an explanatory statement). |
| 71. | I have also suffered retaliatory mental harm created by J.C.'s unchecked public accusations and apparent leaking of my name to certain students. I accelerated my graduation date because my situation on campus became untenable. (Complaint at ¶¶ 33, 34, 205). |
| 72. | If my name is revealed in this action, the impact will be far more than merely "potentially embarrassing," as Brandeis claims. (Opp. at 4). Brandeis's deeply flawed disciplinary process turned benign, everyday occurrences in a nearly two-year consensual sexual relationship into highly charged, reprehensible sexual crimes. When my name was leaked to certain students and employers and they heard the predatory sexual labels given to me by Brandeis – sexual misconduct, sexual harassment, taking sexual advantage of someone's incapacitation, lack of consent to sexual activity, invasion of personal privacy – they dropped me on the spot and ostracized me. |
| 73. | Although my identity is known to certain individuals within the Brandeis community, employers with Brandeis ties, and the media contacts listed in this |

Affidavit, my name has never been publicly revealed. I have already suffered from the adverse impact that disclosure of my identity has had in this small pool of individuals who know my identity.

74. If my identity is revealed publicly through this action, my name will be associated with heinous sexual crimes and spread on the internet with irretrievable consequences to my reputation, privacy, and well-being.

75. Brandeis incorrectly states that OCR administratively closed my complaint with OCR "in part because it could not obtain sufficient evidence to support Plaintiff's allegations." (Opp. at 2 n.1). In fact, OCR's Case Processing Manual, Section 110(b), provides that OCR will close a complaint when "the same allegations have been filed by the complainant against the same recipient with state or federal court." That is what happened in my case.

76. Section 110(b) of the Manual provides an exception to closing a complaint "[w]here OCR has obtained sufficient evidence to support a finding" against the educational institution. It is my understanding that that exception did not apply to my case because the OCR's investigation was only in its very early stage at the time I filed my Complaint in this action.

77. It is my understanding that OCR had not yet reviewed any of the materials relating to my case or anyone else's disciplinary proceedings in the relevant time frame because the documents had only recently been gathered for on-site inspection and OCR had not yet had a chance to review them.

Signed under penalty of perjury this 1 day of June, 2015.

*John Doe*
John Doe

10