UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 15-11557-MLW |
| ) | |
| v. ) | |
| ) | |
| BRANDEIS UNIVERSITY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT BRANDEIS UNIVERSITY'S MOTION TO DISMISS

Defendant Brandeis University ("Brandeis" or "the University") submits this memorandum of law in support of its Motion to Dismiss Plaintiff John Doe's ("Doe") Complaint.  Doe contends that Brandeis violated Title IX, breached its student handbook, and engaged in other tortious activity when it determined that Doe had sexually harassed and assaulted another student, J.C.[1]  Doe's Title IX allegations, however, are fatally flawed because he fails to state any facts suggesting that Brandeis' disciplinary proceedings or findings were motivated by sexual bias.  Furthermore, Doe's common law claims are belied by the facts alleged in the Complaint and/or are deficient as a matter of law.  For these reasons, Brandeis respectfully requests that the Court grant its motion and dismiss Doe's Complaint in its entirety.

---

[1] Doe has filed a motion to proceed under a pseudonym, and has requested that his accuser also remain anonymous.  Docket No. 3.  Brandeis opposes Doe's motion.  Docket No. 11.  Nevertheless, because Doe's motion remains pending before the Court, Brandeis refers to these students by using the pseudonyms provided by Doe.

**Factual Background**[2]

I.       Brandeis' Rights and Responsibilities Handbook and Student Disciplinary Processes

        Brandeis is a private coeducational university located in Waltham, Massachusetts.

Complaint ¶ 40.  Doe, a resident of California, is a former Brandeis student.  Id. at ¶ 39.  At all

times relevant to Doe's Complaint, Brandeis maintained a Rights & Responsibilities handbook

("R&R"), which serves as a guide "regarding the standards that define [the Brandeis

community]."  Complaint Ex. A at p. 1.  To that end, the R&R sets forth guidelines with respect

to academic integrity, public safety, and student conduct.  The R&R contains specific provisions

regarding: physical harm and contact (Section 2.1.d); personal privacy (Section 2.1.e); sexual

misconduct (Sections 3.1-3.3); and sexual harassment (Section 7.2).  Id. at §§ 2.1.d-e, 3.1-3.3,

7.2; Moriello Aff. Ex. A at §§ 2.1.d-e, 3.1-3.3, 7.2.

        The R&R "also contains the procedures the University employs when a member of the

community believes that a student has violated a campus policy."  Complaint Ex. A at p. 1.  The

R&R and its policies and procedures are "constantly reevaluated and tweaked by the [Brandeis]

community every year."  Id.  As a condition of his enrollment, Doe agreed to be bound by the

terms of the R&R.  See Complaint ¶ 67.

        Doe's Complaint focuses on two Brandeis disciplinary procedures: the so-called

"Hearing Process" and the Special Examiner Process.  The Complaint alleges that, as of the

---

        [2]  The facts in this section are derived from Doe's Complaint, the exhibits attached to the
Complaint, and the exhibits attached to the Affidavit of Antonio Moriello.  Because Doe's
Complaint refers to and relies on the documents attached to Mr. Moriello's Affidavit, the Court
may consider them in connection with Brandeis' Motion to Dismiss.  See Watterson v. Page, 987
F.2d 1, 3 (1st Cir. 1993).  The facts alleged in the Complaint are assumed as true only for
purposes of Brandeis' Motion to Dismiss.  Brandeis reserves the right to contest those facts
during subsequent proceedings.

2011-2012 academic year, the Hearing Process applied to all allegations of student misconduct. Id. at ¶ 70, Ex. A §§ 2-3, 18.0.  Beginning with the 2012-2013 school year, Brandeis modified its R&R to include the Special Examiner Process—a distinct disciplinary procedure for allegations of sexual misconduct, sexual harassment, and discrimination.  See Complaint Ex. B §§ 3, 7, 22.6. The Hearing Process still applies to other alleged violations of the R&R.  See id. at § 18.0; Moriello Aff. Ex. A § 18.0.

Under the Hearing Process, an accuser must submit a timely complaint of student misconduct—also known as a Community Standards Report ("CSR")—with the University's Department of Student Rights and Community Standards ("DSRCS").  E.g., Moriello Aff. Ex. A § 18.0.  After a CSR is filed with DSRCS, the "available facts shall be gathered from the Accuser [], and a careful evaluation of these facts, as well as the credibility of the person reporting them, shall be made."  Id.  If a DSRCS administrator determines that the CSR is untimely, lacks merit, or lacks sufficient evidence, he/she may choose not to refer the matter to the conduct system.  Id.

If, however, the DSRCS decides that there is evidence warranting a referral to the conduct system, then the accused student shall be notified of the charges, which he/she must accept or deny.  Id. at § 19.1.  The accused student may then request a hearing before the Student Conduct Board, comprised of a combination of students and faculty members.  Id. at §§ 19.1, 20.2.  The accused student and his/her accuser may present evidence and introduce witnesses during the hearing before the Student Conduct Board, and "shall have the right to view and question all evidence and reports presented to the Board during the hearing."  Id. at §§ 19.6.g, 19.10.  The accuser bears the burden to prove his/her allegations by clear and convincing evidence.  Id. at § 19.6.h-i.

Under the Special Examiner Process, an individual who alleges a violation of R&R Sections 3 or 7 must likewise file a CSR with the University.  Id. at § 22.6.  Once filed, the CSR is investigated preliminarily by DSCRS in the same manner as a CSR under the Hearing Process. Id. at § 18.0.  "In cases where the DSRCS receives a report and determines that one or more possible violations of Section 3 (Sexual Responsibility) or Section 7 (Equal Opportunity, NonDiscrimination, and Harassment) exist, the case will be adjudicated by the Special Examiner's Process."  Id. at § 22.6.  If the CSR contains allegations of sexual misconduct, the University may place the accused student on emergency suspension pending the outcome of the investigation or conduct process.  Id. at § 3.0.

The filing of a CSR begins the "Statements Phase," during which the director of DSRCS meets with the accuser and informs him/her of certain rights and responsibilities.  Id.  Two days after meeting with the accuser, the director of DSRCS must meet with the accused, show him/her the CSR, and suggest that he/she compose a written response to its allegations.  Id.

 If the accused denies responsibility for the allegations, the Special Examiner Process will progress to the "Fact-Finding Phase."  Id.  During this phase, the Special Examiner conducts interviews with the parties and other witnesses, and reviews documents and other physical evidence.  Id.  The Special Examiner has the discretion to determine which individuals will be interviewed, and which documents are of "material importance" so as to be shared equally with the parties.  Id.  Thereafter, the Special Examiner issues a report summarizing his/her findings of fact, and stating his/her conclusions as to the credibility of the parties and the accused's responsibility for the allegations.  Id.  A preponderance of the evidence standard applies to the Special Examiner's findings.  Id.  The Special Examiner's report is submitted to Brandeis' Senior Student Affairs Officer or his/her designee ("SSAO/D").  Id.

During the subsequent "Discussion Phase," the SSAO/D conducts separate meetings with the parties in which he/she provides a summary of the Special Examiner's findings and allows the parties additional time to provide new, pertinent information.  Id.  If the accused is found responsible for any charges in the CSR, the case then progresses to the "Deliberations Phase." Id.  In this phase, a panel of three University administrators and/or faculty, appointed by the SSAO/D, reviews the Special Examiner's report and makes a recommendation as to the outcome for the accused.  Id.  The panel communicates its recommendation to the SSAO/D, who renders a final decision as to any outcomes.  Id.  The parties are entitled to appeal the final decision to the University Appeals Board on Student Conduct only upon presenting specific evidence of fraud, denial of rights under the Special Examiner Process, procedural error, or new material evidence. Id.

