

SANGHAVI LAW OFFICE, LLC

SANGHAVI LAW OFFICE

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY-CLIENT COMMUNICATION**

To:      Lisa Boes, Dean of Academic Services
Cc:      Steven Locke, General Counsel
From:   Elizabeth Sanghavi, Sanghavi Law Office, LLC
Re:      Report of Findings (████ ████ Investigation)
Date:    April 16, 2014

This report addresses: 1) allegations by ████ against ████ and 2) allegations by ████ against ████. ████ filed a community standards report ("CSR") with Brandeis University ("Brandeis" or the "University") on January 14, 2014, alleging that ████ engaged in "numerous inappropriate, nonconsensual sexual interactions" with ████ from approximately September 2011 to May 2013. See Exhibit 1. On January 15, 2014, ████ filed a CSR against ████ stating that ████ "sexually harassed [████ and engaged in sexual misconduct." See Exhibit 2.

This report addresses whether the information obtained is sufficient, based on the preponderance of the evidence standard, to find that: 1) ████ violated the provisions of the 2011-2012 or 2012-2013 Rights and Responsibilities handbooks specific to the allegations against him by ████ and/or 2) ████ violated the provisions of the 2013-2014 Rights and Responsibilities Handbook specific to the allegations against him by ████.[1]

Brandeis requested that Elizabeth Sanghavi of Sanghavi Law Office, LLC conduct an investigation into the above allegations as a special examiner under the procedures outlined in the 2013-2014 Rights and Responsibilities Handbook. See Exhibit 3. Dean Gendron, Director of Student Rights and Community Standards, was the Observer for this investigation. Both parties had advisors during the process. ████ advisor was REDACTED[2] ████ advisor was REDACTED.

During the investigation of the above allegations, Ms. Sanghavi interviewed ████ and ████ (collectively, the "Parties") and eight other individuals (collectively, the "Interviewees"). Unless otherwise noted, the interviews occurred in person, at Brandeis. The individuals interviewed were:

---

[1] After the start of this investigation, ████ filed two additional CSRs against ████ (filed on March 7, 2014 and March 26, 2014) and ████ filed one additional CSR against ████ (filed on March 24, 2014). These CSRs were regarding an alleged violation of a no contact order by ████ and corresponding allegations including but not limited to harassment by both Parties. These allegations will be addressed in a separate report of findings.

[2] ████ was unable to attend interviews on March 12, 2014 and April 7, 2014 in person and was unable to take notes. She participated by Skype and REDACTED attended in-person as a note taker.

20 Jordan Road
Brookline, MA 02446
(617) 651-1970

elizabeth@sanghavilawoffice.com
www.sanghavilawoffice.com

- ███ J.C. ███ [3]
- ███ Doe ███ [4]
- Maggie Balch [5]
- ███ REDACTED ███ [6]
- ███ REDACTED ███ [7]
- ███ REDACTED ███ [8]
- ███ REDACTED ███ [9]
- ███ REDACTED ███ [10]
- ███ REDACTED ███ [11]
- ███ REDACTED ███ [12]

In addition to conducting interviews with the above individuals, Ms. Sanghavi reviewed the following documentation: 1) the 2011-2012 Rights and Responsibilities Handbook; 2) the 2012-2013 Rights and Responsibilities Handbook; 3) the 2013-2014 Rights and Responsibilities Handbook; 3) the January 14, 2014 CSR filed by ███ J.C. ███ (the "January 14 CSR"); 4) the January 15, 2014 CSR filed by ███ Doe ███ (the "January 15 CSR"); and 5) documentation provided by Parties and Interviewees.

## I. Relevant Policies

### A. Charges Against ███ Doe ███

███ J.C. ███ met with Gendron to discuss relevant charges against ███ Doe ███. Based on ███ J.C. ███ conversation with Gendron, ███ Doe ███ was charged with the following sections from the relevant Rights and Responsibilities handbooks: 2.1.d, 2.1.e, 3.1, 3.2, 3.3, and 7.2. The alleged incidents described by ███ J.C. ███ occurred during the 2011-2012 and 2012-2013 academic years. Therefore, the policies as listed in the 2011-2012 Rights and Responsibilities Handbook and the 2012-2013 Rights and Responsibilities Handbook apply.

---

[3] Ms. Sanghavi interviewed ███ J.C. ███ on January 27, 2014, February 3, 2014, March 12, 2014, and April 7, 2014.

[4] Ms. Sanghavi interviewed ███ Doe ███ on February 6, 2014, February 10, 2014, March 14, 2014, and April 9, 2014.

[5] Ms. Sanghavi interviewed Balch, Associate Dean of Students, on February 20, 2014.

[6] Ms. Sanghavi interviewed ███ REDACTED ███ a Brandeis student, on February 20, 2014.

[7] Ms. Sanghavi interviewed ███ REDACTED ███ a Brandeis student, on February 20, 2014, February 26, 2014, and March 18, 2014. ███ REDACTED ███ was abroad during the spring 2014 semester and, therefore, Ms. Sanghavi interviewed him via video conference.

[8] Ms. Sanghavi interviewed ███ REDACTED ███ a Brandeis student, on February 20, 2014 and March 12, 2014.

[9] Ms. Sanghavi interviewed ███ REDACTED ███ a Brandeis student, on March 3, 2014 and March 14, 2014.

[10] Ms. Sanghavi interviewed ███ a Brandeis student, on March 5, 2014. ███ was abroad during the spring 2014 semester and, therefore, Ms. Sanghavi interviewed her via video conference.

[11] Ms. Sanghavi interviewed ███ REDACTED ███, ███ J.C. ███ sister, on March 4, 2014. ███ REDACTED ███ lives in New York and, therefore, Ms. Sanghavi interviewed her via video conference.

[12] Ms. Sanghavi interviewed ███ Executive Assistant to Senior Vice President and Chief of Staff, on March 5, 2014.

The 2011-2012 Rights and Responsibilities Handbook language from the above charges is listed below. Unless noted, the language is the same in the 2011-2012 Rights and Responsibilities Handbook and in the 2012-2013 Rights and Responsibilities Handbook. See Exhibits 4 and 5.

2.1.d.  A student is expected and required to respect the integrity and personal rights of individuals. The University will not tolerate any behavior that physically harms (some examples: hitting, pushing, or physical altercations/violence of any kind).[13]

2.1.e.  A student is expected and required to respect the integrity and personal rights of individuals. The University will not tolerate any behavior that invades personal privacy.[14]

3.1. Students are prohibited from engaging in sexual misconduct. Sexual contact that occurs without the explicit consent of each student involved may be considered sexual misconduct. Consent must be clearly communicated, mutual, non-coercive, and given free of force or threat of force. A student who is physically or mentally incapacitated by drugs, alcohol, or other circumstances is not capable of giving consent. Physical or mental incapacity means the lack of ability to appreciate the fact that the situation is sexual, and/or the inability to rationally and reasonably appreciate the nature and extent of that situation. Evidence of ingestion of drugs and/or alcohol may raise a presumption of physical and/or mental incapacity.

3.2. Causing incapacitation or intoxication, or taking advantage of someone's incapacitation or intoxication for the purpose of engaging in sexual activity is considered sexual misconduct.

3.3. Consent or lack of consent may be communicated verbally or through actions but if a refusal to engage in sexual activity is communicated at any time then the activity must cease immediately.  Lack of consent may also be inferred from the use of force, threat, physical intimidation, or advantage gained by the accuser's mental or physical incapacity or impairment of which the accused was aware or should have been aware. Prior sexual activity

---

[13] The language listed is from the 2011-2012 Rights and Responsibilities Handbook.  The language from the 2012-2013 Rights and Responsibilities Handbook is slightly different, stating: "A student is expected and required to respect the integrity and personal rights of individuals. The University will not tolerate any behavior that physically harms **or is considered unwanted physical contact** (some examples: hitting, pushing, or physical altercations/violence of any kind)." The bolded language is the language in the 2012-2013 Rights and Responsibilities Handbook that differs from that in the 2011-2012 Rights and Responsibilities Handbook.

