## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, : | |
| : | |
| Plaintiff, : | |
| : | Civil Action No. 1:15-cv-1157-FDS |
| v. : | |
| : | |
| BRANDEIS UNIVERSITY, : | **JURY TRIAL DEMANDED** |
| : | |
| Defendant. : | |
| : | |

### AMENDED COMPLAINT

Plaintiff John Doe (hereinafter "John"), by and through his undersigned attorneys, files this Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(B) and in support thereof alleges as follows:

### I.       NATURE OF THE ACTION

1.       This case arises out of actions taken by Defendant Brandeis University ("Brandeis" or "the University") concerning false allegations of sexual misconduct made against John by his ex-boyfriend, referred to herein by the pseudonym J.C., while both were students at Brandeis.

2.       John and J.C. met in August 2011 on the first day of Orientation of their freshman year at Brandeis.  John was unsure of his sexual orientation.  J.C. was openly gay and sexually experienced.

3.       Their attraction to each other was immediate and mutual.  Within weeks, the two became sexually intimate, "came out" to family and friends as a couple, and began a 21-month sexually active, exclusive dating relationship.

4.      In July 2013, however, J.C. broke up with John because J.C. wanted someone "more forceful" who "could stand up to him more."  The two remained cordial for the next four months, but the friendship deteriorated in November-December 2013.

5.      Then, on January 13, 2014, J.C. observed that a male gay student, to whom J.C. was attracted, appeared to be attracted to John.  J.C. sent the student a Facebook "friend request," but the student declined J.C.'s invitation.

6.      The next day after this rebuff, J.C. filed a two-sentence University Community Standards Report ("Report"), accusing John of engaging in "numerous inappropriate, nonconsensual sexual interactions" with J.C. between September 2011 and May 2013.

7.      Upon receipt of the Report, the University banned John from his residence, classes, paid University job, position as community advisor, student-elected position on a prominent University Board, and sequestered him in a campus facility.

8.      Two days later, the University notified John that J.C.s' two-sentence accusation related to six potential violations in Brandeis's "Rights and Responsibilities" Handbook ("R&R Handbook"):  sexual misconduct, lack of consent to sexual activity, taking sexual advantage of incapacitation, sexual harassment, causing physical harm, and invasion of personal privacy.

9.      The Dean of Students told John that the University intended to conduct a formal investigation and adjudication of J.C.'s charges (rather than an informal process recommended by an administrator in the Department of Student Rights and Community Standards) *and* that it would do so through the new "Special Examiner's Process" for sexual misconduct and sexual harassment cases – not the University's long-established Student Conduct "Hearing Process."

10.     John was stunned by the accusation and charges, and the University's precipitous response.  Not once during the 21 months they were together did J.C. complain to John that he was performing any sexual act without J.C.'s consent or was invading his privacy.

11.     Nor was there a trace of physical or other corroborating evidence that John ever physically harmed or sexually harassed J.C.  There were no medical or hospital records, 911 calls, reports to Campus Police or law enforcement, witnesses to any incidents, or complaints by J.C. to friends, relatives, or Brandeis personnel during the entire relationship.

12.     During the next six months, the University subjected John to the Special Examiner's Process.

13.     The contrast between the Hearing Process and the Special Examiner's Process is stark.  In the Hearing Process, the parties participate in a hearing before an impartial four-member tribunal.  The accused must be informed of "the details of the charges" as much as 30 days before the hearing.  At the hearing, the accused and the accuser have the right to present evidence and to ask questions of each other and each other's witnesses.  There is a full and equal opportunity for both parties to hear the evidence and present their claims and defenses.

14.     In the Special Examiner's Process, the hearing is eliminated.  In its place, the University created a secret, inquisitorial process, in which a single individual hired by the University – the "Special Examiner" – conducts a closed-door investigation of the charges and then issues a Report setting forth the Examiner's "finding" about whether the accused is "responsible or not responsible for any or all charges."

15.     The accused never has the opportunity to confront his accuser or question the witnesses.  Because there is no hearing, the accused never knows what the accuser actually has said, but only knows what the Special Examiner chooses to tell him.  In John's case, he was not

told orally or in writing the factual bases for the charges against him at any time before or during the Special Examiner's investigation; instead, he had to try to piece together what in particular he was accused of doing from the questions posed to him by the Special Examiner.

16.     At the conclusion of the investigation, John was informed that the Special Examiner in his case (an outside lawyer) found him responsible for all six charges.

17.     It was only then – after the Special Examiner had concluded the investigation and found John responsible for the charges – that John learned without specific detail the alleged acts that formed the basis for the charges through a "Summary" of the Report prepared by a University administrator.

18.     J.C.'s accusations were frivolous on their face, but the Special Examiner's findings were even more disturbing.  The findings were based on novel notions of consent, sexual harassment, and physical harm that were not specified in the R&R Handbook and that are at odds with traditional legal and cultural norms and definitions.  The findings completely ignored the context of a romantic, dating relationship, and were not supported by the evidence.

19.     For example, the Special Examiner concluded that in the course of their relationship, when John awakened J.C. in the morning with a kiss but J.C. told him to "stop" so that he could go back to sleep, John had sexually assaulted J.C. because sleep is a "state of incapacitation," because the wake-up kiss therefore lacked consent, and because John was thus taking advantage of J.C.'s incapacitation.

20.     The Special Examiner found that, on those occasions when John looked at J.C.'s private parts when the two shared the dorm's same-sex communal bathrooms, John invaded J.C.'s personal privacy, even though the two were in a nearly two-year sexually intimate

relationship, routinely slept together naked, and shared communal facilities, and even though J.C. could have used a private stall but chose not to.

21.    The Special Examiner found that, when John made the "first move" on J.C. while the two were in their pre-dating "flirting" stage by placing J.C.'s hand on John's crotch over his clothing, John had sexually assaulted J.C. because J.C. had not verbally consented to the act. The Special Examiner made this finding even though the very next day the two became sexually intimate and began a 21-month, sexually active dating relationship, and even though J.C. humorously recounted this incident to their mutual friends throughout their relationship.

22.    John was sanctioned by the University with a Disciplinary Warning.  A Disciplinary Warning requires the student to undergo education training to address the infraction. Much more importantly, the warning carries with it a permanent notation on the student's education record that he has violated a disciplinary code.

23.    In John's case, his permanent education record will reflect that he was found responsible for sexual misconduct toward another student involving lack of consent to sexual activity and taking sexual advantage of incapacitation, sexually harassing and physically harming the student, and invading the student's personal privacy.

24.    Brandeis has effectively labeled John as a predatory sexual offender.

25.    The adverse mark on John's education record, stigmatizing him as a sexual offender, will likely prevent John from obtaining admission to law school and pursuing a career in government or public service.  John's disciplinary record will be a lifetime liability.

26.    The flaws in the Special Examiner's findings were compounded by the University's repeated failure to follow its own policies and procedures that were intended to

place checks and balances and provide independent University oversight and review over the

Special Examiner, including but not limited to the following acts and omissions:

a.  In violation of explicit provisions of the R&R Handbook, the University
    eliminated the initial "Statements Phase" of the Special Examiner's Process in
    John's case.  In that Phase, the University asks the accuser to compose in writing
    a "thorough description" of the allegations if the contents of the initial report do
    not represent a full account.  The accused has the opportunity to compose in
    writing a "thorough response" for the Special Examiner's consideration in the
    investigation.  That did not happen in John's case.  To the contrary, University
    officials told John that J.C. had given them "substantially more information" than
    in his initial two-sentence Report, but they refused to provide that information to
    John.  Instead, they told him the Special Examiner would determine in her
    discretion whether or not to share the information with him.

b.  In violation of an explicit provision of the R&R Handbook and federal law,
    University officials refused to provide John with a copy of the Special Examiner's
    Report until *after* his subsequent appeal was denied and his case was closed.  He
    was forced to defend himself against a Report that he was not allowed to read.

c.  In violation of explicit provisions of the R&R Handbook, Lisa Boes, Brandeis's
    Dean of Academic Services who was chosen as the University's "final decision
    maker" on the case, failed to convene a Deliberations Panel of three faculty
    members, whose function during the "Deliberations Phase" of the Process was to
    review the Special Examiner's Report, interview the Special Examiner at their
    discretion, and recommend to Boes whether or not to accept the Special
    Examiner's findings.  Instead, Boes unilaterally accepted the findings without the
    mandated Panel review.

d.  Boes then convened a so-called "Sanctions Panel," which does not exist in the
    R&R Handbook, to determine the sanction for her pre-determined finding.  Her
    elimination of the Deliberations Phase explains the apparent disconnect between
    the seriousness of the charges for which John was found responsible and the light
    sanction.  Clearly, the Sanctions Panel did not agree with the findings, or found
    that the conduct giving rise to them was so innocuous as to warrant a sanction that
    signaled their disbelief in the seriousness of the conduct.

e.  In violation of Brandeis's procedures governing conflicts of interest, the
    University Appeals Board that decided John's subsequent appeal of the findings
    was tainted by a conflict of interest – *i.e.*, the Chair of the Appeals Board served
    on a University Subcommittee on Sexual Violence with J.C.'s Special Examiner's
    Process Advisor at the same time as J.C.'s case against John was pending.  It is
    apparent from statements in the Appeals Board's Decision and the
    Subcommittee's Report, which were issued one week apart, that the Chair and
    J.C.'s Advisor must have discussed details of the case, even though Brandeis's

procedures provide that members of Appeals Boards are not to interact with Advisors about the Process or appeal materials.

f.   John was contractually entitled to have his case decided through the Hearing Process set forth in the 2011-12 R&R Handbook because that is the contract he signed as a condition of his matriculation at Brandeis.  Even if subsequent R&R Handbooks could be applied to John's case, those Handbooks mandated that allegations of physical harm and invasion of privacy must be adjudicated through the Hearing Process.

g.   Upon information and belief, Brandeis violated its contractual obligation to maintain the confidentiality of John's education record by leaking the Special Examiner's findings to third parties.

