UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 15-11557-FDS |
| v. | ) | |
| | ) | **Leave to File Excess Pages** |
| BRANDEIS UNIVERSITY, | ) | **Granted on July 10, 2015** |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BRANDEIS UNIVERSITY'S MOTION TO DISMISS JOHN DOE'S AMENDED COMPLAINT

Defendant Brandeis University ("Brandeis" or "the University") submits this memorandum of law in support of its Motion to Dismiss Plaintiff John Doe's ("Doe") Amended Complaint. Doe contends that Brandeis breached its student handbook and engaged in other tortious activity when it determined that Doe had sexually harassed and assaulted another Brandeis student, J.C. Doe's claims must fail, however, because they are based on plainly erroneous interpretations of Brandeis' student handbook, are belied by the allegations of the Amended Complaint, and/or are deficient as a matter of law. For these reasons, Brandeis respectfully requests that the Court grant its motion and dismiss Doe's Amended Complaint in its entirety.

**Factual Background**[1]

I.      Brandeis' Rights and Responsibilities Handbook and Student Disciplinary Processes

Brandeis is a private coeducational university located in Waltham, Massachusetts. Amended Complaint ¶ 37. Doe, a resident of California, is a former Brandeis student. Id. at ¶ 36. At all times relevant to Doe's Amended Complaint, Brandeis maintained a Rights & Responsibilities handbook ("R&R"), which serves as a guide "regarding the standards that define [the Brandeis community]." Amended Complaint Ex. A at p. 1. To that end, the R&R sets forth guidelines with respect to academic integrity, public safety, and student conduct. The R&R contains specific provisions regarding: physical harm and contact (Section 2.1.d); personal privacy (Section 2.1.e); sexual misconduct (Sections 3.1-3.3); and sexual harassment (Section 7.2). Id. at §§ 2.1.d-e, 3.1-3.3, 7.2; Moriello Aff. Ex. A at §§ 2.1.d-e, 3.1-3.3, 7.2.

The R&R "also contains the procedures the University employs when a member of the community believes that a student has violated a campus policy." Amended Complaint Ex. A at p. 1. The R&R and its policies and procedures are "constantly reevaluated and tweaked by the [Brandeis] community every year." Id. As a condition of his enrollment, Doe agreed to abide by the terms of the R&R. Amended Complaint ¶¶ 26(f), 169.

Doe's Amended Complaint focuses on Brandeis' "Hearing Process" and Special Examiner Process. The Amended Complaint alleges that, as of the 2011-2012 academic year,

---

[1]  The facts in this section are derived from Doe's Amended Complaint, the exhibits attached to the Amended Complaint, and the exhibits attached to the Affidavit of Antonio Moriello (Docket No. 21) and the Second Affidavit of Antonio Moriello. Because Doe's Amended Complaint refers to and relies on the documents attached to Mr. Moriello's Affidavits, the Court may consider them in connection with Brandeis' Motion to Dismiss. See Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). The facts alleged in the Amended Complaint are assumed as true only for purposes of Brandeis' Motion to Dismiss. Brandeis reserves the right to contest those facts during subsequent proceedings.

the Hearing Process applied to all allegations of student misconduct.  See id. at ¶ 63, Ex. A §§ 2-3, 18.0.  Beginning with the 2012-2013 school year, Brandeis modified its R&R to include the Special Examiner Process—a distinct disciplinary procedure for allegations of sexual misconduct, sexual harassment, and discrimination.  See Amended Complaint Ex. B §§ 3, 7, 22.6.  The Hearing Process still applies to other alleged violations of the R&R.  See id. at § 18.0; Moriello Aff. Ex. A § 18.0.

Under the Hearing Process, an accuser must submit a timely complaint of student misconduct—also known as a Community Standards Report ("CSR")—with the University's Department of Student Rights and Community Standards ("DSRCS").  E.g., Moriello Aff. Ex. A § 18.0.  After a CSR is filed with DSRCS, the "available facts shall be gathered from the Accuser [], and a careful evaluation of these facts, as well as the credibility of the person reporting them, shall be made."  Id.  If a DSRCS administrator determines that the CSR is untimely, lacks merit, or lacks sufficient evidence, he/she may choose not to refer the matter to the conduct system.  Id.

If, however, the DSRCS decides that there is evidence warranting a referral to the conduct system, then the accused student shall be notified of the charges, which he/she must accept or deny.  Id. at § 19.1.  The accused student may then request a hearing before the Student Conduct Board, comprised of a combination of students and faculty members.  Id. at §§ 19.1, 20.2.  The accused student and his/her accuser may present evidence and introduce witnesses during the hearing before the Student Conduct Board, and "shall have the right to view and question all evidence and reports presented to the Board during the hearing."  Id. at §§ 19.6.g, 19.10.  The accuser bears the burden to prove his/her allegations by clear and convincing evidence.  Id. at § 19.6.h-i.

Under the Special Examiner Process, an individual who alleges a violation of R&R Sections 3 or 7 must likewise file a CSR with the University.  Id. at § 22.6.  Once filed, the CSR is investigated preliminarily by DSCRS in the same manner as a CSR under the Hearing Process. Id. at § 18.0.  "In cases where the DSRCS receives a report and determines that one or more possible violations of Section 3 (Sexual Responsibility) or Section 7 (Equal Opportunity, NonDiscrimination, and Harassment) exist," the case will then progress through the Special Examiner Process.  Id. at § 22.6.  If the CSR contains allegations of sexual misconduct, the University may place the accused student on emergency suspension pending the outcome of the investigation or conduct process.  Id. at § 3.0.

The filing of a CSR begins the "Statements Phase," during which the director of DSRCS meets with the accuser and informs him/her of certain rights and responsibilities.  Id. at § 22.6. The director must "suggest" that the accuser prepare a "thorough statement" of his/her allegations if the CSR does not constitute a "full account."  Id.  Two days after meeting with the accuser, the director of DSRCS must meet with the accused, show him/her the CSR, and "suggest" that he/she compose a written response to its allegations.  Id.

If the accused denies responsibility for the allegations, the Special Examiner Process will progress to the "Fact-Finding Phase."  Id.  During this phase, the Special Examiner conducts interviews with the parties and other witnesses, and reviews documents and other physical evidence.  Id.  The Special Examiner has the discretion to determine which individuals will be interviewed, and which documents are of "material importance" so as to be shared equally with the parties.  Id.  Thereafter, the Special Examiner issues a report summarizing his/her findings of fact, and stating his/her conclusions as to the credibility of the parties and the accused's responsibility for the allegations.  Id.  A preponderance of the evidence standard applies to the

Special Examiner's findings.  Id.  The Special Examiner's report is submitted to Brandeis' Senior Student Affairs Officer or his/her designee ("SSAO/D").  Id.

During the subsequent "Discussion Phase," the SSAO/D conducts separate meetings with the parties in which he/she provides a summary of the Special Examiner's findings and allows the parties additional time to provide new, pertinent information.  Id.  If the accused is found responsible for any charges in the CSR, the case then progresses to the "Deliberations Phase." Id.  In this phase, a panel of three University administrators and/or faculty, appointed by the SSAO/D, reviews the Special Examiner's report and makes a recommendation as to the "outcomes."  Id.  The panel communicates its recommendation to the SSAO/D, who renders a final decision as to any outcomes.  Id.  The parties may appeal to the University Appeals Board on Student Conduct only upon presenting specific evidence of fraud, denial of rights under the Special Examiner Process, procedural error, or new material evidence.  Id.

II.  <u>Doe's Relationship with J.C. and the Community Standards Report</u>

Doe met J.C., another Brandeis student, in August 2011, during their freshman year at the University.  Amended Complaint ¶¶ 2, 43.  At that time, Doe was "unsure about his sexuality," but J.C. was openly gay.  Id. at ¶¶ 2, 43.  In mid-September 2011, Doe and J.C. became sexually intimate, and by October 2011, Doe revealed to his parents and friends that he and J.C. were dating.  Id. at ¶¶ 3, 46-47.  The two men dated through July 2013, when J.C. ended the relationship.  Id. at ¶¶ 4, 47.

On January 14, 2014, J.C. filed a CSR with Brandeis alleging that: "[s]tarting in the month of September 2011, [Doe] had numerous inappropriate, nonconsensual sexual interactions with me.  These interactions continued to occur until around May 2013."  Id. at ¶ 59; Moriello Aff. Ex. C.  Upon receiving the CSR, and in accordance with the University's R&R, Brandeis

placed Doe on emergency suspension.  See Amended Complaint ¶¶ 7, 60; Moriello Aff. Ex. A §§ 3.0, 22.2.  Two days later, Brandeis notified Doe that J.C.'s accusations related to six discrete violations of the R&R: (1) causing physical harm; (2) invasion of personal privacy; (3) sexual misconduct; (4) taking advantage of incapacitation; (5) lack of consent; and (6) sexual harassment.  Amended Complaint ¶¶ 8, 61; see also Moriello Aff. Ex. A §§ 2.1.d-e, 3.1-3.3, 7.2.

