**Privileged and Confidential**

**Summary Prepared by Lisa Boes, Dean of Academic Services**
**Regarding the Findings (JC/Doe Investigation) of the Special Examiner, Elizabeth Sanghavi**
**April 24, 2014**

**Discussion Phase**

Introduction: Lisa Boes, Dean of Academic Services, serving as the Designee for the Senior Student Affairs Officer.

My role as the Designee is to lead the "Discussion Phase" in which I will read you a summary of findings of the Special Examiner's report, and provide you with an opportunity to respond.

From "Rights and Responsibilities:"
Discussion Phase (approximately 5-10 days)
This phase of the Special Examiner's Process provides the Accuser and the Accused with separate meeting opportunities with the Senior Student Affairs Officer or Designee to hear and respond to the findings made by the Special Examiner, and to offer rebuttal or new information to the Designee based on the findings.

The parties, in separate meetings, will listen to the Designee's summary of findings and engage in dialogue with the Designee about these findings.  Each party will also have two business days within which to provide new, pertinent information or names of witnesses for the Designee's consideration.  If after the meetings with the parties and after the submission of any new information or witness names, the Designee seeks additional fact-finding, the Designee will request the Special Examiner to make any and all necessary inquiries.  The Special Examiner will submit a supplemental report to the Designee based on the inquiries.  The Designee retains the discretion to hold another round of meetings with the parties to discuss new findings.

Dean Gendron is acting as the Observer.

The Special Examiner's report addresses two sets of allegations:

1) The first is in response to a CSR filed on January 14, 2014 by J.C. alleging that Doe engaged in "numerous inappropriate, nonconsensual sexual interactions" between September 2011 and May 2013.
2) The second responds to a CSR filed on January 15, 2014 in which Doe alleged that J.C. "sexually harassed [Doe] and engaged in sexual misconduct." On January 24, 2014, following a meeting with Dean Gendron, Doe clarified that he no longer was alleging sexual harassment.

Between January 27, 2014 and April 9, 2014, the Special Examiner reviewed the documents submitted by the principles and conducted interviews with the two principles and 8 witnesses:

1) Maggie Balch
2) REDACTED
3) REDACTED
4) REDACTED

5) REDACTED
6) REDACTED
7) REDACTED
8) REDACTED

The purpose of the interviews was to determine if sufficient evidence exists, based on the standard of the preponderance of evidence, to find that that there were violations of the "Rights and Responsibilities" handbooks that correspond to the specific allegations.

Charges

The charges against Doe, from the 2011-12 and 2012-13 Handbook include:
   2.1.d (physical harm or unwanted physical contact)
   2.1.e (invasion of personal privacy)
   3.1 (sexual misconduct)
   3.2 (concerning incapacitation or intoxication)
   3.3 (lack of consent)
   7.2 (sexual harassment)

The charges against J.C., from the 2013-14 Handbook include:
   2.1.e (invasion of personal privacy)
   7.5 (false claims)

The Special Examiner's interviews with the principles covered three periods in the relationship between them:
   1) the pre-dating relationship, between August 2011 and mid-October 2011
   2) the dating relationship, between mid-October 2011 and July 2013
   3) and the breakup and post-break up interaction during the summer of 2013.

Concerning the pre-dating and dating relationship, none of the witnesses interviewed observed any of the alleged incidents that occurred.

Credibility

Both parties agree on the basic timeframe of their relationship and both recall many of the same incidents that occurred. However, you do not agree on many of the details important to this investigation, including facts regarding whether consent was given. Further you completely disagree about whether some incidents actually occurred. The Special Examiner's report, therefore, examines the general credibility of both parties.

J.C. was a credible participant in the interviews conducted for this investigation based on his demeanor and consistency. He provided:

   1) consistent statements regarding each alleged incident, not wavering from the initial description of the incidents; and

2) a consistent theme linking many of the alleged incidents, describing the pressure he felt in the relationship, the sense that telling Doe that he was not interested in engaging in sexual activity was often ineffective, and the belief that it was easier to placate Doe by engaging in activities than to continue to object.

Doe questioned J.C.'s credibility based on a contradiction that J.C. told him that he was not strong-willed or forceful enough when they broke up.  Interviews with the principles and witnesses suggest that J.C. was referring to discussions, not sexual activity, therefore the Special Examiner did not find that it weakened J.C.'s credibility.

In general, Doe was a credible participant in the interviews conducted for this investigation based on his demeanor and consistency.  However, significant exceptions were noted, and will be discussed in relation to the specific allegations.