II.     Doe's Relationship with J.C. and the Community Standards Report

Doe met J.C., another Brandeis student, in August 2011, during their freshman year at the University.  Complaint ¶¶ 2, 47.  At that time, Doe was "in the closet," but J.C. was openly gay. Id. at ¶¶ 2, 47.  In mid-September 2011, Doe and J.C. became sexually intimate, and by October 2011, Doe revealed to his parents and friends that he and J.C. were dating.  Id. at ¶¶ 3, 49, 50. The two men dated through July 2013, when J.C. ended the relationship.  Id. at ¶¶ 4, 51, 59.

On January 14, 2014, J.C. filed a CSR with Brandeis alleging that: "[s]tarting in the month of September 2011, [Doe] had numerous inappropriate, nonconsensual sexual interactions with me.  These interactions continued to occur until around May 2013."  Id. at ¶¶ 5, 63; Moriello Aff. Ex. C.  Upon receiving the CSR, and in accordance with the University's R&R, Brandeis placed Doe on emergency suspension.  Complaint ¶¶ 6, 64; Moriello Aff. Ex. A §§ 3.0, 22.2.  Two days later, Brandeis notified Doe that J.C.'s accusations related to six discrete

violations of the R&R: (1) causing physical harm; (2) invasion of personal privacy; (3) sexual

misconduct; (4) taking advantage of incapacitation; (5) lack of consent; and (6) sexual

harassment.  Complaint ¶¶ 7, 65; see also Moriello Aff. Ex. A §§ 2.1.d-e, 3.1-3.3, 7.2.

III.    Brandeis Initiates Its Special Examiner Process and Investigates J.C.'s CSR

Because Doe's CSR contained allegations of sexual misconduct and harassment,

Brandeis initiated its Special Examiner Process.  See Complaint ¶¶ 66, 76, 80; Moriello Aff. Ex.

A § 22.6.  Brandeis provided immediate notice to Doe that the University intended to proceed

through this process.  See Complaint ¶¶ 8, 66.  Doe alleges that he proceeded with the Special

Examiner Process "under protest" because, in his view, he was entitled "to have his case

adjudicated through the University's Hearing Process."  Id. at ¶ 11.

Brandeis hired a neutral third-party attorney to serve as Special Examiner.  Id. at ¶ 89;

Moriello Aff. Ex. B.  Between January 2014 and April 2014, the Special Examiner interviewed

Doe and J.C. four times each.  See Complaint ¶¶ 88, 90.  She interviewed eight additional

witnesses, three of whom were identified by Doe.  Id. at ¶ 90, Moriello Aff. Ex B at 2.  She also

reviewed documents provided by Doe, J.C., and the other interviewees.  Moriello Aff. Ex. B at 2.

For example, the Special Examiner reviewed and considered pictures and Facebook comments

submitted by Doe himself.  Id. at 16.

IV.    The Special Examiner's Report and Findings

After her investigation, the Special Examiner issued a thorough and balanced report in

which she found that some, but not all, of J.C's allegations had merit.  See id.; see also

Complaint ¶ 104 (noting that the Special Examiner found insufficient evidence as to certain

allegations).  The Special Examiner, for example, found insufficient evidence to support J.C.'s

accusations that Doe had sent sexually explicit text messages to J.C. or that Doe had required

J.C. to sleep naked during their relationship.  <u>See</u> Moriello Aff. Ex. B at 22-23.  The Special

Examiner also found, however, that Doe had violated Brandeis' R&Rs[3] on several separate

occasions when he: (1) initiated sexual activity without J.C.'s explicit consent; (2) engaged in

unwanted physical contact with J.C.; (3) invaded J.C.'s physical privacy; and (4) sexually

harassed J.C.  <u>Id.</u> at 17-24.  The facts underlying these findings, and the Special Examiner's

corresponding conclusions, are set forth below.

    A.    *The Movie Incident*

In mid-September 2011, Doe and J.C. visited a friend's room to watch a movie.  <u>Id.</u> at 6,

18.  Doe and J.C. sat on the friend's bed while the friend sat on a chair beside the bed.  <u>Id.</u> at 6.

According to J.C., during the movie, Doe took J.C.'s hand and placed it on Doe's erect penis.  <u>Id.</u>

J.C. alleged that Doe kept J.C.'s hand on top of Doe's penis and that J.C. "froze."  <u>Id.</u>  J.C.

reported that he let his hand go limp, but did not say anything because he did not want his friend

to know what was going on.  <u>Id.</u> at 6-7.  He added that Doe then moved J.C.'s hand back and

forth on Doe's groin.  <u>Id.</u> at 7.  J.C. stated that he eventually "jerked" his hand away.  <u>Id.</u>

Doe recalled that he placed J.C.'s hand on his penis during the movie.  <u>Id.</u>  He stated that

J.C. did not object and that Doe moved his hand off J.C.'s hand after approximately five seconds.

<u>Id.</u>  He added that J.C. kept his hand on Doe's penis for the duration of the movie.  <u>Id.</u>

The Special Examiner determined that Doe did not ask J.C. whether he could engage in

the above conduct and did not otherwise seek consent for placing J.C.'s hand on his penis.  <u>Id.</u> at

18.  In support, the Special Examiner noted that, at the time of the incident, Doe and J.C. had not

yet "hooked up" and were not dating.  <u>Id.</u>  She added that, roughly a week earlier, J.C. told Doe

that he was uncomfortable with several text messages in which Doe expressed interest in

---

[3]  For each alleged violation, the Special Examiner applied the substantive standards
contained in the R&R that was in effect at the time of the alleged conduct.

"hooking up" with J.C.  Id.  Against this backdrop, Doe engaged in the above conduct "without

any prior indication from [J.C.] that he was interested in engaging in activity of a sexual nature

with [Doe]."  Id.  The Special Examiner also cited the statements of another student who

reported that Doe had grabbed her breasts, without consent, on several occasions.  Id.  Doe

admitted to this conduct, but stated that he had done it as a joke.  Id.  According to the Special

Examiner, Doe's conduct demonstrated his "general lack of understanding of consent" and added

to J.C.'s credibility regarding the movie incident allegations.  Id.

The Special Examiner thus concluded, based on a preponderance of the evidence, that

Doe violated Sections 2.1.d, 3.1, and 3.3 of the R&R.  Id. at 21.

> B.     *Sexual Conduct While J.C. Was Sleeping*

J.C. stated that, during his relationship with Doe, he woke up on approximately twelve

occasions to find Doe "behind him, humping him."  Id. at 10.  J.C. said that he would ask Doe to

stop, but Doe would not.  Id.  According to J.C., he physically had to remove Doe's arms from

him.  Id.  J.C. added that, on a few occasions, he would ask Doe later in the morning not to

engage in that behavior again, but Doe would respond to the effect of "I'm just horny" or "Don't

you have any sex drive?"  Id.

Doe denied these allegations, but, in doing so, provided inconsistent responses.  During

one interview, he stated that he sometimes woke J.C. in the mornings by kissing him.  Id. at 19.

Doe reported that if J.C. said he wanted to go back to bed, Doe would sometimes ask

"Seriously?" and continue kissing J.C unless he indicated that he really did want to go back to

bed.  Id.  During another interview, Doe stated twice that J.C. never said he wanted to go back to

bed when Doe woke J.C. by kissing him.  Id.  When the Special Examiner noted the discrepancy

in Doe's statements, he attempted to clarify by saying that J.C. might have said he wanted to go back to sleep if awakened at 8:00 a.m., but not if awakened at 10:00 a.m.  Id.

Based on this inconsistency, the Special Examiner found J.C to be more credible on this point.  Id.  The Special Examiner noted that, because sleep is a state of incapacitation, Doe did not obtain consent before waking J.C. with kisses and other sexual contact.  Id.  She further noted that, even under Doe's initial description of events, he continued to kiss J.C. after J.C. told Doe that he wanted to go back to sleep.  Id.