[14] The language listed is from the 2011-2012 Rights and Responsibilities Handbook.  The language from the 2012-2013 Rights and Responsibilities Handbook is slightly different, stating: "A student is expected and required to respect the integrity and personal rights of individuals. The University will not tolerate any behavior that invades personal privacy **or constitutes stalking of any type (see Sections 2.5, 11.2, 11.3, and 17)."** The bolded language is the language in the 2012-2013 Rights and Responsibilities Handbook that differs from that in the 2011-2012 Rights and Responsibilities Handbook.

or an existing acquaintance, friendship, or relationship that has been sexual in nature does not constitute consent for the continuation or renewal of sexual activity.[15]

7.2. Examples of Sexual Harassment: Depending on the circumstances, conduct which may constitute sexual harassment includes, but is not limited to:

- Unwelcome sexual conduct toward an individual, including offensive comments, touching or sexual propositions
- Threats or insinuations that a person's employment, academic standing, grade, assignments, or other conditions of employment or academic life may be adversely affected by not submitting to sexual advances.
- Leering, making sexual gestures, touching, patting, pinching, rubbing, impeding or blocking movements, displaying of sexually suggestive objects, pictures, cartoons or posters, suggestive or obscene letters or e-mails, notes, invitations or gifts
- Making or using derogatory comments, epithets, slurs or jokes with a sexual content
- Persistent unsolicited and unwelcome invitations for dates, encounters, or pressure to engage in sexual activity of an implied or explicit nature
- Persistent inappropriate and unwelcome questions asked about personal life
- Comments to, or about, any individual or their appearance that is sexually graphic or would otherwise tend to be degrading
- Displaying, sending, forwarding, downloading or otherwise distributing sexual materials via the Internet, computer, cellular data network, or e-mail
- Consensual sexual relationships where such relationships lead to favoritism towards the student with whom the instructor is sexually involved, which adversely affects other students[16]

**B. Charges Against ▮▮J.C.▮▮**

▮▮Doe▮▮ met with Gendron to discuss relevant charges against ▮▮J.C.▮▮ Based on ▮▮Doe▮▮ conversation with Gendron, ▮▮J.C.▮▮ initially was charged with the following sections from the 2013-2014 Rights and Responsiblities Handbook: 2.1.e., 7.2, and 7.5.  On January 24, 2014, ▮▮Doe▮▮ dropped the charge of 7.2 (i.e. sexual harassment) against ▮▮J.C.▮▮ ▮▮Doe▮▮ clarified that he no longer was alleging sexual harassment.

The language from the above charges is listed below:

2.1.e. Respect the integrity and personal rights of individuals. The University will not tolerate any behavior that invades personal privacy (see Sections 2.5, 11.2, 11.3, and 17).

---

[15] The language listed is from the 2011-2012 Rights and Responsibilities Handbook.  The language in the 2012-2013 Rights and Responsibilities Handbook is the same, except that the first letters in "accuser" and "accused" are capitalized.

[16] The language listed is from the 2011-2012 Rights and Responsibilities Handbook.  The language in the 2012-2013 Rights and Responsibilities Handbook is the same, except that the sixth bullet states: "Persistent inappropriate and unwelcome questions asked about **one's** personal life."  The bolded language is the language in the 2012-2013 Rights and Responsibilities Handbook that differs from that in the 2011-2012 Rights and Responsibilities Handbook.

Page 4: Report of Findings (▮▮J.C.▮▮  ▮▮Doe▮▮)

7.5. False Claims: If it is determined that an individual falsified a claim of harassment or discrimination, it may result in corrective actions up to and including dismissal from school or release from employment.

## II. Facts

███ and ███ entered Brandeis as freshmen in the fall of 2011. They met online before coming to Brandeis through a Brandeis-sponsored Facebook group called MyDeis. Through MyDeis, ███ contacted ███ and they began to correspond online. Approximately two weeks after this initial contact, ███ asked ███ whether he wanted to be roommates and ███ agreed. Due to administrative issues, however, Brandeis did not assign them as roommates. They both arrived at Brandeis in August 2011 and were assigned to live in Shapiro Hall, with ███ in a double and ███ in a triple.

### A. August 2011 through Approximately October 18, 2011 (Pre-Dating Relationship)

███ and ███ became very friendly within the first few weeks of school. One Interviewee recalled that it was "cute" that ███ and ███ became best friends so quickly. Although ███ was "out" as gay at the beginning of the 2011-2012 academic year, ███ was not.

According to ███ during the pre-dating relationship, ███ engaged in the following unwanted sexual conduct with ███ 1) unwanted touching while walking; 2) coercion to watch pornography (the "Pornography Incidents"); 3) sending of sexually-explicit text messages; (the "Text Messaging Incident"); 4) inappropriate behavior while watching a movie (the "Movie Incident"); and 5) inappropriate conduct of a sexual nature after the Movie Incident ("Post-Movie Conduct").

This section presents ███ allegations regarding ███ conduct during the pre-dating relationship, and ███ responses to the allegations. None of the Interviewees observed any of the alleged incidents that occurred during the pre-dating relationship.

#### 1. Unwanted Touching While Walking

According to ███ prior to dating ███ touched ███ in a sexual manner and caused ███ to touch ███ accidentally. ███ stated that ███ fondled his groin and butt when they were walking during their pre-dating relationship. Based on an interview with ███ when this occurred ███ stated something like, "This is normal for straight Jewish guys" and ███ respond by stating that he did not want ███ to continue. ███ reported that when this occurred, he grabbed ███ hand and took it off of him. In addition, ███ stated that sometimes when he and ███ walked together, ███ bent over so that ███ was forced to walk into his butt and that ███ also altered how he walked so that ███ accidentally touched him with his hands. ███ did not recall the above interactions. Rather, he stated that during the pre-dating relationship, he hugged ███ in public, but stated that ███ never objected to this. ███ reported that he did say something like, "This is normal for straight Jewish guys" when he hugged ███

### 2. Pornography Incidents



According to [J.C.] in September 2011 when he and [Doe] hung out in [Doe] dorm, [Doe] sometimes asked [J.C.] if he wanted to watch porn. [J.C.] reported that if he stated that he did not want to watch porn, [Doe] moved his laptop computer so that it was in front of [J.C.] face. Based on interviews with [J.C.] told [Doe] on these occasions that he would leave the dorm room unless [Doe] turned off the porn and that [Doe] then would turn off the porn. According to [J.C.] also sometimes said [J.C.] name so that he would turn his head and face the porn. [J.C.] reported that he then stated, "Get it away from me" or "Turn that off."

[Doe] remembered watching porn with [J.C.] and other friends, and that [J.C.] did not object to watching this. [Doe] recalled watching porn with [J.C.] in [Doe] dorm room, but after, not before, [J.C.] and [Doe] started dating. [Doe] stated that they did not watch porn [J.C.] objected.

### 3. Text Messaging Incident



Sometime in September 2011, [Doe] sent [J.C.] text messages that, according to [J.C.] were sexually-explicit. According to [J.C.] [Doe] sent approximately 10 to 12 texts and that after receipt of every text, [J.C.] asked [Doe] to stop sending them. [J.C.] who believed that [Doe] was straight, thought that [Doe] was making fun of him. [J.C.] indicated during an interview for this investigation that the texts made him feel uncomfortable and he asked [Doe] to stop sending texts of that nature. [Doe] recalled sending texts to [J.C.] in which he expressed interest in [J.C.] for the first time. [Doe] stated that in the texts he used the term "hook up" but that the texts were not sexually-explicit. Neither [J.C.] nor [Doe] kept copies of the text messages.

On or around the day after [Doe] sent the above text messages, he and [J.C.] met in Sherman Dining Hall to discuss them. According to [J.C.] [Doe] explained that he was confused about his sexuality, wanted to explore it with [J.C.] and blamed the inappropriate touching and texts on this confusion. [J.C.] recalled stating that he was not interested in becoming romantically involved with [Doe] because "didn't want to get dragged back into the closet" by someone who was not openly gay. [Doe] agreed that he and [J.C.] met to discuss the texts, but denied that he inappropriately touched [J.C.] or blamed such touching on confusion about his sexuality.

### 4. The Movie Incident

Approximately one week after the Text Messaging Incident, on approximately September 17 or September 18, 2011, [J.C.] [Doe] and a friend watched *Mr. and Mrs. Smith* in the friend's room. [J.C.] and [Doe] were sitting on the friend's bed and the friend was on the chair next to the bed. According to [J.C.] during the movie, [Doe] took [J.C.] hand and placed it on [Doe] erect penis. Based on an interview with [J.C.], [Doe] kept [J.C.] hand on top of [Doe] penis and [J.C.] "froze." [J.C.] reported that he did not want the friend to know

what was going on so did not say anything, but let his hand go limp. ▆▆ stated that ▆▆ then moved ▆▆ hand back and forth on ▆▆ groin, massaging ▆▆ penis. According to ▆▆ he eventually "jerked" his hand away.

▆▆ recalled watching *Mr. and Mrs. Smith* with ▆▆ and remembered that ▆▆ put ▆▆ hand on ▆▆ penis during the movie. ▆▆ stated that ▆▆ did not object. ▆▆ recalled that he moved his hand off ▆▆ hand after approximately five seconds, but that despite this, ▆▆ kept his hand on ▆▆ penis for the duration of the movie.

According to ▆▆ the day after the Movie Incident, he and ▆▆ had a conversation about what had occurred during the Movie Incident. Based on an interview with ▆▆ ▆▆ stated that he believed that he was straight, but wanted to experiment with men. ▆▆ stated that he was not interested in being in a sexual relationship with ▆▆ as he did not want to "deal with the mess" of dating someone in the closet. According to ▆▆ ▆▆ stated that he respected this and agreed to be friends. According to ▆▆ however, the day after the Movie Incident, ▆▆ performed oral sex on ▆▆ ▆▆ stated that he did not remember performing oral sex on ▆▆ the day after the Movie Incident.