27.   Not content with the sanction in John's case, J.C. revealed the University's confidential findings to third parties and defamed John by repeatedly making public accusations, orally and in writing, on social media and to the press, that John was his "attacker," and subjected J.C. to "multiple forms of rape."  Brandeis knew those public accusations were false because J.C. had explicitly told the Special Examiner John never raped him, which J.C. defined as penetration without consent, and because there was no accusation and no finding of responsibility for either "rape" or physical "attacks."

28.   Upon information and belief, Brandeis intentionally "leaked" the Special Examiner's findings to John's then-current and prospective employers (one of whom told John she had been "made aware" of his situation at Brandeis from "several sources"), or at the very least failed to adequately safeguard the confidentiality of the findings as it is required to do under federal law.  These violations directly resulted in John's being fired from his internship position working for a high-ranking elected official, the withdrawal of employment offers, and the withdrawal of employment references.

29.   Brandeis's and J.C.'s egregious conduct has caused John severe emotional distress, including panic attacks leading to suicidal ideation on at least two occasions, loss of

weight and appetite, a complete inability to sleep through the night, and anxiety and depression requiring psychological counseling.  He has been subjected to hateful and intimidating comments by other students, including a student at a public function who loudly called him "rapist."

30.     John found the environment on campus so hostile and toxic that he accelerated his graduation date to leave a University that betrayed his trust.

31.     Brandeis violated its contractual pledge to "preserv[e] the rights . . . of all its students through all of it disciplinary procedures" by vesting in a single individual, the Special Examiner, the conflicting and unregulated roles of investigator, prosecutor, and *de facto* judge.

32.     The Special Examiner's findings were arbitrary and capricious.  The Examiner relied on definitions of sexual conduct that were not set forth in the R&R Handbook and that are inconsistent with traditional legal definitions and customary norms.  J.C.'s charges lacked a shred of evidentiary support; the Special Examiner ignored John's witnesses, social media documentation, and the circumstances of a 21-month consensual sexual relationship indicating that John and J.C had a normal, healthy relationship that eventually ran its course.

33.     Brandeis allowed a malicious ex-lover to hijack the University's disciplinary processes for his own illegitimate purposes, and aided and abetted his abuse of process.  It allowed Boes and a biased Appeals Board to rubber stamp the Special Examiner's findings, even though they could not be squared with the evidence, and elevated commonplace, everyday interactions in a nearly two-year consensual relationship into serious sexual transgressions.

34.     By implementing this deeply flawed Process, and permitting it to play out unchecked in John's case in violation of its own policies and procedures, Brandeis has set a dangerous precedent that hurts all real victims of sexual violence.

35.      Justice Brandeis would be appalled.

## II.   PARTIES

36.   Plaintiff John Doe is a natural person who resides in California.  John was a student at Brandeis University, who graduated with high honors on February 1, 2015.

37.   Defendant Brandeis University ("Brandeis" or "the University") is a private, coeducational research university with a principal address of 415 South Street, Waltham, Massachusetts 02545.  Brandeis was founded in 1948 by the Jewish community as a non-sectarian institution "open to all . . . with a commitment to making a positive impact on the world."  ("School Mission and Unique Qualities," U.S. News & World Report, National Rankings.  http://colleges.usnews.rankingsand reviews.com/best-colleges/brandeis-university-2133) (last visited 3/03/2015).  Named for Louis Brandeis, the first Jewish justice of the United States Supreme Court, Brandeis encourages its 3,500 undergraduate students to focus on community service, consistent with the University's "commitment to Social Justice."  (*Id.*)

38.   Brandeis is among the nation's leading universities, ranking 35 in U.S. News & World Report's 2015 National Universities list.  (*Id.*).

39.   At all times material hereto, Brandeis acted by and through its agents, servants, employees, and representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of Brandeis's business, mission and/or affairs.

### III.   JURISDICTION AND VENUE

40.   For diversity purposes, John is a citizen of the state of California and Brandeis is a citizen of the Commonwealth of Massachusetts.

41.   This Court has original diversity jurisdiction over this claim pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

42.     Venue is proper in the Eastern Division of the District of Massachusetts pursuant to 12 U.S.C. § 1391(b)(2) and District of Massachusetts Local Rule 40.1(D) because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in the District of Massachusetts and because the Defendants reside in Middlesex County.

## IV.     FACTUAL BACKGROUND

### A.     The Relationship Between John and J.C.

43.     John and J.C. met in August 2011, when they began their freshmen year at Brandeis.  John was 17 years old.  J.C. was 18 years old.  At the time, John was unsure of his sexual orientation, and had never engaged in sexual activity with another man.  J.C. was openly gay and sexually experienced.

44.     The two became close friends.  J.C. knew that John was attracted to him, and they began to flirt with each other.

45.     When the two discussed the fact that John was sexually attracted to J.C. but was torn about whether to act on it, J.C. responded that he would never make the first move on a straight guy.  That was a clear signal to John that he would have to initiate any sexual activity. John did so while the two watched a movie in a friend's dorm room and cuddled against each other by placing J.C.'s hand on John's crotch over his clothing, and J.C. kept his hand there for the rest of the movie.  The very next day, the two became sexually intimate when J.C. performed oral sex on John.

46.     A month later, in October 2011, John "came out of the closet" to his parents, and he and J.C. revealed to their Brandeis friends that they were boyfriends.

47.     Between September 2011 and July 2013, a period of 21 months, John and J.C. were involved in an intimate, sexually active, and, insofar as John is aware, exclusive, dating relationship (the "Relationship").

48.     Always at J.C.'s insistence, John and J.C. slept together (usually naked) in the same bed.  Often, one awakened the other in the morning with a kiss.

49.     They showered together, shared the dorm's same-sex communal bathrooms, and observed each other naked.

50.     John and J.C. were happy in the Relationship.

51.     Not once during the entire Relationship did J.C. ever complain to John, or to any of their friends or relatives, law enforcement, University Campus Police, or any Brandeis administrator that John was performing any sexual act without J.C.'s consent, was invading his privacy, causing him physical harm, or was sexually harassing him.  In fact, on occasion, J.C. stated he wished John would surprise him more and reciprocate sexual acts more than he did.

52.     Before the Relationship, J.C. told John that J.C.'s mother had a history of alcohol abuse, had neglected J.C. and his siblings, and had attempted suicide, which led to J.C.'s removal from her custody and placement in foster care.

53.     In light of his family history, J.C. did not drink alcohol during the entire Relationship and insisted that John not drink alcohol as well.

54.     John respected and supported J.C.'s sober lifestyle.

55.     In July 2013, J.C. broke up with John because J.C. felt they had lost a connection and because he claimed John was not strong-willed enough.  In J.C.'s words, J.C. wanted a "more forceful" partner who "could stand up to him more."

**B.     J.C. Falsely Accuses John of Sexual Misconduct.**

56.     After the Relationship ended in late July 2013, the two remained cordial for approximately four months.  They had dinner with friends, collaborated on a campus LGBT project, co-interviewed a candidate for a newly created Sexual Assault Prevention Specialist position, and exchanged friendly email messages.

57.     In November-December 2013, J.C. and John had several dissonant social interactions, and their friendship deteriorated.  John also was put off because J.C. had started drinking alcohol to excess, which John perceived as being hypocritical given J.C.'s insistence during the Relationship that John not have alcohol.

58.     In January 2014, J.C. observed that a gay male student seemed to be attracted to John.  J.C. was attracted to the student as well.  When J.C. sent that student a Facebook "friend request," the student declined the invitation.  The very next day, J.C. made the false accusation against John that is the basis for this lawsuit.

59.     On January 14, 2014, more than six months after their Relationship ended, and more than two years after their first sexual contact, J.C. filed a Report with the University, stating in full: "Starting in the month of September, 2011, the Alleged Violator of Policy [John] had numerous inappropriate, nonconsensual sexual interactions with me.  These interactions continued to occur until around May 2013."

60.     That same day, Brandeis's Dean of Students, Jamele Adams, without giving John an opportunity to explain his side of the story, took punitive action against him.  He banned him from his residence, classes, paid campus job, community advisor position, high-ranking student-elected position on a University Board, and sequestered him in a campus facility.  Adams had no knowledge of any facts underlying J.C.'s non-specific, two-sentence allegation, and had no information remotely suggesting John was a danger to J.C. or the Brandeis community.

61.     Two days later, the University informed John that J.C.'s accusations raised six potential code violations in the R&R Handbook:  sexual misconduct, taking sexual advantage of incapacitation, lack of consent to sexual activity, sexual harassment, causing physical harm to

another, and invasion of personal privacy.  The University did not inform John of any of the alleged acts that formed the basis for these claims.

62.     The University informed John that his case would be formally handled through the University's new Special Examiner's Process (bypassing an informal process suggested by an administrator in the Department of Student Rights and Community Standards), and that he was not entitled to have his case decided through the Hearing Process.

### C.     <u>The University Abandons the Hearing Process for the Special Examiner's Process for Sexual Misconduct and Sexual Harassment Allegations.</u>

#### 1.     <u>The  Hearing Process.</u>

63.     When John entered Brandeis as a freshman in August 2011, the University's method of handling sexual misconduct and harassment allegations was through the Student Conduct Hearing Process ("Hearing Process").  As set forth in the 2011-12 R&R Handbook, in the Hearing Process students and faculty hear and decide the cases before them, with panels consisting of two students and two faculty members for academic violations, and three students and one faculty member for all other violations.  (Excerpts from 2011-12 R&R Handbook, attached as Ex. A, Sections 2 & 3, at 3-6; Section 20.2, at 25; Section 23.B, at 30).