III.     Brandeis Initiates Its Special Examiner Process and Investigates J.C.'s CSR

Because J.C.'s CSR contained allegations of sexual misconduct and harassment, Brandeis initiated its Special Examiner Process.  See Amended Complaint ¶¶ 9, 12, 62; Moriello Aff. Ex. A § 22.6.  Brandeis provided immediate notice to Doe that the University intended to proceed through this process.  See Amended Complaint ¶¶ 9, 62.

Brandeis hired a neutral third-party attorney to serve as Special Examiner.  Id. at ¶ 90; Moriello Aff. Ex. B.  Between January 2014 and April 2014, the Special Examiner interviewed Doe and J.C. four times each.  Amended Complaint ¶¶ 89, 91.  She interviewed eight additional witnesses, three of whom were identified by Doe.  Id. at ¶ 91, Moriello Aff. Ex. B at 2.  She also reviewed documents provided by Doe, J.C., and the other interviewees.  Moriello Aff. Ex. B at 2.  For example, the Special Examiner reviewed and considered pictures and Facebook comments submitted by Doe himself.  Id. at 16.

IV.     The Special Examiner's Report and Findings

After her investigation, the Special Examiner issued a thorough and balanced report in which she found that some, but not all, of J.C's allegations had merit.  See generally id.; see also Amended Complaint ¶ 106 (noting that the Special Examiner found insufficient evidence as to certain allegations).  The Special Examiner, for example, found insufficient evidence to support J.C.'s accusations that Doe had sent sexually explicit text messages to J.C. or that Doe had

6

required J.C. to sleep naked during their relationship.  <u>See</u> Moriello Aff. Ex. B at 22-23.  The

Special Examiner also found, however, that Doe had violated Brandeis' R&Rs[2] on several

separate occasions when he: (1) initiated sexual activity without J.C.'s explicit consent; (2)

engaged in unwanted physical contact with J.C.; (3) invaded J.C.'s physical privacy; and (4)

sexually harassed J.C.  <u>Id.</u> at 17-24.  The facts underlying these findings, and the Special

Examiner's corresponding conclusions, are set forth below.

    A.    *The Movie Incident*

In mid-September 2011, Doe and J.C. visited a friend's room to watch a movie.  <u>Id.</u> at 6,

18.  Doe and J.C. sat on the friend's bed while the friend sat on a chair beside the bed.  <u>Id.</u> at 6.

According to J.C., during the movie, Doe took J.C.'s hand and placed it on Doe's erect penis.  <u>Id.</u>

J.C. alleged that Doe kept J.C.'s hand on top of Doe's penis and that J.C. "froze."  <u>Id.</u>  J.C.

reported that he let his hand go limp, but did not say anything because he did not want his friend

to know what was going on.  <u>Id.</u> at 6-7.  He added that Doe then moved J.C.'s hand back and

forth on Doe's groin.  <u>Id.</u> at 7.  J.C. stated that he eventually "jerked" his hand away.  <u>Id.</u>

Doe recalled that he placed J.C.'s hand on his penis during the movie.  <u>Id.</u>  He stated that

J.C. did not object and that Doe moved his hand off J.C.'s hand after approximately five seconds.

<u>Id.</u>  He added that J.C. kept his hand on Doe's penis for the duration of the movie.  <u>Id.</u>

The Special Examiner determined that Doe did not ask J.C. whether he could engage in

the above conduct and did not otherwise seek consent for placing J.C.'s hand on his penis.  <u>Id.</u> at

18.  In support, the Special Examiner noted that, at the time of the incident, Doe and J.C. had not

yet "hooked up" and were not dating.  <u>Id.</u>  She added that, roughly a week earlier, J.C. told Doe

that he was uncomfortable with several text messages in which Doe expressed interest in

---

    [2] For each alleged violation, the Special Examiner applied the substantive standards
contained in the R&R that was in effect at the time of the alleged conduct.

"hooking up" with J.C.  Id.  Against this backdrop, Doe engaged in the above conduct "without

any prior indication from [J.C.] that he was interested in engaging in activity of a sexual nature

with [Doe]."  Id.  The Special Examiner also cited the statements of another student who

reported that Doe had grabbed her breasts, without consent, on several occasions.  Id.  Doe

admitted to this conduct, but stated that he had done it as a joke.  Id.  According to the Special

Examiner, Doe's conduct demonstrated his "general lack of understanding of consent" and added

to J.C.'s credibility regarding the movie incident allegations.  Id.

 The Special Examiner thus concluded, based on a preponderance of the evidence, that

Doe violated Sections 2.1.d, 3.1, and 3.3 of the R&R.  Id. at 21.

 B. *Sexual Conduct While J.C. Was Sleeping*

 J.C. stated that, during his relationship with Doe, he woke up on approximately twelve

occasions to find Doe "behind him, humping him."  Id. at 10.  J.C. said that he would ask Doe to

stop, but Doe would not.  Id.  According to J.C., he physically had to remove Doe's arms from

him.  Id.  J.C. added that, on a few occasions, he would ask Doe later in the morning not to

engage in that behavior again, but Doe would respond to the effect of "I'm just horny" or "Don't

you have any sex drive?"  Id.

 Doe denied these allegations, but, in doing so, provided inconsistent responses.  During

one interview, he stated that he sometimes woke J.C. in the mornings by kissing him.  Id. at 19.

Doe reported that if J.C. said he wanted to go back to bed, Doe would sometimes ask

"Seriously?" and continue kissing J.C unless he indicated that he really did want to go back to

bed.  Id.  During another interview, Doe stated twice that J.C. never said he wanted to go back to

bed when Doe woke J.C. by kissing him.  Id.  When the Special Examiner noted the discrepancy

in Doe's statements, he attempted to clarify by saying that J.C. might have said he wanted to go back to sleep if awakened at 8:00 a.m., but not if awakened at 10:00 a.m.  Id.

Based on this inconsistency, the Special Examiner found J.C to be more credible on this point.  Id.  The Special Examiner noted that, because sleep is a state of incapacitation, Doe did not obtain consent before waking J.C. with kisses and other sexual contact.  Id.  She further noted that, even under Doe's initial description of events, he continued to kiss J.C. after J.C. told Doe that he wanted to go back to sleep.  Id.

The Special Examiner therefore concluded, based on a preponderance of the evidence, that Doe violated Sections 2.1.d, 3.1, 3.2, and 3.3 of the R&R.  Id. at 21.

     C.     *The North Adams Incident*

J.C. alleged that Doe attempted to perform oral sex on him approximately three to four times, despite J.C.'s objections.  Id. at 11, 20.  J.C. added that he was flaccid during these incidents, that he would tell Doe to stop, and that Doe would give up after a short time.  Id. at 11.  Doe denied these allegations, stating that if J.C. indicated he was not interested, Doe would state "Seriously?" and stop.  Id.  Doe also said that, if J.C. said "no" a second time, Doe would not continue.  Id.

One of the incidents described by J.C. occurred in May 2013 when he and Doe visited J.C.'s father's North Adams home.  Id.  According to J.C., Doe attempted, without consent, to perform oral sex on J.C. during this trip.  Id. at 12.  When J.C. asked Doe whether he knew that such conduct constituted sexual assault, Doe became very upset, moved from the bed to the floor, and stated that he could not believe he was being accused of sexual assault.  Id.

The Special Examiner noted that, during his initial interview, Doe did not discuss lying on the floor.  Id.  When asked specifically about this issue in a follow-up interview, Doe stated

the he did not remember whether he slept on the floor.  Id.  Then, Doe changed his story to suggest that he slept on the ground due to heat, not an argument.  Id.  The Special Examiner noted, however, that when asked what he would do if he got hot while sleeping with J.C., Doe never mentioned that he would move to the floor.  Id. at 20.  In light of Doe's inconsistent statements, and the fact that sleeping on the floor would have been an unusual and memorable occurrence for Doe, the Special Examiner found that J.C.'s account was more credible.  Id.

The Special Examiner therefore concluded, based on a preponderance of the evidence, that Doe violated Sections 2.1.d, 3.1, and 3.3 of the R&R.  Id. at 21.

D.     *The Bathroom Incidents*

J.C. alleged that, throughout his relationship with Doe, Doe would stare at J.C.'s penis while they were in the University's communal bathrooms.  Id. at 8, 22.  J.C. stated that he objected to this conduct every time, and attempted to reposition himself so that Doe could not see his penis.  Id. at 8.  Doe, in turn, stated that when he and J.C. were in the bathroom together, he would crane his head over in an obvious way and tell J.C. that he could see J.C.'s penis.  Id. Doe added that he engaged in this conduct as a joke.  Id.  He did not recall whether J.C. would react by repositioning himself.  Id.