Although J.C. alleged that Doe's initial filing and subsequent withdrawal of the sexual harassment charge against him indicated Doe was not credible, the Special Examiner found that this did not weaken Doe's credibility.

The fact that Doe and J.C. were in what appeared to be a happy relationship and J.C. did not inform friends about his allegations during the relationship does not bolster Doe's credibility or weaken J.C.'s credibility.


Findings of the Allegations by J.C. against Doe

**Part I—The preponderance of evidence indicates that Doe violated sections 3.1, 3.2 and 3.3 of the 2011-12 and 2012-13 Rights and Responsibilities Handbook, finding that sexual activity occurred and that consent was not provided for such activity.**

I will discuss 6 incidents relevant to these sections of the handbook, and share the relevant evidence presented, the credibility of those providing information, and the findings of the Special Examiner.

1) *Unwanted Touching While Walking (September 2011)*
According to J.C., Doe altered his walking in a way that required J.C. to touch him accidentally on the butt.  Doe denied that he did this.  J.C. also stated that in the fall of 2011, Doe fondled his groin without consent.  None of the witnesses observed these behaviors, and both parties were equally credible based on demeanor and consistency with regard to their relevant statements.  As a result, the evidence is insufficient to indicate that these incidents occurred.

2) *The Movie Incident*
Both parties agree while they were watching a movie together, before dating, Doe placed J.C.'s hand on his penis without obtaining consent to engage in this activity.  Doe could not have understood from past conversations or otherwise, that J.C. would provide clear consent.

During this investigation, another student, REDACTED, described that in the fall of 2011 Doe grabbed her breasts on several occasions without obtaining consent, a behavior that Doe described as a joke.  This indicates Doe's general lack of understanding of consent and adds to the credibility of

J.C.'s description of this incident.  Therefore, based on the preponderance of the evidence, Doe violated section 3.1 of the 2011-12 Rights and Responsibilities Handbook.

3)  *Post-Movie Conduct*
J.C. alleged that in mid-October 2011, before he and Doe began dating, Doe often was naked in his room, despite J.C.'s objections.  J.C. stated that on one occasion Doe tried to kiss J.C. even though J.C. moved to avoid the kisses.  Doe stated that had J.C. objected, he would have stopped but would have sulked and been moody.  J.C. also alleged that Doe put J.C.'s hand on Doe's groin without J.C.'s consent.  Doe denied this.  None of the witnesses observed these behaviors, and both parties were equally credible based on demeanor and consistency with regard to their relevant statements.  As a result, the evidence is insufficient to indicate that these incidents occurred.

4)  *Sexual Conduct While* J.C. *was Sleeping*
Regarding the sexual conduct of Doe while J.C. was sleeping, J.C. provided a consistent description of being wakened by sexual conduct, such as humping or kissing, by Doe, at which time J.C. asked him to stop.  Doe, on the other hand, provided inconsistent statements in regards to these incidents.  On one occasion he stated that he did sometimes wake J.C. by kissing him, and recalled in another interview that J.C. never stated that he wanted to go back to bed when Doe woke him up by kissing him. After being informed of the inconsistencies in the interview statements, Doe altered his response concerning if this behavior happened at around 8 am, at which time J.C. might want to go back to bed, but not if it was around 10 am.

The Special Examiner therefore finds that Doe did engage in sexual contact with J.C. while he was sleeping, a state of incapacitation under sections 3.1 and 3.2 of the Handbook.  Further, Doe violated section 3.3 because, by both men's accounts, sexual activity did not cease immediately when J.C. awoke and communicated that he did not want to participate.

5)  *Attempting to have J.C. Perform Oral Sex*
J.C. alleged that approximately eight to ten times when he was lying on Doe's stomach or chest, Doe pushed J.C.'s head down to his penis to try to have J.C. perform oral sex.  Based on J.C.'s interviews, Doe continued holding J.C.'s head down even when J.C. verbally indicated that he did not want to perform oral sex.  According to Doe, he did ask J.C. to perform oral sex, but never put his hand on J.C.'s head to push J.C. down to his penis.  Both parties were equally credible based on demeanor and consistency regarding their relevant statements in regard to this conduct.  Although the information obtained during this investigation confirms that Doe requested oral sex, it is not sufficient, based on the preponderance of evidence, to indicate that Doe pushed J.C.'s head toward his penis in an attempt to have J.C. perform oral sex.