The Special Examiner therefore concluded, based on a preponderance of the evidence, that Doe violated Sections 2.1.d, 3.1, 3.2, and 3.3 of the R&R.  Id. at 21.

C.      *The North Adams Incident*

J.C. alleged that Doe attempted to perform oral sex on him approximately three to four times, despite J.C.'s objections.  Id. at 11, 20.  J.C. added that he was flaccid during these incidents, that he would tell Doe to stop, and that Doe would give up after a short time.  Id. at 11.  Doe denied these allegations, stating that if J.C. indicated he was not interested, Doe would state "Seriously?" and stop.  Id.  Doe also said that, if J.C. said "no" a second time, Doe would not continue.  Id.

One of the incidents described by J.C. occurred in May 2013 when he and Doe visited J.C.'s father's home in North Adams, Massachusetts.  Id.  According to J.C., Doe attempted, without consent, to perform oral sex on J.C. during this trip.  Id. at 12.  When J.C. asked Doe whether he knew that such conduct constituted sexual assault, Doe became very upset, moved from the bed to the floor, and stated that he could not believe he was being accused of sexual assault.  Id.

The Special Examiner noted that, during his initial interview, Doe did not discuss lying on the floor.  Id.  When asked specifically about this issue in a follow-up interview, Doe stated the he did not remember whether he slept on the floor.  Id.  Then, Doe changed his story to suggest that he slept on the ground due to heat, not an argument.  Id.  The Special Examiner noted, however, that when asked what he would do if he got hot while sleeping with J.C., Doe never mentioned that he would move to the floor.  Id. at 20.  In light of Doe's inconsistent statements, and the fact that sleeping on the floor would have been an unusual and memorable occurrence for Doe, the Special Examiner found that J.C.'s account was more credible.  Id.

The Special Examiner therefore concluded, based on a preponderance of the evidence, that Doe violated Sections 2.1.d, 3.1, and 3.3 of the R&R.  Id. at 21.

D.    *The Bathroom Incidents*

J.C. alleged that, throughout his relationship with Doe, Doe would stare at J.C.'s penis while they were in the University's communal bathrooms.  Id. at 8, 22.  J.C. stated that he objected to this conduct every time, and attempted to reposition himself so that Doe could not see his penis.  Id. at 8.  Doe, in turn, stated that when he and J.C. were in the bathroom together, he would crane his head over in an obvious way and tell J.C. that he could see J.C.'s penis.  Id.  Doe added that he engaged in this conduct as a joke.  Id.  He did not recall whether J.C. would react by repositioning himself.  Id.

The Special Examiner noted that Doe, in effect, had admitted that he engaged in the conduct alleged by J.C.  Id. at 22.  She further added that, given the allegations of another student that Doe had touch her breasts "as a joke," Doe was not able to distinguish effectively between jokes and inappropriate behavior that invades another's personal privacy.  Id.

The Special Examiner thus concluded, based on a preponderance of the evidence, that Doe violated Section 2.1.e of the R&R.

E.     *Sexual Harassment*

J.C. alleged throughout the investigation that Doe had pressured him to engage in sexual activity.  Id. at 23.  J.C. indicated that he was forced to drop a course and its corresponding practicum as a result of stress related to Doe's conduct.  Id. at 24.  J.C. and other witnesses also noted that J.C. began to drink alcohol after he broke up with Doe.  Id. at 15-16.

The Special Examiner found that J.C.'s allegations were consistent with Doe's own description of events, in which he often stated "Seriously?" after J.C. indicated a lack of interest in sexual activity.  Id. at 23.  She found that J.C.'s recent use of alcohol aligned with statistical studies indicating a correlation between assault and alcohol abuse.  Id. at 15.  The Special Examiner also found corroborative of J.C.'s allegations Doe's statements that he would get sulky or moody if J.C. declined sexual activity.  Id.

The Special Examiner thus concluded, based on a preponderance of the evidence, that Doe violated Section 7.2 of the R&R.[4]

---

[4] Doe repeatedly alleges that the findings against him are "absurd," "defied common sense," "ludicrous," and "arbitrary and capricious."  Complaint ¶¶ 18, 98.  The common thread running through all of Doe's claims is that, because Doe and J.C. had a dating relationship, consent to any and all sexual activity must be assumed.  That is not, however, the standard set forth in the R&R.  Section 3.3 of the 2013-2014 R&R states, "[p]rior sexual activity or an existing acquaintanceship, friendship, or other relationship that has been sexual in nature does not constitute consent for the continuation or renewal of sexual activity."  Moriello Aff. Ex. A § 3.3.  Furthermore, lack of consent may "be inferred from …[an] advantage gained by the Accuser's mental or physical incapacity or impairment of which the Accused was aware." Id. Sleep, for example, constitutes incapacitation.  Although Doe does not subscribe to these principles, they governed the accusations that J.C. made against Doe, and the Special Examiner was required to apply them.

V.     Subsequent Proceedings and Doe's Appeal

On April 24, 2014, Lisa Boes—Brandeis' Dean of Academic Services—met with Doe and read to him a summary she prepared of the Special Examiner's findings.  Complaint ¶ 95. Two days later, Ms. Boes provided Doe with a copy of her written summary.  Id. at ¶ 96.  Doe did not receive a copy of the Special Examiner's full report at that time.  Id.  On May 2, 2014, Doe submitted a written response to Ms. Boes' summary, in which he again refuted the allegations against him.  Id. at ¶ 130.

On May 30, 2014, Ms. Boes notified Doe that, after a review of the Special Examiner's report and Doe's response, she found Doe responsible for violating the six R&R provisions identified above.  See id. at ¶ 131.  Doe appealed this finding on the grounds of fraud, procedural error, and denial of rights.  Id. at ¶ 136.  The University Appeals Board denied Doe's appeal on June 20, 2014.  Id. at ¶ 137.  On June 24, 2014, Ms. Boes informed Doe of the final, adverse outcome against him.  Id.  At the conclusion of these proceedings, Doe was sanctioned by the University with a written Disciplinary Warning.  Id. at ¶ 138; Moriello Aff. Ex. A § 21.1.b.

VI.    Post-Decision Conduct and Alleged Defamation

Following Doe's Disciplinary Warning, J.C. filed additional CSRs accusing Doe of stalking, sexual harassment, retaliation, and intimidation.  Complaint ¶ 187.  None of these claims was found to be credible.  Id.  Nevertheless, J.C. initiated a "campaign" to defame and harass Doe.  Id.  J.C. wrote to Brandeis staff stating that Doe was his "attacker" and a threat to the safety of the Brandeis campus.  Id. at ¶ 188.  In June 2014, he posted on his Facebook page a copy of the University's final disciplinary decision against Doe.  Id. at ¶ 189.  Although J.C. redacted Doe's name from the document, he identified Doe by name to people "off-line."  Id.  He also added commentary to the posted letter, accusing Doe of "multiple forms of rape."  Id. at ¶

190.  In separate conversations with other Brandeis students and news reporters, J.C. referred to

Doe as his "attacker" and accused him of anally raping J.C.  Id. at ¶ 192-96.  According to Doe,

Brandeis "has known of these false and defamatory actions" and has "aided and abetted them."

Id. at ¶ 185.

Separately, Doe alleges that Brandeis administrators either "leaked" information about

the Special Examiner's findings to Doe's then-current and prospective employers, or "recklessly

failed" to keep the information confidential.  Id. at ¶ 186.  When Doe's then-current internship

employer—a highly ranked public official—learned of the situation with J.C., Doe was

terminated from his position.  Id. at ¶ 199.  He also lost a job offer from another prospective

employer.  Id. at ¶ 201.