5. Post-Movie Conduct

According to ▆▆ after the Movie Incident, ▆▆ respected ▆▆ personal boundaries less than previously. ▆▆ provided as an example that ▆▆ often tried to grab ▆▆ hand under the table in the dining hall or in various other locations, and that he sometimes grabbed ▆▆ hand and put it on ▆▆ groin. ▆▆ denied engaging in this conduct. ▆▆ stated that he sometimes casually put his hand on ▆▆ knee. According to ▆▆ ▆▆ did not move away or say, "Don't touch me."

During an interview for this investigation, ▆▆ stated that in mid-October 2011, sometimes when he and ▆▆ were in ▆▆ room, ▆▆ removed some or all of his clothing. ▆▆ reported that when he asked ▆▆ to put his clothes back on, ▆▆ stated that he could be naked if he wanted to in his room. Based on an interview with ▆▆ once after ▆▆ took off his clothes, he tried to kiss ▆▆ several times but ▆▆ objected. ▆▆ stated that he continually moved his face so that ▆▆ could not kiss him, but that ▆▆ finally kissed ▆▆ to placate him. According to ▆▆ this was the quickest and easiest way to get ▆▆ off of him.

When asked about the allegation of insisting on being naked, ▆▆ stated that he was naked sometimes in his room when ▆▆ was there, but that ▆▆ had not objected to this. He also stated that ▆▆ had objected when ▆▆ tried to kiss him, ▆▆ would not have continued trying to kiss him, but probably would have sulked and been moody for a while.

6. Decision to Begin Dating

After the Movie Incident, ▆▆ and ▆▆ began "quietly hooking up" according to ▆▆ but did not immediately begin dating. According to ▆▆ he was unsure whether he wanted to begin dating someone who was not out of the closet. ▆▆ recalled that he was

conflicted about whether he wanted to "come out" as he believed that this could ruin his future in politics.

J.C. stated that he felt coerced into starting a dating relationship with Doe because Doe stated that he only would come out if J.C. promised to be in a relationship with him. According to J.C. this put him in an awkward position. J.C. and Doe had multiple conversations about this. According to J.C. Doe was very persistent and J.C. finally stated that he might consider being his boyfriend if Doe came out. Approximately a week before Doe and J.C. began dating, they went to a performance at Chums Coffeehouse. J.C. commented that one of the performers was attractive and Doe became jealous. This led to discussions between Doe and J.C. regarding their relationship. On or around October 17, 2011, Doe told his parents and his best friends from home that he had a boyfriend. Both Parties agreed that they began dating after this.

**B. Dating Relationship (October 2011 through July 2013)**

On or around October 18, 2011, J.C. and Doe began dating. Several friends commented that J.C. and Doe got along well, with one stating that they were happy and "cuddly" with each other, and had high opinions of each other. However, according to J.C. during the dating relationship, Doe engaged in the following unwanted sexual conduct: 1) watching J.C. use the bathroom (the "Bathroom Incidents"); 2) staring at J.C. when he returned from the shower ("Post-Shower Conduct"); 3) mandating that J.C. sleep naked; 4) engaging in sexual activity with J.C. while J.C. was sleeping; 5) attempting to force J.C. to perform oral sex; and 6) performing oral sex on J.C. without consent.

This section presents J.C. allegations regarding Doe conduct during the dating relationship, and Doe responses to the allegations. None of the Interviewees observed any of the alleged incidents that occurred during the dating relationship.

1. Bathroom Incidents

According to J.C. almost every time that he used a communal restroom in a residence hall when Doe was present, Doe maneuvered himself to watch J.C. at the urinal. J.C. stated that he told Doe to stop every time and repositioned himself so that Doe could not see his penis, but that Doe would state something like, "I've seen your dick before. What's the big deal?"

Doe reported that when he and J.C. were in the bathroom together, he would crane his head over in an obvious way and tell J.C. that he could see his penis. According to Doe J.C. responded by stating something like, "That's fantastic. It's not like you haven't seen it before." Doe stated that he did not recall J.C. trying to reposition himself so that Doe could not see his penis, and that J.C. never expressed any discomfort with Doe actions in the bathroom. Doe explained during an interview that looking at J.C.s penis was a joke, that it was a humorous situation because they were in a same sex relationship and could use the bathroom together. When informed of this explanation, J.C. responded that Doe refused to accept that J.C. was uncomfortable with Doe

bathroom behavior, and [Doe] tried to "sanitize" his behavior by explaining that he was joking. [J.C.] stated that although [Doe] joked about looking at [J.C.] penis, [J.C.] did not engage in such joking banter, but rather objected to [Doe] behavior.

[J.C.] also reported that sometimes when he was in a stall, [Doe] knocked on the door and asked to enter. [J.C.] stated that in these situations, he refused to allow [Doe] to enter and that [Doe] then became upset and asked what was wrong with [J.C.] [Doe] recalled that he and [J.C.] did sometimes go into a single-person stall together. He did not remember [J.C.] ever refusing to allow him to enter if [Doe] knocked.

[J.C.] stated that at a certain point in their relationship, he knew that telling [Doe] to stop looking at his penis in the bathroom would be pointless because [Doe] continued his behavior despite [J.C.] multiple objections.

2. Post-Shower Conduct

According to [J.C.] multiple times throughout his relationship with [Doe] stared at [J.C.] when he returned to his dorm room after taking a shower and was trying to dress. Based on interviews with [J.C.] if he turned away when changing, [Doe] asked him not to so that [Doe] could look at him. [J.C.] also stated that [Doe] sometimes took [J.C.]'s towel off and stated something like, "when you look like that, how could you expect me not to do this" and "you should take this as a compliment." [J.C.] stated that [Doe] was so insistent, that [J.C.] sometimes took his towel off to placate [Doe] and [Doe] then would stare at him for a few seconds.

[Doe] recalled telling [J.C.] that he did not need to put his clothes on after he returned from the shower. [Doe] explained in an interview that this was a request, not an order, and that this was a way for [Doe] to initiate having sex. [Doe] stated that sometimes this would lead to sexual activity and sometimes it would not. [Doe] also recalled asking [J.C.] to turn around so that he could look at him. According to [Doe] [J.C.] stated, "No," [Doe] asked "Why not" and [J.C.] explained that he had to go somewhere. [Doe] stated that he did not recall [J.C.] repositioning his body so that [Doe] could not look at him while he got dressed. According to [Doe] [J.C.] never seemed uncomfortable when he changed with [Doe] in the room, never asked [Doe] to look away, and never required that he leave the room while he changed. [Doe] agreed that he made comments about the attractiveness [J.C.] body when [J.C.] was naked or mostly naked, but that this was not necessarily after [J.C.] showered. [Doe] stated that [J.C.] engaged in similar behavior (e.g. staring at [Doe] removing [Doe] towel).

According to [Doe], [J.C.] sometimes invited [Doe] over to his room, knowing that when [Doe] arrived [J.C.] would be returning from the shower. [J.C.] agreed that sometimes he called [Doe] immediately prior to [J.C.] taking a shower, asking [Doe] to come over. However, according to [J.C.] this was due to logistical reasons (e.g. if they were going out together soon after), not because he wanted to have sex with [Doe] after returning from the shower.

3. Mandating that ▮J.C.▮ Sleep Naked

During his sophomore year, ▮Doe▮ was a community advisor ("CA") and, therefore, had a single room. Because ▮J.C.▮ had a double room, ▮J.C.▮ and ▮Doe▮ often slept in ▮Doe▮ room which had two single beds that were pushed together. According to ▮J.C.▮ ▮Doe▮ liked to sleep naked. ▮J.C.▮ stated that sometimes he wanted to sleep naked, but other times he wanted to wear clothing. Based on interviews with ▮J.C.▮ ▮Doe▮ did not allow ▮J.C.▮ to get into bed until he took his clothes off. According to ▮J.C.▮ he would turn off the lights and take his clothes off, but then ▮Doe▮ demanded that ▮J.C.▮ turn the lights on so that ▮Doe▮ could see him naked. ▮J.C.▮ stated that after ▮Doe▮ saw him naked for a few seconds, he allowed ▮J.C.▮ to turn the lights off and get into bed. ▮J.C.▮ alleged that these types of incidents occurred approximately two to three dozen times throughout their relationship. ▮J.C.▮ stated that if he saw ▮Doe▮ with his boxers on in bed, ▮J.C.▮ commented that there was a double-standard as ▮Doe▮ could choose to sleep with boxers on but ▮J.C.▮ could not.

In an interview conducted for this investigation, ▮Doe▮ stated that ▮J.C.▮ s allegations about ▮Doe▮ requiring ▮J.C.▮ to sleep naked were "a complete mischaracterization" and that ▮J.C.▮ description regarding ▮Doe▮ requiring ▮J.C.▮ to take his clothes off with the lights on was "a lie." ▮Doe▮ stated that he, not ▮J.C.▮ did not want to sleep naked. ▮Doe▮ said that if he got into bed with boxers on, ▮J.C.▮ stated, "Get those off."

▮Doe▮ stated that he liked to sleep in t-shirts, underwear, shorts, or long sleeve shirts. ▮Doe▮ commented that he had told ▮J.C.▮ that he did not like to sleep naked.