64.     Pursuant to the Hearing Process, the accused must be "**<u>inform[ed] . . . of the details of the charges</u>**" as many as 30 days before the hearing.  (*Id*. Sections 19.1 & 19.6, at 22-23) (emphasis added).  The University's hearing administrator must "**<u>be available prior to the hearing at the request of the accused student to provide information regarding the alleged violation</u>** . . . ."  (*Id*., Section 19.6, at 23) (emphasis added).

65.     At the hearing, the accuser and the accused have the right to "present evidence and introduce witnesses."  They each have "**<u>the right to question all witnesses appearing before the Board</u>**," including the right to question each other and re-question each other after

13

other witnesses have testified.  (*Id.*, Sections 19.9, 19.11, at 23-24; Section 23, at 30-31) (emphasis added).  Board members may question the parties and all witnesses.  (*Id.*, Section 23, at 30).

66.     The accuser is required to prove his or her allegations by "clear and convincing evidence."  (*Id.*, Section 19.13, at 24).

67.     The Board prepares a Hearing Report summarizing the evidence and its decision, and the parties have access to it as an "education record" pursuant to the Family Educational Rights and Privacy Act ("FERPA") and the R&R Handbook.  (*Id.*, Section 17.4, at 20).

## 2.        The Special Examiner's Process.

68.     In the 2012-13 R&R Handbook, the University supplanted the Hearing Process with the Special Examiner's Process for allegations involving sexual misconduct and sexual harassment.  (*See* Excerpts from 2012-13 R&R Handbook, attached as Ex. B, Section 3.0, at 6-7; Section 7.0, at 11-13; Section 22.6, at 35).  All other student conduct violations remained subject to the Hearing Process.  (*Id.*, Sections 2.1, 2.3, at 4-5; Sections 19-22.5, at 24-40).

69.     Brandeis adjudicated John's case under three R&R Handbooks.  Because the alleged incidents occurred during the 2011-12 and 2012-13 academic years, the R&R Handbooks from those years were supposed to be used by the Special Examiner to define the alleged charges and conduct.  Brandeis decided it would apply the 2013-14 R&R Handbook to govern the procedures to be used in the Special Examiner's Process, ostensibly because J.C. filed the charges in the 2013-14 academic year.

70.     Those procedures consisted of seven "Phases" – Statements, Fact-Finding, Discussion, Responsibility Findings, Deliberations, Outcome Notification, and Appeals.  (*See* Excerpts from 2013-14 R&R Handbook, attached as Ex. C).

(a)     <u>**Statements Phase.**</u>

71.     In the Statements Phase, the Director of the Department of Student Rights and Community Standards meets in-person with the accuser, and suggests that the accuser "compose in writing a thorough statement of the allegation(s) if the contents of the initial report do not represent a full account." (Ex. C, Section 22.6, at 43). The Director then meets in-person with the accused and suggests that he or she "compose in writing a thorough response to the allegations" and submit documents and names of witnesses for consideration by the Special Examiner in the investigation. (*Id*. at 44).

(b)     <u>**Fact-Finding Phase.**</u>

72.     In the Fact-Finding Phase, a single individual, the Special Examiner, investigates the allegations and evidence. (Ex. C, at 42, 44-45).

73.     The Special Examiner separately interviews the parties and witnesses, and considers documents and other physical evidence. The Special Examiner chooses which, if any, witnesses to interview, what questions to ask of everyone interviewed, and determines what information the accused receives during the Process. (*Id*. at 45).

74.     A member of the faculty or staff serves as an Observer during all interviews involving the parties held by the Special Examiner. (*Id*. at 42). An Advisor chosen by each party serves as support and may offer guidance to the party throughout the Process. Advisors can be any current member of the Brandeis community, including students, faculty, administrators, and staff. (*Id*. at 42).

75.     After completing the investigation, the Special Examiner prepares a Report summarizing disputed and undisputed facts. In the 2012-13 R&R Handbook, the Special Examiner "**<u>may</u>** offer conclusions or recommendations as to the credibility of testimony or **<u>potential</u>** outcomes." (Ex. B, Section 22.6, at 38) (emphasis added).

15

76.     In the 2013-14 R&R Handbook, Brandeis significantly expanded the Special Examiner's authority.  Whereas previously the Special Examiner had served only in the role of "investigator" (who "may" offer "recommendations" about "potential outcomes"), Brandeis added the roles of fact-*finder* and *adjudicator*, specifically authorizing the Special Examiner to "**make[ ] a finding about whether the Accused is responsible or not responsible for any or all charges**."  (Ex. C, Section 22.6, at 45) (emphasis added).

77.     The Special Examiner uses a preponderance of the evidence standard "**in evaluating the responsibility of the accused**."  (*Id*. at 43) (emphasis added).

**(c)     Discussion Phase.**

78.     In the Discussion Phase, the accuser and the accused meet separately with the University's "final decision maker" (the Senior Student Affairs Officer or designee) to "listen" to the final decision maker's "Summary" of the findings in the Special Examiner's Report.  (Ex. C, at 45-46).

79.     When John's case was adjudicated, Brandeis did not permit the parties to read the Special Examiner's Report.  (*Id*. at 46).  Brandeis imposed this prohibition even though the federal Family Educational Rights and Privacy Act of 1974 ("FERPA") gives each student access to the student's education record, and disciplinary reports unquestionably are a part of a student's education record.  Brandeis acknowledged its FERPA obligation in a separate contractual provision of the R&R Handbook.  (*Id*., Section 17.4, at 26).

80.     The parties have two business days to respond to the Summary and submit new information or additional witness names.  The final decision maker decides whether to submit the new material to the Special Examiner for additional fact-finding.  (*Id*., Section 22.6, at 46).

16

### (d) **Responsibility Findings Phase.**

81.     If the accused is found not responsible by the Special Examiner, the final decision maker notifies the parties in writing within two business days.  (Ex. C, at 46).

82.     "If the Accused is found responsible for one or more charges, the Special Examiner's Process progresses to the Deliberations Phase."  (*Id.* at 46).

### (e) **Deliberations Phase.**

83.     In the Deliberations Phase, the final decision maker appoints a Panel of three University administrators and/or faculty in order for them to read the Special Examiner's Report, interview the Special Examiner at their discretion, and vote on whether to recommend to the final decision maker to accept or not accept the Examiner's findings.  (Ex. C, at 43 ("Panel"), 46 ("Deliberations Phase")).  The final decision maker may not serve on the Panel.  (*Id.* at 46).  The final decision maker "renders the final decision as to any outcomes."  (*Id.*).

### (f) **Outcome Notification Phase.**

84.     The final decision maker communicates the final outcome decision in writing to the parties within seven days.  At that time, the parties will be informed of any sanctions that relate to the final outcome.  (Ex. C, at 46).

### (g) **Appeals Phase.**

85.     In the Appeals Phase, the accuser and the accused may appeal the "final decision by the panel in the Special Examiner's Process to the University Appeals Board . . . ."  (Ex. C, at 46).  The Appeals Board consists of three voting faculty members, and appeals may be based on "fraud, denial of rights under this process, procedural error, or the claim of new evidence . . . ."  (*Id.*, Section 20.7, 20.8, at 37; Section 22.6, at 43, 46).  The final decision maker retains ultimate discretion whether to reverse, amend or uphold the original final decision.  (*Id.* at 47).

17

86.     In every Phase of the Special Examiner's Process in John's case, Brandeis administrators and the Special Examiner blatantly violated the University's own policies and procedures, failed to adhere to its standard of evidence, and misconstrued its written definitions of consent, privacy, harassment, and physical harm, all to John's severe detriment.

### D.     The Special Examiner's Investigation and Finding of Responsibility.

87.     Immediately after receiving notice of the charges against him on January 14, 2014, and for weeks thereafter, John repeatedly asked University officials to inform him of the factual bases for J.C.'s charges against him.  He had not been provided with anything more than J.C.'s two-sentence, 29-word accusation.  John still had no idea what he was alleged to have done wrong during his nearly two-year Relationship with J.C.

88.     The University refused his requests.

89.     The first time John learned *any* of the factual allegations underlying J.C.'s accusation was when the Special Examiner interviewed John for the first time in February 2014, and began to ask him questions about particular incidents occurring over the course of the two-year Relationship and during the "flirting" period before the Relationship began.  John surmised that these incidents had been brought up by J.C. during J.C.'s first and second interviews with the Special Examiner conducted in late January and early February 2014.

90.     For John's case, Brandeis hired an outside lawyer to serve as Special Examiner.

91.     During the next two-and-a-half months, the Special Examiner conducted three additional interviews with John and two additional interviews with J.C.  The Special Examiner also interviewed two University administrators, one of whom was identified by John, two additional witnesses whom John identified, and four witnesses identified by J.C.  None of the witnesses was an "eye witness" to any of the alleged incidents.  They provided only general information about the Relationship and breakup.

18

92.     During this entire process, John received nothing orally or in writing stating what it was in particular that J.C. accused him of doing.  John had to try to piece those accusations together based on the questions the Special Examiner asked him during his interviews.

93.     The questions centered on mundane, everyday routines, or isolated incidents over a nearly two-year period.  For example, the Special Examiner asked John questions about John's and J.C.'s use of the dorm's communal bathrooms.  The Special Examiner asked John about "wake up morning kisses," and whether John had "slept on the floor" during a visit he and J.C. had made to J.C.'s father's house.  John was forced to try to recollect events over the course of the Relationship that were not imprinted in his memory because they were unremarkable.