The Special Examiner noted that Doe, in effect, had admitted that he engaged in the conduct alleged by J.C.  Id. at 22.  She further added that, given Doe's separate admission that he had touched another student's breasts "as a joke," Doe was not able to distinguish effectively between jokes and inappropriate behavior that invades another's personal privacy.  Id.

The Special Examiner thus concluded, based on a preponderance of the evidence, that Doe violated Section 2.1.e of the R&R.

E.    *Sexual Harassment*

J.C. alleged throughout the investigation that Doe had pressured him to engage in sexual activity.  Id. at 23.  J.C. indicated that he was forced to drop a course and its corresponding practicum as a result of stress related to Doe's conduct.  Id. at 24.  J.C. and other witnesses also noted that J.C. began to drink alcohol after he broke up with Doe.  Id. at 15-16.

The Special Examiner found that J.C.'s allegations were consistent with Doe's own description of events, in which he often stated "Seriously?" after J.C. indicated a lack of interest in sexual activity.  Id. at 23.  She found that J.C.'s recent use of alcohol aligned with statistical studies indicating a correlation between assault and alcohol abuse.  Id. at 15.  The Special Examiner also found corroborative of J.C.'s allegations Doe's statements that he would get sulky or moody if J.C. declined sexual activity.  Id. at 23.

The Special Examiner thus concluded, based on a preponderance of the evidence, that Doe violated Section 7.2 of the R&R.

V.    Subsequent Proceedings and Doe's Appeal

On April 24, 2014, Lisa Boes—Brandeis' Dean of Academic Services—met with Doe and read to him a summary she prepared of the Special Examiner's findings.  Amended Complaint ¶ 96; see also Second Moriello Aff. Ex. A.  Ms. Boes' summary was comprehensive and discussed each of J.C.'s allegations, Doe's responses, and the Special Examiner's findings.  Second Moriello Aff. Ex. A.  Brandeis provided Doe with a copy of Ms. Boes' written summary.  Amended Complaint ¶ 98.  Doe did not receive a copy of the Special Examiner's full report at that time.  Id.  On May 2, 2014, Doe submitted a written response, refuting J.C.'s allegations.  Id. at ¶ 131.

On May 12, 2014, Ms. Boes notified Doe that, after a review of the Special Examiner's report and Doe's response, she found Doe responsible for violating the six R&R provisions identified above.  See id. at ¶ 132.  In accordance with the R&R, Ms. Boes then convened a three-member panel to recommend an outcome (and any sanction) for Doe.  Id. at ¶ 134.  After their deliberation, the panel gave Doe a Disciplinary Warning, which Doe admits was "the lightest sanction possible."  Id. at ¶ 135; see also Moriello Aff. Ex. A § 21.1.b.

Doe appealed this finding and sanction on the grounds of fraud, procedural error, and denial of rights.  Amended Complaint ¶ 141.  The University Appeals Board denied Doe's appeal.  Id. at ¶ 142.  Doe alleges that the Appeals Chair had a "conflict of interest arising from his interaction with J.C.'s [faculty] Advisor ..." Id. at ¶¶ 33, 166.  On June 24, 2014, Ms. Boes informed Doe of the final, adverse outcome against him.  Id. at ¶ 142.

VI.   Post-Decision Conduct and Alleged Defamation

Following Doe's Disciplinary Warning, J.C. filed additional CSRs accusing Doe of stalking, sexual harassment, retaliation, and intimidation.  Amended Complaint ¶¶ 186, 189.  None of these claims was found to be credible.  Id. at ¶ 189.  Nevertheless, J.C. initiated a "campaign" to defame and harass Doe.  Id.  J.C. wrote to Brandeis staff stating that Doe was his "attacker" and a threat to the safety of the Brandeis campus.  Id. at ¶ 190.  In June 2014, he posted on his Facebook page a copy of the University's final disciplinary decision against Doe.  Id. at ¶ 191.  Although J.C. redacted Doe's name from the document, he identified Doe by name to people "off-line."  Id.  He also added commentary to the posted letter, accusing Doe of "multiple forms of rape."  Id. at ¶ 192.  In separate conversations with other Brandeis students and news reporters, J.C. referred to Doe as his "attacker" and accused him of anally raping J.C.

Id. at ¶ 194-96.  According to Doe, Brandeis "has known of these false and defamatory actions" and has "aided and abetted them."  Id. at ¶ 187.

Separately, Doe alleges that Brandeis administrators either "leaked" information about the Special Examiner's findings to Doe's then-current and prospective employers, or "recklessly failed" to keep the information confidential.  Id. at ¶¶ 28, 174, 188.  When Doe's then-current internship employer—a highly ranked public official—learned of the situation with J.C., Doe was terminated from his position.  Id. at ¶¶ 188, 200.  He also lost a job offer from another prospective employer.  Id. at ¶ 202.

VII.   Doe's Request to Reopen His Appeal and His OCR Complaint

In light of J.C.'s conduct, Doe asked Brandeis to reopen his appeal.  Id. at ¶ 203. Brandeis denied this request.  Id. at ¶ 204.  Doe then filed a complaint with the Department of Education's Office for Civil Rights ("OCR"), alleging that Brandeis' disciplinary findings were erroneous and violated Title IX.  Id. at ¶ 207.  The OCR notified Doe on August 29, 2014 that it had accepted his complaint for investigation under Title IX.  Id. at ¶ 208.  Doe filed this lawsuit on April 9, 2015, and originally asserted a Title IX claim against Brandeis.  Docket No. 1 ¶¶ 206-28.[3]  On April 22, 2015, the OCR notified Doe and Brandeis that it was administratively closing Doe's OCR complaint.  Amended Complaint ¶ 211; Second Moriello Aff. Ex. B.  In doing so, the OCR noted as follows:

> The Complainant in the above-referenced OCR complaint filed an action against the University in federal court on or about April 9, 2015. OCR has determined that the allegations that the Complainant filed against the University in federal court are the same as those that he filed with OCR. In addition, OCR has not obtained sufficient evidence to support a finding with regard to the allegations filed with OCR. Accordingly, OCR is administratively closing this complaint.

Second Moriello Aff. Ex. B.  (emphasis added).

---

[3] Doe has since withdrawn his Title IX claim.  Amended Complaint ¶¶ 207-16.

13

**Standard of Review**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. A court may disregard "bald assertions, unsupportable conclusions, and opprobrious epithets." In re Citigroup, Inc., 535 F.3d 45, 52 (1st Cir. 2008) (citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. "In other words, a plaintiff must offer 'more than an unadorned, the-defendant-unlawfully-harmed-me accusation,' in order to claim a 'plausible entitlement to relief.'" Sanchez v. Pereira–Castillo, 590 F.3d 31, 48 (1st Cir. 2009) (citations omitted).

**Argument**

I.      Breach of Contract

In Count I of his Amended Complaint, Doe asserts a claim for breach of contract. Amended Complaint ¶¶ 145-78, 217-21. Doe points to numerous alleged violations of the R&R.[4]

"In reviewing a student discipline case like this one involving an alleged contractual relationship, [courts] consider whether the university violated any of the student's reasonable

---

[4] For purposes of Brandeis' Motion to Dismiss, the University concedes that its R&R is an enforceable contract. Brandeis reserves the right to dispute this point during any subsequent proceedings.

expectations created by one or more specific provisions of the contract." Morris v. Brandeis Univ., No. 01-P-1573, 2004 WL 369106, at *1 (Mass. App. Ct. Feb. 27, 2004) (citing Schaer v. Brandeis Univ., 432 Mass. 474, 478 (2000)). Contract interpretation, including whether any ambiguities exist in the disputed contractual terms, is generally a question of law for the court. Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 783 (1st Cir. 2011); Driscoll v. Bd. of Trs. of Milton Acad., 70 Mass. App. Ct. 285, 293 (2007).

A.   *Brandeis Did Not Eliminate the Statements Phase of the Special Examiners Process*

First, Doe contends that Brandeis "eliminated the Statements Phase from the [Special Examiner] Process." Amended Complaint ¶ 147. Specifically, Doe alleges that Brandeis failed to obtain "a thorough statement" of J.C.'s allegations at the outset, which would have afforded Doe the opportunity to compose a "thorough response" for the Special Examiner's consideration. Id. That is not, however, what the R&R requires. The 2013-2014 R&R states that, during the Statements Phase, the director of DSRCS must only "suggest" that the accuser compose a "thorough statement" of his/her allegations if the initial report does not represent a "full account." Moriello Aff. Ex. A § 22.6. If the accuser declines to submit a "thorough statement," he/she runs the risk that his/her CSR will be dismissed for lack of merit or sufficient evidence. Id. at § 18.0. Furthermore, even when an accuser drafts a "thorough statement," the R&R does not require that the statement be shared with the accused. The R&R states only that, during the director of DSRCS's subsequent meeting with the accused, the director must "suggest" that the accused compose a "thorough response" to the allegations "described in the CSR." Id. at § 22.6 (emphasis added). In short, nothing in the R&R required Brandeis to obtain a "thorough statement" from J.C., or to share that statement with Doe.