6)  *Doe Performing Oral Sex on J.C.*
According to J.C., Doe performed oral sex on him approximately three to four times despite J.C.'s objections.  Doe denies this, stating that if J.C. indicated he was not interested, Doe would state, "Seriously?" and stop performing oral sex.  According to Doe, if J.C. stated "no" a second time, Doe did not continue.

One of the incidents occurred in May 2013 when Doe was visiting J.C.'s father's home in North Adams.  According to J.C., after Doe tried to perform oral sex on J.C. despite his objections, J.C. asked Doe whether he understood that this was sexual assault.  J.C. stated that Doe became upset by this accusation and wound up lying on the floor until J.C. apologized and cajoled him back into

bed. During one interview Doe stated that he did not recall anything unusual occurring during this trip and denied that J.C. ever brought up the fact that he felt sexually assaulted. However, in subsequent interviews, Doe offered inconsistent responses, initially stating that he did not remember if he slept on the floor, then stating that he thought he was on the floor due to heat, not an argument. The inability of Doe to recall whether he moved to the floor during this visit weakens his credibility regarding his response to J.C.'s allegations that Doe performed oral sex on him without consent. In contrast, J.C.'s discussion of and responses to the questions about his allegation regarding the North Adams visit were consistent and credible.

Therefore, based on a preponderance of evidence, Doe violated section 3.1 of the Handbook because J.C. never clearly communicated that he wanted Doe to perform oral sex during this visit, and he violated section 3.3 when he did not stop when J.C. asked him to do so.

**Part II—The preponderance of evidence indicates that Doe violated section 2.1.d of the 2011-12 and 2012-13 Rights and Responsibilities Handbook, regarding physical harm.**

The analysis in Part I indicates that Doe engaged in sexual acts against J.C.'s will and unwanted physical contact. Specifically, these acts were, 1) the placement of J.C.'s hand on Doe's penis during the movie incident; 2) engaging in sexual activity while J.C. slept; and 3) performing oral sex on J.C. without consent during the North Adams visit. Therefore, it is more likely than not that Doe violated section 2.1.d of the 2011-12 and 2012-13 Rights and Responsibilities handbooks.

**Part III—The preponderance of evidence indicates that Doe violated section 2.1.e of the 2011-12 and 2012-13 Rights and Responsibilities Handbook, regarding the invasion of personal privacy.**

To find someone responsible for violating 2.1.e of the 2011-12 and 2012-13 Rights and Responsibilities handbooks, the preponderance of evidence must indicate that the individual engaged in activity that invades another's privacy.

The Special Examiner's report discusses 5 incidents relevant to these sections of the handbook. I will share the evidence presented, the credibility of those providing information, and the findings of the Special Examiner.

1) *Text Messaging Incident*
J.C. alleged that in the fall of 2011, Doe texted him sexually-explicit messages, despite J.C.'s objections. Doe denied this, and neither retained the messages as evidence. Both parties were equally credible with regard to their relevant statements about the messages. As a result, the information is insufficient to find, based on the preponderance of the evidence, that Doe sent sexually-explicit text messages to J.C. despite J.C.'s objections.

2) *Pornography Incidents*
J.C. alleged that Doe found porn online and moved his computer into J.C.'s view so that J.C. would see the porn. Doe denied engaging in this behavior. As the alleged porn incidents occurred when the two were alone, no witnesses observed these incidents. Both parties were equally credible with regard to their relevant statements about the pornography incidents. As a result, the information is insufficient to find, based on the preponderance of the evidence, that Doe engaged in the alleged pornography incidents.

*3) Bathroom Incidents*

J.C. alleged that throughout his relationship with Doe, Doe actively looked at J.C.'s penis when they were in the bathroom together despite J.C.'s objections. Doe admitted that he did look at J.C.'s penis when they were in the bathroom together, but that Doe did it as a joke. Doe's similar comment that touching another student's breasts was a joke suggests that Doe does not effectively distinguish between a joke and inappropriate behavior that invades other's personal privacy. Therefore, the preponderance of the evidence indicated that Doe invaded J.C.'s privacy by looking at J.C.'s penis when J.C. used the bathroom.

*4) Post-Shower Conduct*

J.C. alleged that Doe stared at him when he changed after taking a shower, despite J.C.'s objections to this behavior. As the alleged conduct occurred when the parties were alone, no witnesses observed these incidents. Both parties were equally credible with regard to their relevant statements regarding post-shower conduct. As a result, the information is insufficient to find, based on the preponderance of the evidence, that J.C. objected to Doe's conduct.