## **Standard of Review**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, (2007)).  "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  "The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully."  Id.  A court may disregard "bald assertions,

unsupportable conclusions, and opprobrious epithets."  In re Citigroup, Inc., 535 F.3d 45, 52 (1st

Cir. 2008) (citation omitted).  "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.  "In other

words, a plaintiff must offer 'more than an unadorned, the-defendant-unlawfully-harmed-me

accusation,' in order to claim a 'plausible entitlement to relief.'" Sanchez v. Pereira–Castillo, 590 F.3d 31, 48 (1st Cir. 2009) (citations omitted).

## Argument

I.    Title IX

In Count I of his Complaint, Doe alleges that Brandeis' Special Examiner Process was inadequate, inequitable, and discriminatory under Title IX. See Complaint ¶¶ 206-28.

Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance. . . ." 20 U.S.C. § 1681(a) (emphasis added). The First Circuit has not articulated the proper standard for examining allegations of sex discrimination in the context of university disciplinary proceedings. Bleiler v. College of Holy Cross, No. 11-11541-DJC, 2013 WL 4714340, at *5 (D. Mass. Aug. 26, 2013). The Second and Sixth Circuits have outlined several standards—the "erroneous outcome" standard, the "selective enforcement" standard, the "deliberate indifference" standard, and the "archaic assumptions" standard—all of which have been applied by the federal district courts. See id.; Yusuf v. Vassar Coll., 35 F.3d 709, 715-16 (2d Cir. 1994); Mallory v. Ohio Univ., 76 Fed. App'x 634, 638-39 (6th Cir. 2003); Doe v. Univ. of the South, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009).

Under any of the aforementioned standards, however, the plaintiff must show that the conduct of the university in question was motivated by sexual bias. See Bleiler, 2013 WL 4714340 at *6 (declining to decide which standard applied where plaintiff "failed to show a genuine issue of material fact as to the presence of impermissible bias based upon sex"); Doe v. Columbia Univ., No. 14-cv-3573 (JMF), 2015 WL 1840402, at *9 (S.D.N.Y. May 13, 2015)

(noting that sexual bias was the touchstone for either an erroneous outcome claim or a selective enforcement claim); Mallory, 76 Fed. App'x at 639 (similar); Harris v. St. Joseph's Univ., No. 13-3937, 2014 WL 1910242, at *4 (E.D. Pa.  May 13, 2014) (finding no plausible claim of sex bias despite allegations that university disregarded exculpatory text messages, failed to provide plaintiff the opportunity to review an investigative report before a hearing, and denied plaintiff the right to cross-examine accusers).

Here, Doe's Complaint appears to allege an erroneous outcome claim, a selective enforcement claim, and/or a deliberate indifference claim.  See, e.g., Complaint ¶¶ 106-7, 111, 115, 118, 120-26, 210, 216-18, 225.  Doe's Title IX allegations, however, are fatally flawed because they fail to state a plausible claim that the Special Examiner Process was inequitable based on Doe's sex.  Doe alleges, in conclusory fashion, that the disciplinary process discriminated against him "on the basis of his sex."  Id. at ¶ 210.  Such allegations, however, ignore the fact that Doe's accuser, J.C., was a member of the same sex.  See id. at ¶ 1. Importantly, Doe has not pled any facts suggesting that Brandeis' female students are subjected to a different disciplinary process.  Nor has he pointed to any facially discriminatory comments or statements made by Brandeis or the Special Examiner.  See Marshall v. Ohio Univ., No. 2:15-CV-775, 2015 WL 1179955, at *8 (S.D. Ohio Mar. 13, 2015) (finding no likelihood of success on Title IX claim where, among other things, plaintiff "ha[d] not provided any gender-biased statements or questions posed by university officials during the disciplinary hearing…").

When read in its entirety, Doe's Complaint merely alleges that Brandeis, through its Special Examiner Process, was more favorable to J.C., the accuser, than it was to Doe, the accused.  See, e.g., Complaint ¶ 201 (alleging that Brandeis' "inequitable implementation" of the Special Examiner Process "subjected [Doe] to different rules of sexual behavior than his

accuser."), ¶¶ 36, 173-176 (allegations of bias in favor of J.C.).  Title IX does not prohibit

discrimination based on a student's status as the accused.  Sahm v. Miami Univ., No. 1:14-CV-

698, 2015 WL 2406065, at *4 (S.D. Ohio May 20, 2015) (dismissing Title IX claim, noting that

the "facts pleaded against [defendant] do not suggest a gender bias against males so much as

against students accused of sexual assault"); King v. DePauw Univ., No. 2:14-cv-70-WTL-DKL,

2014 WL 4197507, at *10 (S.D. Ind. Aug. 22, 2014) (noting that a Title IX plaintiff must "prove

that the disparity in treatment was due to his gender, rather than his status as a student accused of

sexual misconduct").[5]  Thus, Doe's Title IX allegations are fatally flawed.

 Doe challenges many of the procedural aspects of Brandeis' Special Examiner Process,

alleging that it failed to provide him with due and fair process.  See Complaint ¶¶ 214-15, 220-

23.  Citing heavily to the U.S. Department of Education Office for Civil Rights' ("OCR") 2011

Dear Colleague Letter, Doe maintains that he should have been provided with: (1) a formal

hearing before an impartial tribunal; (2) the opportunity to confront and cross-examine his

accuser; (3) access to the Special Examiner's full report; and (4) the opportunity to meet with

Brandeis officials with the assistance of counsel.  See id. at ¶¶ 14, 96, 134, 169, 220-23.

Doe's process-based claims fail for four distinct reasons.  First, because Brandeis is a

private university, it "is not required to adhere to the standards of due process guaranteed to

_____

[5] To be sure, Doe correctly notes that a claim for same-sex harassment is actionable under Title IX.  See Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 66 (1st Cir. 2002).  But a claim alleging same-sex harassment is qualitatively different than a claim alleging same-sex discrimination in the discipline context.  In the case of same-sex harassment (as with opposite-sex harassment), the alleged harasser is accused of targeting the victim on account of his/her sex.  If a university knows of such conduct, and is deliberately indifferent to it, then the university is liable under the statute.  Id.  Similarly, in the case of an opposite-sex disciplinary proceeding, either of the participants could plausibly argue that he/she was subjected to discrimination (e.g., less favorable process) based on his/her sex.  In the case of same-sex disciplinary proceedings, however, the university cannot logically be accused of sex discrimination simply because its processes favor a male accuser over a male accused.

criminal defendants or to abide by rules of evidence adopted by courts." <u>Schaer v. Brandeis</u> <u>Univ.</u>, 432 Mass. 474, 482 (2000).  Second, the OCR's Dear Colleague Letter does not carry the force of law.  See <u>Bleiler</u>, 2013 WL 4714340 at \*5 (noting that the OCR's guidance "does not have the independent force of law"); <u>see also</u> Moriello Aff. Ex. D at n. 1 (identifying itself as a "significant guidance document" that "does not add requirements to applicable law").  Third, no private right of action exists to enforce the Dear Colleague Letter or even the regulation discussed in the Letter, 34 C.F.R. § 106.8(b).  See <u>Univ. of the South</u>, 687 F. Supp. 2d at 758 ("the legal basis upon which Plaintiffs seek recovery, namely the University's alleged violation of the U.S. Department of Education's guidelines, do not provide for a private right of action under Title IX"); <u>Doe v. Bradshaw</u>, No. 11-11593-DPW, 2013 WL 5236110, at \*10 (D. Mass. Sept. 16, 2013) (dismissing as "not actionable" plaintiff's allegation that school violated 34 C.F.R. § 106.8(b) by failing to appoint a Title IX coordinator).[6]  Fourth, the Dear Colleague Letter does not require the procedures to which Doe claims he was entitled.  Indeed, the Letter: (1) takes no position on the propriety of an adjudicative hearing; (2) explains that cross-examination and confrontation of the accuser would actually violate Title IX; (3) takes no position as to which documents the parties must receive; and (4) does not require that the parties have a right to counsel.  See Moriello Aff. Ex. D.