▮Doe▮ stated that he did not like having ▮J.C.▮ sleep over and that he did not sleep as well when ▮J.C.▮ slept over. ▮Doe▮ indicated that he needed space when sleeping, which he did not have when ▮J.C.▮ slept over. He also stated that he got hot when ▮J.C.▮ slept over and explained that to try to remedy this, ▮Doe▮ either stopped cuddling, rolled over to the adjoining bed, or slept on top of the covers. As a result of ▮Doe▮ discomfort, in approximately the spring of their sophomore year, ▮J.C.▮ slept at ▮Doe▮ only on the weekends.

4. Sexual Contact While Sleeping

According to ▮J.C.▮ he woke up approximately 12 times in the middle of the night because ▮Doe▮ was behind him, humping him. ▮J.C.▮ stated that ▮Doe▮ hands were on ▮J.C.▮ body during these incidents, sometimes on his penis. Based on interviews with ▮J.C.▮ he asked ▮Doe▮ to stop, but ▮Doe▮ did not. ▮J.C.▮ stated that he had to physically remove ▮Doe▮ arms from him. According to ▮J.C.▮ on a few of these occasions, he asked ▮Doe▮ later in the morning not to engage in that behavior again, and that ▮Doe▮ responded by stating something like, "I'm just horny" or "Don't you have any sex drive?" ▮J.C.▮ stated that these incidents occurred during the first half to two-thirds of his relationship with ▮Doe▮

According to ▮Doe▮ he never woke ▮J.C.▮ up in the middle of the night with sexual activity. ▮Doe▮ stated that in the morning, he sometimes woke ▮J.C.▮ up by kissing him. According to ▮Doe▮ he sometimes would "masturbate" ▮J.C.▮ ▮Doe▮ and Ms. Sanghavi discussed

these types of incidents during two separate interviews. During one interview, [Doe] stated that if he kissed [J.C.] in the morning, sometimes [J.C.] stated that he wanted to go back to sleep. [Doe] recalled that [J.C.] stated this, [Doe] sometimes said, "Seriously?" and continued kissing [J.C.] unless [J.C.] indicated again that he really did want to go back to bed. During another interview, [Doe] stated two times that when he woke [J.C.] up by kissing him, [J.C.] "never" said that he wanted to go back to bed. When Ms. Sanghavi pointed out the inconsistency between this comment and his statement in the earlier interview, [Doe] commented that later in the morning, around 10:00 AM, [J.C.] would never say that he wanted to go back to bed, but that if [Doe] tried to wake him up earlier, at about 8:00 AM, [J.C.] might have said that he wanted to go back to bed.

### 5. Attempts to Have [J.C.] Perform Oral Sex

According to [J.C.] approximately five to ten times during his relationship with [Doe] when [J.C.] was lying on [Doe] chest or stomach, [Doe] tried to have [J.C.] perform oral sex on him through force. [J.C.] explained that [Doe] did this by pushing [J.C.]'s head down to [Doe] penis. Based on interviews with [J.C.] stated something like, "Stop. I don't want to do this," but [Doe] did not remove his hand from [J.C.] head. Rather, [J.C.] had to move his head away from [Doe] penis. According to [J.C.] when he did this [Doe] stated something like, "You can't lie on me and not expect me to want more," and asked "Am I not attractive?" "Don't you want me?" "Don't you have any sex drive?"

[Doe] denied ever pushing [J.C.] head toward his penis in order to have [J.C.] perform oral sex on him. He stated that [J.C.] did sometimes lie on [Doe] stomach, which [Doe] did not like because he was self-conscious about his stomach. [Doe] also stated that [J.C.] knew that if he lay on [Doe] stomach, [Doe] would become aroused. [Doe] felt that [J.C.] was teasing him by lying on his stomach and this frustrated [Doe] stated during an interview that he asked [J.C.] not to lie on his stomach unless he intended to perform oral sex.

Both [Doe] and [J.C.] agreed that [J.C.] commented at least one time that if [Doe] stopped asking for oral sex, [J.C.] might initiate it. [J.C.] stated that he was trying to explain to [Doe] that [J.C.] might want to perform oral sex if [Doe] stopped pressuring him. [Doe] stated that [J.C.] never used the word "pressure."

### 6. Performing Oral Sex on [J.C.]

According to [J.C.] on some occasions [Doe] indicated that he was interested in sexual activity and [J.C.] told him that he was not interested. [J.C.] recalled that sometimes [Doe] persisted in asking to engage in sexual activity, and [J.C.] continued to state, "No." According to [J.C.] approximately three to four times during his relationship with [Doe] then offered to give [J.C.] "head" and [J.C.] declined the offer, but [Doe] then put [J.C.] penis in his mouth. [J.C.] stated that he was flaccid during these incidents, that he told [Doe] to stop, and that [Doe] gave up after a short time. [J.C.] recalled that if he objected to this sexual activity, [Doe] was annoyed and angrily went to bed. [J.C.] stated that the last time one of these incidents happened was in May 2013 when [Doe] visited [J.C.]

at his father's house in North Adams, Massachusetts (the "North Adams Trip").  According to J.C. he asked Doe after he tried to perform oral sex without J.C.'s consent whether he realized this was sexual assault.  Based on interviews with J.C. Doe became very upset, got out of bed and lay on the floor, stated that he loved J.C. too much to assault him, and commented that he could not believe that J.C. was accusing him of assault.  J.C. stated that Doe convinced J.C. that he was wrong.  J.C. asked that Doe forget about the conversation and apologized to Doe.  According to J.C. the logical part of his brain was not sorry for raising the issue, but he wondered how he could accuse someone who he loved of such a horrible thing.

Doe denied that he ever performed oral sex on J.C. without his consent.  Doe stated that he sometimes asked J.C. whether he could give J.C. "head." According to Doe if J.C. stated "No," Doe stated "Seriously?" and moved away from J.C. indicated again that he was not interested, then Doe did not continue.  Doe recalled that he would be annoyed if J.C. did not want him to perform oral sex, and would turn over.

During the first interview in which the North Adam's trip was discussed with Doe he stated that he remembered the trip being "normal." He stated that J.C. did not accuse him of sexual assault during this trip. During this interview, Doe did not discuss lying on the floor. In a follow-up interview, when specifically asked about lying on the floor, Doe initially stated that he did not remember if he slept on the floor, then stated that he thought he slept on the ground due to heat, not an argument.

### C. Break Up and Post-Break Up Interactions

#### 1. Summer 2013

In the summer of 2013, J.C. worked at Brandeis as the Orientation Core Committee Coordinator. As stated above, before Doe left for a job in California, he visited J.C. at his home in North Adams, Massachusetts. In June 2013, Doe visited J.C. at Brandeis. During this visit, J.C. and Doe went to _____ home for a dinner. According to _____ Doe was very considerate J.C. allowing him to sit in the front seat when ___ drove them to her house, and bringing gluten-free food for J.C. given his dietary restrictions. ___ stated that when Doe and J.C. were at her house, they "were very much a couple" and seemed very comfortable with each other. ___ stated that Doe and J.C. discussed their future together.

In July 2013, J.C. broke up with Doe over the phone. According to J.C. he felt physically repelled by Doe. In addition, J.C. and Interviewees with whom he spoke about the break up, stated that he felt Doe called too often, did not stand up enough for his beliefs, and was not strong-willed or forceful enough. J.C. and Doe friends were surprised by the break up.

2. <u>Sexual Assault Trainings in the Fall of 2013</u>

██████ was Orientation Core Committee Coordinator for the fall 2013 new student orientation. This orientation involved sexual assault training. According to ██████ the training forced him to start thinking about what he viewed as sexual harassment within his relationship with ██████ After these trainings, he could not stop thinking about incidents that occurred during his relationship with ██████ ██████ stated that he felt overwhelmed and had difficulty sleeping. He considered not returning to Brandeis but eventually decided to return.

3. <u>Deterioration of Friendship</u>

██████ and ██████ in addition to several Interviewees, agreed that ██████ and ██████ initially tried to stay friends in the fall of 2013. They had mutual friends, so saw each other occasionally. For example, ██████ roommate, REDACTED, is good friends with ██████ and invited him over several times. At least one time REDACTED asked ██████ if it was okay if she invited ██████ over and ██████ indicated that he would not be uncomfortable if ██████ came over. <u>See Exhibit 6</u>. In addition, ██████ and ██████ attended the same party in September 2013. One friend commented that he did not notice any problems between ██████ and ██████ during the party.

However, the friendship between ██████ and ██████ deteriorated throughout the fall of 2013. According to one Interviewee, ██████ voiced some mean comments regarding ██████ and ██████ was extremely upset by this. ██████ believed that ██████ stated to mutual friends that ██████ was emotionally handicapped. ██████ agreed they he did make "not nice" comments about ██████ ██████ felt that ██████ ignored him, and ██████ told mutual friends that he did not feel that ██████ was treating him well.

██████ stated that the friendship really began to deteriorate when he found out that ██████ had started drinking alcohol. ██████ had refused to drink alcohol in the past and, when he was dating ██████ "mandated" that ██████ also not drink. This restriction caused at least one argument. At some point in October 2013, ██████ heard that ██████ had been intoxicated at a party. This made ██████ very upset because he felt that ██████ was hypocritical, as he had not allowed ██████ to drink while they dated. Several Interviewees stated that they had never seen ██████ drink before the fall of 2013, and in fact believed that he could not drink due to a medical condition. These Interviewees corroborated that ██████ began drinking after the break up. ██████ also confirmed this.