94.     John was not told what J.C.'s witnesses said in their interviews.

95.     After completing the investigation, the Special Examiner concluded that John was responsible for all six charges based on four alleged incidents.  At no point in the Process was John allowed to question his accuser or witnesses, or even to know exactly what it is they said.

E.     **The University Finally Presents John With a "Summary" of the Special Examiner's Findings.**

96.     On April 24, 2014, Lisa Boes, the University's Dean of Academic Services, who was chosen to serve as the "final decision maker" in John's case, met with John and read to him the "Summary" she had prepared of the findings in the Special Examiner's Report.

97.     Boes was ill-prepared for her pivotal role in the case.  She was not familiar with the Special Examiner's Process; she had not served as the final decision maker before; and she was chosen to serve in that capacity in spite of her inexperience only because the Brandeis administrator who normally presided over the Special Examiner's Process had recused himself. As final decision maker, Boes failed to follow critically important procedures that resulted in an unfair and procedurally flawed Process.

98.     John requested but was not given a copy of the Special Examiner's Report at that time or at any time while his case was being adjudicated.   The University provided John with the Report only *after* his case had been decided and closed by the University.  The University provided John with a copy of the Summary while his case was pending.

99.     The Summary sketched out for John without factual detail what it is he allegedly did wrong.

100.     The accusations of sexual misconduct were incredible to John and he expressed his shock to Boes.  Even more disconcerting were the findings of the Special Examiner.

101.     The Special Examiner analyzed each of J.C.'s alleged 12 "incidents" in isolation. She ignored the context of the couple's long-term consensual relationship and applied definitions of consent, sexual harassment, physical harm, and privacy that were not contained in any of the three R&R Handbooks that were supposed to have been used in the case and were at odds with traditional legal and cultural norms and definitions.  In the absence of objective, verifiable evidence that any of the alleged incidents actually occurred, the Special Examiner used manipulative interrogation techniques to create trivial "inconsistencies" in John's recollection of events over a nearly two-year period, and accorded John's witnesses and documentary evidence no weight in the decision-making process.

### 1.     The Movie Incident.

102.     Three of J.C.'s alleged "incidents" concerned conduct occurring more than two years before, while J.C. and John were "flirting" and just before they "came out" to their friends as a couple.

103.     First, J.C. accused John of "walking" with J.C. in a way that required J.C. to accidentally touch John "on the butt."  According to J.C., this "unwanted touching" constituted sexual misconduct and lack of consent.

104.    Second, J.C. accused John of "the Movie Incident," in which John made the first move on J.C. by placing J.C.'s hand on John's crotch while watching a movie in a friend's dorm room.  According to J.C., this constituted sexual misconduct because John had not obtained J.C.'s verbal consent.

105.    Third, J.C. accused John of "Post-Movie" sexual misconduct on the basis that before they began dating John tried to kiss J.C., was naked in his room, and put J.C.'s hand on (his) John's groin.

106.    The Special Examiner found the evidence was insufficient to indicate that the walking and post-movie incidents occurred.

107.    However, the Special Examiner found John responsible for sexual misconduct and lack of consent with respect to "the Movie Incident," crediting J.C.'s story that he "froze" and submitted to the sexual contact without giving verbal consent.

108.    The Special Examiner made this finding even though it was undisputed that the two had been "flirting," J.C. had indicated to John just prior to the contact that John would have to make the first move sexually, and within a day of the incident the two began a **__21-month dating relationship__**.  It defied reason for the Special Examiner to have concluded that John's "first move" leading to a 21-month consensual relationship was a sexual assault.

109.    The Special Examiner also misapplied the University's definition of "consent," which in all of the R&R Handbooks that were supposed to apply to John's case permitted consent to be "communicated verbally or ***through actions*** . . . ."  (*See* R&R Handbooks 2011-12, 2012-13, 2013-14, Ex. A, Section 3.3, at 5; Exs. B & C, Sections 3.3, at 6) (emphasis added). The Special Examiner improperly required explicit verbal consent, ignoring the actions surrounding the act that communicated consent.

21

110.    In response to the Movie Incident finding, John provided Boes with the names of witnesses who would have attested to the fact that J.C. humorously recounted the Movie Incident to mutual friends throughout the Relationship.  Boes refused to forward those names to the Special Examiner for further fact-finding.

> ## 2.    **The Wake-Up Kiss Incidents.**

111.    Next, J.C. accused John of engaging in nonconsensual sexual conduct on several occasions while J.C. was sleeping, such as "humping" or rubbing up against him, which awakened J.C.  This alleged misconduct occurred during the sexually-active "dating" phase of the Relationship.  When the Special Examiner initially questioned John about these "sleeping" and "wake-up" incidents, John denied rubbing against J.C. in his sleep but acknowledged he would sometimes wake up J.C. by kissing him.  The Special Examiner made no finding regarding the alleged humping.

112.    The Special Examiner concluded, however, that some of the "wake-up kisses" were unwanted sexual activity.  In his initial interview, John said that J.C. would never tell him to "stop" kissing him, but in a subsequent interview John clarified that on some occasions, when the wake-up kiss was too early in the morning (8:00 a.m. instead of 10:00 a.m.), J.C. would tell John to "stop" so that he could go back to sleep.

113.    The Special Examiner concluded that John had been "inconsistent" by not telling the Examiner in the first interview that J.C. sometimes had told him to stop.  On this basis, the Special Examiner found that those wake-up kisses constituted sexual misconduct because sleep is a "state of incapacitation," the wake-up kiss therefore lacked consent, and John thus took sexual advantage of J.C.'s incapacitation.

114.    This finding was arbitrary and capricious.  Under the Special Examiner's reasoning, sexual misconduct among couples in a long-term relationship is an everyday

occurrence.  In addition to improperly imposing a verbal consent standard and ignoring the circumstances of a committed, dating relationship, the Special Examiner failed to consider the undisputed facts that the two slept together at J.C.'s insistence throughout the Relationship and regularly engaged in consensual sexual contact, including mutual "wake-up" kisses.

### 3.      The North Adams Incident.

115.      Next, the Special Examiner found John responsible for sexual misconduct and lack of consent based on J.C.'s accusation that John tried to perform oral sex on J.C. when the two were in bed while visiting J.C.'s father's home in North Adams, Massachusetts.  J.C. alleged he objected to the sexual contact and asked John whether he realized this was sexual assault. J.C. claimed John was upset and moved to the floor.

116.      When initially questioned by the Special Examiner about whether anything unusual had occurred during the visit, John said no.  When asked by the Special Examiner in a subsequent interview whether he had "slept on the floor" when J.C. accused him of sexual assault, John denied J.C. ever brought up that he felt sexually assaulted but recalled he had moved to the floor on one occasion due to discomfort sleeping in a twin bed with J.C.

117.      The Special Examiner concluded that John's accounts of the visit were "inconsistent" because he had not acknowledged sleeping on the floor in his first interview, even though the Special Examiner had not asked John whether he slept on the floor until the second interview.  On this basis, the Special Examiner found that unwanted sexual activity had occurred.

118.      The Special Examiner's conclusion was based on nothing more than a manufactured "inconsistency" elicited through a patently unfair interrogation process. Additionally, the Special Examiner ignored the undisputed fact that J.C. continued to engage with John sexually during the months following the visit until the end of the Relationship.

4. **The Bathroom Incidents.**

119.    Next, the Special Examiner found John responsible for invading J.C.'s privacy by looking at J.C.'s private parts when the two were using the dorm's communal bathrooms.

120.    John had been questioned by the Special Examiner during interviews about "bathroom incidents" and responded that he and J.C. were in a same-sex relationship and used same-sex communal bathrooms, during which they looked at each other's private parts, sometimes as a joke.  The Special Examiner found that John's response indicated he did not effectively distinguish between a joke and inappropriate behavior that invades another's privacy. On this basis, the Special Examiner found John responsible for invasion of personal privacy.

121.    The Special Examiner's finding was arbitrary, capricious, and unfair.  The Special Examiner failed to consider the undisputed facts that the two were in a consensual same-sex relationship for nearly two years; they regularly and routinely used communal, same-sex dorm bathrooms together during which they inevitably viewed each other's private parts; and J.C. always had the option of using the bathroom alone.

5. **Sexual Harassment Finding.**

122.    The Special Examiner found John responsible for sexual harassment on the basis of the four "incidents" and because John allegedly pressured J.C. to engage in unspecified unwelcome sexual activity at various times throughout the Relationship.  The Special Examiner based this conclusion in part on John's admission that he would get "sulky" after J.C. declined to engage in sexual activity.  The Special Examiner found that John's admission of "sulkiness" corroborated J.C.'s allegation of "feeling pressured."

123.    This conclusion defies common sense, as "sulky" behavior is not uncommon between sexual partners trying to balance each other's differing sexual needs.  If "sulky"

behavior constitutes sexual harassment, then under the Special Examiner's reasoning, sexual harassment is a common occurrence in normal, everyday long-term relationships.

124.    More importantly, the Special Examiner misapplied the University's definition of "sexual harassment," which in all of the R&R Handbooks that were supposed to apply to John's case requires "persistent" behavior that "create[s] an intimidating, hostile or offensive environment in which to work, study, or live . . . ."  (*See* 2011-12, 2012-13, 2013-14 R&R Handbooks, Ex. A, Section, 7, at 10; Ex. B, Section 7, at 12; Ex. C, Section 7, at 13).  It was arbitrary and capricious for the Special Examiner to conclude that occasional "sulking" is intimidating, hostile or offensive conduct that could be deemed to constitute sexual harassment.