15

B.     *The Special Examiner's Findings Were Based on Sufficient
       Evidence and Correct Applications of the R&R's Standards*

Second, Doe alleges that Brandeis breached its "contractual pledge" to "preserv[e] the

rights . . . of all its students through all of its disciplinary procedures."  Amended Complaint ¶

150.  To support this claim, Doe contends that the Special Examiner's findings were "not

supported by a preponderance of the evidence."  Id.  This allegation is baseless.  The Special

Examiner's report goes to great lengths to detail the appropriate standard and to apply that

standard to the facts of the case.  See Moriello Aff. Ex. B.  The report is balanced and analyzes

each claim of misconduct and harassment on its own merits.  Id.  Upon applying the appropriate

standard, the Special Examiner found that the evidence was insufficient to support some

allegations, but sufficient to support others.  Id.  In doing so, the Special Examiner set out all the

facts as described by Doe, J.C., and other witnesses, and articulated the precise reasons

supporting her responsibility findings.  She also pointed specifically to Doe's inconsistent

statements and lack of credibility on certain issues.  Her credibility findings are entitled to

substantial deference.  See Gen. Dynamics Corp., Quincy Shipbuilding Div. v. Occupational

Safety & Health Review Comm'n, 599 F.2d 453, 463 (1st Cir. 1979) ("The credibility findings

of the person who sees and hears the witnesses be he ALJ, jury, or judge is entitled to

considerable deference.").  Brandeis, in turn, received and reviewed the Special Examiner's full

report, along with Doe's response, prior to issuing its decision.  See Amended Complaint ¶¶ 96,

132.  Doe cannot claim that the Special Examiner applied an incorrect standard simply because

he disagrees with her findings.  See Schaer, 432 Mass. at 479 & n. 9.

Doe also contends that the Special Examiner's findings against him "defied common

sense," "could not be squared with the evidence," and were "arbitrary and capricious" because

they failed to account for Doe and J.C's twenty-one-month-long relationship.  See Amended

16

Complaint ¶¶ 32-33, 150, 242.  As an initial matter, the Special Examiner explicitly addressed

the fact that Doe and J.C. were in a dating relationship for a substantial portion of the time period

at issue.  Indeed, she divided the alleged incidents into three temporal categories—"Pre-Dating

Relationship," "Dating Relationship," and "Break Up and Post-Break Up Interactions"—and

analyzed them accordingly.  See, e.g., Moriello Aff. Ex. B at 7 (finding that Doe had not

received consent from J.C. during the "Movie Incident" because at the time of the incident, Doe

and J.C. had not yet "hooked up" and were not dating).  The Special Examiner also identified

and applied the specific R&R guidelines regarding sexual misconduct in dating and sexual

relationships.  Id. at 3-4.  As noted by the Special Examiner, Section 3.3 of the 2013-2014 R&R

states, "[p]rior sexual activity or an existing acquaintanceship, friendship, or other relationship

that has been sexual in nature does not constitute consent for the continuation or renewal of

sexual activity."  Moriello Aff. Ex. A § 3.3.  Lack of consent may "be inferred from …[an]

advantage gained by the Accuser's mental or physical incapacity or impairment of which the

Accused was aware." Id.  Sleep, for example, constitutes incapacitation.  Doe appears to allege in

his Amended Complaint that, because he and J.C. had a dating relationship, consent to any and

all sexual activity must be assumed.  That is not, however, the standard set forth in the R&R.

Although Doe does not subscribe to the above principles, they governed the accusations that J.C.

made against Doe, and the Special Examiner was required to apply them.

Doe alleges that the Special Examiner misapplied the R&R's definition of "consent."

Amended Complaint ¶ 109.  The R&R states that "[c]onsent or lack of consent may be

communicated verbally or through actions but if a refusal to engage in sexual activity is

communicated at any time then the activity must cease immediately."  Moriello Aff. Ex. A § 3.3.

Doe contends that the Special Examiner improperly based her "Movie Incident" and "Wake-up

Kiss" findings on a "verbal consent standard."  Amended Complaint ¶¶ 104, 107, 114.  The Special Examiner applied no such standard.  With respect to the "Movie Incident," the Special Examiner determined that Doe had not obtained J.C.'s consent because the two were not yet dating at the time of the incident and, once Doe placed J.C.'s hand on Doe' penis, J.C. immediately withdrew his hand.  Moriello Aff. Ex. B at 18.  With respect to the "Wake-up Kiss" allegations, the Special Examiner determined that Doe had not obtained J.C.'s consent because J.C. was asleep at the time Doe initiated sexual contact and, after J.C. woke up, Doe continued his advances despite J.C.'s requests that he stop.  Id. at 19-20.  Ultimately, the Special Examiner did not apply a "verbal consent standard" but, rather, found lack of consent based on J.C.'s express actions, words, and incapacitation.

Doe alleges that the Special Examiner also misapplied the R&R definition of "sexual harassment."  Amended Complaint ¶ 124.  Specifically, he contends that the R&R "requires 'persistent' behavior that 'create[s] an intimidating, hostile or offensive environment in which to work, study, or live . . . .'"  Id.  He also contends that the Special Examiner's harassment finding was erroneous because it was based "in part on [Doe's] admission that he would get 'sulky' after J.C. declined to engage in sexual activity."  Id. at ¶ 122.  These allegations are premised on selective and incomplete readings of the R&R and the Special Examiner's report.  The 2011-2012 and 2012-2013 R&Rs define "harassment" as "conduct [that] has the purpose or effect of unreasonably interfering with a person's education or work performance by creating an intimidating, hostile or offensive environment in which to work, study or live; or otherwise adversely affects a person's employment or educational opportunities."  Amended Complaint Ex. B § 7.1, Ex. C § 7.1.  The R&Rs provide several examples of conduct that may constitute sexual harassment.  Amended Complaint Ex. B § 7.2, Ex. C § 7.2.  For example, sexual harassment may

include "[u]nwelcome sexual conduct toward an individual," or "persistent unsolicited and unwelcome . . . pressure to engage in sexual activity …"  Amended Complaint Ex. B § 7.2, Ex. C § 7.2.  A plain reading of these passages reveals that, although "persistent" intimidating behavior is sufficient to support a sexual harassment finding, it is not necessary. The Special Examiner's reference to Doe's "sulky" mood, moreover, was not the only basis on which the Special Examiner made her harassment finding.  Doe tacitly concedes this point in his Amended Complaint.  Amended Complaint ¶ 122 (noting that the finding was based, in part, on Doe's "sulky" mood).  The Special Examiner explained that, given Doe's other sexual misconduct (i.e. the Movie Incident, the Wake-up Kiss allegations, etc.), the "evidence is sufficient to indicate that Doe did engage in unwelcome sexual conduct."  Moriello Aff. Ex. B at 23.  That alone was sufficient to support the Special Examiner's harassment finding.  The Special Examiner mentioned Doe's sulky behavior only to make the additional point that Doe often pressured J.C. to engage in sexual activity.  Id.  This observation was clearly identified as "corrobora[ting]" evidence, not determinative evidence.  Id.  Therefore, even if the Special Examiner arrived at this conclusion erroneously, it is not enough to set aside her harassment finding.

Doe alleges that the Special Examiner also misapplied the R&R's definition of "physical harm."  Amended Complaint ¶ 129.  In Doe's view, "physical harm requires a battery distinct from unwanted sexual contact, in the form of 'hitting, pushing, or physical altercations/violence of any kind.'"  Id.  Again, Doe selectively misquotes and misinterprets the R&R.  Under Section 2.1.d of the 2011-2012 R&R, "[t]he University will not tolerate any behavior that[] physically harms. (some examples: hitting, pushing, or physical altercations/violence of any kind)."  Amended Complaint Ex. B § 2.1.d (emphasis added).  The OCR's 2011 Dear Colleague Letter, which provides guidance regarding Title IX disciplinary proceedings, defines sexual violence as

"physical sexual acts perpetrated against a person's will ...."  Moriello Aff. Ex. D at 1.  The

Special Examiner identified and applied this standard to Doe's conduct.  Moriello Aff. Ex. B. at

21.  Doe does not suggest that this definition was unreasonable, or that his conduct fell outside of

its reach.  Furthermore, under Section 2.1.d of the 2012-2013 R&R, "[t]he University will not

tolerate any behavior that[] physically harms <u>or is considered unwanted physical contact</u> (some

examples: hitting, pushing, or physical altercations/violence of any kind).  Amended Complaint

Ex. C § 2.1.d (emphasis added).  In accordance with this definition, the University proscribed

<u>any</u> unwanted physical contact, including any contact of a sexual nature.  The R&R's attempt to

provide "some examples" of "unwanted physical contact" does not limit the breadth of that term.