*5) Mandating that J.C. Sleep Naked*

J.C. alleged that Doe required him to sleep naked when J.C. slept over at Doe's room. Doe denied this and emphatically stated that in fact J.C. required Doe to sleep naked when they slept together. Both J.C. and Doe were credible with regard to their statements. No interviewees witnessed or were aware of either parties requiring the other to sleep naked. The information is insufficient to find, based on the preponderance of the evidence, that Doe required J.C. to sleep without clothing.

In summary, based in the preponderance of evidence provided, Doe invaded J.C. 's personal privacy by often looking at J.C.'s penis in the bathroom, in violation of 2.1.e.

**Part IV—The preponderance of evidence indicates that Doe violated section 7.2 of the 2011-12 and 2012-13 Rights and Responsibilities Handbook, regarding sexual harassment.**

As described in Parts I and III, the evidence is sufficient to indicate that Doe did engage in unwanted sexual conduct. Further, throughout the investigation, J.C. made statements indicating that Doe pressured him to engage in sexual activity, consistent with Doe's own description of incidents in which he responded, "Seriously?" to J.C.'s lack of interest in sexual activity. Doe's statement that he was moody and sulky if J.C. did not want to engage in sexual activity also corroborates J.C.'s statements that Doe pressured him to engage in sexual activity.

J.C. alleged two ways in which Doe's conduct adversely affected his access to programs at Brandeis: 1) participation in the Taskforce; and 2) dropping of a course and practicum.

Concerning the Taskforce, J.C. stated that in the fall of 2013, he was excluded from the decision making and had not been properly informed about the Queering of the SCC. Information collected from witnesses for this investigation does not support that that Doe adversely affected this opportunity.

J.C. indicated during the investigation that he dropped a course and its corresponding practicum as a result of stress related to Doe's conduct. The conduct leading J.C. to drop the course and practicum occurred prior to and during May 2013. As a result, based on the preponderance of evidence, Doe's behavior had the adverse effect of interfering with J.C.'s education, and therefore, Doe violated section 7.2 of the 2011-12 and 2012-13 Rights and Responsibilities handbooks.

Findings of the Allegations by Doe against J.C.

**Part I—Information is insufficient to find, based on the preponderance of evidence that J.C. violated section 2.1.e of the 2013-14 Rights and Responsibilities Handbook, regarding the invasion of personal privacy.**

Individuals within Brandeis have a right under University policy to bring complaints regarding unwanted sexual conduct.  Universities are required under Title IX to have procedures that allow community members to file such complaints.  Regardless of the ultimate findings, universities are required to complete investigations in order to determine whether school policies have been violated.  Further, under Title IX universities may take interim measures while investigations are in process, such as changing individual's housing or implementing no contact orders.  Universities, including Brandeis, would be unable to meet their Title IX obligations if they could not take interim measures or conduct investigations. Investigations are very personal, but are required.  Individuals would likely reconsider filing complaints if they thought that they could be found in violation of Brandeis policy for invading the other party's personal privacy by filing complaints that led to interim measures, investigations, and potential embarrassment to the other party. Such result would be contrary to the intent of Title IX.

Based on the preponderance of evidence, J.C. did not violate section 2.1.e by filing the January 14, 2014 CSR, but rather took action permitted by the University and began a process that the University must have available under Title IX.

**Part II—Information is insufficient to find, based on the preponderance of evidence that J.C. violated section 7.5 of the 2013-14 Rights and Responsibilities Handbook, regarding false claims.**

Doe alleged that J.C. violated section 7.5 of the 2013-14 Rights and Responsibilities Handbook, prohibiting false claims of sexual harassment or discrimination.  To find a violation under 7.5, the preponderance of evidence must indicate that an individual intentionally brought false claims against someone else.  A complaint is not a false claim simply because it could not be corroborated.  As the findings substantiate that Doe did violate the sections of the Rights and Responsibility Handbooks identified by J.C., J.C. did not make false claims against Doe.

Discussion:
Do you wish to respond?
Is there anything you would like to say or ask?
Questions about the process will be directed to the Dean of Students.


Next step in the process:
As I reviewed earlier in the meeting, as part of the discussion phase, you have 2 business days within which to provide new information or names of witnesses for additional consideration.

I will review anything you provide and decide if it is necessary to request that the Special Examiner make any more inquiries.

Following that, you will receive a letter indicating if you are or are not found responsible for the charges outlined in the report and the next steps in the process.