Accordingly, the Court should dismiss Count I of Doe's Complaint.

---

[6]  In <u>Bleiler</u>, another session of this Court noted that a university may not "arbitrarily or capriciously dismiss a student." <u>Bleiler</u>, 2013 WL 4714340 at \*5 (citing <u>Coveney v. President &</u> <u>Trustees of the Coll. of the Holy Cross</u>, 388 Mass. 16, 21 (1983)).  The Court went on to examine the merits of the plaintiff's "equitable resolution" claim. <u>Id.</u> at \*8-14.  The Court did so, however, because it assumed, without deciding, that a private right of action exists for such claims. <u>Id.</u> at \*4 n. 3.  As noted above, no such right of action exists.  In any event, Doe was not dismissed by Brandeis, and the <u>Coveney</u> case relied on by the <u>Bleiler</u> court is not a Title IX case. This analysis, therefore, has no bearing on Doe's present claims.

II.    Breach of Contract

Count II of Doe's Complaint asserts a claim for breach of contract.  Complaint ¶¶ 144-67, 229-33.

"In reviewing a student discipline case like this one involving an alleged contractual relationship, [courts] consider whether the university violated any of the student's reasonable expectations created by one or more specific provisions of the contract."  Morris v. Brandeis Univ., No. 01-P-1573, 2004 WL 369106, at *1 (Mass. App. Ct. Feb. 27, 2004) (citing Schaer, 432 Mass. at 478).  Contract interpretation, including whether any ambiguities exist in the disputed contractual terms, is generally a question of law for the court.  Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 783 (1st Cir. 2011); Driscoll v. Bd. of Trs. of Milton Acad., 70 Mass. App. Ct. 285, 293 (2007).

Doe points to nine alleged violations of the R&R.[7]  First, Doe alleges that under the 2011-2012 version of the R&R, he was contractually entitled to proceed before the Student Conduct Board, not a Special Examiner.  Complaint ¶ 146.[8]  In support, Doe alleges that he agreed in writing to be bound by the 2011-2012 version of the handbook, not the 2013-2014 version, and that Brandeis did not reserve the right to unilaterally revise the handbook's disciplinary proceedings.  Id. at ¶¶ 147-48.

---

[7]  For purposes of Brandeis' Motion to Dismiss, the University concedes that its R&R is an enforceable contract. Brandeis reserves the right to dispute this point during subsequent proceedings.

[8]  Oddly, Doe contends that he was entitled to proceed via the Hearing Process even though two important aspects of that process—the right to cross-examination and the use of a clear and convincing evidence standard—were denounced by the OCR in the same Dear Colleague Letter on which Doe relies.  See Moriello Aff. Ex. D at 6-7.

Doe's allegations on this issue are deficient as a matter of law.  Doe recognizes that, as noted in the 2011-2012 R&R, Brandeis was permitted to "tweak" the handbook every year.  Id. at ¶¶ 138-39.  By agreeing to these terms, Doe accepted that the R&R was an evolving document, and that he would be bound by its updates and amendments.  In Doe's view, "'tweaking' cannot reasonably be read to permit the elimination of [one disciplinary] process and the introduction of an entirely new process."  Id. at ¶ 149.  This argument, however, passes over an essential point—namely, that the word "tweak" modifies, and pertains to, all of the R&R's disciplinary procedures.  Brandeis acknowledges that, between the 2011-2012 and 2013-2014 schools years, certain components of the Hearing Process were changed, and the Special Examiner Process was added.  On the whole, however, the Hearing Process remained largely intact, and the Special Examiner Process was created for only a narrow subset of student misconduct.  Compare Complaint Ex. A §§ 18.0-20.10 with Moriello Aff. Ex. A §§ 18.0-20.11, 22.6.  These changes were, in fact, no more than a "tweak" of Brandeis' R&R.[9]

In addition, as the exhibits to the Complaint make clear, each R&R corresponded to a particular academic year.  See Complaint Exs. A-D.  Doe received each version of the R&R during his time at Brandeis.  See id.  Because the 2011-2012 R&R was expressly labelled as such, Doe could not have had a reasonable expectation that its terms and procedures would apply beyond that school year.  To the contrary, the only reasonable expectation is that each R&R

---

[9] Moreover, the term "tweak" is of such a subjective and discretionary nature that Doe cannot plausibly claim that Brandeis' R&R amendments were improper.  See Lovelace v. Southeastern Mass. Univ., 793 F. 2d 419, 422-23 (1st Cir. 1986) (deciding that the requirement for "justification" in a recommendation of non-renewal of a professor's  employment did not take away from the discretion of the president to make a subjective judgment; the Court also decided that "improvement" was an elusive, judgmental concept that could not confer any rights on the plaintiff); see also Spiegel v. Trustees of Tufts Coll., Civ. A. No. 86-3330-S, 1987 WL 15874, at *4 (D. Mass. July 30, 1987) (stating that the term "excellence" was "completely subjective" and "not litigable").  Brandeis drafted the R&R and retained the discretion to determine how much "tweaking" it was permitted to do.

applied only for the specific school year it referenced, and that a new R&R would be issued every year.

Second, Doe alleges that Brandeis breached certain preliminary investigation provisions by adjudicating J.C.'s "threadbare accusation."  Complaint ¶ 151.  This allegation defies logic. Brandeis recognizes that, under the R&R, it was required to make a "careful evaluation of the facts" and the "credibility of the accuser" once a CSR was filed.  The University, however, effectively performed these obligations.  The Special Examiner carefully considered all the facts and, in doing so, determined that J.C. was credible and that Doe was responsible for the allegations in the CSR.  Based on a review of the Special Examiner's report, and Doe's subsequent written response, the University found Doe responsible for sexual misconduct and issued him a Disciplinary Warning.  Therefore, Doe's allegations are baseless to the extent he suggests that, if Brandeis had performed a preliminary investigation, it would not have referred the case through a formal proceeding.  See Complaint ¶ 152.

Third, Doe alleges that Brandeis breached the R&R by failing to provide him with the Special Examiner's full report.  Id. at ¶¶ 153-57.  Both the 2011-2012 and 2013-2014 R&Rs contained the following provision:

> Student Records: The Federal Family Educational Rights and Privacy Act of 1974 (FERPA) gives each enrolled student at Brandeis certain rights, including access to the student's educational records, the right to request amendment of those records where the student believes a record is inaccurate or misleading, and the right to add a statement presenting the student's view if the records are not amended. A detailed statement of the rights and responsibilities of a student under the Act, the location of all records pertaining to a student, and the procedures for requesting access are contained in the Brandeis University Records Policy. The policy is available from the University Registrar and, at www.brandeis.edu/registrar/bulletin/EducRecordsPolicy.html, and is on reserve in the University Library.

Complaint Ex. A § 17.4; Moriello Aff. Ex. A § 17.4.

Doe alleges that the report was an "education record" that Brandeis was required to provide under this provision. The plain language of this provision, however, imposes no affirmative obligation on Brandeis. It merely notifies Brandeis' students of their rights under FERPA. To the extent Doe seeks relief under FERPA itself, he is foreclosed from doing so. Frazier, 276 F.3d at 69 (holding that there is no private right of action for a violation of FERPA).