At the end of November 2013 or the beginning of December 2013, ██████ stated, "hi" to ██████ when they saw each other on a sidewalk. ██████ believed that ██████ ignored him. According to ██████ he did reply "hello" but had yawned before doing so and ██████ did not hear him. In response to what he believed to be lack of response by ██████ ██████ stated something like, "Or you can keep ignoring me."

4. Queer Policy Alliance Events

▓J.C.▓ and ▓Doe▓ are both members of the Queer Policy Alliance ("QPA"). ▓J.C.▓ and ▓REDACTED▓ are co-presidents of the QPA. During the fall of 2013, ▓J.C.▓ and ▓REDACTED▓ led the weekly QPA meetings and ▓Doe▓ attended these meetings. ▓REDACTED▓ stated that ▓J.C.▓ and ▓Doe▓ appeared to act normally towards each other at these meetings. In the fall of 2013, ▓J.C.▓ and ▓Doe▓ helped organize an event for QPA during which a member of the Massachusetts Attorney General's Civil Rights Division spoke. See Exhibit 7. According to ▓REDACTED▓ who attended the event, ▓J.C.▓ and ▓Doe▓ sat together at the event and appeared to get along.

In the fall of 2013, QPA and the other queer organizations at Brandeis formed a taskforce (the "Taskforce") comprised of one member from each queer group to promote a proposal for an LGBTQ center and full-time gender and sexuality diversity coordinator (the "Proposal"). See Exhibits 8. According to ▓REDACTED▓ he and ▓J.C.▓ agreed that ▓REDACTED▓ would be the Taskforce member from QPA. To promote the Proposal, the Taskforce organized an event during which volunteers hung rainbow streamers in the SCC on October 10, 2013 ("Queering the SCC"). All members of QPA had been informed of this event through an email. See Exhibit 9. In addition, according to ▓REDACTED▓ as the Taskforce member from QPA he had informed QPA members about the progress of the Taskforce at each QPA meeting. He stated that at a QPA meeting, he asked for volunteers to participate in Queering the SCC. ▓REDACTED▓ stated that ▓J.C.▓ was at each of the QPA meetings.

5. Initial Disclosure of Sexual Misconduct

▓J.C.▓ was a mid-year orientation leader in the spring 2014 semester. The orientation for mid-year students included sexual assault training. ▓J.C.▓ attended this training and felt as though "there was a sign on [his] forehead" alerting others to the fact that he had been sexually assaulted. ▓J.C.▓ also became concerned around this same time about ▓Doe▓ behavior toward a mid-year student with whom ▓Doe▓ was friendly. According to ▓J.C.▓ based on the sexual assault training and because he wanted to make sure that ▓Doe▓ would not treat anyone else the way that ▓J.C.▓ believed ▓Doe▓ treated him, ▓J.C.▓ decided to file a CSR.[17]

On or around January 10 or 11, 2014, ▓J.C.▓ confided in two of his friends, ▓REDACTED▓ and ▓REDACTED▓ that ▓Doe▓ had engaged in nonconsensual sexual activity with him. Specifically, ▓J.C.▓ told both friends that ▓Doe▓ had sexually assaulted him. ▓J.C.▓ told ▓REDACTED▓ that ▓Doe▓ had not, however, raped him.[18] ▓J.C.▓ spoke with ▓REDACTED▓ on a bus ride back from a mid-year orientation event and ▓REDACTED▓ in her room. ▓REDACTED▓ stated that ▓J.C.▓ was sobbing and that she had never seen him "anything but happy" before. ▓J.C.▓ told ▓REDACTED▓ that he was disgusted by ▓Doe▓ ▓REDACTED▓ described ▓J.C.▓ as crying for a long time. ▓J.C.▓ also called his sister around

---

[17] As part of this investigation, the alleged behavior of ▓Doe▓ toward the mid-year student was examined. Based on interviews, ▓Doe▓ had a friendly relationship with a mid-year student which some students found inappropriate because ▓Doe▓ was a CA and, therefore, was in a mentoring role to the mid-year student. However, information from this investigation did not indicate that the relationship was inappropriate.

[18] ▓J.C.▓ differentiated "rape" from "sexual assault" by stating that "rape" involved penetration.

this same time and disclosed that he had been assaulted by  He called late at night, which according to his sister was unusual, and before he began to speak, he began sobbing and had difficulty breathing. ▆ disclosed to his sister the following: 1) ▆ sexually touched ▆ while he was sleeping; 2) ▆ had forced ▆ hand onto his penis; 3) ▆ gave ▆ oral sex without his consent; and 4) in response to ▆ telling ▆ that his actions constituted sexual assault, ▆ stated that this was impossible because he loved ▆ too much. ▆ told his sister that sometimes when ▆ engaged in nonconsensual activity ▆ acquiesced because ▆ was his boyfriend.

▆ filed a CSR against ▆ on January 14, 2014. ▆ filed a CSR with allegations against ▆ on January 15, 2014.

## IV. Analysis

This report examines whether: 1) ▆ violated relevant sections of the 2011-2012 and 2012-2013 Rights and Responsibilities handbooks; and/or 2) ▆ violated relevant sections of the 2013-2014 Rights and Responsibilities Handbook. The standard used to determine whether each of the alleged incidents occurred and whether either party violated any relevant section of the Rights and Responsibilities handbooks is the preponderance of the evidence standard.

### A. General Credibility

▆ and ▆ agree on the basic timeframe of their relationship, and both recall many of the same incidents that occurred during their relationship. However, they do not agree on many of the details important to this investigation (e.g. facts regarding whether consent was given). Further, they completely disagree about whether some incidents actually occurred (e.g. the North Adams incident). This report, therefore, examines the general credibility of both parties. Significant exceptions to the analysis below regarding credibility are discussed within the sections on specific incidents.

#### 1. ▆ Credibility

▆ was a credible participant in the interviews conducted for this investigation based on his demeanor and consistency. He provided: 1) consistent statements regarding each alleged incident, not waivering from the initial description of the incidents; and 2) a consistent theme linking many of the alleged incidents, describing the pressure that he felt in the relationship, the sense that telling ▆ he was not interested in engaging in sexual activity often was ineffective, and the belief that it was easier to placate ▆ by engaging in activities than to continue to object.

Further, ▆ allegation that he experienced unwanted sexual activity was credible, given his behavior after he broke up with ▆ Specifically, ▆ began drinking after he broke up with ▆ which he had not done previously. A study of physical and sexual abuse found that past or recent occurrence of assault is associated with significantly increased rates of reported alcohol use. See Exhibit 10 at 843. ▆ ▆ and other Interviewees reported that although ▆ had not used alcohol before the break up with ▆ after the break up

██ began drinking. ██ reported that he now feels like he "needs a drink" and sometimes drinks in order to fall asleep. In addition, he reported that on the weekends he "drinks too much," having 12 to 14 drinks. In addition, ██ began seeing a mental health professional in January 2014 for treatment related to sexual assault. ██ s new use of alcohol and mental health services strengthen his credibility that he experienced unwanted sexual conduct.

██ questioned ██ credibility based on the fact that ██ told him that he was not strong-willed or forceful enough when they broke up. ██ believed that ██ allegations against him (i.e. that he engaged in sexual activity without consent) contradicted this statement. ██ clarified that he meant that ██ did not "stick to his guns" during discussions. Two Interviewees also believed from their conversations with ██ that his comments regarding ██ not being strong-willed referred to the fact that ██ gave in during discussions instead of standing up for his opinion. As a result, ██ statement that ██ was not strong-willed or forceful enough does not weaken the credibility ██ as ██ was referring to being forceful during discussions, not during sexual activity.

2. ██ Credibility

In general, ██ was a credible participant in the interviews conducted for this investigation based on his demeanor and consistency. However, significant exceptions to this general assessment are noted below in the discussion of each incident.

Note that ██ mentioned several times that ██ initial filing of the sexual harassment charge against him and ██ subsequent withdrawal of the sexual harassment charge, indicated that ██ was not credible. ██ explained that he had filed the sexual harassment charge because he was in an "emotional state," but later realized that he did not have enough evidence to bring such a charge and, therefore, promptly withdrew the allegation before an investigation on it occurred. The fact that ██ made allegations that he promptly withdrew does not weaken his credibility.

Several Interviewees implied that ██ was more credible than ██ because the Parties seemed happy and comfortable together. To support this, ██ presented documentation including pictures in which ██ and ██ appeared to be happy and Facebook comments that suggested a normal, happy dating relationship. See Exhibit 11.[19] Note, however, that sexual misconduct does occur in dating relationships and that such conduct can occur for years. See Exhibits 12. Further, studies have noted that individuals likely underreport incidents of intimate partner violence to friends and family due to a number of reasons, including shame and embarrassment, and may underreport because they do not perceive unwanted sexual contact with an intimate partner as coercive. See Exhibits 13 and 14. The fact that ██ and ██ were in what appeared to be a happy dating relationship and ██ did not inform friends about his allegations during the relationship, therefore, does not bolster ██ credibility or weaken ██ credibility.