125.    The Special Examiner also found sexual harassment on the basis of J.C.'s post break-up behavior, including the fact that he began drinking alcohol and sought counseling from a mental health professional.  The Special Examiner relied on a single, hearsay research study in the 1990s reporting significantly increased rates of alcohol use among women (not men) after recent occurrences of sexual assault as "probative" that J.C. probably had experienced unwanted sexual conduct.

126.    The Special Examiner ignored the information supplied by one of John's witnesses that J.C. began drinking at his grandmother's funeral, two months after J.C. and John broke up, and the undisputed fact that J.C. grew up in a severely dysfunctional, alcoholic family, suggesting that J.C.'s resort to alcohol was triggered by *family* history and events, not by unwanted sexual activity with John.

127.    The Special Examiner completely ignored the testimony of John's three witnesses – including two students and the executive assistant to a University administrator – who reported to the Special Examiner that J.C. and John seemed happy and comfortable together during the

Relationship and during the post-breakup period before J.C. seemingly became envious of John's interest in another gay man.  The Special Examiner ignored the 32-pages of social media documentation that John and a witness provided, including photographs and Facebook postings, showing the couple surrounded by friends and indicating a normal, happy dating Relationship.

128.   Instead of crediting this tangible evidence, the Special Examiner relied on a handful of hearsay research studies reporting that individuals under-report intimate partner violence to friends and family and do not perceive unwanted sexual contact with their partner as coercion.  Exclusively on the basis of these research studies, the Special Examiner concluded that the testimony of John's witnesses and the documentary evidence should be accorded no weight in determining John's guilt or innocence on the sexual harassment charge.

### 6.   Physical Harm Finding.

129.   With respect to the finding of physical harm, the Special Examiner concluded that John had physically harmed J.C. based on the Movie Incident, the Wake-up Kiss Incidents, and the North Adams Incident.  The Special Examiner improperly equated unwanted sexual contact with physical harm, even though the University's definition of physical harm in all of the R&R Handbooks that were supposed to apply to John's case makes clear that physical harm requires a battery distinct from unwanted sexual contact, in the form of "hitting, pushing, or physical altercations/violence of any kind."  (*See* 2011-12, 2012-13, 2013-14 R&R Handbooks, Ex. A, Section 2, at 3; Ex. B, Section 2, at 4; Ex. C, Section 2, at 4).  J.C. made no accusation, and the Special Examiner's Report made no finding, that any physical battery or physical or sexual violence of any kind ever happened.

### F.   John's Response to the Summary of the Special Examiner's Findings.

130.   John was stunned by the Summary of the Special Examiner's findings.  When he requested that Lisa Boes furnish him with a copy of the Special Examiner's Report, she refused.

131.    On May 2, 2014, John responded to the Summary of the Report, supplying additional facts, names of additional witnesses, and his sworn affidavit, demonstrating that the accusations against him were frivolous and not supported by any objective or credible evidence, and that the Special Examiner's findings, as summarized by the University, were arbitrary, capricious, irrational, and not supported by a preponderance of the evidence.

### G.    The University's Decision, Sanction, and Denial of Appeal.

132.    On May 12, 2014, Lisa Boes notified John that, on the basis of her review of the Special Examiner's Report and John's response, she (alone) concurred with the Special Examiner's findings on all six charges.

133.    Boes's decision contained no analysis of the Special Examiner's Report or John's response to it.  She refused to refer any of John's additional facts, witnesses, or affidavit to the Special Examiner for further consideration.  Even more significantly, Boes made the decision to accept the Special Examiner's findings unilaterally – without convening the Deliberations Panel to review the Report and make a recommendation to Boes whether or not to accept the findings.

134.    Thereafter, Boes convened a three-member Panel to recommend a sanction.

135.    The Panel gave John the lightest sanction possible given the finding of sexual misconduct – a disciplinary warning – which required him to receive sensitivity training.  Through this sanction, the Panel members clearly signaled that they did not agree with the findings or concluded that the conduct as issue was not serious and did not warrant the labels put on it by the Special Examiner.

136.    The disciplinary warning, however, automatically carried with it life-altering consequences because John's permanent education record will list serious sexual transgressions without any explanation of the *actual* conduct – *i.e.*, it will state he was found responsible for

sexual misconduct, lack of consent, taking advantage of incapacitation, sexual harassment, physical harm, and invading personal privacy.

137.    Instead of taking action to rectify Boes's violation of a critically important procedural safeguard, Brandeis allowed these findings to stand on John's permanent education record, effectively branding him as a predatory sexual offender.

138.    After receiving notice of the sanction, John again asked the University for a copy of the Special Examiner's Report for purposes of his appeal.  John also asked for all of the interview notes taken by the Special Examiner and Observer.

139.    John needed the full Report and underlying interview notes in order to be apprised of all of the facts contained in the Report, including exactly what it is that J.C. said about him, what J.C.'s witnesses said, the weight the Special Examiner gave to the parties' and witnesses' interview statements, and a full understanding of the factual and legal bases for the Special Examiner's findings.  The Summary given to John lacked this information.

140.    Boes, as well as the University's General Counsel, Chief Legal Officer, and Senior Vice President of Students and Enrollment, each communicated to John the University's refusal to provide the Report or interview notes.

141.    Accordingly, John was forced to appeal the Special Examiner's findings without being able to read the Report that made those findings.  Based on Boes's Summary, John appealed on grounds of procedural error, denial of rights, and fraud.

142.    On June 20, 2014, the Appeals Board rejected John's appeal, and on June 24, 2014, Boes notified John of the final, adverse outcome against him.

143.    John had worked hard at Brandeis to achieve a 3.8 GPA and to graduate *magna cum laude* so that he could get into law school and pursue a career in government or public

service.  He was politically active on and off campus as part of his commitment to public issues

and political discourse, values central to Brandeis's educational mission.

144.     John will now have to disclose and defend himself against his deeply blemished

University record to every law school and professional graduate school to which he applies,

government and public service employers, other prospective employers, colleagues and friends

who get wind of what happened, and, should he run for public office, the public.

### H.     Brandeis Committed Numerous Material Breaches of Its Contractual Obligations to John Throughout the Special Examiner's Process.

145.     In every substantive Phase of the Special Examiner's Process in John's case,

Brandeis committed material breaches of its written policies and procedures, which adversely

impacted the outcome of the case and resulted in a fundamentally unfair, arbitrary and capricious

disciplinary Process.

146.     Brandeis's breaches are set forth below without limitation.

### 1.     Brandeis Eliminated the Statements Phase from the Process.

147.     As alleged previously in paragraphs 26a., 60-61, 87-89, 92, Brandeis eliminated

the Statements Phase from the Process.  Brandeis should have obtained from J.C. a "thorough

statement" of his allegations, because the contents of his initial Report were not a "full account"

of the allegations, so that John would be able to compose in writing a "thorough response" for

the Special Examiner's consideration.  (Ex. C, at 43).

148.     That never happened.  All John was given in the Statements Phase was J.C.'s two-

sentence accusation.  Within days of J.C.'s initial Report, Brandeis's General Counsel told John

that the Dean's office had received "substantially more information" about J.C.'s allegations.

Instead of providing John with that information, the University withheld it, and told him the

Special Examiner retained discretion whether or not to disclose it to him.

149.     The deliberate withholding of known information about the allegations violated the Statements Phase of the Process, which was intended to provide the accused with enough information to know what he is alleged to have done wrong and to respond to it.  In fact, John never learned the factual allegations that formed the basis for J.C.'s claims until after the Special Examiner's findings had been issued and Lisa Boes read to him her "Summary" of the findings.

### 2.     The Fact and Responsibility-Findings Phases of the Process Were Arbitrary and Capricious and Lacked Any University Oversight or Unbiased Review.

150.     For all the reasons alleged previously in paragraphs 13-21, 87-129, the Special Examiner's Process breached Brandeis's contractual pledge to "preserv[e] the rights . . . of all its students through all of its disciplinary procedures."  The Special Examiner's findings were not supported by a preponderance of the evidence; they were arbitrary and capricious, ignored the context of the Relationship, and misconstrued the University's definitions of consent, harassment, and physical harm.   As explained in subsections 4 and 5 below, the University allowed the Special Examiner's flawed fact and responsibility findings to stand un-reviewed, without any independent, unbiased oversight by the University.

### 3.     Brandeis Breached its Contractual Obligation to Provide John with the Special Examiner's Report.

151.     As alleged previously in paragraphs 26b., 138-140, Lisa Boes, Brandeis's General Counsel, and Brandeis's Chief Legal Officer repeatedly refused to provide John with the Special Examiner's Report at any time during the Special Examiner's Process, even though he requested the Report during the Discussion Phase and prior to the Appeals Phase, so that he would know exactly what facts the Examiner reviewed, what credibility determinations the Examiner made, and the bases for each finding.

152.    As John repeatedly told University officials, the University contractually obligated itself to provide a student with the student's "education records" in compliance with FERPA in all of the R&R Handbooks that were supposed to apply to John's case.  Disciplinary records unquestionably are education records.  (*See* 2011-12, 2012-13, 2013-14 R&R Handbooks, Ex. A, Section 17.4, at 20; Ex. B, Section 17.4, at 23; Ex. C, Section 17.4, at 26).

153.    John was forced to defend himself against a Report he was not allowed to read.

154.    Brandeis finally gave John a copy of the Special Examiner's Report in July 2014, *after* Brandeis had denied his appeal and the case was closed, and long past the 45 days FERPA allows Brandeis to furnish the Report.

155.     The University *still* refuses to provide John with the interview notes taken by the Special Examiner and Observer, even though they are subject to FERPA.