The Special Examiner specifically found Doe responsible for violating Section 2.1.d of the 2012-

2013 R&R because, in addition to the reasons above, his actions constituted "unwanted physical

contact" with J.C.  Moriello Aff. Ex. B at 21.  The Special Examiner committed no error.

C.    *Brandeis Was Not Obligated to Provide Doe*
      *With a Copy of the Special Examiner's Full Report*

        Third, Doe alleges that he was denied access to the Special Examiner's full report, which

prevented him from knowing the "facts the Examiner reviewed, what credibility determinations

the Examiner made, and the bases for each finding."  Amended Complaint ¶ 151.  Both the 2011-

2012 and 2013-2014 R&Rs contained the following provision:

> Student Records: The Federal Family Educational Rights and Privacy Act
> of 1974 (FERPA) gives each enrolled student at Brandeis certain rights,
> including access to the student's educational records, the right to request
> amendment of those records where the student believes a record is
> inaccurate or misleading, and the right to add a statement presenting the
> student's view if the records are not amended. A detailed statement of the
> rights and responsibilities of a student under the Act, the location of all
> records pertaining to a student, and the procedures for requesting access
> are contained in the Brandeis University Records Policy. The policy is
> available      from      the      University      Registrar      and,      at

www.brandeis.edu/registrar/bulletin/EducRecordsPolicy.html, and is on reserve in the University Library.

Amended Complaint Ex. A § 17.4; Moriello Aff. Ex. A § 17.4.

Doe alleges that the report was an "education record" that Brandeis was required to provide. Amended Complaint ¶ 152. The plain language, however, imposes no affirmative obligation on Brandeis. It merely notifies Brandeis' students of their rights under FERPA. To the extent Doe seeks relief under FERPA itself, he is foreclosed from doing so. Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 69 (1st Cir. 2002) (no private right of action under FERPA); Zona v. Clark Univ., 436 F. Supp. 2d 287, 290 (D. Mass. 2006) (FERPA "did not create any individually enforceable federal rights").

    D.    *Brandeis Did Not Eliminate the Deliberations*
          *Phase from the Special Examiner Process*

Fourth, Doe alleges that Brandeis "completely eliminated" the Deliberations Phase from the Special Examiner Process. Amended Complaint ¶ 156. Specifically, Doe contends that Ms. Boes improperly convened a three-member "Sanctions Panel" when she was required to convene a "Deliberations Panel" to determine whether or not to accept the Special Examiner's findings. Id. Doe misunderstands the chronology underlying the Special Examiner Process and the purpose of the Deliberations Phase. As set forth in Section 22.6 of the R&R, the Special Examiner leads the Fact-Finding Phase and, at the end of that phase, issues his/her findings of fact. During the Discussion Phase, the parties are provided with a summary of those findings and are afforded the opportunity to offer a rebuttal or new information to the SSAO/D. The University's final factual findings are made during the next stage—the Responsibility Findings Phase—by the SSAO/D. If the accused is found responsible for one or more charges during this Phase, the Special Examiner Process progresses to the Deliberations Phase. The R&R makes

21

clear that the panel convened during this phase is tasked with recommending outcomes, not findings of fact.  As used in the R&R, "outcomes" refers to the University's post-finding actions/decisions, including any sanctions.  See also OrbusNeich Med. Co., BVI v. Boston Scientific Corp., 694 F. Supp. 2d 106, 114 (D. Mass. 2010) ("It is a canon in the interpretation of contracts that every word and phrase must be presumed to have been employed with a purpose, and must be given a meaning and effect whenever reasonably possible.") (citation omitted).  Indeed, the Special Examiner Process has an Outcome Notification Phase that is two stages removed from the phase during which responsibility findings are made.  The three-member panel convened during the Deliberations Phase fully comported with the R&R.  There was no breach.

     E.    *The University Appeals Board Was Not "Tainted" by a Conflict of Interest*

Fifth, Doe alleges that the Chair of the University Appeals Board had a conflict of interest and should not have decided his case.  Amended Complaint ¶¶ 26(e), 160.  Although Doe's claim appears to be based, in part, on Brandeis' Conflict of Interest Policy, Doe does not point to any specific provision of that policy that the University breached.  See id. at ¶ 26(e).  Per Brandeis' policy, "[a] conflict of interest can arise when a Brandeis community member has the opportunity to influence the University's business, administrative, academic or other decisions in ways that can lead to personal, family or financial advantage of any kind for himself or herself." Second Moriello Aff. Ex. C.  Doe does not allege that the Chair, or any other member of the Appeals Board, had any conflict of interest under this definition.  Instead, Doe relies on an alleged statement by Ms. Boes that the "members of the [Appeals Board] do not interact with either party or their advisors about the process or appeal materials." Amended Complaint ¶ 160.  Notably, however, Ms. Boes' alleged representation is not contained in any R&R or any other

document that could arguably constitute an enforceable contract. Therefore, it cannot provide the basis for a breach of contract claim against Brandeis.

Further, Doe's allegations on this issue are blatantly speculative. According to Doe, "[t]here is substantial reason to conclude that the Chair and J.C.'s Advisor improperly discussed [Doe's] case, based on the fact that the [Subcommittee on Sexual Violence's] Report on Sexual Violence and the Appeals Board's Decision – which were issued within one week of each other – contain references related to two events in [Doe's] case." Id. at ¶ 162. This claim ignores several key points. For one, it is equally reasonable to conclude that the Chair authored both documents without actually discussing the Doe-J.C. case or appeal materials with J.C.'s advisor. In addition, the two things with which Doe takes issue—namely, the references to "minimum sanctions" and a No Contact Order—have no bearing on the merits of the Doe-J.C. case. They are extraneous issues that do not relate to the Appeals Board's limited task of reviewing for fraud, denial of rights, procedural error, or new material evidence. Therefore, there is no basis to conclude that the Chair's alleged conflict had any bearing on the Board's substantive decision.

F.    *Doe Was Not Entitled to Proceed Through the Hearing Process*

Sixth, Doe alleges that under the 2011-2012 version of the R&R, he was contractually entitled to proceed before the Student Conduct Board, not a Special Examiner. Amended Complaint ¶¶ 168-72. In support, Doe alleges that he agreed in writing to be bound by the 2011-2012 version of the handbook, not the 2013-2014 version, and that Brandeis did not reserve the right to unilaterally revise the handbook's disciplinary proceedings. Id. at ¶¶ 169-72.

Doe's allegations on this issue are deficient as a matter of law. Doe recognizes that, as noted in the 2011-2012 R&R, Brandeis was permitted to "tweak" the handbook every year. Id. at ¶ 170. By agreeing to these terms, Doe accepted that the R&R was an evolving document, and

that he would be bound by its updates and amendments.  In Doe's view, "'tweaking' cannot reasonably be read to permit the elimination of [one disciplinary] process and the introduction of an entirely new process."  Id. at ¶ 171.  This argument, however, passes over an essential point—namely, that the word "tweak" modifies, and pertains to, all of the R&R's disciplinary procedures.  Brandeis acknowledges that, between the 2011-2012 and 2013-2014 schools years, certain components of the Hearing Process were changed, and the Special Examiner Process was added.  On the whole, however, the Hearing Process remained largely intact, and the Special Examiner Process was created for only a narrow subset of student misconduct.  Compare Amended Complaint Ex. A §§ 18.0-20.10 with Moriello Aff. Ex. A §§ 18.0-20.11, 22.6.  These changes were, in fact, no more than a "tweak" of Brandeis' R&R.[5]

In any event, even if the "tweak" language were not itself sufficient, a college is "clearly entitled to modify [its rules and regulations] so as to properly exercise its educational responsibility."  Coveney v. President & Trustees of Coll. of Holy Cross, 388 Mass. 16, 22 (1983) (quoting Mahavongsanan v. Hall, 529 F.2d 448, 450 (5th Cir. 1976)).  A university's right to amend its rules and regulations is "implicit in the student's contract with the university upon matriculation."  Mahavongsanan, 529 F.2d at 450.  As the exhibits to the Amended Complaint make clear, each R&R corresponded to a particular academic year.  See Amended Complaint Exs. A-D.  Doe received each version of the R&R during his time at Brandeis.  See

_____

[5]  Moreover, the term "tweak" is of such a subjective and discretionary nature that Doe cannot plausibly claim that Brandeis' R&R amendments were improper.  See Lovelace v. Southeastern Mass. Univ., 793 F. 2d 419, 422-23 (1st Cir. 1986) (deciding that the requirement for "justification" in a recommendation of non-renewal of a professor's  employment did not take away from the discretion of the president to make a subjective judgment; the Court also decided that "improvement" was an elusive, judgmental concept that could not confer any rights on the plaintiff); see also Spiegel v. Trustees of Tufts Coll., Civ. A. No. 86-3330-S, 1987 WL 15874, at *4 (D. Mass. July 30, 1987) (stating that the term "excellence" was "completely subjective" and "not litigable").  Brandeis drafted the R&R and retained the discretion to determine how much "tweaking" it was permitted to do.

id.  Because the 2011-2012 R&R was expressly labelled as such, Doe could not have had a

reasonable expectation that its terms and procedures would apply beyond that school year.  To

the contrary, the only reasonable expectation is that each R&R applied only for the specific

school year it referenced, and that a new R&R would be issued every year.  Brandeis had the

unquestioned right to change and interpret its student handbook.[6]

> G.    *Doe Was Not Entitled to a Hearing on the*
>       *Charges of Physical Harm and Invasion of Privacy*

Seventh, Doe alleges that the Special Examiner Process is limited to complaints of sexual

misconduct, and that he was denied his right to a Student Conduct Board hearing on the charges

of physical harm and invasion of privacy.  Amended Complaint ¶ 173.  This allegation belies the

clear language of the R&R.  See Moriello Aff. Ex. A § 22.6 ("In cases where the DSRCS

receives a report and determines that one or more possible violations of Section 3 (Sexual

Responsibility) or Section 7 (Equal Opportunity, NonDiscrimination, and Harassment) exist, the

case will be adjudicated by the Special Examiner's Process.") (emphasis added).  Because J.C.'s

CSR contained several alleged violations of R&R Sections 3 and 7, the University properly

adjudicated his claims via the Special Examiner Process.