Fourth, Doe alleges that Brandeis breached the R&R by adjudicating J.C.'s untimely student complaint. Complaint ¶¶ 158-60. Under the R&R, "written reports or complaints shall be submitted to the DSCRS . . . in a timely manner." Complaint Ex. A § 18.0; Moriello Aff. Ex. A § 18.0. This language, however, imposes no affirmative obligation on Brandeis. Neither the 2011-2012 R&R nor the 2013-2014 R&R defines "timely" or states that Brandeis is precluded from adjudicating "untimely" complaints. Moreover, both R&Rs go on to state that, if a complaint is untimely, the University may choose not to refer the matter to the conduct system. Complaint Ex. A § 18.0; Moriello Aff. Ex. A § 18.0. If anything, this language simply permits Brandeis to disregard complaints if filed too long after the alleged violations. Doe cannot have a reasonable expectation that untimely complaints must be ignored by the University, particularly in the context of sexual misconduct/Title IX complaints.

Fifth, Doe alleges that the Special Examiner Process is limited to complaints of sexual misconduct, and that he was denied his right to a Student Conduct Board hearing on charges of physical harm and invasion of privacy. Complaint ¶ 161. This allegation belies the clear language of the R&R. Moriello Aff. Ex. A § 22.6 ("In cases where the DSRCS receives a report and determines that one or more possible violations of Section 3 (Sexual Responsibility) or Section 7 (Equal Opportunity, NonDiscrimination, and Harassment) exist, the case will be adjudicated by the Special Examiner's Process.") (emphasis added).

Sixth, Doe alleges that Brandeis failed to review the Special Examiner's findings through a three-member panel of University faculty or administrators. Complaint ¶ 162. Even if true, Doe fails to state sufficient facts suggesting that this failure, in itself, caused him any harm. See Amicas, Inc. v. GMG Health Sys., Ltd., 676 F.3d 227, 231 (1st Cir. 2012) (noting that, if damages are sought, then causation is an essential element of a breach of contract claim). Doe acknowledges the adverse findings of the Special Examiner. Complaint ¶¶ 101-22. He concedes that, after Ms. Boes reviewed the Special Examiner's report, as well as Doe's written response to her summary, Ms. Boes concurred in full with the Special Examiner. Id. at ¶ 131. He also acknowledges his Disciplinary Warning, and does not suggest that it was disproportionate to the underlying findings. Id. at ¶ 138. Given this background, Doe has not pled a plausible claim that, had Brandeis convened a three-member panel, two of the panel members would have recommended a different "outcome," i.e. sanction.[10] See Moriello Aff. Ex. A § 22.6 (noting that the panel's recommendation is based on a full panel vote). Nor has he pled a plausible claim that, had the three-member panel recommended a different outcome, Ms. Boes would have accepted it. See id. (noting that the SSAO/D "will render the final decision as to any outcomes").

Seventh, Doe alleges that Brandeis improperly placed him on "emergency suspension" following the filing of the CSR, and subjected him to "additional interim sanctions." Complaint ¶¶ 163-64. The 2013-2014 R&R, however, plainly states that "any student accused of sexual misconduct may be placed on campus restriction or emergency suspension pending the outcome

---

[10] Although "outcome" is not a defined term, the R&R makes clear that it equates to sanctions. See Moriello Aff. Ex. A § 22.6 (noting that, "[i]f the Accused is found responsible" the Special Examiner Process "will progress to the Deliberations Phase," where outcomes are assessed).

of any investigation or conduct process []." Moriello Aff. Ex. A § 3.0. Brandeis was, therefore, entirely within its rights to place Doe on emergency suspension and/or limit his on-campus privileges. Further, both the 2011-2012 and 2013-2014 R&Rs provide as follows: "[p]ending final action on a violation of University regulations, the status of a student shall not be altered, or their right to be present on the campus and to attend classes suspended, except for reasons of imminent danger to their physical or emotional safety or well-being, or for reasons of imminent danger to the safety or wellbeing of the University community." Complaint Ex. A § 22.2; Moriello Aff. Ex. A § 22.2.[11] Doe seems to allege that he was not, in fact, a danger to the community, and should not have been subjected to interim restrictions. See Complaint ¶ 165. This allegation misses the point. Under the above provision, Brandeis was permitted to suspend Doe "for reasons of imminent danger" to the community. The merits of those reasons are inapposite. Doe does not allege that Brandeis' reasons were pretext; he states only that its reasons were incorrect. Such claims are not actionable under the R&R.

Eighth, Doe alleges that even if the preponderance of the evidence standard applied, Brandeis failed to base its findings on that standard. Id. at ¶ 166. This allegation is baseless. The Special Examiner's report goes to great lengths to detail the appropriate standard and to apply that standard to the facts of the case. See Moriello Aff. Ex. B. The report is balanced and analyzes each claim of misconduct and harassment on its own merits. Id. In applying the preponderance of the evidence standard, the Special Examiner found that the evidence was insufficient to support some allegations, but sufficient to support others. Id. Brandeis received and reviewed that full report, along with Doe's response, prior to issuing its decision. See Complaint ¶¶ 95-96, 131. In the end, "[c]ourts are chary about interfering with academic and

---

[11] In addition, the Dear Colleague Letter recommends the use of interim measures for the purpose of protecting the complainant. Moriello Aff. Ex. D. at 9.

disciplinary decisions made by private colleges and universities." Schaer, 432 Mass. at 482 (citation omitted).  Doe cannot claim that the Special Examiner erred simply because he disagrees with her findings.

Ninth, Doe alleges that Brandeis breached the R&R by "allowing J.C. to disclose the [Special Examiner's] findings" and "by allowing persons within the administration to 'leak' information about the Special Examiner's findings" to third parties.  Complaint ¶ 167.  In support, Doe cites to several provisions in the 2013-2014 R&R, only two of which impose any confidentiality obligations on Brandeis—Sections 19.5 and 19.6.j.  Those sections, however, do not impose any liability on Brandeis for actions taken by students such as J.C.   Also, the sections pertain to written records and hearing reports creating during the Hearing Process.  See Moriello Aff. Ex. A §§ 19.5, 19.6.j.  There is no dispute that Doe's case proceeded through the Special Examiner Process, not the Hearing Process.  Although Section 22.6 states that "[d]ocuments generated from the Special Examiner's Process will be retained pursuant to the rules in Sections 17.4, 19.5, and 19.6.j.," Doe does not allege that Brandeis itself distributed any confidential documents.  See Complaint ¶ 167 (alleging only that Brandeis allowed leaks of "information about the Special Examiner's findings").

Accordingly, the Court should dismiss Count II of Doe's Complaint.

III.     Breach of the Implied Covenant of Good Faith and Fair Dealing

In Count III, Doe alleges that Brandeis breached the implied covenant of good faith and fair dealing by "failing to provide [him] with a hearing before an impartial tribunal, and instead, subjecting him to an inquisitorial, secret and arbitrary and capricious Special Examiner's Process."  Complaint ¶ 235.