---

[19] Note that ██ presented 32 pages of such documents. Exhibit 6 is a sample of these documents.

Based on the assessment above, ▓▓▓ general allegation of having experienced unwanted sexual conduct and harassment is credible. This report further analyzes each specific incident to determine whether it contributed to sexual misconduct. The report therefore examines each alleged incident to determine whether, based on the preponderance of the evidence, it occurred, and if so, whether ▓▓▓ violated any relevant section of the Rights and Responsibilities handbook as a result.

**B. Allegations by ▓▓▓ against ▓▓▓**

This report examines, based on the preponderance of the evidence, whether the incidents described by ▓▓▓ occurred and, if so, whether ▓▓▓ thereby violated Sections 3.1, 3.2, 3.3, 2.1.d., 2.1.e., and/or 7.2 of the 2011-2012 and/or the 2012-2013 Rights and Responsibilities handbooks.

    1. <u>Preponderance of the Evidence Indicates that ▓▓▓ Violated Sections 3.1, 3.2 and 3.3 of the 2011-2012 and 2012-2013 Rights and Responsibilities Handbooks</u>

To find someone responsible for non-consensual sexual activity under the 2011-2012 and 2012-2013 Rights and Responsibilities handbooks, the preponderance of the evidence must indicate that sexual activity occurred and that consent was not provided for such activity.

The introduction to Section 3 of the Rights and Responsibilities handbook titled "Sexual Responsibility – Seeking and Communicating Consent" (the "Sexual Responsibility Section"), includes language applicable throughout Section 3. The introduction states in relevant part, "Consent must be sought and clearly understood and communicated before engaging in any sexual activities." Further, in relevant part Section 3.1 states, "Students are prohibited from engaging in sexual misconduct. Sexual contact that occurs without the explicit consent of each student involved may be considered sexual misconduct. Consent must be clearly communicated, mutual, non-coercive, and given free of force or threat of force. . . ." 3.1 and 3.2 both state that consent cannot be provided by someone who is incapacitated. 3.3 states in relevant part, "Consent or lack of consent may be communicated verbally or through actions but if a refusal to engage in sexual activity is communicated at any time then the activity must cease immediately.... Prior sexual activity or an existing acquaintance, friendship, or relationship that has been sexual in nature does not constitute consent for the continuation or renewal of sexual activity."

Based on these sections of the Rights and Responsibilities handbooks, failing to seek consent, engaging in sexual contact without explicit, clearly communicated consent prior to engaging in sexual activities, engaging in sexual activity with someone who is incapacitated, or engaging in sexual activity despite communicated lack of consent violate the 2011-2012 and 2012-2013 Sexual Responsibility Section in the Rights and Responsibilities handbooks.

▓▓▓ described several actions by ▓▓▓ that, if true, could indicate that ▓▓▓ violated sections 3.1, 3.2 and 3.3 of the Rights and Responsibilities Handbook. These incidents are: 1) unwanted touching while walking in September 2011; 2) the Movie Incident; 3) Post-Movie

Conduct; 4) engaging in sexual conduct with ▮J.C.▮ while he was sleeping; 5) attemp ▮J.C.▮ perform oral sex; and 6) performing oral sex on ▮J.C.▮ without consent.

***Unwanted Touching While Walking (September 2011):*** According to ▮J.C.▮ before he and ▮Doe▮ started dating, ▮Doe▮ altered his walking in a way that required ▮J.C.▮ to touch him accidentally, sometimes on the "butt." ▮Doe▮ denied that he did this. ▮J.C.▮ also stated that in the fall of 2011, ▮Doe▮ fondled his groin without consent. None of the Interviewees who were friends with ▮Doe▮ and ▮J.C.▮ in the fall of 2011 observed this and both parties were equally credible based on demeanor and consistency with regard to their relevant statements. As a result, the evidence is insufficient to indicate that these incidents occurred.

***Movie Incident:*** Both Parties agreed that during the Movie Incident, ▮Doe▮ placed ▮J.C.▮ hand on his penis. ▮Doe▮ did not ask whether he could engage in this conduct. ▮Doe▮ stated that he only kept his hand on ▮J.C.▮ s for a few seconds and then ▮J.C.▮ willingly kept his hand on ▮Doe▮ penis. According to ▮J.C.▮ he did not willingly keep his hand on ▮Doe▮ penis, but rather kept it there because ▮Doe▮ kept his hand on ▮J.C.▮ hand and because ▮J.C.▮ did not want to alert his friend who was present during the Movie Incident of what was occurring.

▮Doe▮ did not seek consent prior to putting ▮J.C.▮ hand on his penis. ▮J.C.▮ and ▮Doe▮ had not hooked up and were not dating at this point. ▮J.C.▮ indicated approximately a week earlier that he was uncomfortable with ▮Doe▮ texts in which ▮Doe▮ expressed interest in hooking up. Despite this, ▮Doe▮ took ▮J.C.▮ hand and put it on his penis. He did this without any prior indication from ▮J.C.▮ that he was interested in engaging in activity of a sexual nature with ▮Doe▮ Under the 2011-2012 Rights and Responsibilities Handbook, ▮Doe▮ had to seek and obtain explicit consent prior to engaging in sexual activity. Based on the preponderance of the evidence, ▮Doe▮ did not seek consent or obtain explicit consent prior to putting ▮J.C.▮ hand on his penis, nor could he have understood, from past conversations or otherwise, that ▮J.C.▮ would provide clear consent.

Further, during this investigation, another student, ▮REDACTED▮ described that in the fall of 2011, ▮Doe▮ grabbed her breasts on several occasions. He did not ask if he could touch her breasts. ▮Doe▮ admitted in an interview that he had grabbed ▮REDACTED▮ breasts, and was unable to explain why he had done so. Rather, he said that he had done it as a joke. Therefore, at approximately the same time as the Movie Incident, ▮Doe▮ engaged in sexual conduct without first obtaining clearly communicated consent from another student, indicating ▮Doe▮ general lack of understanding of consent, and adding to the credibility of ▮J.C.▮ s description of the Movie Incident.

Given the above information, based on the preponderance of evidence, ▮Doe▮ violated Section 3.1 when he placed ▮J.C.▮ s hand on his penis. He did not seek consent from ▮J.C.▮ prior to engaging in this activity and did not obtain explicit consent to do so prior to engaging in this behavior. Based on the preponderance of the evidence, therefore, ▮Doe▮ violated Section 3.1 of the 2011-2012 Rights and Responsibilities Handbook.

***Post-Movie Conduct:***  ▇ alleged that in mid-October 2011, before he and ▇ began dating, ▇ often was naked in his room, despite ▇ objections. ▇ stated that on one occasion, while ▇ was naked, he tried to kiss ▇ even though ▇ moved to avoid the kisses. ▇ stated that had ▇ objected, ▇ would have stopped but would have sulked and been moody. ▇ also alleged that ▇ put ▇ hand on ▇ groin without ▇ consent after the Movie Incident and before they started dating. ▇ denied this. None of the Interviewees observed this behavior and both parties were equally credible based on demeanor and consistency with regard to their relevant statements. As a result, the evidence is insufficient to indicate that these incidents occurred.

***Sexual Conduct While*** ▇ ***was Sleeping:*** ▇ alleged that on approximately 12 occasions, ▇ woke up to ▇ humping him. ▇ stated that this behavior occurred in the middle of the night and that when he woke up, he asked ▇ to stop, but that ▇ did not. Although ▇ denied this, he provided inconsistent responses. During one interview, ▇ stated that he did sometimes wake ▇ up by kissing him, but that he did this in the morning, not in the middle of the night. ▇ reported that if ▇ said that he wanted to go back to sleep, sometimes ▇ said, "Seriously?" and continued kissing ▇ unless ▇ indicated again that he really did want to go back to bed. ▇ altered his recollection during another interview, by stating twice that ▇ never stated that he wanted to go back to bed when ▇ woke him up by kissing him. After being informed of the inconsistency with his previous interview, ▇ commented that he meant that ▇ might have stated that wanted to go back to bed if ▇ woke him up at about 8:00 AM, but not if he woke him up at 10:00 AM. ▇ statements in response to ▇ allegation that ▇ engaged in sexual activity with ▇ while he slept do not appear credible as ▇ altered his story when asked about the allegation for a second time, and then changed it again when presented with his inconsistency. In contrast, ▇ provided consistent descriptions about and responses regarding waking up to sexual conduct by ▇ With regard to these incidents, therefore, ▇ description is more credible than is ▇

Based on the determination that ▇ description is more credible than ▇ this report assumes that ▇ did engage in sexual conduct with ▇ when he was sleeping. This section, therefore, analyzes whether ▇ sought and received consent for the sexual activity that occurred while ▇ was sleeping. Under Sections 3.1 and 3.2, a student who is incapacitated cannot give consent to sexual activity. Sleep is a state of incapacitation. As a result, based on the preponderance of the evidence, ▇ violated Sections 3.1 and 3.2 by initiating sexual activity with ▇ when he was sleeping. Further, under 3.3, sexual activity must cease immediately if "a refusal to engage in sexual activity is communicated at any time." As ▇ did not stop when requested to by ▇ ▇ also violated Section 3.3.