### 4.    Brandeis Eliminated the Deliberations Phase from the Process.

156.    As alleged previously in paragraphs 26c., 132-133, the University's final decision maker, Lisa Boes, completely eliminated the Deliberations Phase from the Process.  Boes was supposed to have appointed a Deliberations Panel of three administrators and/or faculty to consider the Special Examiner's Report and recommend to her whether or not to accept the findings.  (Ex. C, at 43 ("Panel"), 46 ("Deliberations Phase")).

157.    That never happened.  Instead, Boes unilaterally decided to accept the findings, without Panel review, and then convened a "Sanctions Panel," which she created out of whole cloth.  Her elimination of the Deliberations Phase explains why the Panel gave John a sanction that apparently does not reflect the serious charges for which John was found responsible.  The only logical explanation for the disparity between the charges/findings and the sanction is that the Panel disagreed with the findings, or found the conduct giving rise to them so benign that they concluded any sanction other than "sensitivity training" would be unwarranted.

31

158.   Boes blatantly abrogated a critically important procedure designed to provide independent review of the Special Examiner's fact and responsibility-findings through debate among three Panelists.

159.   Had Boes appointed the Deliberations Panel and allowed them to deliberate on the findings and to recommend outcomes, as required by Brandeis's own procedures, it is highly likely a different result would have been reached.   Yet, Brandeis allowed the un-reviewed findings to stand as a permanent stain on John's education record.

### 5.   The Appeals Board Was Tainted By A Conflict of Interest and Denied John's Rights Under the Process.

160.   As alleged previously in paragraph 26e., there was a clear conflict of interest in the Appeals Phase of the Process.  On June 17, 2014, Boes informed John that a three-member Appeals Board had been selected to decide his appeal.  She told him that "members of the [Appeals Board] **do not interact with either party or their advisors about the process or appeal materials**."  She assured John that he three faculty members serving on the Appeals Board "have been vetted for potential conflicts prior to being selected . . . for this role."

161.   That was not the case.  The Chair of the Appeals Board and J.C.'s Advisor in the Special Examiner's Process collaborated on a University-sponsored Subcommittee on Sexual Violence during the pendency of the Special Examiner's Process in John's case.

162.   There is substantial reason to conclude that the Chair and J.C.'s Advisor improperly discussed John's case, based on the fact that the Subcommittee's Report on Sexual Violence and the Appeals Board's Decision – which were issued within one week of each other – contain references related to two events in John's case.

163.   Both documents called for "recommended minimum sanctions" in the Special Examiner's Process for sexual misconduct charges.  The Appeals Board's Decision expressly

disapproved of the "apparent discrepancy between the serious nature of the charges and the light punishment in this case," and noted the "potential value of establishing recommended minimum sanctions to guide future deliberations under the Special Examiner's Process."  Guidelines for "recommended minimum sanctions" appear prominently in the Subcommittee's Report, including recommended expulsion for rape or sexual misconduct other than rape.

164.    Both documents refer negatively to events involving No Contact Orders.  The Subcommittee's Report disapprovingly refers to the lack of campus police enforcement of No Contact Orders, and mentions two student cases "known to a committee member" where the campus police granted No Contact Orders against sexual assault complainants.  J.C.'s Advisor was a staunch advocate for J.C. in a series of complaints J.C. brought against John involving No Contact Orders.

165.    The Appeals Board's Decision refers to a No Contact Order that was at issue in a second case J.C. separately filed against John.  The Appeals Decision states with disapproval that John was only issued a "warning" in the second case for violating the No Contact Order with "no further punishment."  But, J.C.'s second case had been investigated and adjudicated in a separate Special Examiner's Process in which John was found not responsible for allegedly violating the No Contact Order and therefore received no sanction.  That case was not on appeal before the Appeals Board.  The Appeals Board had no reason to mention it and should not have had possession of any information about it.  The fact that the Appeals Board disapprovingly referred to it in its Decision indicates that the Chair and J.C.'s Advisor discussed it, and the Chair was biased against John.

166.    The Chair should have recused himself from the Appeals Board to avoid any potential or actual conflict of interest arising from his interaction with J.C.'s Advisor on the

33

Sexual Violence Subcommittee.  The fact that he served in the influential position of Chair on the Appeals Board and was the only faculty member on the Board with tenure makes his failure to recuse himself even more egregious.

167.    Furthermore, the Appeals Board knew that the University had refused to provide John with the Special Examiner's Report.  Although the Appeals Board received a copy of the Special Examiner's Report and made their decision based on it, it denied John his contractual and FERPA rights to have a copy for his appeal.  He could only appeal based on the eight-page Summary of the 25-page, single-spaced Report which also included 15 exhibits, none of which accompanied the Summary.  John's appeal arguments were negatively affected as a result.

**6.    John Was Contractually Entitled to the Hearing Process.**

168.    John was contractually entitled to a hearing before the Student Conduct Board. The Special Examiner's Process should never have been initiated.

169.    As a condition of his matriculation at Brandeis, John agreed in writing to be bound by the rules and regulations in the 2011-12 R&R Handbook, and the University agreed to be bound by its contractual obligations set forth in that R&R Handbook.

170.    Nowhere in that Handbook does Brandeis reserve the right to eliminate the Hearing Process for sexual misconduct allegations.  The Handbook states that it "contains *the* procedures the University employs when a member of the community believes that a student has violated campus policy.  *This process* . . . is ultimately *a* Brandeis-grown and nurtured *one* that is constantly evaluated and *tweaked* by the community every year."  (Ex. A, at 1).

171.    A student might reasonably expect that Brandeis could "tweak" its disciplinary process.  But, "tweaking" cannot reasonably be read to permit the University to eliminate that process and replace it with an entirely new process that severely curtailed John's rights.

34

172.    Even if Brandeis was contractually permitted to change its disciplinary process, it is not permitted under Massachusetts law to replace it with one that lacks fairness and that is arbitrary and capricious.

**7.    John was Contractually Entitled to a Hearing on the Charges of Physical Harm and Invasion of Privacy.**

173.    John was denied his contractual right to a hearing on the charges of physical harm and invasion of personal privacy.  Even if John's case was properly adjudicated under the procedures in the 2013-14 R&R Handbook, that Handbook makes clear that alleged violations of physical harm and invasion of personal privacy must be adjudicated by the Hearing Process pursuant to a clear and convincing standard.  (*See* Ex. C, Sections 2.1.d, 2.1.e, at 4; Section 3.0, at 6; Section 7.0, at 12; Section 18, at 27; Section 22.6, at 42).

**8.    Brandeis Violated its Contractual Obligation and Duties Under FERPA to Maintain the Confidentiality of John's Disciplinary Record.**

174.    Brandeis violated its contractual obligation and its duties under FERPA to maintain confidentiality about John's education record by allowing J.C. to disclose the findings to third parties and, upon information and belief, allowing persons within the administration to "leak" information about the Special Examiner's findings to third parties outside of the inner-circle of administrators responsible for handling John's case, or by not adequately safeguarding the disciplinary record from being disclosed to third parties.  (Ex. C, Sections 17.4, at 26 ("Student Records"); Section 19.5, 19.6.j., at 30, 32; Section 22.6, at 47 ("Records Retention")). As more fully explained below, any such "leaks" are also defamatory.

**I.    Brandeis Subjected John to a Fundamentally Unfair Disciplinary Process.**

175.    In addition to these breaches of explicit policies and procedures in its R&R Handbook, Brandeis breached its general contractual pledge to "preserv[e] the rights . . . of all of

35

its students through all of its disciplinary procedures."  (Ex. C, Section 22.6, at 42).  It also

violated Massachusetts common law that infuses every contract with a "reasonable expectations"

requirement and mandates that college and university disciplinary actions cannot be "unfair,"

"unreasonable," or "arbitrary or capricious."

176.    The Special Examiner's Process as conceived and as implemented in John's case

was and is fundamentally unfair, arbitrary and capricious.   Although the accuser knows his or

her story before the investigation even begins, the accused is left in the dark concerning the facts,

never knowing what the accuser and witnesses actually have said except as filtered through the

Special Examiner.  The accused is subjected to an investigation process that in John's case was

handled by the Special Examiner like a secret police interrogation of a criminal suspect rather

than an open and independent investigation by an impartial investigator.

177.    Instead of proceeding to a hearing or some sort of forum at which *both* sides hear

*all* of the evidence and have an *equal* opportunity to present their claims and defenses before an

impartial, independent tribunal or fact-finder(s), the Special Examiner's Process effectively ends

with the interrogation and the preparation of a one-side report, short circuiting a fair, equitable,

and open process and allowing the interrogator to serve in the conflicting roles of fact-finder,

prosecutor and *de facto* judge.

178.    Despite the fact that John meticulously documented for the University's final

decision maker and Appeals Board these contractual breaches, as well as the unfairness of the

Process and arbitrariness and capriciousness of the Special Examiner's findings, the University

did nothing to correct this flawed and unfair Process and outcome.

**J.**     **Brandeis has Acknowledged its Procedures Were Unfair in John's Case by Changing Them Since His Case was Closed.**

179.     Since John's case, the University has changed several (but not all) of its deeply flawed procedures in the Special Examiner's Process.

180.     It now requires a "Co-Examiner" to be involved in the Fact-Finding Phase.  (*See* 2014-15 R&R Handbook, attached as Ex. D, Section 22, at 52).

181.     It now provides the Special Examiner's Report to the parties promptly – *during* the Process, *not when it is over* (as happened in John's case) – so that the accused has a meaningful opportunity to respond and defend himself in the Discussion and Appeals Phases. (*Id*., Section 22, at 55-56).