> H.    *Brandeis Did Not Violate Any Confidentiality Provision in the R&R*

Eighth, Doe alleges that Brandeis breached the R&R by "allowing J.C. to disclose the

[Special Examiner's] findings" and "by allowing persons within the administration to 'leak'

information about the Special Examiner's findings" to third parties.  Amended Complaint ¶ 174.

In support, Doe cites to several provisions in the 2013-2014 R&R, only two of which impose any

---

[6]  It also bears noting that Brandeis' R&R amendments followed in time the OCR's April 2011 Dear Colleague Letter, and are consistent with the OCR's Title IX guidance.  Therefore, Doe's claims fail to the extent he suggests that Brandeis modified its R&R arbitrarily and capriciously.

confidentiality obligations on Brandeis—Sections 19.5 and 19.6.j.  Those sections, however, do not impose any liability on Brandeis for actions taken by students such as J.C.  Also, the sections pertain to written records and hearing reports creating during the Hearing Process.  See Moriello Aff. Ex. A §§ 19.5, 19.6.j.  There is no dispute that Doe's case proceeded through the Special Examiner Process, not the Hearing Process.  Although Section 22.6 states that "[d]ocuments generated from the Special Examiner's Process will be retained pursuant to the rules in Sections 17.4, 19.5, and 19.6.j.," Doe does not allege that Brandeis itself distributed any confidential documents.  See Amended Complaint ¶ 174 (alleging only that Brandeis allowed leaks of "information about the Special Examiner's findings").

I.    *Brandeis' Disciplinary Proceedings Were Fair and Reasonable*

Finally, Doe alleges that Brandeis' disciplinary policies and procedures were fundamentally unfair, arbitrary and capricious.  Id. at ¶ 175.  While a reviewing court must examine disciplinary proceedings to ensure they comport with notions of "basic fairness," Cloud v. Trustees of Boston Univ., 720 F.2d 721, 724-25 (1983),  "[g]reat deference is extended to university decision-making on academic and disciplinary matters."  Morris, 60 Mass. App. Ct. 1119; Schaer, 432 Mass. at 482.

Doe faults Brandeis for failing to conduct a hearing before an "independent tribunal," in which he would have been allowed to hear "all of the evidence" and present his "claims and defenses."  Amended Complaint ¶ 177.  Brandeis was not required, however, to provide any such hearing.  See Coveney, 388 Mass. at 21-22 (noting that a private university was not required to provide a hearing where there was no right to one under the terms of its student handbook); see also Driscoll, 70 Mass. App. Ct. at 295 (finding that the school satisfied "basic fairness" where "[t]he student was given an opportunity to explain his behavior" and "[b]oth of his parents were

26

informed of the proceedings shortly thereafter"). In accordance with the principle of basic fairness, the Special Examiner (a neutral outside attorney) conducted four separate interviews with Doe, and heard his side of the story. Amended Complaint ¶¶ 89-91. She also interviewed three additional witnesses that Doe identified, and examined documentary evidence that Doe submitted. Id. at ¶ 91; Moriello Aff. Ex. B at 2, 16. After the Special Examiner issued her report, Ms. Boes provided Doe with a comprehensive summary of its contents, and afforded Doe the opportunity to rebut the report and/or provide additional information. Amended Complaint ¶¶ 96, 131; Second Moriello Aff. Ex. A. Ms. Boes made her final decision based on all of the evidence before her, including Doe's response statement. Amended Complaint ¶ 132. An independent three-member panel reviewed Doe's case and recommended a sanction for his conduct. See id. at ¶¶ 134-35. By Doe's own admission, he received "the lightest sanction possible." Id. at ¶ 135. Thereafter, Doe was allowed the opportunity to appeal the decision and sanction to the University Appeals Board. Id. at ¶¶ 141-42. By providing all of these processes and procedures, Brandeis went well beyond the obligations of basic fairness. Nothing more was required.

Doe also takes issue with the Special Examiner's alleged failure to consider certain evidence, her reliance on a "hearsay study," and Ms. Boes' supposed refusal to forward additional evidence to the Special Examiner. Amended Complaint ¶¶ 110, 125-28. However, "[a] university is not required to adhere to the standards of due process guaranteed to criminal defendants or to abide by rules of evidence adopted by courts." Schaer, 432 Mass. at 482. Moreover, courts are not empowered to "tell universities what statements they may consider and

what statements they must reject." Id. at 481.  Thus, Doe's allegations on these issues are

without merit.[7]

Accordingly, the Court should dismiss Count I of Doe's Amended Complaint.

## II.      Breach of the Implied Covenant of Good Faith and Fair Dealing

In Count II, Doe alleges that Brandeis breached the implied covenant of good faith and

fair dealing by "subjecting him to an unfair, arbitrary and capricious Special Examiner's Process,

and denying him the fruits of his contracts with Brandeis."  Amended Complaint ¶ 223.

"The covenant of good faith and fair dealing is implied in every contract."  Uno Rests.,

Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004) (citations omitted).  "The

purpose of the covenant is to guarantee that 'the parties remain faithful to the intended and

agreed expectations of the contract.'"  Kuchera v. Parexel Int'l Corp., 719 F. Supp. 2d 121, 125

(D. Mass. 2010) (quoting Eigerman v. Putnam Invs., 450 Mass. 281, 287 (2007)).  "The

covenant may not, however, be invoked to create rights and duties not otherwise provided for in

the existing contractual relationship, as the purpose of the covenant is to guarantee that the

parties remain faithful to the intended and agreed expectations of the parties in their

performance."  Uno Rests., Inc., 441 Mass. at 385.  Also, "while every breach of contract has the

effect of destroying or injuring the rights of the other party to receive [its] fruits, not every

breach of contract is a breach of the implied covenant of good faith and fair dealing."

Christensen v. Kingston Sch. Comm., 360 F. Supp. 2d 212, 226 (D. Mass. 2005) (internal

quotation marks omitted).  To sustain a claim for breach of the implied covenant of good faith

---

[7] Doe points to several subsequent amendments to the R&R as alleged evidence that
Brandeis has "acknowledged" its flawed procedures.  Amended Complaint ¶¶ 179-85.  Doe's
allegations on this issue are improper, and the Court should disregard them.  See Fed. R. Evid.
407 ("When measures are taken that would have made an earlier injury or harm less likely to
occur, evidence of the subsequent measures is not admissible to prove[] culpable conduct.").

and fair dealing, there must be conduct taken in bad faith either to deprive a party of the fruits of labor already substantially earned or unfair leveraging of contract terms to secure undue advantage.  Id.

As noted above, the R&R is an evolving document that Brandeis was free to amend. Because J.C.'s CSR was filed during the 2013-2014 academic year, the processes and procedures included in the 2013-2014 R&R governed the J.C.-Doe matter.  Brandeis' resort to the Special Examiner Process was entirely proper, and Brandeis complied with all of the procedures required under that Process.  There was no breach of contract and, likewise, no violation of the implied covenant.  In addition, even if the 2011-2012 R&R applied to J.C.'s CSR or if Doe was entitled to a hearing under principles of basic fairness, Doe has not pled sufficient facts suggesting that Brandeis proceeded through the Special Examiner Process in bad faith or to gain an unfair advantage.  See Amended Complaint.  Therefore, assuming Doe's claims had any merit, Doe's breach of contract claim would be sufficient and his implied covenant claim would be duplicative.  See Sorenson v. H & R Block, Inc., No. 99–10268–DPW, 2002 WL 31194868, at *17 (D. Mass. Aug. 27, 2002) (dismissing claim for breach of implied covenant of good faith and fair dealing as duplicative of breach of contract claim where they were based on the same factual predicate).