"The covenant of good faith and fair dealing is implied in every contract." <u>Uno Rests., Inc. v. Boston Kenmore Realty Corp.</u>, 441 Mass. 376, 385 (2004) (citations omitted). "The purpose of the covenant is to guarantee that 'the parties remain faithful to the intended and agreed expectations of the contract.'" <u>Kuchera v. Parexel Int'l Corp.</u>, 719 F. Supp. 2d 121, 125 (D. Mass. 2010) (quoting <u>Eigerman v. Putnam Invs.</u>, 450 Mass. 281, 287 (2007)). "The covenant may not, however, be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." <u>Uno Rests., Inc.</u>, 441 Mass. at 385. Also, "while every breach of contract has the effect of destroying or injuring the rights of the other party to receive [its] fruits, not every breach of contract is a breach of the implied covenant of good faith and fair dealing." <u>Christensen v. Kingston Sch. Comm.</u>, 360 F. Supp. 2d 212, 226 (D. Mass. 2005) (internal quotation marks omitted). To sustain a claim for breach of the implied covenant of good faith and fair dealing, there must be conduct taken in bad faith either to deprive a party of the fruits of labor already substantially earned or unfair leveraging of contract terms to secure undue advantage. <u>Id.</u>

As noted above, the R&R is an evolving document that Brandeis was free to amend. Because J.C.'s CSR was filed during the 2013-2014 academic year, the processes and procedures included in the 2013-2014 R&R governed the J.C.-Doe matter. Brandeis' resort to the Special Examiner Process was entirely proper. There was no breach of contract and, likewise, no violation of the implied covenant. In addition, even if the 2011-2012 R&R applied to J.C.'s CSR, Doe has not pled sufficient facts suggesting that Brandeis proceeded through the Special Hearing Process in bad faith or to gain an unfair advantage. <u>See</u> Complaint. Therefore,

assuming the 2011-2012 R&R applied, Doe's breach of contract claim would be sufficient and his implied covenant claim would be duplicative.  See Sorenson v. H & R Block, Inc., No. 99–10268–DPW, 2002 WL 31194868, at *17 (D. Mass. Aug. 27, 2002) (dismissing claim for breach of implied covenant of good faith and fair dealing as duplicative of breach of contract claim where they were based on the same factual predicate).

Accordingly, the Court should dismiss Count III of Doe's Complaint.

IV.    Estoppel and Reliance

In Count IV, Doe asserts a claim for promissory estoppel.  Complaint ¶¶ 238-43.

Promissory estoppel is generally asserted as an "alternative theory of recovery for a contract that is not supported by consideration."  Hannigan v. Bank of Am., N.A., 48 F. Supp. 3d 135, 141 (D. Mass. 2014) (citation omitted).  To prevail on a claim of promissory estoppel, the plaintiff must establish that the defendant made an unambiguous promise and that the plaintiff relied on that representation.  Id.  A promissory estoppel claim must be dismissed where it is predicated on alleged promises that were never made.  In re Northwood Properties, LLC, 517 B.R. 27, 39-40 (Bankr. D. Mass. 2014).

Doe's promissory estoppel claim, like his breach of contract claim, is based on a strained reading of the R&R, and on promises that Brandeis simply did not make.  Thus, it suffers the same legal deficiencies as his breach of contract claim, and should be dismissed on that basis. Alternatively, to the extent the Court finds that Brandeis did make any of the alleged promises, e.g. a promise to dismiss all untimely student complaints, Doe already has a breach of contract claim for those allegations.  Thus, with respect to those promises, Doe's estoppel claim is duplicative and unnecessary.

Accordingly, the Court should dismiss Count IV of Doe's Complaint.

V.      Negligence and Negligent Infliction of Emotional Distress

In Counts V and IX, Doe alleges that Brandeis negligently investigated and adjudicated the charges against him.  Complaint ¶¶ 244-48, 269-75.

A negligence claim cannot be used to create a private cause of action based on Title IX's procedural requirements.  See Doe v. Univ. of South, No. 4:09-CV-62, 2011 WL 1258104, at *14 (E.D. Tenn. Mar. 31, 2011) (dismissing negligence claim based on OCR guidance and 34 C.F.R. 106.8(b)).  Further, "[u]nder Massachusetts law, a negligence claim may arise out of a contractual relationship with the standard of care linked to the terms of the contract."  Spinal Imaging, Inc. v. Aetna Health Mgmt. LLC, No. CIV. 09-11873-LTS, 2014 WL 1278012, at *15 (D. Mass. Mar. 26, 2014).  In other words, "to the extent there is a negligence claim . . . between contracting parties, it is measured by the terms of the contract."  Arthur D. Little Int'l, Inc. v. Dooyang Corp., 928 F. Supp. 1189, 1203 (D. Mass. 1996).  If the negligence claim is entirely duplicative of a breach of contract claim, it may be dismissed.  See Malden Cliffside Apartments, LLC v. Steffian Bradley Associates, Inc., 66 Mass. App. Ct. 1101 (2006).

Here, Doe's negligence claims are, at bottom, an attempt to create a private right of action to enforce Title IX's procedural requirements.  They are entirely improper and could be dismissed on that basis alone.  See Univ. of South, 2011 WL 1258104 at *14.  Further, the duties owed by Brandeis to Doe—at least with respect to student disciplinary proceedings—are explicitly set forth in the R&R.  Because Brandeis did not breach its contractual obligations, it cannot be held liable on a parallel tort theory.  Finally, to the extent that any of Doe's contract-based allegations have merit, his negligence claims would be duplicative and serve no independent purpose.  See Franchi v. New Hampton Sch., 656 F. Supp. 2d 252, 267 (D.N.H. 2009) (expressing concern that negligence claim was duplicative and stating that it could be

merged into contract and statutory claims on summary judgment); see also Fox v. F & J Gattozzi Corp., 41 Mass. App. Ct. 581, 592 (1996) (noting that damages award for negligent misrepresentation claim could not be duplicative of damages already awarded for breach of contract claim).[12]

Accordingly, the Court should dismiss Counts V and IX of Doe's Complaint.

VI.     Defamation

In Count VI, Doe alleges that Brandeis defamed him by: (1) leaking information about the Special Examiner's findings to third parties; and (2) aiding and abetting J.C.'s smear campaign against Doe.  Complaint ¶¶ 250-53.

To state a claim for defamation, a plaintiff must establish that the defendant published a false statement about him to a third party that caused him economic loss or is actionable without proof of economic loss.  Ferguson v. Turner, No. 14-14208-GAO, 2014 WL 7239852, at *2 (D. Mass. Dec. 16, 2014) (citing White v. Blue Cross & Blue Shield of Mass., Inc., 442 Mass. 64, 66 (2004)).  "Conclusory charges of defamation are insufficient to state a claim."  Tomaselli v. Beaulieu, 967 F. Supp. 2d 423, 453-54 (D. Mass. 2013).  Liability for aiding and abetting a tort "attaches where: (1) the defendant provides substantial assistance or encouragement to the other party; and (2) the defendant has unlawful intent, i.e., knowledge that the other party is breaching a duty and the intent to assist that party's actions."  Bamberg v. SG Cowen, 236 F. Supp. 2d 79, 90 (D. Mass. 2002) (internal quotation marks and citations omitted).

Here, Doe's defamation allegations fail to state a claim upon which relief may be granted.

---

[12]  Similarly, a claim for negligent infliction of emotional distress will be dismissed as duplicative where it relies on the same facts as an asserted negligence claim.  See Barnes v. Town of Webster, No. 042420, 2005 WL 2864801, at *2 (Mass. Super. Oct. 11, 2005).

First, the allegations premised on the "leaked" information are entirely conclusory.  Doe alleges only that "Brandeis administrators 'leaked' information about the Special Examiner's findings" to third parties.  Complaint ¶¶ 186, 251.  He does not identify the specific information that was leaked, or the Brandeis administrators who leaked it.  Nor does he allege any facts showing that Brandeis administrators leaked defamatory information with knowing or reckless disregard of its falsity.[13]

Second, Doe fails to plead a viable claim for aiding and abetting defamation.  Doe alleges only that Brandeis "allowed" J.C. to disclose the Special Examiner's findings, and sat idly while J.C. defamed Doe to media outlets and other Brandeis students.  See id. at ¶¶ 187-98, 250.  Doe does not allege that Brandeis provided any affirmative assistance to J.C. in this regard, or participated actively in disseminating his comments or writings.  Although Doe states, in conclusory fashion, that Brandeis "endorse[d] and perpetuat[ed]" J.C.'s actions, Doe fails to state any facts supporting this claim.

Accordingly, the Court should dismiss Count VI of Doe's Complaint.