Note also, that even if the description provided by ▇ were true, he would have violated Sections 3.1 and 3.3 as he stated that he continued kissing ▇ even after ▇ indicated lack of consent by stating that he wanted to go back to bed. ▇ did not obtain clearly communicated consent to continue kissing ▇ required under 3.1. Further, based on his own words, ▇ sometimes required ▇ to indicate his lack of consent twice before stopping the sexual activity, in violation of 3.3 which requires sexual activity to stop immediately after an individual has indicated a refusal to engage in the activity. Therefore, under either ▇ or

[Doe] account, [Doe] violated the Sexual Responsibility Section of the Rights and Responsibilities Handbook.

***Attempting to have [J.C.] Perform Oral Sex:*** [J.C.] alleged that approximately eight to ten times when he was lying on [Doe] stomach or chest, [Doe] pushed [J.C.] head down to his penis to try to have [J.C.] perform oral sex. Based on [J.C.]'s interviews, [Doe] continued holding [J.C.] head down even when [J.C.] verbally indicated that he did not want to perform oral sex. According to [Doe] he did ask [J.C.] to perform oral sex, but never put his hand on [J.C.] head to push [J.C.] down to his penis. Both parties were equally credible based on demeanor and consistency regarding their relevant statements about whether [Doe] pushed [J.C.] head to try to have [J.C.] perform oral sex. Although the information obtained during this investigation confirms that [Doe] requested oral sex, it is not sufficient, based on the preponderance of the evidence, to indicate that [Doe] pushed [J.C.]'s head toward his penis in an attempt to have [J.C.] perform oral sex.

***Performing Oral Sex on [J.C.]:*** According to [J.C.] [Doe] performed oral sex on him approximately three to four times despite [J.C.] objections. [Doe] denied this, stating that if [J.C.] indicated he was not interested, [Doe] would state, "Seriously?" and stop performing oral sex. According to [Doe] if [J.C.] stated "no" a second time, [Doe] did not continue.

One of the incidents described by [J.C.] occurred in May 2013 when [Doe] was visiting [J.C.] father's home in North Adams. According to [J.C.] after [Doe] tried to perform oral sex on [J.C.] despite his objections, [J.C.] asked [Doe] whether he understood that this was sexual assault. [J.C.] stated that [J.C.] became very upset by this accusation and wound up lying on the floor until [J.C.] apologized and cajoled him back into bed. During one interview for this investigation, [Doe] stated that he did not recall anything unusual occurring during the North Adams trip, and denied that [Doe] ever brought up the fact that he felt sexually assaulted. However, in subsequent interviews, [Doe] offered inconsistent responses, initially stating that he did not remember if he slept on the floor, then stating that he thought he was on the ground due to heat, not an argument. [Doe] lack of memory regarding whether he wound up on the floor is not credible. During this investigation, in the many conversations regarding sleeping arrangements in [Doe] and [J.C.]'s relationship, [Doe] had never previously mentioned moving to or sleeping on the floor. Even when, as part of this investigation, [Doe] was asked specifically what he did when he was hot when sleeping with [J.C.] he did not mention that he moved to the floor. Rather, he stated that he stopped cuddling, rolled over to an adjoining bed, or went on top of the sheets. It is likely, therefore, that moving to the floor due to temperature control issue was an unusual event and that, therefore, [Doe] would have remembered if he did move to or sleep on the floor during the North Adams visit. The inability of [Doe] to recall whether he moved to the the floor during his North Adams visit, weakens [Doe] credibility regarding his response to [J.C.] allegation that [Doe] performed oral sex on him without consent. In contrast, [J.C.] discussion of and responses to questions about his allegation regarding the North Adams Visit were consistent and credible.

Based on the determination that [J.C.] statement is more credible than [Doe] this report assumes that [J.C.] description of the North Adams incident occurred as described by [J.C.]

This section, therefore, analyzes whether ▮Doe▮ sought and received consent for the sexual activity that occurred during the North Adams incident. ▮J.C.▮ never clearly communicated that he wanted ▮Doe▮ to perform oral sex. ▮Doe▮ violated section 3.1 by performing oral sex, despite this lack of clear consent from ▮J.C.▮ Further, ▮J.C.▮ specifically asked ▮Doe▮ to stop, but ▮Doe▮ did not, in violation of section 3.3. As a result, based on the preponderance of the evidence, ▮Doe▮ violated sections 3.1 and 3.3 of the 2012-2013 Rights and Responsibilities Handbook.

Based on the above, the preponderance of the evidence indicates that ▮Doe▮ did engage in unwanted sexual conduct with ▮J.C.▮ in violation of Sections 3.1 and 3.3 of the 2011-2012 and 2012-2013 Rights and Responsibilities Handbook. He violated 3.1 and 3.3: 1) during the Movie Incident;[20] 2) by initiating sexual activity while ▮J.C.▮ was sleeping;[21] and 3) by performing oral sex on ▮J.C.▮ without his consent during the North Adams Visit.[22] Further, ▮Doe▮ violated 3.2 of the 2011-2012 Rights and Responsibility Handbook by initiating sexual activity when ▮J.C.▮ was in a state of incapacitation as he slept.

2. Preponderance of the Evidence Indicates that ▮Doe▮ Violated Section 2.1.d. of the 2011-2012 and 2012-2013 Rights and Responsibilities handbooks

To find someone responsible for physically harming another in violation of Section 2.1.d. of the 2011-2012 and 2012-2013 Rights and Responsibilities handbooks, the preponderance of the evidence must indicate that physical harm, including "violence of any kind," occurred. The Rights and Responsibilities handbooks do not define violence. Therefore, this report uses the definition of sexual violence provided by the U.S. Department of Education, Office for Civil Rights in its April 4, 2011 Dear Colleague Letter. The Dear Colleague Letter defines sexual violence as "physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent due to the victim's use of drugs or alcohol." See Exhibit 15. Note that 2.1.d. of the 2012-2013 Rights and Responsibilities handbook prohibits any unwanted physical contact.

Based on the analysis provided in Section IV(B)(1) above, the preponderance of the evidence indicates that ▮Doe▮ engaged in sexual acts against ▮J.C.▮ will and unwanted physical contact with ▮J.C.▮ These acts were: 1) the placement ▮J.C.▮ hand on ▮Doe▮ penis during the Movie Incident; 2) engaging in sexual activity while ▮J.C.▮ slept; and 3) performing oral sex on ▮J.C.▮ without consent during the North Adams Visit. As a result, it is more likely than not that ▮Doe▮ violated Section 2.1.d. of the 2011-2012 and 2012-2013 Rights and Responsibilities handbooks.

---

[20] The 2011-2012 Rights and Responsibility Handbook applies to this incident.
[21] The 2011-2012 and 2012-2013 Rights and Responsibilities handbooks apply to these incidents.
[22] The 2012-2013 Rights and Responsibilities Handbook applies to this incident.

3. Preponderance of the Evidence Indicates that ▮▮Doe▮▮ Violated Section 2.1.e. of the 2011-2012 and 2012-2013 Rights and Responsibilities handbooks

To find someone responsible for violating 2.1.e. of the 2011-2012 and 2012-2013 Rights and Responsibilities handbooks, the preponderance of the evidence must indicate that the individual engaged in activity that invaded another's personal privacy. The allegations by ▮J.C.▮ that may have invaded his personal privacy if true were: 1) the Text Messaging Incident; 2) the Pornography Incidents; 3) the Bathroom Incidents; 4) Post-Shower Conduct; and 5) mandating that ▮J.C.▮ sleep naked. Each of these types of incidents is analyzed separately to determine whether the information is sufficient, based on the preponderance of the evidence, to find that they occurred, and if so, whether ▮Doe▮ violated section 2.1.e. by engaging in such conduct.

***Text Messaging Incident:*** ▮J.C.▮ alleged that in the fall of 2011, ▮Doe▮ texted him sexually-explicit message, despite ▮J.C.▮ objections. ▮Doe▮ denied this. Neither ▮J.C.▮ nor ▮Doe▮ kept the text messages and both parties were equally credible with regard to their relevant statements about the text messages. As a result, the information is insufficient to find, based on the preponderance of the evidence, that ▮Doe▮ sent sexually-explicit text messages to ▮J.C.▮ despite ▮J.C.▮ objections.

***Pornography Incidents:*** ▮J.C.▮ alleged that ▮Doe▮ found porn online and moved his computer into ▮J.C.▮ view so that ▮J.C.▮ would see the porn. ▮Doe▮ denied engaging in this behavior. As the alleged porn incidents occurred when ▮J.C.▮ and ▮Doe▮ were alone, no witnesses observed these incidents. Both Parties were equally credible with regard to their relevant statements about the Pornography Incidents. As a result, the information is insufficient to find, based on the preponderance of the evidence, that ▮Doe▮ engaged in the alleged Pornography Incidents.