182.     It now requires the accuser to give a detailed description of the alleged conduct in the initial Report – who, what, when, where, how – unlike the two-sentence Report it allowed J.C. to submit.  (*Id*., Section 17, at 33).

183.     It now requires the Director of the Department of Student Rights and Community Standards to "first determine that there is sufficient evidence of a violation" **before** referring the case to a formal adjudication.  (*Id.*, Section 17, at 33-34).

184.     It now has an extensive written policy requiring the parties to maintain the confidentiality of the proceedings by restricting their disclosures to persons with a "need to know."  (*Id*., Section 17, at 34-35).

185.     John did not have the benefit of any of these subsequent remedial measures.

**K.**     **Brandeis Has Aided and Abetted J.C.'s Defamatory Conduct and Upon Information and Belief Has Defamed John in its Own Right.**

186.     Not content with the sanction in John's case, J.C. filed additional, frivolous Reports in an attempt to get the University to expel John and defamed John to University officials, students, and the media.

187.     Brandeis has known of these false and defamatory actions by J.C. and has aided and abetted them.

188.     Upon information and belief, Brandeis administrators "leaked" information about the Special Examiner's findings to John's internship employer and prospective employer, or recklessly failed to exercise adequate safeguards to keep the information strictly confidential as required under federal privacy laws and Title IX regulations.  As a direct result, John was fired from his internship, which has also withdrawn promised references for a paying job, and another prospective employer with ties to Brandeis has withdrawn its job offer.  John has been severely harmed in his prospects for other future permanent employment.

189.     J.C.'s escalating and unchecked campaign to defame and harass John included filing three additional Reports with the University with claims of stalking, sexual harassment, retaliation and intimidation based on John's alleged violations of a No Contact Order entered after J.C.'s initial Report.  None of these claims was found to be credible, and none of them should have been accepted for adjudication in the first place.

190.     On three separate occasions in March 2014, J.C. sent letters to multiple University administrators – including the Title IX Coordinator, General Counsel, Senior Vice President for Students and Enrollment, Chief Legal Officer, Director of Public Safety, and Vice President for Human Resources – referring to John as his "attacker" and calling John a threat to the safety and well-being of the entire campus.

191.     In June 2014, J.C. posted the University's final outcome letter regarding John's finding of responsibility and sanction on J.C.'s Facebook page, and encouraged others to share it.  Although J.C. blacked out John's name, J.C. identified John by name to students and media reporters off-line.

192.    J.C. added commentary to the posted letter accusing John of "multiple forms of rape" and characterizing him as his "attacker."  Three days later, J.C. again posted on his Facebook page, repeatedly referring to John as his "attacker" (without using his name), calling him a "sexual assailant," and claiming that John had been given a "freebie" for "rape."

193.    These accusations were false and malicious.  As John learned when he finally received the Special Examiner's Report in July 2014 , J.C. specifically told the Special Examiner that John never "raped" him (which J.C. defined as penetration without consent), and nowhere in the Special Examiner's Report is there an allegation or a finding that John ever "attacked" or "raped" J.C.

194.    In June 2014, J.C. took his story (and confidential documents from the disciplinary proceeding) to a national publication.  J.C. revealed his name, but not John's name. In the article, J.C. repeatedly referred to John as his "attacker."  A University spokesperson publicly stated there were "factual errors in the information" J.C. provided to the publication, but did nothing to publicly identify and correct those errors.

195.     On or about September 9, 2014, a reporter for NPR station WBUR informed John that J.C. told the reporter John anally raped J.C. – even though J.C. told the Special Examiner John never "raped" him (*i.e.*, John never penetrated him without consent).

196.    J.C. also told Brandeis students that John got J.C. drunk and anally raped him, a palpably false statement since J.C. never drank during the entirety of the Relationship and, of course, J.C. explicitly stated that John never raped him.

197.    In September 2014, J.C. posted on his Facebook page a photograph of himself wearing a poster board with the handwritten notation that he had been sexually assaulted.  J.C.

vowed he would wear the poster board around campus every day until he graduated, whether or not his "attacker" was expelled.

198.     As a result of J.C.'s and Brandeis's outrageous conduct, other Brandeis students have publicly taunted and accused John of rape; one student loudly did so, calling him "rapist" in front of a group of Brandeis students and the Democratic nominee for Massachusetts Attorney General (now the Attorney General) at a National Organization for Women fundraiser.

199.     J.C.'s defamatory statements and Brandeis's independent defamatory conduct have ruined John's reputation in the Brandeis community and severely harmed his current and prospective employment prospects.

200.     In October 2014, John received a call from his internship employer for a highly-ranked public official, informing John that the employer had been "made aware" of his situation at Brandeis from "several sources," and that John was fired.

201.     That same internship employer had promised to find John a permanent job after he graduated.  That promise has been withdrawn.

202.     Another prospective employer with ties to Brandeis stopped responding to John's emails after promising to hire him for the fall semester.

203.     In the wake of these events, John asked the University to re-open his appeal, on grounds that J.C.'s outrageous and defamatory post-appeal conduct called into question J.C.'s veracity with respect to J.C.'s initial Report, and because John had gathered new evidence and witnesses after receiving the Special Examiner's Report that contradicted certain of J.C.'s allegations and findings by the Special Examiner, including additional witnesses who would testify that J.C. began drinking for reasons unrelated to John and that J.C. humorously recounted the "Movie Incident" to mutual friends throughout the Relationship.

204.    Two University administrators voiced their belief the case should be re-opened, but Brandeis's General Counsel denied the request.

205.    John continued to be subjected to such a hostile campus environment that he accelerated his studies for early graduation in February 2015.

206.    Although he has left the University that betrayed his trust, John continues to suffer the consequences of Brandeis's acts and omissions, including psychological, emotional, and physical damages, damages to his reputation, damages to his future educational and career prospects, and future economic losses.

### FORMER COUNT I - WITHDRAWN
**(Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*)**

207.    After the University refused to re-open John's appeal to consider his new false-claims evidence, John filed a complaint with the Department of Education, Office of Civil Rights ("OCR"), alleging *inter alia* that Brandeis wrongly disciplined him, violated Title IX's mandate that both parties involved in sexual misconduct proceedings be treated fairly, and failed to equitably consider John's claim that, if what John did violated the University's sexual misconduct policies, then J.C. (who engaged in the exact same conduct) was equally culpable of sexual misconduct toward John.

208.    On August 29, 2014, the OCR notified John that it had accepted John's OCR complaint for investigation under Title IX.

209.    On April 9, 2015, John filed his civil Complaint in this action, which included a Title IX Count that asserted essentially the same allegations contained in his OCR complaint.

210.    John was aware that under the OCR's most current Case Processing Manual the OCR might administratively close his OCR complaint if the OCR concluded that "the same

allegations have been filed by the complainant against the same recipient [*i.e.*, educational institution] with state or federal court."  OCR Case Processing Manual, Section 110(b).

211.    On April 22, 2015, the OCR notified John that it was administratively closing his OCR complaint because OCR had determined that the allegations in John's civil Complaint against Brandeis are the same as those he filed with the OCR.

212.    Section 110(b) of the OCR Case Processing Manual provides an exception to closing a complaint "[w]here OCR has obtained sufficient evidence to support a finding" against the educational institution.

213.    That exception did not apply to John's OCR complaint because the OCR's investigation was in its very early stage when John filed this action, and OCR had not yet reviewed any of Brandeis's records relating to John's or any other students' cases.

214.    The OCR Case Processing Manual permits an OCR complaint to be re-filed within 60 days following termination of the parallel court proceedings if there has been no decision on the merits or settlement of the civil complaint allegations.

215.    In voluntarily withdrawing his Title IX claim, John does not concede any lack of merit in the claim.  Unlawful gender and sexual orientation stereotyping infuses the Special Examiner's Report.

216.    The Special Examiner approached the Relationship as if John was the Dominant Male Aggressor and J.C. was the Submissive Female Victim, stereotypes derived from heterosexual culture.  Those stereotypes would be inappropriate in any sexual misconduct investigation, but clearly they did not apply to John's and J.C.'s Relationship.  It was undisputed that J.C. was out of the closet and sexually experienced, but John had not had any sexual contact with a man and was not sure of his sexual orientation when they met; J.C. broke up with John for

not being "forceful" enough with him; and John's alleged conduct involved commonplace sexual

activity.  Nothing in the evidence suggested that J.C. was weak, passive, or dominated by John,

but that female-male heterosexual stereotype was imposed on John throughout the Special

Examiner's Report.  The Special Examiner should have known that closeted gay men are not in a

dominant position to "pressure" openly gay men who are sexually experienced into an unwanted

sexual relationship.  It is highly unlikely that Brandeis would have initiated a Special Examiner's

Process if a heterosexual female student had accused her former male partner of sexual assault

on the basis of his waking her up with a kiss in the morning on occasion, glancing at her naked

body while she used their shared dorm bathroom, or initiating oral sex on her on one occasion.

## COUNT I
### (Breach of Contract)

217.    The foregoing allegations are incorporated herein by reference.

218.    At all times relevant hereto, a contractual relationship existed between Brandeis

and John through Brandeis's R&R Handbooks.

219.    Brandeis is required to act in accordance with the R&R Handbooks in

adjudicating reports of alleged violations of student conduct standards.

220.    For all the reasons set forth above, Brandeis has materially breached its contracts

with John by failing to comply with its obligations, standards, policies, and procedures set forth

in the R&R Handbooks in the course of the Special Examiner's Process against John, and by

subjecting him to a blatantly arbitrary and capricious disciplinary proceeding.