Accordingly, the Court should dismiss Count II of Doe's Amended Complaint.

III.    Estoppel and Reliance

In Count III, Doe asserts a claim for promissory estoppel.  Amended Complaint ¶¶ 226-31.

Promissory estoppel is generally asserted as an "alternative theory of recovery for a contract that is not supported by consideration."  Hannigan v. Bank of Am., N.A., 48 F. Supp. 3d

135, 141 (D. Mass. 2014) (citation omitted).  To prevail on a claim of promissory estoppel, the plaintiff must establish that the defendant made an unambiguous promise and that the plaintiff relied on that representation.  Id.  A promissory estoppel claim must be dismissed where it is predicated on alleged promises that were never made.  In re Northwood Properties, LLC, 517 B.R. 27, 39-40 (Bankr. D. Mass. 2014).

Doe's promissory estoppel claim, like his breach of contract claim, is based on an erroneous interpretation of the R&R, and on promises that Brandeis simply did not make.  Thus, it suffers the same legal deficiencies as his breach of contract claim and should be dismissed on that basis.  Alternatively, to the extent the Court finds that Brandeis did make any of the alleged promises, Doe already has a breach of contract claim for those allegations.  Thus, with respect to those promises, Doe's estoppel claim is duplicative and unnecessary.

Accordingly, the Court should dismiss Count III of Doe's Amended Complaint.

IV.     Negligence and Negligent Infliction of Emotional Distress

In Counts IV and VIII, Doe asserts claims for negligence and negligent infliction of emotional distress.  Amended Complaint ¶¶ 232-38, 259-65.  Doe's claims fail for several distinct reasons.

First, Doe's negligence claims are an improper end-run around his deficient contract and quasi-contract claims.  The student-college relationship is essentially contractual in nature.  Mangla v. Brown Univ., 135 F.3d 80, 83 (1st Cir. 1998); see also Shocrylas v. Worcester State Coll., No. CIV.A.06-40278-FDS, 2009 WL 3298126, at *9 (D. Mass. Aug. 7, 2009).  In reviewing university academic and disciplinary decisions, courts examine whether the decision satisfied basic fairness and/or comported with the student's reasonable expectations under an express contract.  Cloud, 720 F.2d at 724; see also Schaer, 432 Mass. at 482 (noting that

30

<u>Coveney's</u> deferential standard governs where there is no express contract between the student and university).  Notably, no Massachusetts court has held that a university also owes a general tort duty of reasonable care when making academic or disciplinary decisions.  See <u>Driscoll</u>, 70 Mass. App. Ct. at 292 (affirming dismissal of negligence claim because, in part, the law did not recognize the alleged tort duty); <u>see also</u> <u>Berkowitz v. President & Fellows of Harvard Coll.</u>, 58 Mass. App. Ct. 262, 269-70 (2003) (noting that, "in the absence of a violation of a reasonable expectation created by the contract, or arbitrary and capricious conduct by the university, courts are not to intrude into university decision-making") (internal citations omitted).  Furthermore, "[u]nder Massachusetts law, a negligence claim may arise out of a contractual relationship with the standard of care linked to the terms of the contract."  <u>Spinal Imaging, Inc. v. Aetna Health Mgmt. LLC</u>, No. CIV. 09-11873-LTS, 2014 WL 1278012, at *15 (D. Mass. Mar. 26, 2014).  In other words, "to the extent there is a negligence claim . . . between contracting parties, it is measured by the terms of the contract."  <u>Arthur D. Little Int'l, Inc. v. Dooyang Corp.</u>, 928 F. Supp. 1189, 1203 (D. Mass. 1996).  A plaintiff who asserts a deficient breach of contract claim against a university, therefore, may not repackage his claim as a negligence claim to avoid dismissal.  <u>Cf.</u> <u>Sullivan v. Boston Architectural Ctr., Inc.</u>, No. 96-4267C, 2000 WL 35487586 (Mass. Sup. Ct. April 3, 2000) (dismissing contract and negligence claims that, in essence, were based on unrecognized theory of educational malpractice) <u>aff'd</u>, 57 Mass. App. Ct. 771 (2003).[8]

Here, Doe has not identified any cognizable tort duty that Brandeis owed him in connection with the University's investigation of the Doe-J.C. matter.  Under governing Massachusetts law, all the duties owed by Brandeis to Doe—at least with respect to student conduct and disciplinary proceedings—are explicitly set forth in the R&R.  Alternatively, if the

---

[8] A plaintiff also may not ask a court to retry the underlying disciplinary dispute.  <u>See</u> <u>Gomes v. Univ. of Maine Sys.</u>, 365 F. Supp. 2d 6, 13 (D. Me. 2005).

R&R is not considered a binding contract, then Brandeis was only required to provide Doe with basic fairness in adjudicating J.C.'s CSR.  Doe's Amended Complaint appears to acknowledge these limited duties, as Doe's negligence claims are essentially repackaged allegations that Brandeis failed to provide Doe with basic fairness.  Amended Complaint ¶¶ 234-36.  As explained above, however, Brandeis exceeded its obligations under the basic fairness standard and did not breach any express provision in the R&R.  Thus, it cannot be held liable on a parallel, unrecognized tort theory.  See Harris v. Saint Joseph's Univ., No. CIV.A. 13-3937, 2014 WL 1910242, at *6 (E.D. Pa. May 13, 2014) (dismissing negligence claim under "gist of the action" doctrine where student-university relationship was contractual in nature); cf. Gomes, 365 F. Supp. 2d at 43-44 (granting summary judgment on negligence claim because it "track[ed]" plaintiff's due process allegations, and the court had already determined that the due process allegations lacked merit).[9]

Second, Doe's specific negligence allegations are plainly erroneous, are based on rank speculation, and/or ignore Brandeis' wide discretion in adjudicating disciplinary proceedings.  Doe alleges that Brandeis breached a duty of care owed to him by allowing Ms. Boes to "eliminate[] the Deliberations Phase of the Special Examiner's Process."  Amended Complaint ¶ 235.  As noted above, however, Brandeis fully discharged its duties to convene a three-member outcomes panel during the Deliberations Phase.  Doe's allegation that Ms. Boes "accepted the

---

[9] To the extent that any of Doe's contract-based allegations have any merit, his negligence claims would be duplicative and serve no independent purpose.  See Franchi v. New Hampton Sch., 656 F. Supp. 2d 252, 267 (D.N.H. 2009) (expressing concern that negligence claim was duplicative and stating that it could be merged into contract and statutory claims on summary judgment); see also Fox v. F & J Gattozzi Corp., 41 Mass. App. Ct. 581, 592 (1996) (noting that damages award for negligent misrepresentation claim could not be duplicative of damages already awarded for breach of contract claim).  Similarly, a claim for negligent infliction of emotional distress will be dismissed as duplicative where it relies on the same facts as an asserted negligence claim.  See Barnes v. Town of Webster, No. 042420, 2005 WL 2864801, at *2 (Mass. Super. Oct. 11, 2005).

Special Examiner's findings uncritically" is belied by his acknowledgement that Ms. Boes issued a final decision based on "her review of the Special Examiner's Report and [Doe's] response." Id. at ¶ 132.  Further, even if Ms. Boes did decline to review the Special Examiner's report in a critical manner, her decision to do so would fall well within the University's "wide discretion" in adjudicating student disciplinary matters.  See Driscoll, 70 Mass. App. Ct. at 292 (finding school's decision not to include student's parents or counsel in the underlying investigation to fall within the school's "wide discretion"); see also Cloud, 720 F.2d at 724 (stating that, "if school officials act in good faith and on reasonable grounds . . . their decision to suspend or expel a student will not be subject to successful challenge in the courts") (citation omitted). Doe's allegation that Brandeis "failed to conduct proper conflict checks" is pure makeweight. Id. at ¶ 236.  There was no conflict of interest under the terms of Brandeis' express Conflict of Interest Policy.  Doe's reliance on a supposed interaction between J.C.'s Advisor and the Appeals Board Chair is based entirely on conjecture and coincidence.  And there is no basis to conclude that any alleged conflict actually caused the Appeals Board to reach a different, improper result on the issues before it—i.e. whether the Doe-J.C. adjudication was tainted by fraud, procedural error, or a denial of rights.  See Amended Complaint ¶ 141.

Accordingly, the Court should dismiss Counts IV and VIII of Doe's Amended Complaint.

V.      Defamation

In Count V, Doe alleges that Brandeis defamed him by: (1) leaking information about the Special Examiner's findings to third parties; and (2) aiding and abetting J.C.'s smear campaign against Doe.  Amended Complaint ¶¶ 239-46.