---

[13] In addition, Doe's claim fails to the extent it is based on any "leak" of the Special Examiner's report itself.  "The lodestar of Massachusetts defamation law is the axiom that truth is an absolute defense to defamation."  Taylor v. Swartwout, 445 F. Supp. 2d 98, 102 (D. Mass. 2006) (citing Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 42 (1st Cir. 1998)).  If the statement in question is "substantially true," it cannot be defamatory.  Reilly v. Assoc. Press, 59 Mass. App. Ct. 764, 770 (2003); see also Encompass Ins. Co. of Mass. v. Giampa, 522 F. Supp. 2d 300, 313 (D. Mass. 2007) (granting motion to dismiss defamation counterclaim, in part, because it was based on statements that were "substantially true").  Here, the contents of the Special Examiner's report were substantially true.  Indeed, Doe himself admitted to engaging in much of the conduct for which he was found responsible.  See Moriello Aff. Ex. B at 18 ("[b]oth parties agree that during the Movie Incident, [Doe] placed [J.C.'s] hand on his penis"), at 19 (noting that Doe admitted to kissing J.C. as he slept and after J.C. asked him to stop), at 22 ("[Doe] admitted that he did look at J.C.'s penis when they were in the bathroom together").  The fact that Doe did not conclude—as the Special Examiner did—that his actions constituted sexual misconduct is immaterial.

VII.   <u>Invasion of Privacy</u>

In Count VII, Doe asserts a claim for invasion of privacy.  Complaint ¶¶ 257-61.

Under M.G.L. c. 214, § 1B, "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy."  M.G.L. c. 214, § 1B.  Section 1B protects people from "disclosure of facts . . . that are of a highly personal or intimate nature when there exists no legitimate, countervailing interest."  <u>Dasey v. Anderson</u>, 304 F.3d 148, 153 (1st Cir. 2002).  Massachusetts does not, however, recognize a cause of action for false light invasion of privacy.  <u>Id.</u>; <u>Melville v. Town of Adams</u>, 9 F. Supp. 3d 77, 87 (D. Mass. 2014); <u>see</u> <u>also</u> <u>ELM Med. Lab., Inc. v. RKO Gen., Inc.</u>, 403 Mass. 779, 787 (1989) ("The only invasion of privacy the plaintiffs assert is 'putting plaintiff[s] in a false light.' This court has not recognized that tort and does not choose to do so now.").

Here, Doe alleges that Brandeis disclosed facts of a highly personal and intimate nature, namely "the findings of the Special Examiner," to third parties.  Complaint ¶ 258.  Because Doe also alleges that the Special Examiner's findings were, among other things, "ludicrous," "erroneous," and "patently arbitrary," <u>see</u> <u>id.</u> at ¶¶ 98, 118, 225, his privacy claim is of the false light variety, and must fail.  Furthermore, to the extent that Doe's claim is based on other personal information not included in the Special Examiner's findings, such as his sexual orientation, Doe fails to allege that Brandeis disseminated that information, or that such information was private.  <u>See</u> Complaint ¶ 50 (alleging that, in October 2011, Doe "came out of the closet" and revealed to his parents and friends that he was dating J.C.).

Accordingly, the Court should dismiss Count VII of Doe's Complaint.

VIII.   <u>Intentional Infliction of Emotional Distress</u>

In Count VIII, Doe asserts a claim for intentional infliction of emotional distress.  <u>Id.</u> at

¶¶ 262-68.  As with Doe's other claims, this claim is based on Brandeis' "fundamentally flawed"

Special Examiner Process.  <u>Id.</u> at ¶ 264.

To establish a claim for intentional infliction of emotional distress, "a plaintiff must show

that (1) a defendant either intended to inflict emotional distress or knew or should have known

that emotional distress was the likely result of his conduct; (2) the conduct was extreme and

outrageous; (3) the conduct caused the plaintiff emotional distress; and (4) the emotional distress

was severe and of a nature that no reasonable person could be expected to endure."  <u>Agis v.

Howard Johnson Co.</u>, 371 Mass. 140, 144-45 (1976); <u>Rua v. Glodis</u>, No. CIV. 10-40251-FDS,

2014 WL 5151296, at *12 (D. Mass. Sept. 24, 2014).  "The standard for making a claim of

intentional infliction of emotional distress is very high." <u>Doyle v. Hasbro, Inc.</u>, 103 F.3d 186,

195 (1st Cir. 1996).

Conduct qualifies as "extreme and outrageous" only if it "go[es] beyond all possible

bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized

community."  <u>Roman v. Trustees of Tufts Coll.</u>, 461 Mass. 707, 718 (2012) (citation omitted).

"A judge may grant a motion to dismiss where the conduct alleged in the complaint does not rise

to this level."  <u>Polay v. McMahon</u>, 468 Mass. 379, 386 (2014); <u>see</u> <u>also</u> <u>Gouin v. Gouin</u>, 249 F.

Supp. 2d 62, 78 (D. Mass. 2003) (dismissing IIED claim as deficient as a matter of law).

Here, Doe's allegations cannot sustain a claim for intentional infliction of emotional

distress.  As noted above, upon receiving the CSR at issue, Brandeis investigated the allegations

in accordance with its obligations under Title IX and the R&R.  Doe does not suggest that

Brandeis performed these obligations in bad faith, and he has failed to state a plausible claim of

sex-based discrimination.  See Complaint.  Even if Brandeis conducted its investigation

incorrectly (which Brandeis disputes), it simply did not engage in "extreme and outrageous"

conduct as a matter of law.  See Bradshaw, 2013 WL 5236110 at *13 (noting that conduct that

amounts to "malice" or "deliberate indifference" may still fall short of being "extreme and

outrageous").

Accordingly, the Court should dismiss Count VIII of Doe's Complaint.

IX.     Declaratory Judgment

Finally, Count X of Doe's Complaint asserts a claim for a declaratory judgment.

Complaint ¶¶ 276-80.  Doe alleges that Brandeis "has committed numerous violations of it [sic]

contractual obligations and of federal and state law."  Id. at ¶ 277.  On that basis, Doe seeks a

declaration ordering Brandeis to, among other things, reverse the Special Examiner's findings,

vacate Doe's sanction, and expunge Doe's disciplinary record.  Id. at ¶ 280.

Because Doe's declaratory judgment claim is predicated on his deficient substantive

claims, it too must fail.  See, e.g., Yu v. Vassar Coll., No. 13-CV-4373 RA, 2015 WL 1499408,

at *31 (S.D.N.Y. Mar. 31, 2015) (granting summary judgment on declaratory judgment claim

that rested on other, failed claims); In re Joint Eastern & Southern Dist. Asbestos Litig., 14 F.3d

726, 731 (2d Cir. 1993) ("The Declaratory Judgment Act does not ... provide an independent

cause of action."); Emhart Indus., Inc. v. U.S. Dep't of the Air Force, No. CA 11-023 S, 2011

WL 5184192, at *3 (D.R.I. Nov. 1, 2011) (dismissing declaratory judgment claims that

corresponded to deficient substantive claims).

Accordingly, the Court should dismiss Count X of Doe's Complaint.

## Conclusion

For the foregoing reasons, Brandeis respectfully requests that the Court grant its motion to dismiss Doe's Complaint.

Respectfully submitted,

BRANDEIS UNIVERSITY,

By its attorneys,

/s/ Antonio Moriello
Alan D. Rose (BBO #427280)
Antonio Moriello (BBO #685928)
Rose, Chinitz & Rose
One Beacon Street, 23rd Floor
Boston, Massachusetts  02108
(617) 536-0040
Fax: (617) 536-4400
adr@rose-law.net
am@rose-law.net

Dated:  June 9, 2015

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent via mail to those indicated as non-registered participants on June 9, 2015.

/s/ Antonio Moriello