***Bathroom Incidents***: ▮J.C.▮ alleged that throughout his relationship with ▮Doe▮ actively looked at ▮J.C.▮ penis when they were in the bathroom together despite ▮J.C.▮ objections. ▮Doe▮ admitted that he did look at ▮J.C.▮ penis when they were in the bathroom together, but that ▮Doe▮ did it as a joke. ▮Doe▮ similar comment that touching another student's breasts was a joke suggests that ▮Doe▮ does not effectively distinguish between a joke and inappropriate behavior that invades other's personal privacy. Based on the above, the preponderance of the evidence indicates that ▮Doe▮ invaded ▮J.C.▮ privacy by looking at ▮J.C.▮ penis when ▮J.C.▮ used the bathroom.

***Post-Shower Conduct***: ▮J.C.▮ alleged that ▮Doe▮ stared at him when he changed after taking a shower, despite ▮J.C.▮ objection to this behavior. According to ▮J.C.▮ ▮Doe▮ was so persistent with regard to asking ▮J.C.▮ to take his towel off and to let ▮Doe▮ stare, that ▮J.C.▮ complied to placate ▮Doe▮ ▮Doe▮ admitted that he looked at ▮J.C.▮ when ▮J.C.▮ was changing, but that ▮J.C.▮ never objected to this behavior. As the alleged conduct occurred when ▮J.C.▮ and ▮Doe▮ were alone, no witnesses observed these incidents. Both parties were equally credible based on demeanor and consistency with regard to their relevant statements regarding the Post-Shower Conduct. As a result, the information is insufficient to find, based on the preponderance of the evidence, that ▮J.C.▮ objected to ▮Doe▮ conduct.

***Mandating that*** ▮J.C.▮ ***Sleep Naked***: ▮J.C.▮ alleged that ▮Doe▮ required him to sleep naked when ▮J.C.▮ slept over at ▮Doe▮ room. ▮Doe▮ denied this and emphatically stated that in

fact ███ required ███ to sleep naked when they slept together.  Both ███ and ███ were credible with regard to their statements.  No Interviewees witnessed or were aware of either ███ or ███ requiring the other to sleep naked.  One Interviewee believed that she recalled, but was not sure, that ███ liked to sleep naked.  Another Interviewee stated that ███ slept with clothes on.  The information is insufficient to find, based on the preponderance of the evidence, that ███ required ███ to sleep without clothing.

Based on the preponderance of the evidence provided above, ███ invaded ███ personal privacy by often looking at ███ penis in the bathroom, in violation of 2.1.e.

4.  Preponderance of the Evidence Indicates that ███ Violated Section 7.2 of the 2011-2012 and 2012-2013 Rights and Responsibilities handbooks

To find someone responsible for violating 7.2 of the Rights and Responsibilities Handbook, the preponderance of the evidence must indicate that the individual engaged in conduct described in 7.2, including, for example, unwelcome sexual conduct or "persistent unsolicited and unwelcome invitations for dates, encounters, or pressure to engage in sexual activity of an implied or explicit nature."  To violate the Rights and Responsibilities handbook, the conduct must have "the purpose or effect of unreasonably interfering with a person's education or work performance by creating an intimidating, hostile or offensive environment in which to work, study or live; or otherwise adversely affects a person's employment or educational opportunities," as stated in 7.1.

As described in sections IV(B)(1)-(3) above, the evidence is sufficient to indicate that ███ did engage in unwelcome sexual conduct.  Further, throughout this investigation, ███ made statements indicating that ███ pressured him to engage in sexual activity.  ███ allegation of feeling pressured is consistent with ███ own description of incidents in which he stated "Seriously?" after ███ indicated lack of interest in sexual activity (i.e. when engaging in sexual activity in the morning; when attempting to perform oral sex on ███ ███ statement that he was moody and sulky ███ did not want to engage in sexual activity also corroborated ███ statements that ███ pressured him to engage in sexual activity.

As the alleged incidents occurred during or before May 2013, this investigation examined the impact of these incidents on ███ regardless of whether the potential impact occurred before or after May 2013.  ███ alleged two ways in which ███ conduct adversely affected his access to programs at Brandeis: 1) participation in the Taskforce; and 2) dropping of a course and practicum.[23]

*Taskforce:*  ███ stated that in the fall of 2013, he was excluded from the decision making with regard to the Taskforce, and had not been properly informed about the Queering of the SCC.

---

[23] Note that ███ alleged that ███ conduct negatively impacted his school work, and provided graded assignments from the spring of 2014 to support this.  As these are individual assignments and not final grades that could be compared to previous final grades, this analysis does not address ███ academic performance.

However, the information collected for this investigation does not support this. According to ████ he and ██ decided that ████ would be the QPA Taskforce representative. ████ stated that he informed all attendees at QPA's meetings, including ██ about the progress of the Taskforce and the Queering of the SCC. In addition, at least one email was sent to QPA members regarding the Queering of the SCC. Further, ██ was included on some general emails regarding the Taskforce. ████ stated that ██ was a little controlling regarding the Taskforce, but that this was not directed at ██ Based on the information provided for this investigation, ████ conduct toward ██ did not impact ██ access to the Taskforce.

***Course and practicum:*** ██ indicated during this investigation that he had to drop a course and its corresponding practicum as a result of stress related to ████ conduct. The conduct leading ██ to drop the course and practicum occurred prior to and during May 2013. As a result, based on the preponderance of the evidence, ████ behavior had the effect of interfering with ██ education, and, therefore, ████ violated 7.2 of the 2011-2012 and 2012-2013 Rights and Responsibilities handbooks.

## C. Allegations by ████ Against ██

This report examines, based on the preponderance of the evidence, whether ██ violated sections 2.1.e. and/or 7.5 of the 2013-2014 Rights and Responsibilities Handbook.

> 1. <u>Information is Insufficient to Find, Based on the Preponderance of Evidence, that ██ Violated Section 2.1.e. of the 2013-2014 Rights and Responsibilities Handbook</u>

To find someone responsible for violating 2.1.e. of the 2013-2014 Rights and Responsibilities Handbook, the preponderance of the evidence must indicate that the individual engaged in activity that invaded another's personal privacy. ████ alleged that his personal privacy was invaded through the filing of the January 14 CSR because, as a result of the filing: 1) he had to leave his dorm room and temporarily live in the Faculty Lodge; 2) a no contact order requiring ████ to avoid certain parts of campus was issued; 3) he was removed as the student representative of the Board of Trustees; and 4) he was humiliated due to the allegations.

Individuals within Brandeis have the right under University policy to bring complaints regarding unwanted sexual conduct. Universities are required under Title IX to have procedures that allow community members to file such complaints. Regardless of the ultimate findings (e.g. even if a university determines that the allegations are not supported by evidence), universities are required to complete investigations in order to determine whether school policies have been violated. Further, under Title IX universities may take interim measures while investigations are in process, such as changing individual's housing or implementing no contact orders. Universities, including Brandeis, would be unable to meet their Title IX obligations if they could not take interim measures or conduct investigations. Investigations are very personal, but are required. Individuals likely would reconsider filing complaints if they thought that they could be found in violation of Brandeis policy for invading the other party's personal privacy by filing

complaints that led to interim measures, investigations, and potential embarrassment to the other party. Such a result would be contrary to the intent of Title IX.

Based on the preponderance of evidence, ████ did not violate Section 2.1.e. by filing the January 14 CSR, but rather took action permitted by the University and began a process that the University must have available under Title IX.

### 2. Information is Insufficient to Find, Based on the Preponderance of the Evidence, that ████ Violated Section 7.5 of the 2013-2014 Rights and Responsibilities Handbook

████ alleged that ████ violated Section 7.5 of the 2013-2014 Rights and Responsibilities Handbook. Section 7.5 prohibits false claims of sexual harassment or discrimination. To find a violation under 7.5, the preponderance of the evidence must indicate that an individual intentionally brought false claims against someone else. A complaint is not a false claim simply because it could not be corroborated.

As the findings above substantiate that ████ did violate the sections of the Rights and Responsibilities handbooks identified by ████ did not make false claims against ████ Even if the report did not find that ████ violated any sections of the Rights and Responsibilities handbooks, that alone would not be enough to find that ████ made false claims of sexual harassment. The fact that the evidence was not sufficient to find that each of the incidents alleged by ████ occurred does not indicate that ████ intentionally filed a false claim. ████ was credible in his belief that each of the alleged incidents occurred, even if the evidence was not sufficient to support his allegations. The preponderance of the evidence is insufficient to indicate that ████ intentionally filed a false claim.

## V.   Conclusion

Based on the preponderance of the evidence, the information above indicates that ████ 1) engaged in sexual activity with ████ without ████ explicit consent, in violation of 3.1, 3.2, and 3.3; 2) engaged in unwanted physical contact with ████ in violation of 2.1.d.; 3) invaded ████ personal privacy, in violation of 2.1.e.; and 4) sexually harassed ████ in violation of 7.2.

Based on the preponderance of the evidence, the information above is insufficient to find that: 1) ████ invaded ████ personal privacy in violation of 2.1.e. by filing the January 14 CSR; or 2) ████ filed false claims against ████