221.    As a direct, proximate, and foreseeable consequence of Brandeis's numerous

material breaches, John's academic and career prospects, earning potential, and reputation have

been severely harmed.  He has sustained significant damages, including but not limited to,

damages to physical well-being, emotional and psychological damages, damages to reputation,

past and future economic losses, loss of educational and professional opportunities, loss of future

career prospects, and other direct and consequential damages.  As a result of the foregoing, John

is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest

and attorneys' fees and costs.

**COUNT II**
**(Breach of the Covenant of Good Faith and Fair Dealing)**

222.    The foregoing allegations are incorporated herein by reference.

223.    Based on the foregoing facts, Brandeis violated the covenant of good faith and

fair dealing implied in its contracts with John by subjecting him to an unfair, arbitrary and

capricious Special Examiner's Process, and denying him the fruits of his contracts with Brandeis.

224.    As a direct, proximate, and foreseeable consequence of these breaches, John's

academic and career prospects, earning potential, and reputation have been severely harmed.  He

has sustained significant damages, including but not limited to, damages to physical well-being,

emotional and psychological damages, damages to reputation, past and future economic losses,

loss of educational and professional opportunities, loss of future career prospects, and other

direct and consequential damages.

225.    As a result of the foregoing, John is entitled to recover damages in an amount to

be determined at trial, plus prejudgment interest and attorneys' fees and costs.

**COUNT III**
**(Estoppel and Reliance)**

226.    The foregoing allegations are incorporated herein by reference.

227.    Brandeis's various standards, policies and procedures constitute representations

and promises that Brandeis expected or should have reasonably expected would induce action or

forbearance by John.

44

228.     Brandeis expected or should have expected John to accept the University's offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises, including that Brandeis would provide John with a fair process and would "preserv[e] the rights . . . of all its students through all of its disciplinary procedures" in the event he was accused of a sexual misconduct violation.

229.     John relied to his detriment on Brandeis's express and implied promises and representations.

230.     As a direct, proximate, and foreseeable consequence of the above-identified conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed.  He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

231.     As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT IV
### (Negligence)

232.     The foregoing allegations are incorporated herein by reference.

233.     Brandeis owed duties of care to John.  Such duties included, without limitation, a duty of reasonable care in selecting and supervising competent, trained, and unbiased faculty and administrators to be involved in the Special Examiner's Process.

234.     Brandeis breached its duty of care by appointing a final decision maker in John's case, Lisa Boes, who was not familiar with the Special Examiner's Process, had never served as

the final decision maker before, and was selected for that role solely because the Dean of Students who would normally serve in that capacity recused himself from the case.

235.    Boes was so unfamiliar with, or indifferent to, the Special Examiner's Process that she completely eliminated the Deliberations Phase of the Process, and unilaterally decided the case without Panel review.  Boes accepted the Special Examiner's findings uncritically, as evidenced by her discussion with John, in which she informed him that it was her job to read the Special Examiner's Report, but not to evaluate whether the Examiner's findings were supported by the preponderance of the evidence standard.

236.    Brandeis further breached its duty of care owed to John by intentionally, recklessly or negligently failing to conduct a proper conflicts check to assure that John's appeal was decided by an unbiased Appeals Board.  Brandeis allowed The Chair of the Appeals Board and J.C.'s Advisor to collaborate on a University-sponsored Sexual Violence Subcommittee during the pendency of J.C.'s case against John.  The Appeals Board Decision and the Subcommittee's Report, issued one week apart, refer to events in John's case that indicate The Chair and The Advisor improperly discussed the case.

237.    As a direct, proximate, and foreseeable consequence of Brandeis's aforementioned conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed.  He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

238.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT V
### (Defamation)

239.    The foregoing allegations are incorporated herein by reference.

240.    Brandeis has aided and abetted J.C. in defaming John, allowing J.C. to publish statements concerning John to third parties, both orally and in writing, which Brandeis knows are false and malicious.

241.    Brandeis has independently defamed John by deliberately, recklessly, or negligently leaking information about the Special Examiner's findings to third parties outside of the University's inner circle of administrators with a need to know John's disciplinary history.

242.    University administrators knew that the Special Examiner's findings could not be squared with the preponderance of the evidence, defied common sense, and were arbitrary and capricious, and knew that J.C.'s initial Report, subsequent Reports, and public accusations against John were false.  Nevertheless, the University permitted the Special Examiner's findings to be leaked to third parties.

243.    Brandeis's conduct in defaming John and in aiding and abetting J.C.'s defamatory conduct was done with reckless and/or intentional disregard as to their falsity.

244.    Brandeis's conduct has harmed John's reputation in the community, leading directly to the loss of employment, loss of University positions, loss of prospective employment opportunities, and loss of educational and professional opportunities and prospects.

245.    As a direct, proximate, and foreseeable consequence of Brandeis's aforementioned conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed.  He has sustained significant damages, including but not limited to, damages to reputation, damages to physical well-being, emotional and psychological damages,

past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

246.     As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

**COUNT VI**
**(Invasion of Privacy)**

247.     The foregoing allegations are incorporated herein by reference.

248.     Upon information and belief, Brandeis has unreasonably, substantially, and seriously interfered with John's privacy by disclosing facts of a highly personal and intimate nature, including the findings of the Special Examiner, to John's current and prospective employers.

249.     Brandeis has disclosed these facts in bad faith and without any legitimate reason for doing so.

250.     As a direct, proximate, and foreseeable consequence of Brandeis's aforementioned conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed.  He has sustained significant damages, including but not limited to, damages to reputation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

251.     As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

**COUNT VII**
**(Intentional Infliction of Emotional Distress)**

252.     The foregoing allegations are incorporated herein by reference.

253.     The actions of Brandeis were willful and intentional.

254.     Brandeis knew or should have known that its actions in finding John responsible for J.C.'s patently frivolous charges, in conducting a fundamentally flawed disciplinary process, and in sanctioning John by effectively labeling him as a predatory sexual offender would cause John severe emotional distress.

255.     Brandeis's conduct was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

256.     Brandeis's conduct was the direct and proximate cause of John's severe emotional distress.  He is deeply depressed and anxious; he has lost weight; he is no longer able to sleep through the night; and he has had serious suicidal ideation.

257.     As a direct, proximate, and foreseeable consequence of Brandeis's aforementioned conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed.  He has sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

258.     As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT VIII
### (Negligent Infliction of Emotional Distress)

259.     The foregoing allegations are incorporated herein by reference.

260.    When Brandeis undertakes to investigate allegations of sexual and other misconduct against one of its students, it owes that student a duty to protect him from foreseeable harm.

261.    By participating in the Special Examiner's Process, John reasonably relied upon Brandeis's duty to protect him from harm.

262.    For all the reasons above, Brandeis breached its duties of reasonable care.

263.    As a result, John has suffered physical harm, including severe emotional distress. He is deeply depressed and anxious; he has lost weight; he is no longer able to sleep through the night; and he has had serious suicidal ideation.

264.    A reasonable person would have suffered severe emotional distress under the same or similar circumstances.

265.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT IX
### (Declaratory and Permanent Injunctive Relief)

266.    The foregoing allegations are incorporated herein by reference.

267.    Brandeis has violated its contractual obligations and state law.

268.    John's educational and career opportunities have been severely damaged. Without appropriate redress, Brandeis will continue to label John as a predatory sexual offender, greatly jeopardizing his prospects for law school, and government and public sector employment, as well as private employment, with no end in sight.

269.    Pursuant to 28 U.S.C. § 2201, John requests a declaration that Brandeis breached its contractual obligations to John and that John is entitled to redress that will make him whole.

270.    John further requests that this Court issue a permanent injunction:  (a) reversing the findings and sanction against John made by Brandeis pursuant to the Special Examiner's Process; (b) ordering Brandeis to expunge John's disciplinary record and remove it from his education record at Brandeis; (c) ordering Brandeis to provide John with a Dean's Certification that shall be made available to third parties (such as law school admissions officers, bar admissions officers, and prospective and current employers) certifying that the findings and sanction have been reversed and expunged from John's education record; and (d) ordering Brandeis to restore John's reputation to third parties to whom the University has leaked and/or failed to adequately safeguard the findings of the Special Examiner's Process.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Doe, respectfully requests that this Honorable Court:

a.    Order Brandeis to reverse and expunge its findings of responsibility and sanction from John's education record, and to publicly state that Brandeis has reversed and expunged the findings and sanction;

b.    Order Brandeis to verify this reversal and expungement of John's education record by providing John with a Dean's Certification certifying to third parties that the findings and sanction have been reversed and expunged from John's education record;

c.    Award John compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages;

d.    Award prejudgment interest;

e.      Award attorneys' fees and costs pursuant to statutory or common law doctrines

providing for such award; and

f.      Grant such other and further relief that the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully submitted,

/s/ *Michael R. Schneider*
Michael R. Schneider, Esq.
(Mass. Bar No. 446475)
Good Schneider Cormier
83 Atlantic Avenue
Boston, MA 02110-3711
Tel:  (617) 523-5933
Email:  ms@gscboston.com

/s/ *Patricia M. Hamill*
Patricia M. Hamill, Esquire
(PA Attorney I.D. No. 48416)
Jeannette M. Brian, Esquire
(PA Attorney I.D. No. 66169)
Conrad O'Brien PC
1500 Market Street
Centre Square – West Tower, 39th Fl
Philadelphia, Pennsylvania 19102-1921
Telephone:  (215) 864-9600
Facsimile:   (215) 864-9620

*Attorneys for Plaintiff John Doe*

Dated: June 23, 2015

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent via email to those indicated as non-registered participants on June 23, 2015.

/s/ Michael R. Schneider
Michael R. Schneider, Esquire