To state a claim for defamation, a plaintiff must establish that the defendant published to a third party a false statement about him that caused him economic loss or is actionable without proof of economic loss.  Ferguson v. Turner, No. 14-14208-GAO, 2014 WL 7239852, at *2 (D. Mass. Dec. 16, 2014) (citing White v. Blue Cross & Blue Shield of Mass., Inc., 442 Mass. 64, 66 (2004)).  "Conclusory charges of defamation are insufficient to state a claim."  Tomaselli v. Beaulieu, 967 F. Supp. 2d 423, 453-54 (D. Mass. 2013).  Liability for aiding and abetting a tort "attaches where: (1) the defendant provides substantial assistance or encouragement to the other party; and (2) the defendant has unlawful intent, i.e., knowledge that the other party is breaching a duty and the intent to assist that party's actions."  Bamberg v. SG Cowen, 236 F. Supp. 2d 79, 90 (D. Mass. 2002) (internal quotation marks and citations omitted).

Here, Doe's defamation allegations fail to state a claim upon which relief may be granted.  First, the allegations premised on the "leaked" information are entirely conclusory.  Doe alleges only that Brandeis administrators "leaked information about the Special Examiner's findings" to third parties.  Amended Complaint ¶¶ 241.  He does not identify the specific information that was leaked, or the Brandeis administrators who leaked it.  Nor does he allege any facts showing that Brandeis administrators leaked defamatory information with knowing or reckless disregard of its falsity.[10]

_____

[10] In addition, Doe's claim fails to the extent it is based on any "leak" of the Special Examiner's report itself.  "The lodestar of Massachusetts defamation law is the axiom that truth is an absolute defense to defamation."  Taylor v. Swartwout, 445 F. Supp. 2d 98, 102 (D. Mass. 2006) (citing Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 42 (1st Cir. 1998)).  If the statement in question is "substantially true," it cannot be defamatory.  Reilly v. Assoc. Press, 59 Mass. App. Ct. 764, 770 (2003); see also Encompass Ins. Co. of Mass. v. Giampa, 522 F. Supp. 2d 300, 313 (D. Mass. 2007) (granting motion to dismiss defamation counterclaim, in part, because it was based on statements that were "substantially true").  Here, the contents of the Special Examiner's report were substantially true.  Indeed, Doe himself admitted to engaging in much of the conduct for which he was found responsible.  See Moriello Aff. Ex. B at 18 ("[b]oth parties agree that during the Movie Incident, [Doe] placed [J.C.'s] hand

34

Second, Doe fails to plead a viable claim for aiding and abetting defamation.  Doe alleges only that Brandeis "allowed" J.C. to disclose the Special Examiner's findings, and sat idly while J.C. defamed Doe to media outlets and other Brandeis students.  See id. at ¶¶ 174, 187-98, 240.  Doe does not allege that Brandeis provided any affirmative assistance to J.C. in this regard, or participated actively in disseminating his comments or writings.

Accordingly, the Court should dismiss Count V of Doe's Amended Complaint.

VI.   <u>Invasion of Privacy</u>

In Count VI, Doe asserts a claim for invasion of privacy.  Amended Complaint ¶¶ 257-61.

Under M.G.L. c. 214, § 1B, "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy."  M.G.L. c. 214, § 1B.  Section 1B protects people from "disclosure of facts . . . that are of a highly personal or intimate nature when there exists no legitimate, countervailing interest."  <u>Dasey v. Anderson</u>, 304 F.3d 148, 153 (1st Cir. 2002).  Massachusetts does not, however, recognize a cause of action for false light invasion of privacy.  <u>Id.</u>; <u>Melville v. Town of Adams</u>, 9 F. Supp. 3d 77, 87 (D. Mass. 2014); <u>see</u> <u>also</u> <u>ELM Med. Lab., Inc. v. RKO Gen., Inc.</u>, 403 Mass. 779, 787 (1989) ("The only invasion of privacy the plaintiffs assert is 'putting plaintiff[s] in a false light.' This court has not recognized that tort and does not choose to do so now.").

Here, Doe alleges that Brandeis disclosed facts of a highly personal and intimate nature, namely "the findings of the Special Examiner," to third parties.  Amended Complaint ¶ 248.

---

on his penis"), at 19 (noting that Doe admitted to kissing J.C. as he slept and after J.C. asked him to stop), at 22 ("[Doe] admitted that he did look at J.C.'s penis when they were in the bathroom together").  The fact that Doe did not conclude—as the Special Examiner did—that his actions constituted sexual misconduct is immaterial.

Because Doe also alleges that the Special Examiner's findings "defied common sense," "could not be squared with the evidence," and were "arbitrary and capricious" see id. at ¶¶ 32-33, 150, 242, his privacy claim is of the false light variety, and must fail. Furthermore, to the extent that Doe's claim is based on other personal information not included in the Special Examiner's findings, such as his sexual orientation, Doe fails to allege that Brandeis disseminated that information, or that such information was private. See id. at ¶ 46 (alleging that, in October 2011, Doe "came out of the closet" and revealed to his parents and friends that he was dating J.C.).

Accordingly, the Court should dismiss Count VI of Doe's Amended Complaint.

VII.    Intentional Infliction of Emotional Distress

In Count VII, Doe asserts a claim for intentional infliction of emotional distress. Id. at ¶¶ 252-58.

To establish a claim for intentional infliction of emotional distress, "a plaintiff must show that (1) a defendant either intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous; (3) the conduct caused the plaintiff emotional distress; and (4) the emotional distress was severe and of a nature that no reasonable person could be expected to endure." Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976); Rua v. Glodis, No. CIV. 10-40251-FDS, 2014 WL 5151296, at *12 (D. Mass. Sept. 24, 2014). "The standard for making a claim of intentional infliction of emotional distress is very high . . . " Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996).

Conduct qualifies as "extreme and outrageous" only if it "go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." Roman v. Trustees of Tufts Coll., 461 Mass. 707, 718 (2012) (citation omitted).

36

"A judge may grant a motion to dismiss where the conduct alleged in the complaint does not rise to this level." Polay v. McMahon, 468 Mass. 379, 386 (2014); see also Gouin v. Gouin, 249 F. Supp. 2d 62, 78 (D. Mass. 2003) (dismissing IIED claim as deficient as a matter of law).

Here, Doe's allegations cannot sustain a claim for intentional infliction of emotional distress. As noted above, upon receiving the CSR at issue, Brandeis investigated the allegations in accordance with all its obligations. Doe does not suggest that Brandeis performed these obligations in bad faith. Even if Brandeis conducted its investigation incorrectly (which Brandeis disputes), it simply did not engage in "extreme and outrageous" conduct as a matter of law. See Bradshaw, 2013 WL 5236110 at *13 (noting that conduct that amounts to "malice" or "deliberative indifference" may still fall short of being "extreme and outrageous").

Accordingly, the Court should dismiss Count VII of Doe's Amended Complaint.

VIII.   Declaratory Judgment & Injunctive Relief

Finally, Count IX of Doe's Amended Complaint asserts a claim for declaratory and injunctive relief. Amended Complaint ¶¶ 266-70. Doe specifically requests "a declaration that Brandeis breached its contractual obligations" and seeks a permanent injunction ordering Brandeis to, among other things, reverse the Special Examiner's findings, vacate Doe's sanction, and expunge Doe's disciplinary record. Id. at ¶ 270.

Because this claim is predicated on Doe's deficient substantive claims, including his breach of contract claim, it too must fail. See, e.g., Yu v. Vassar Coll., No. 13-CV-4373 RA, 2015 WL 1499408, at *31 (S.D.N.Y. Mar. 31, 2015) (granting summary judgment on declaratory judgment claim that rested on other, failed claims); In re Joint Eastern & Southern Dist. Asbestos Litig., 14 F.3d 726, 731 (2d Cir. 1993) ("The Declaratory Judgment Act does not ... provide an independent cause of action."); Emhart Indus., Inc. v. U.S. Dep't of the Air Force, No. CA 11-

023 S, 2011 WL 5184192, at *3 (D.R.I. Nov. 1, 2011) (dismissing declaratory judgment claims

that corresponded to deficient substantive claims); <u>Payton v. Wells Fargo Bank, N.A.</u>, No.

CIV.A. 12-11540-DJC, 2013 WL 782601, at *6 (D. Mass. Feb. 28, 2013) ("injunctive relief is

not a stand-alone cause of action under Massachusetts or federal law").

Accordingly, the Court should dismiss Count IX of Doe's Amended Complaint.

<u>Conclusion</u>

For the foregoing reasons, Brandeis respectfully requests that the Court grant its motion

to dismiss Doe's Amended Complaint.

Respectfully submitted,

BRANDEIS UNIVERSITY,

By its attorneys,


/s/ Antonio Moriello
Alan D. Rose (BBO #427280)
Antonio Moriello (BBO #685928)
Rose, Chinitz & Rose
One Beacon Street, 23rd Floor
Boston, Massachusetts  02108
(617) 536-0040
Fax: (617) 536-4400
adr@rose-law.net
am@rose-law.net

Dated:  July 14, 2015

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent via mail to those indicated as non-registered participants on July
14, 2015.


/s/ Antonio Moriello