## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JOHN DOE,

              Plaintiff,

          v.

BRANDEIS UNIVERSITY,

              Defendant.

Civil Action No. 1:15-cv-11557-FDS

**(Leave to file excess pages granted on July 17, 2015)**

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BRANDEIS UNIVERSITY'S MOTION TO DISMISS AMENDED COMPLAINT

Michael R. Schneider, Esquire
(Mass. Bar No. 446475)
Good Schneider Cormier
85 Atlantic Avenue
Boston, MA  02110-3711
Tel:  (617) 523-5933
Email:  ms@gscboston.com

Patricia M. Hamill, Esquire
(PA Attorney I.D. No. 48416)
(Admitted *Pro Hac Vice*)
Jeannette M. Brian, Esquire
(PA Attorney I.D. No. 66169)
(Admitted *Pro Hac Vice*)
Conrad O'Brien PC
1500 Market Street, Centre Square
Suite 3900, West Tower
Philadelphia, PA  19102-2100
Tel:  (215) 864-9600
Fax:  (215) 864-9620
Email:  phamill@conradobrien.com
       jbrian@conradobrien.com

*Attorneys for Plaintiff*

## <u>TABLE OF CONTENTS</u>

I.   OVERVIEW OF AMENDED COMPLAINT ALLEGATIONS ........................................... 1

II.   ARGUMENT ..................................................................................................................... 4

   A.   Standards Governing Rule 12(b)(6) Motion to Dismiss. .................................................. 4

   B.   John Sufficiently Alleges Brandeis Breached its Contractual Obligations. .................... 5

      1.   Standards Governing Breach of Contract Claims. .................................................. 5

      2.   John Has Alleged Plausible Breach of Contract Claims. ........................................ 7

         a.   Brandeis Breached the Contract by Effectively Eliminating the
              Statements Phase of the Special Examiner's Process. ................................. 7

         b.   Brandeis Breached its Contractual Obligation to Provide John with a
              Copy of the Special Examiner's Report. ................................................... 10

         c.   Brandeis Breached the Contract by Eliminating the Deliberations
              Phase of the Special Examiner's Process. ................................................. 12

            i.   The Word "Outcomes" Must be Construed Broadly to Mean the
                 End Result of the Special Examiner's Process, Including
                 Findings of Responsibility, Not Merely "Sanctions." .................. 14

            ii.   Brandeis's Chronology Impermissibly Requires the Court
                  to Add or Omit Words to Fit Its Interpretation. ............................ 17

         d.   Brandeis Breached Its Express Representation to John that the
              Three Members of the University Appeals Board Did Not Have
              a Conflict of Interest. ................................................................................ 18

         e.   Brandeis Breached Its Contractual Obligation to Have John's Case
              Decided Through the Hearing Process Set Forth in the
              2011-12 R&R Handbook. ......................................................................... 21

         f.   The 2013-14 R&R Handbook Entitled John to a Hearing on the
              Charges of Physical Harm and Invasion of Privacy. ................................ 24

g.    Brandeis Breached Its Contractual Obligation to Maintain the Confidentiality of John's Education Record. .............................................25

h.    Brandeis Breached Its Contractual Obligation to Ensure the Special Examiner's Findings Were Based on a Preponderance of the Evidence and Were Not Arbitrary and Capricious. ..................................25

C.  John Has Alleged Plausible Claims of Breach of the Covenant of Good Faith and Fair Dealing and Estoppel and Reliance. ............................................................... 28

D.  John Has Alleged a Plausible Negligence Claim. ........................................... 29

E.  John Has Alleged a Plausible Defamation Claim. ........................................... 32

F.  John Has Alleged a Plausible Invasion of Privacy Claim. .............................. 33

G.  John Has Alleged a Plausible Claim of Intentional Infliction of Emotional Distress.... 34

H.  John Has Alleged a Plausible Claim of Negligent Infliction of Emotional Distress. .... 35

III.  CONCLUSION ....................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ackermann v. President & Trs. of Holy Cross College*,
    2003 Mass. Super. LEXIS 111 (Mass. Super. Ct. Apr. 1, 2003) ................................................6

*Agis v. Howard Johnson Co.*,
    371 Mass. 140, 355 N.E.2d 315 (1976) ..................................................................................34

*Anthony's Pier Four, Inc. v. HBC Assocs.*,
    411 Mass. 451, 583 N.E.2d 806 (1991) ..................................................................................28

*Aware, Inc. v. Centillium Communs., Inc.*,
    604 F. Supp. 2d 306 (D. Mass. 2009) .........................................................6, 7, 10, 12, 15, 17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................................................5

*Berish v. Bornstein*,
    437 Mass. 252, 770 N.E.2d 961 (2002) ..................................................................................31

*Bloomer v. Becker College*,
    2010 U.S. Dist. LEXIS 82997 (D. Mass. Aug. 13, 2010) .........................................................5

*Boland v. George S. May Int'l Co.*,
    81 Mass. App. Ct. 817, 969 N.E.2d 166 (2012) .....................................................7, 10, 12, 17

*Bratt v. Int'l Bus. Machs. Corp.*,
    392 Mass. 508, 467 N.E.2d 126 (1984) ..................................................................................33

*Brown v. Bank of Am., N.A.*,
    67 F. Supp. 3d 508 (D. Mass. 2014) ..................................................................................5, 21

*Cloud v. Trs. of Boston Univ.*,
    720 F.2d 721 (1st Cir. 1983) .....................................................................................................6

*Continental Cas. Co. v. Gilbane Bldg. Co.*,
    391 Mass. 143, 461 N.E.2d 209 (1984) ..................................................................................18

*Coveney v. President & Trs. of Holy Cross College*,
    388 Mass. 16, 445 N.E.2d 136 (1983) .....................................................................................6

*Crooker v. United States*,
    2014 U.S. Dist. LEXIS 100126 (D. Mass. July 23, 2014) .......................................7, 10, 12, 17

*Dinu v. President & Fellows of Harvard College*,
    56 F. Supp. 2d 129 (D. Mass. 1999) .........................................................................................6

*Foley v. Wells Fargo Bank, N.A.*,
   772 F.3d 63 (1st Cir. 2014)..................................................................4, 5

*Foster v. The Loft, Inc.*,
   26 Mass. App. Ct. 289, 526 N.E.2d 1309 (1988) ...................................30

*Freelander v. G. & K. Realty Corp.*,
   357 Mass. 512, 258 N.E.2d 786 (1970) ...................................................6

*Havlik v. Johnson & Wales Univ.*,
   509 F.3d 25 (1st Cir. 2007)......................................................................6

*Lyons v. Salve Regina College*,
   556 F.2d 200 (1st Cir. 1977)....................................................................6

*Mangla v. Brown Univ.*,
   135 F.3d 80 (1st Cir. 1998).......................................................................5

*Merrimack Valley Nat'l Bank v. Baird*,
   372 Mass. 721, 363 N.E.2d 688 (1977) ...............................7, 10, 12, 17

*Payton v. Abbott Labs.*,
   386 Mass. 540, 437 N.E.2d 171 (1982) .................................................35

*Phelan v. May Dep't Stores Co.*,
   443 Mass. 52, 819 N.E.2d 550 (2004) ...................................................32

*Pratt v. Martineau*,
   69 Mass. App. Ct. 670, 870 N.E.2d 1122 (2007) ..................................36

*Schatz v.Republican State Leadership Comm.*,
   699 F.3d 50 (1st Cir. 2012)......................................................................5

*Spartans Ind., Inc. v. John Pilling Shoe Co.*,
   385 F.2d 495 (1st Cir. 1967).....................................................................7

*Tech Plus, Inc. v. Ansel*,
   59 Mass. App. Ct. 12, 793 N.E.2d 1256 (2003) ....................................35

*United States v. Miami Univ.*,
   294 F.3d 797 (6th Cir. 2002) ............................................................11, 31

*Walker v. President & Fellows of Harvard College*,
   2014 U.S. Dist. LEXIS 178301 (D. Mass. Dec. 30, 2014)................6, 15

*Warner Ins. Co. v. Commissioner of Ins.*,
   406 Mass. 354, 548 N.E.2d 188 (1990) .................................................28

iv

*Woods v. Wells Fargo Bank, N.A.*,
    733 F.3d 349 (1st Cir. 2013)..................................................................................4

*Zajac v. Zajac*,
    2007 Mass. Super. LEXIS 336 (Mass. Super. Ct. Aug. 16, 2007) ...........................................35

**STATUTES**

20 U.S.C. § 1232g.........................................................................................................31

20 U.S.C.S. § 1232g(b)(1) .........................................................................................31

John Doe ("John") submits this Memorandum in Opposition to Brandeis University's ("Brandeis" or "the University") Motion to Dismiss Amended Complaint.  John has sufficiently met his burden to allege a plausible breach of contract claim.  He identifies specific provisions in the R&R Handbooks governing Brandeis's contractual obligations to students in sexual misconduct proceedings and alleges specific facts showing that Brandeis breached those provisions in John's case, causing him to suffer grievous harm.  In response, Brandeis offers one-sided, self-serving alternative interpretations of the provisions at issue, none of which can be squared with the reasonable expectation standard governing the interpretation of university-student contracts or with fundamental rules of contract construction.  To the extent Brandeis offers a plausible alterative interpretation to John's plausible interpretation, the contract is ambiguous and must be construed against Brandeis as the author.  The facts alleged in the Amended Complaint also sufficiently state independent tort claims of negligence, defamation, invasion of privacy, and intentional and negligent infliction of emotional distress.

## I.      OVERVIEW OF AMENDED COMPLAINT ALLEGATIONS

In his Amended Complaint, John seeks redress against Brandeis for its grievous mishandling of false accusations of sexual misconduct brought against him while a student at Brandeis by J.C., a fellow Brandeis student and former boyfriend with whom John had had a 21-month consensual, dating relationship.  (Am. Compl. ¶¶ 1-4).  In January 2014 – six months after the relationship ended and nearly two years after their first sexual encounter – J.C. filed with Brandeis a 29-word, two-sentence allegation:  "Starting in the month of September, 2011, the Alleged Violator of Policy had numerous inappropriate, nonconsensual sexual interactions with me.  These interactions continued to occur until around May 2013."  (*Id*. ¶¶ 5-6).

Brandeis immediately placed John on emergency suspension and two days later notified him that J.C.'s non-specific accusation related to six alleged violations of student conduct in Brandeis's 2011-12 and 2012-13 Rights and Responsibilities Handbooks ("R&R Handbooks"): sexual misconduct, lack of consent, taking advantage of incapacitation, sexual harassment, physical harm to another, and invasion of personal privacy.  (*Id*. ¶¶ 7-8).  On the same day, Brandeis informed John it would adjudicate his case using the new Special Examiner's Process in the 2013-14 R&R Handbook for sexual misconduct and sexual harassment allegations, not the University's long-established Student Conduct "Hearing Process."  (*Id*. ¶ 9).

John was stunned by the accusation and charges and the University's precipitous response.  Not once during their 21-month relationship did J.C. complain to John or anyone else that John had performed any sexual act without J.C's consent or had invaded J.C.'s privacy.  Nor was there a trace of physical or other corroborating evidence that John had ever physically harmed or sexually harassed J.C.  (*Id*. ¶¶ 10-11).  There were no medical records, 911 calls, reports to campus police or law enforcement, witnesses to any incidents, or complaints by J.C. to friends, relatives, or Brandeis personnel at any time during the entire relationship.  (*Id*. ¶ 11).

The University handed over the case to a single individual – the Special Examiner – an outside lawyer hired by the University.  After a series of closed-door, separate interviews with John, J.C., and witnesses (none of whom had any first-hand knowledge of any alleged instances of misconduct), the Special Examiner found John responsible for all six charges.  (*Id*. ¶¶ 12-16, 31, 91).  It was only after the Special Examiner had concluded the investigation and found John responsible that John learned with any degree of clarity what acts he was alleged to have committed.  At no time during the entire Special Examiner's Process was John permitted to

question his accuser or any witnesses or to know first-hand what they said.  He was not even permitted to view the Special Examiner's Report.  (*Id.* ¶¶ 15, 17, 92, 94-95, 138-140, 151-154).

The Special Examiner's findings of responsibility defied common sense and were based on novel notions of consent, sexual harassment, and physical harm that were not in the R&R Handbooks and were at odds with traditional cultural norms.  (Am. Compl. ¶¶ 18, 32).  As more fully explained below, the Special Examiner completely ignored the context of a romantic, dating relationship and elevated commonplace, everyday interactions in a nearly two-year consensual relationship into serious sexual transgressions – *e.g.*, the Examiner concluded that when John woke up J.C. in the morning with a kiss, John took advantage of J.C.'s incapacitation, even though J.C. insisted the two sleep together throughout the relationship; that when John looked at J.C.'s private parts in the dorm's same-sex communal bathrooms, John invaded J.C.'s personal privacy, even though the two were in a nearly two-year dating relationship and routinely used communal bathrooms; and that when John made the "first move" on J.C. during the couple's "flirting stage," he lacked explicit consent and therefore engaged in sexual misconduct, even though J.C. had told John that John would have to make the first move sexually, and the very next day the two began a 21-month sexually-active dating relationship. (*Id.* ¶¶ 18-21, 104-109, 111-114,119-121).

John was sanctioned by the University with a Disciplinary Warning, which carries a permanent notation in the student's education record which will have life-altering consequences. (*Id.* ¶¶ 22, 136).  In John's case, his education record will state that he was found responsible for sexual misconduct, lack of consent, taking advantage of incapacitation, sexual harassment, causing physical harm, and invading personal privacy.  (*Id.* ¶ 23).  Brandeis has effectively labeled John as a predatory sexual offender.  (*Id.* ¶ 24).  John worked hard at Brandeis to attain a

3.82 GPA and to graduate *magna cum laude* because he aspired to a career in law, government, and public service, fields of employment central to Brandeis's educational mission.  (*Id*. ¶ 143). The stigma on John's record will likely diminish his prospects of obtaining admission to law school and pursuing a career in government or public service.  (*Id*. ¶ 25).  He will have to disclose and defend himself against his deeply blemished record to every law school, state bar admissions board, and professional graduate school to which he applies, to prospective employers, and to colleagues and friends who get wind of what happened to him at Brandeis. John's ill-deserved disciplinary record will be a lifetime liability.  (*Id*. ¶¶ 25, 144).

The flaws in the Special Examiner's findings were compounded by the University's repeated failure to follow its own policies and procedures in the 2013-14 R&R Handbook, which were intended to provide checks and balances and independent University oversight and review over the Special Examiner's Process.  These failures constituted material breaches of Brandeis's express contract with John and violated Massachusetts common law requiring universities to act reasonably and in good faith in implementing disciplinary processes.  (*Id*. ¶¶ 26 a.-g., 68-86, 145-178, 179-185, 218-221).  The University breached additional promises and representations made to John independent of the R&R Handbooks, violating the covenant of good faith and fair dealing and providing the basis for John's claim for estoppel and reliance.  (*Id*. ¶¶ 222-231). The Amended Complaint also asserts sufficient facts to establish plausible tort claims.  (*Id*. ¶¶ 27-30, 186-206, 232-265).

## II.   ARGUMENT

### A.   Standards Governing Rule 12(b)(6) Motion to Dismiss.

"A court's goal in reviewing a Rule 12(b)(6) motion is to determine whether the factual allegations in the plaintiff's complaint set forth 'a plausible claim upon which relief may be granted.'"  *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 71 (1st Cir. 2014), quoting *Woods v.*

*Wells Fargo Bank, N.A.*, 733 F.3d 349, 353 (1st Cir. 2013).  "The court must take all of the pleaded factual allegations in the complaint as true" and make "reasonable inferences, drawn from the alleged facts, in the pleader's favor."  *Id*. at 71, 75.  "[P]laintiffs are not required to submit evidence to defeat a Rule 12(b)(6) motion, but need only sufficiently allege in their complaint a plausible claim."  *Id*. at 72.  "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels [the Court] to draw on [its] judicial experience and common sense."  *Brown v. Bank of Am., N.A.*, 67 F. Supp. 3d 508, 513 (D. Mass. 2014), quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012).  "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'"  *Bloomer v. Becker College*, 2010 U.S. Dist. LEXIS 82997, at *9 (D. Mass. Aug. 13, 2010), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

**B.      John Sufficiently Alleges Brandeis Breached its Contractual Obligations.**

Brandeis concedes (as it must) that the three R&R Handbooks it used to adjudicate John's case are enforceable contracts.  (Def. Mem. at 14 n.4).  *See Bloomer*, 2010 U.S. Dist. LEXIS 82997, at *28-29 ("The student-college relationship is essentially contractual in nature.  The terms of the contract may include statements provided in student manuals and registration materials."), quoting *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998).  Brandeis argues, however, that John fails to allege a plausible claim that Brandeis breached any contractual provision.  Brandeis is wrong as demonstrated at length below.

**1.      Standards Governing Breach of Contract Claims.**

In construing the terms of a contract between a university and its students, courts in Massachusetts employ "the standard of 'reasonable expectation – what meaning the party

making the manifestation, the university, should reasonably expect the other party to give it.'"
*Cloud v. Trs. of Boston Univ.*, 720 F.2d 721, 724 (1st Cir. 1983), citing *Lyons v. Salve Regina College*, 565 F.2d 200, 202 (1st Cir. 1977). This requires the court to "consider what meaning the College should reasonably expect its students to give the terms of the contract embodied in the handbook . . . ." *Ackermann v. President & Trs. of Holy Cross College*, 2003 Mass. Super. LEXIS 111, at *7 (Mass. Super. Ct. Apr. 1, 2003).[1] With respect to disciplinary procedures in the university's handbook, "the university cannot tell its students that certain procedures will be followed and then fail to follow them . . . . There is simply too much at stake for an individual student to countenance the university's failure to abide by the rules it has itself articulated." *Id.* at *4.[2] Additionally, it is well settled in Massachusetts that a private university, college, or school "must not act 'arbitrarily and capriciously' in disciplining students." *Id.* at *5, citing *Coveney v. President & Trs. of Holy Cross College*, 388 Mass. 16, 19, 445 N.E.2d 136, 138 (1983). School officials must act "in good faith and on reasonable grounds . . . ." *Coveney*, 388 Mass. at 19, 445 N.E.2d at 139.

Several other black-letter rules of contract construction govern this Court's determination of the sufficiency of the pleadings in this case. "Court[s] interpret[ ] contracts in accordance with their plain meaning." *Aware, Inc. v. Centillium Communs., Inc.*, 604 F. Supp. 2d 306, 310

---

[1] "Contracts between students and universities are interpreted 'in accordance with the parties' reasonable expectations, giving those terms the meaning that the university reasonably should expect the student to take from them.'" *Walker v. President & Fellows of Harvard College*, 2014 U.S. Dist. LEXIS 178301, at *5 (D. Mass. Dec. 30, 2014), quoting *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007).

[2] In a case involving Harvard College, this Court framed the "reasonable expectations" test in terms of what a "reasonable Harvard College student . . . upon reading the disciplinary provisions of the Handbook" would "reasonably believe" the provisions mean "in the context of this case." *Dinu v. President & Fellows of Harvard College*, 56 F. Supp. 2d 129, 132-33 (D. Mass. 1999) (also framing the test in terms of what a "hypothetical student" would "recognize" the provisions at issue to mean so they are not illogical when read in conjunction with other provisions).

(D. Mass. 2009), citing *Freelander v. G. & K. Realty Corp.*, 357 Mass. 512, 516, 258 N.E.2d 786, 788 (1970).  "In so doing, however, the Court reviews the Agreement as a whole rather than considering its terms in isolation."  *Id.*, citing *Spartans Indus., Inc. v. John Pilling Shoe Co.*, 385 F.2d 495, 499 (1st Cir. 1967) ("It is elementary that a construction which comports with the Agreement as a whole is to be preferred even if it be thought that certain language, viewed only by itself, more readily suggests something else.").  "Words that are plain and free from ambiguity must be construed in their usual and ordinary sense."  *Boland v. George S. May Int'l Co.*, 81 Mass. App. Ct. 817, 825, 969 N.E.2d 166, 173 (2012).  "A term is ambiguous if it is susceptible of more than one meaning and if reasonably intelligent people would differ over the proper meaning."  *Id.* at 827, 969 N.E.2d at 174.  "As a general rule, a writing is construed against the author of the doubtful language . . . if the circumstances surrounding its use and the ordinary meaning of the words do not indicate the intended meaning."  *Id.* at 827, 969 N.E.2d at 174-75, quoting *Merrimack Valley Nat'l Bank v. Baird*, 372 Mass. 721, 724, 363 N.E.2d 688, 690 (1977).  "The author of the ambiguous term is held to any reasonable interpretation attributed to that term which is relied on by the other party."  *Merrimack*, 372 Mass. at 724, 363 N.E.2d at 690-91.  "If the language of a contract is ambiguous a motion to dismiss must be denied."  *Crooker v. United States*, 2014 U.S. Dist. LEXIS 100126, at *20 (D. Mass. July 23, 2014), quoting *Aware, Inc.*, 604 F. Supp. 2d at 310.

    **2.**  **John Has Alleged Plausible Breach of Contract Claims.**

      **(a)**  **Brandeis Breached the Contract by Effectively Eliminating the Statements Phase of the Special Examiner's Process.**

   Brandeis breached its contract with John by effectively eliminating the "Statements Phase" of the Special Examiner's Process in John's case.  (Am. Compl. ¶¶ 26a., 71, 147-149; *see also* Ex. C to Am. Compl., at 43-44 ("Statement Phase")).  In its response, Brandeis contends

that the Statements Phase procedures in the 2013-14 R&R Handbook only required Brandeis to (1) "suggest" that the accuser compose a "thorough statement" of the allegations if the accuser's initial Report ("CSR" or "Report") did not provide a "full account" of the allegations, and (2) "suggest" that the accused compose a "thorough response" to the allegations <u>described in the</u> <u>CSR</u>." (Def. Mem. at 15 (Brandeis underscore)).  According to Brandeis, the terms "suggest" and "described in the CSR" mean that Brandeis was not "*required*" to obtain a "thorough statement" from J.C. or to "*share*" that statement with John so that John could prepare  a "thorough response" to it.  (*Id.*)

At the outset, Brandeis's focus on the term "suggest" misses the point.  As alleged in the Amended Complaint, within days after J.C. filed his initial Report, Brandeis's General Counsel informed John that J.C. had provided "***substantially more information***" to the Dean's office beyond the non-specific, two-sentence allegation in his initial Report.  (Am. Compl. ¶¶ 147-148) (emphasis added).[3]  Thus, J.C. in fact provided Brandeis with a "thorough statement" of the allegations in the CSR.   But, when John asked for that information so that he could prepare a "thorough response," Brandeis refused to provide it to him, insisting that the Special Examiner retained discretion whether or not to disclose that information to him during the Fact-Finding Phase.  (*Id.* ¶ 148).  A reasonable, hypothetical Brandeis student in John's situation would reasonably expect the University to share with the accused the accuser's "thorough statement" of the allegations *during the Statements Phase of the Process*, so that the accused student could provide a meaningful, corresponding "*thorough response*" to *those* allegations.  It would be unreasonable to expect an accused student to prepare a "thorough response" to the accuser's initial, *insufficient* CSR, while withholding from the accused student the accuser's "*thorough*

---

[3]        As noted, J.C.'s initial Report stated in full:  "Starting in the month of September, 2011, the Alleged Violator of Policy had numerous inappropriate nonconsensual sexual interactions with me. These interactions continued to occur until around May 2013."  (Am. Compl. ¶ 59).

*statement*."

Brandeis's illogical reading of the language is further demonstrated by reference to the Fact-Finding procedures in the R&R Handbook, which explicitly state that the Special Examiner will conduct the Fact-Finding Phase "***based on both materials and information offered by the parties during the Statements Phase***," and "other materials and information discovered in the course of this phase."  (*See* Am. Compl., Ex. C, at 44 ("Fact-Finding Phase")) (emphasis added). Reading this provision in conjunction with the Statements Phase provision, an accused student would reasonably understand that the "materials ***and information*** offered by the parties during the Statements Phase" would include the accuser's information supplied to the University during the Statements Phase (whether the information had been supplied to University officials in writing or orally) *and* the accused student's response to ***that*** information.  It would be unreasonable, arbitrary, and capricious for Brandeis to submit the accuser's information to the Special Examiner but to refuse to share that information with the accused.  This is especially so in John's case, given the length of the relationship, the number of sexual encounters between John and J.C., and the sketchiness of the initial CSR.

A reasonable Brandeis student reading the R&R Handbook would understand that the Statements Phase was intended to provide the accused with enough information about the accuser's allegations so that he is able to prepare his defense and provide a response for the Special Examiner's consideration.  In John's case, however, he was never told in writing or orally at any time during the Statements Phase what he allegedly did wrong beyond the initial 29-word allegation.  John and J.C. had been in a nearly two-year dating relationship.  In these circumstances, it is not surprising that J.C. provided Brandeis with "substantially more information."  But, Brandeis kept John in the dark by purposely withholding this information,

violating John's reasonable expectations.  (Am. Compl. ¶¶ 15-17, 87-89, 92).[4]

To the extent that both John's and Brandeis's interpretations are plausible, the language is ambiguous and must be construed against Brandeis as the author, and the motion to dismiss must be denied.  *Boland*, 81 Mass. App. Ct. at 827, 969 N.E.2d at 174; *Merrimack*, 372 Mass. at 724, 363 N.E.2d at 690-91 ("The author of the ambiguous term is held to any reasonable interpretation attributed to that term which is relied on by the other party."); *Crooker*, 2014 U.S. Dist. LEXIS 100126, at *19 ("If the language of a contract is ambiguous a motion to dismiss must be denied."); *Aware, Inc.*, 604 F. Supp. 2d at 310 (same).

> **(b)     Brandeis Breached its Contractual Obligation to Provide John with a Copy of the Special Examiner's Report.**

Brandeis breached its contractual obligation to provide John with a copy of the Special Examiner's Report.  (Am. Comp. ¶¶ 26b., 79, 98, 130, 138-141, 151-154; *see also* Ex. C to Am. Compl., Section 17.4, at 26).  As John alleges, Brandeis officials refused to provide John with a copy of the Special Examiner's Report at any time during the Special Examiner's Process, even though he requested the Report during the Discussion and Appeals Phases of the Process and explained that he needed the Report so that he would know exactly what facts the Special Examiner reviewed, what credibility determinations the Examiner made and on what basis, and the factual and legal bases for each of the Examiner's findings of responsibility.  (*Id.* ¶¶ 130, 138-139, 151).  As John told Brandeis officials, the University contractually obligated itself to provide a student with the student's "education records" in compliance with the Family

---

[4]     Not only was John left in the dark during the Statements Phase, he remained in the dark during the entire Fact-Finding Phase because the Special Examiner never shared J.C.'s statement with John, and John had to piece together what he allegedly did wrong from the questions the Special Examiner asked him in a series of interviews that were conducted by the Special Examiner like a secret police interrogation of a criminal suspect rather than an independent investigation by an impartial investigator. (Am. Compl. ¶¶ 91-93, 176).

Educational Rights and Privacy Act ("FERPA").  Instead, John was left in the completely

unreasonable position of having to defend himself against a Report he was not allowed to read.

(*Id*. ¶¶ 152-153).[5]

In its response, Brandeis argues that it undertook no affirmative, contractual obligation to

provide education records to John and, to the extent it allegedly violated FERPA by refusing to

provide the Report to him, John has no private right of action against Brandeis under FERPA.

(Def. Mem. at 21).  John disagrees.  Brandeis affirmatively incorporated FERPA rights into its

contract with Brandeis students.  In doing so, Brandeis undertook a contractual obligation to

comply with FERPA.  The contention that John has no private right of action against Brandeis

under FERPA is irrelevant.  John has a contract cause of action.

Further, Brandeis's interpretation of Section 17.4 cannot be reconciled with the

reasonable expectation standard.  In that provision, Brandeis informed its students that "***each***

***enrolled student at Brandeis***" has "***certain rights***" under FERPA, including "***access to the***

***student's educational records*** . . . ."  (Am. Compl, Ex. C, at 26) (emphasis added).  Section 17.4

further informed Brandeis students that "***the location of all records pertaining to a student***, and

the ***procedures for requesting access*** are contained in the ***Brandeis University Records Policy***."

(*Id*.) (emphasis added).  A reasonable Brandeis student reading this language would understand

that Brandeis had *agreed to comply with FERPA*.  A reasonable Brandeis student would ***not***

understand this language to mean that Brandeis retained discretion whether or not to comply with

FERPA and whether or not to withhold a student's requested education record.  But, that is what

---

[5]     There is no question that the Special Examiner's Report is an "education record" under FERPA.
*See* 34 C.F.R. 99.3 (defining "education record" to include all records that are (1) "[d]irectly related to a
student" and (2) "[m]aintained by an educational agency or institution or a party acting for the agency or
institution"); *see United States v. Miami Univ.*, 294 F.3d 797, 812-15 (6th Cir. 2002) (holding that
disciplinary records are education records under FERPA, including an investigative report and witness
statements held in the investigative file).

Brandeis did in John's case.  Brandeis purposely withheld the Special Examiner's Report from John until *after* his appeal was denied and his case was closed, even though the Report unquestionably was the single most important education record pertaining to John's disciplinary proceeding.  It was only after the process was over that the University finally released the Report to him.  (Am. Compl. ¶ 154).  Brandeis's conduct breached the R&R Handbook, and was unreasonable, arbitrary, capricious, and undertaken in bad faith in violation of Massachusetts common law governing University disciplinary procedures.

To the extent that both John's and Brandeis's interpretations are plausible, the language is ambiguous and must be construed against Brandeis as the author, and the motion to dismiss must be denied.  *Boland,* 81 Mass. App. Ct. at 827, 969 N.E.2d at 174; *Merrimack*, 372 Mass. at 724, 363 N.E.2d at 690-91; *Crooker,* 2014 U.S. Dist. LEXIS 100126, at *19; *Aware, Inc*., 604 F. Supp. 2d at 310.

**(c)      Brandeis Breached the Contract by Eliminating the Deliberations Phase of the Special Examiner's Process.**

Brandeis breached its contract with John by eliminating the Deliberations Phase of the Special Examiner's Process.  (Am. Compl. ¶¶ 26c. & d., 83, 132-133, 156-159; *see also* Ex. C to Am. Compl., at 46 ("Deliberations Phase")).  John alleges that after the Special Examiner issued the Examiner's Report finding John responsible for all six charges, Lisa Boes, the University's final decision maker in John's case, should have but failed to convene a three-member Deliberations Panel, whose function was to review the Examiner's Report, interview the Examiner at the Panel's discretion, and make recommendations to Boes regarding "outcomes" for the accused.  (*Id*. ¶ 156).  After receiving the Panel's recommendations on outcomes, Boes was to "render[] the final decision as to any outcomes" for the accused based on the Panel's recommendations.  (*Id*. ¶ 83).  John contends that the term "outcomes" broadly refers to the

12

result or consequence of the Special Examiner's Process – *i.e.,* will the accused be found responsible for the charges, and if so, what sanctions will be imposed.

Instead of following this sequence of events, Boes unilaterally accepted the Special Examiner's finding of responsibility without Panel review, and then convened a "Sanctions Panel" to determine sanctions.  (*Id.* ¶¶ 26c. & d., 156-157).  Boes abrogated a critically important procedure designed to provide independent review of the Special Examiner's fact and responsibility-findings through debate among three Panelists.  The fact that the Sanctions Panel gave John a sanction that appears to be incommensurate with the seriousness of the charges for which Boes found John responsible signals that the Panel disagreed with the charges/findings or found the conduct giving rise to them so benign as to warrant the lightest possible sanction.  (*Id.* ¶¶ 157-158).  Had Boes convened the Panel to deliberate on the findings, it is likely a different result would have been reached on the "outcome" of the responsibility findings.  (*Id.* ¶ 159).

In its response, Brandeis contends that John misunderstands the chronology of the Special Examiner's Process and the purpose of the Deliberations Phase.  According to Brandeis, the chronology is as follows:  (1) the Special Examiner issues "findings of fact" at the end of the Fact-Finding Phase; (2) the University's final decision maker-SSAO/D[6] makes "final factual findings"; (3) if the final decision maker-SSAO/D finds the accused responsible, the Special Examiner's Process progresses to the Deliberations Phase; (4) in the Deliberations Phase, the final decision maker-SSAO/D convenes a three-member Panel to recommend "outcomes." Brandeis argues that the term "outcomes" refers to "any sanctions" and excludes any findings or decisions about the responsibility of the accused.  (Def. Mem. at 21-22).

---

[6]      In the Amended Complaint, John uses the term "final decision maker," while Brandeis uses the acronym "SSAO/D" used in the R&R Handbook, which stands for "Senior Student Affairs Officer or designee."  The terms are synonymous, *i.e.*, the SSAO/D is the final decision maker in the Special Examiner's Process.

Brandeis's contention that the word "outcomes" mean "sanctions" ignores other provisions relating to the Special Examiner's Process that make clear "outcomes" means "final decisions" about the responsibility of the accused, and "sanctions" means actions taken by the University when a student is found responsible.  Further, Brandeis's chronology cannot be reconciled with the plain language of the R&R Handbook and impermissibly requires the Court to add or omit words to fit Brandeis's interpretation.  Finally, at best the word "outcomes" and other words and phrases describing the sequence of Phases in the R&R Handbook are ambiguous and must be construed against Brandeis as the author.

> **(i)  The Word "Outcomes" Must be Construed Broadly to Mean the End Result of the Special Examiner's Process, Including Findings of Responsibility, Not Merely "Sanctions."**

Brandeis argues the word "outcomes" means "sanctions," as opposed to "decisions" or "findings" regarding the accused's responsibility.  (Def. Mem. at 22).  The term "outcomes" is not specifically defined in the Deliberations Phase provision of R&R Handbook, but in the very next provision describing the "Outcome Notification" Phase, the use of the words "outcomes" and "sanctions" supports John's interpretation that "outcomes" means the "final decision" regarding the accused's responsibility for the charges, and "sanctions" means penalties that relate to that decision.  This provision states in relevant part:  "The . . . ***SSAO/D will communicate the final outcome(s) decision in writing . . . to the Accuser and the Accused within 7 days*** under usual circumstances.  ***The Accuser will be informed of any sanctions that relate to them*** in accordance with applicable law."  (Am. Compl., Ex. C, at 46 ("Outcome Notification")).  Here, the term "final outcome(s) decision" is distinct from the term "any sanctions."  The phrase "any sanctions that relate ***to them***" plainly means "any sanctions that relate to the final outcome(s) decision."  Thus, the "final outcome(s) decision" is communicated to the parties, along with "any

sanctions" relating to the final outcome(s) decision.  "Outcomes decision" is simply *not* the same as "sanctions."

The distinction between "outcomes" and "sanctions" is further underscored by the definition of "sanctions" in a different provision relating to both the Hearing Process and the Special Examiner's Process.  There, "***sanctions***" is defined as "***a variety of actions that may be taken as a consequence of being found responsible for a violation of community standards***." (Am. Compl., Ex. C, Section 21.0, at 38).  "Sanctions" is *not* defined as "outcomes."  As one would expect, it is defined as actions taken after a finding of responsibility.

Dictionary definitions of the word "outcomes" provide further guidance on the plain meaning of the term[7]:

- "1. a final product or end result; consequence; issue; 2. a conclusion reached through a process of logical thinking"; "something that follows from an action, dispute, situation, etc.; result; consequence" (http://dictionary.reference.com);

- "1. The final result of a process, meeting, activity, etc.; 2. The possible or likely result of something" (http://www.macmillandictionary.com)

- "The way a thing turns out; a consequence" (http://www.oxforddictionaries.com/us/definition/american-english);

- "the result or effect of an action, situation, or event" (http://dictionary.cambridge.org);

---

[7]    *See Aware, Inc. v. Centillium Communs., Inc.*, 604 F. Supp. 2d 306, 310-11 (D. Mass. 2009) (court interpreted plain meaning of term "due" by consulting Black's Law Dictionary and American Heritage College Dictionary); *Walker v. President & Fellows of Harvard College*, 2014 U.S. Dist. LEXIS 178301, at *6-7 (D. Mass. Dec. 30, 2014) (court consulted Merriam-Webster Dictionary Online and Oxford Dictionaries.com for plain meaning of the term "submit").

- "conclusion, event, fallout, issue, chain reaction, end result, reaction, result, aftereffect, aftermath", etc. (http://www.thesaurus.com);

- "An end result; a consequence" (http://www.thefreedictionary.com).

These definitions support John's interpretation that the word "outcomes" is a broad term encompassing the "end result" of the Special Examiner's Process, which logically would include decisions regarding findings of responsibly and also any sanctions relating to the findings. Accordingly, when the Deliberations Panel "makes recommendations as to the outcome(s) for the Accused," and the final decision maker "render[s] the final decision as to any outcomes," the terms "outcomes" and "final decision as to any outcomes" logically encompass both decisions about responsibility and sanctions.  (Am. Compl., Ex. C, at 46 ("Deliberations Phase")).[8]

Yet another provision of the R&R Handbook undermines Brandeis's position that the Panel's role is limited to recommending "sanctions."  According to this provision, the final decision maker has several functions in the Process:  she or he conducts the "Discussion Phase" conversations with the parties, "***communicates findings*** to the parties ***made by*** the Special Examiner and ***the panel***," and render[s] the final decision as to any outcomes for the Accused based on the recommendations of the panel."  (Am. Compl., Ex. C, at 43) (emphasis added). The phrase "***communicates findings . . . made by . . . the panel***" indicates the Panel makes recommendations about "findings," not just about "sanctions."

---

[8]    Lisa Boes likely confused the procedures in the 2012-13 R&R Handbook with the new procedures in the 2013-14 R&R Handbook with respect to the Deliberations Phase.  In the 2012-13 R&R Handbook, there is no panel and no Deliberations Phase; instead, the Dean of Student Life "renders the Final Decision as to the outcome of the case after receiving the findings from the Special Examiner." (Am. Compl., Ex. B, at 36 ("Dean of Student Life")).  In the 2012-13 R&R Handbook, the Discussion Phase, during which the Dean of Students discusses the Special Examiner's findings with the parties, is followed immediately by the "Outcome Phase," in which the Dean of Students issues "the binding Final Decision."  (*Id*. at 38 ("Discussion Phase") & "Outcome Phase")).  In the 2013-14 R&R, the Special Examiner's Process was changed by adding a panel and adding the Deliberations Phase, during which the panel recommends "outcomes" for the accused to the final decision maker-SSAO/D, who then "renders the final decision."  (Am. Compl., Ex. C, at 43 ("Panel"), 46 ("Deliberations Phase")).

16

At the very least, the word "outcomes" is ambiguous and must be interpreted against Brandeis as the author, and the motion to dismiss must be denied.  *Boland*, 81 Mass. App. Ct. at 827, 969 N.E.2d at 174; *Merrimack*, 372 Mass. at 724, 363 N.E.2d at 690-91; *Crooker*, 2014 U.S. Dist. LEXIS 100126, at *19; *Aware, Inc*., 604 F. Supp. 2d at 310).

**(ii)      Brandeis's Chronology Impermissibly Requires the Court to Add or Omit Words to Fit its Interpretation.**

Brandeis's chronology relating to the Fact-Finding and Responsibility Findings Phases impermissibly requires the Court to add or omit words to fit Brandeis's interpretation.  Brandeis states that the Special Examiner issues "***findings of fact***" at the end of the Fact-Finding Phase, but omits important, relevant language.  (Def. Mem. at 21) (emphasis added).  The R&R Handbook states as follows:  "***the Special Examiner will assemble a report*** for the SSAO/D ***that summarizes undisputed and disputed facts*** . . . ***and makes a finding about whether the Accuser is responsible or not responsible for any or all charges***."  (*See* Am. Compl., Ex. C, at 45 ("Special Examiner's Report")) (emphasis added).

In the next phase, the Discussions Phase, the final decision maker orally summarizes the Special Examiner's findings in separate meetings with the parties and decides whether to submit new evidence offered by the parties to the Special Examiner, who may supplement the findings with new findings.  (Am. Compl., Ex. C, at 45-46).  In the "Responsibility Findings Phase," one of two possible things happens.  First, "[i]f the Accused is found not responsible for all charges, the SSAO/D will contact the parties in writing . . . within 2 business days."  Second, "[i]f the Accused is found responsible for one or more charges, the Special Examiner's Process will progress to the Deliberations Phase."  (*Id*. at 46 ("Responsibility Findings")).  By its plain terms, this Phase involves a two-day notice period in which the final decision maker-SSAO/D informs the parties whether or not the accused has been found responsible for any of the charges.  The

17

provision does *not* state that during this Phase the ***SSAO/D makes a final decision about the accused's responsibility***.  The references to "found not responsible" and "found responsible" pertain to the ***Special Examiner's finding of responsibility***.  Brandeis's interpretation would impermissibly require the Court to add words to this provision that do not exist.  *See Continental Cas. Co. v. Gilbane Bldg. Co*., 391 Mass. 143, 147, 461 N.E.2d 209, 212 (1984) ("We read the policy as written.  [Courts] are not free to revise it or change the order of the words.").

At best, the language in the Responsibility Findings Phase provision is reasonably susceptible to more than one interpretation, and therefore, must be construed against Brandeis as the author.  *Boland*, *supra*; *Merrimack*, *supra*; *Aware, Inc.*, *supra*.

> **(d)  Brandeis Breached Its Express Representation to John that the Three Members of the University Appeals Board Did Not Have a Conflict of Interest.**

Brandeis breached its express, written representation to John that the three members of the University Appeals Board who were selected by Brandeis to decide John's appeal had been vetted for possible conflicts of interest and that no conflicts of interest existed.  (Am. Compl. ¶¶ 26e., 160-167).  As John alleges, on June 17, 2014, Lisa Boes informed John in writing that a three-member Appeals Board had been selected to decide his appeal.  She told John that "***members of the [Appeals Board] do not interact with either party or their advisors about the process or appeal materials***."  (*Id*. ¶ 160) (emphasis added).  She assured John that the three faculty members serving on the Appeals Board "have been vetted for ***potential conflicts*** prior to being selected . . . for this role."  (*Id*.) (emphasis added).

But, as John later discovered, that was not the case.  The Chair of the Appeals Board and J.C.'s Special Examiner's Process Advisor collaborated on a University Subcommittee on Sexual Violence during the pendency of the Special Examiner's Process in John's case.  (*Id*. ¶ 161).  There can be no question that Brandeis knew at that time that the Chair and J.C.'s Advisor

18

served on the Subcommittee together, since the University *sponsored* the Subcommittee.  (*Id*.).

Had the Chair and J.C.'s Advisor served on an *academic* subcommittee together, the University

might be excused for concluding that no potential conflict of interest existed.  But here, the Chair

and J.C.'s Advisor served on a *sexual violence* subcommittee, convened by the University to

deal with the perceived burgeoning problem of student-on-student sexual misconduct.  At the

very least, the University should have informed John of the potential conflict, so that he could

seek recusal of the Chair from the Appeals Board.  Instead, not only did Boes fail to disclose the

potential conflict to John, she affirmatively told him that the members of the Board had been

"vetted" for "potential conflicts" prior to their selection.

      In its response, Brandeis claims that Boes's representation "is not contained in any R&R

or any other document that could arguably constitute an enforceable contract."  (Def. Mem. at

22-23).  John disagrees.  Boes's written representation was made during the course of the R&R

Handbook's Special Examiner's Process and was a communication in furtherance of that

Process.  The written document informed John of the next stage of the Process and assured him

that stage would be free from conflicts of interest.  Boes's representation was an integral part of

communicating the procedures contained in the R&R Handbook.  In any event, John has asserted

a claim for estoppel and reliance on the basis that Brandeis made "express and implied promises

and representations" to John apart from those contained in the R&R Handbook, and John relied

on those promises and representations to his detriment.  (Am. Compl. ¶¶ 226-231).  Boes's

representation is clearly such an "express promise and representation."

      Brandeis takes issue with John's allegation that "there is substantial reason to conclude

that the Chair and J.C.'s Advisor improperly discussed John's case, based on the fact that the

Subcommittee's Report on Sexual Violence and the Appeals Board's Decision – which were

issued within one week of each other – contain references related to two events in John's case."
(Am. Compl. ¶ 162).  Brandeis argues this allegation is "blatantly speculative."  (Def. Mem. at
23).  There is nothing speculative about John's allegations, which are grounded in actual words
and concepts that appear in both documents.  He alleges the Appeals Board's Decision expressly
disapproved of the "light punishment" given to John and advocated for "mandatory minimum
sanctions," just as the Subcommittee's Report advocated for "mandatory minimum sanctions,"
including mandatory expulsion for rape or sexual misconduct other than rape.  (*Id*. ¶ 163).  John
further alleges that the Appeals Board's Decision contained an extensive and disapproving
discussion of John's purported violation of a No Contact Order, for which John purportedly
received a "warning" with "no further punishment," just as the Subcommittee's Report
disapproved of the lack of campus police enforcement of No Contact Orders.  (*Id*. ¶¶ 164-165).
As John alleges, the No Contact Order discussed in the Appeals Board's Decision was not even
an issue before the Board, because J.C. had separately filed a No Contact Order complaint
against John, which was adjudicated in a separate Special Examiner's Process, and which
resulted in John's being found not responsible.  (*Id*. ¶ 165).  There was no reason for the Appeals
Board's Decision to even refer to the No Contact Order, and in fact, the Appeals Board should
not have had any information about the No Contact Order case in the record before it.  (*Id*.).  The
fact that the Appeals Board's Decision refers to the No Contact Order from a different case
strongly indicates that the Chair received that information from J.C.'s Advisor, who had been a
staunch advocate for J.C. in a series of No Contact Order cases he brought against John (none of
which did J.C. prevail).  (*Id*. ¶¶ 164-165).

       Brandeis also argues that "it is equally reasonable to conclude that the Chair authored
both documents without actually discussing the Doe-J.C. case or appeal materials with J.C.'s

advisor." (Def. Mem. at 23). To the contrary, it is unreasonable to conclude that the Chair of

John's Appeals Board also authored the Subcommittee's Report given that that Report was

issued under the byline of J.C.'s Advisor. More to the point, Brandeis's "equally reasonable"

argument simply confirms that discovery will be required to determine whether in fact the Chair

and J.C.'s Advisor improperly discussed John's case. It is axiomatic that "a motion to dismiss is

not the proper time to determine whose version of the facts reigns supreme." *Brown v. Bank of*

*Am., N.A.*, 67 F. Supp. 3d 508, 519 (D. Mass. 2014).

Brandeis also argues that the references in both documents to "mandatory minimum

sanctions" and No Contact Orders "have no bearing on the merits of the Doe-J.C. case," as they

are "extraneous issues" from which there is "no basis to conclude that the Chair's alleged

conflict had any bearing on the Board's substantive decision." (Def. Mem. at 23). Brandeis is

wrong. The fact that these two "extraneous issues" were prominently and improperly discussed

in the Appeals Board's Decision strongly suggests that the Chair had an animus against John that

had nothing to do with the merits of John's appeal. That animus permeates the Decision; it is

dismissive in tone, barely touches on the merits, and dwells on two "extraneous issues" that

never should have been there. The extraneous issues are tell-tale signs of bias and a

predisposition against John, which John is entitled to explore in discovery.

> **(e)** **Brandeis Breached Its Contractual Obligation to Have John's Case Decided Through the Hearing Process Set Forth in the 2011-12 R&R Handbook.**

John was contractually entitled to have his case decided through the Hearing Process set

forth in the 2011-12 R&R Handbook because that is the contract he signed as a condition of his

matriculation at Brandeis and it provided that all allegations of student code violations, including

sexual misconduct, would be adjudicated through the Hearing Process. (Am. Compl. ¶¶ 26f., 63,

168-172; *see also* Ex. A to Am. Compl., at 1, 21-31).[9]  As John alleges, the 2011-12 R&R

Handbook explicitly stated that it "contains *the* procedures the University employs when a

member of the community believes that a student has violated campus policy.  *This* process . . .

is ultimately a Brandeis-grown and nurtured one that is constantly evaluated and ***tweaked*** *by the*

*community every year*."  (*Id*. ¶ 170 & Ex. A at 1) (emphasis added).  A Brandeis student reading

this language would reasonably expect that Brandeis could "tweak" its Process from year to year.

But "tweaking" cannot reasonably be read to permit the University to entirely eliminate that

Process with respect to allegations of sexual misconduct and harassment and replace it with a

radically different Process that severely curtails an accused student's rights.  (*Id*. ¶ 171).

     That is what Brandeis did.  The Special Examiner's Process as conceived and as

implemented in John's case was (and is) fundamentally unfair, arbitrary, and capricious.  The

contrast between the Hearing Process and the Special Examiner's Process is stark.  In the

Hearing Process, the accused and the accuser participate in a hearing before an impartial tribunal

during which both parties present and hear all of the evidence and have the right to question each

other and all of the witnesses.  (Am. Compl. ¶ 13).  In the Special Examiner's Process, the

hearing is eliminated.  In its place, a single individual hired by the University – the Special

Examiner – serves in the conflicting and unregulated roles of investigator, prosecutor, judge and

jury.  (*Id*. ¶¶ 14, 176-177).  The investigation by the Special Examiner is conducted behind

closed doors in a series of separate interviews with the parties and witnesses.  (*Id.* ¶ 14).

Although the accuser knows his or her story before the Special Examiner's investigation begins,

the accused is left in the dark concerning the facts, never knowing what the accuser and

---

[9]     Brandeis handled John's case under three R&R Handbooks.  Because J.C.'s alleged incidents occurred during the 2011-12 and 2012-13 academic years, the Special Examiner used the R&R Handbooks for those years to define the charges and standards of conduct.  Brandeis decided to apply the Special Examiner's Process in the 2013-14 R&R Handbook as the method to adjudicate the case apparently because J.C. filed his Report in the 2013-14 academic year.  (Am. Compl. ¶ 69).

witnesses actually have said except as filtered through the Special Examiner. (*Id*. ¶ 15). In John's case, the systematic withholding of facts was particularly harmful to John's defense given the length of the relationship and number of sexual encounters between the two dating parties. Further, the investigation in John's case was handled by the Special Examiner like a secret police interrogation of a criminal suspect rather than an impartial investigation. (*Id*. ¶¶ 87-89, 92, 176). Instead of proceeding to a hearing or some sort of forum at which *both* sides hear *all* of the evidence and have an equal opportunity to present their claims and defenses before an impartial tribunal or fact finder, the Special Examiner's Process effectively ends with the interrogation. The Special Examiner *alone* hears the evidence and determines the responsibility of the accused. (*Id*. ¶ 177). In John's case, the final decision maker made the Process even more unfair by unilaterally deciding to accept the Special Examiner's findings instead of subjecting those findings to scrutiny and debate by a Deliberations Panel. (*Id*. ¶¶ 156-159).

In its response, Brandeis argues that these changes "were, in fact, no more than a 'tweak' of Brandeis's R&R." (Def. Mem. at 24). That contention has no merit. In fact, the University completely supplanted the Hearing Process with an altogether different Process when it instituted the Special Examiner's Process for sexual misconduct and harassment cases. That is not "tweaking" the Process.[10] Brandeis also argues that as a matter of law it may "modify" or "amend" its rules and regulations from year to year. (*Id*.). But, Brandeis did much more than that when it completely overhauled the Process, and in any event, it expressly limited itself to

---

[10]     Dictionaries consistently define "tweak" as "small" or "fine" adjustments: "to change (something) slightly in order to improve it: to make small adjustments to (something)" (http://www.merriam-webster.com/dictionary); "To adjust, fine-tune" (http://www.thefreedictionary.com); "Improve (a mechanism or system) by making fine adjustments to it" (http://www.oxforddictionaries.com/us/defintion/american_english); "to change slightly, esp. in order to make something more effective or correct" (http://dictionary.cambridge.org/us/dictionary/american-english); "to make a minor adjustment to" (http://dictionary.reference.com/browse).

"tweaking" the rules.  Further, under Massachusetts common law applicable to university disciplinary processes, Brandeis is *not* permitted to replace a disciplinary process with one that is unreasonable, arbitrary, and capricious.  (Am. Compl. ¶ 172).  Brandeis recognized its obligation to be fair by pledging to "preserv[e] the rights . . . of all of its students through all of its disciplinary procedures."  (*Id*. ¶ 175 & Ex. C, Section 22.6, at 42).  By instituting the Special Examiner's Process, Brandeis breached that promise.

### (f)    The 2013-14 R&R Handbook entitled John to a Hearing on the Charges of Physical Harm and Invasion of Privacy.

Even if the Special Examiner's Process in the 2013-14 R&R Handbook could be applied to John's case, that R&R Handbook provided that allegations of physical harm and invasion of personal privacy must be adjudicated through the Hearing Process.  (Am. Compl. ¶¶ 26f., 68, 173).  The Special Examiner's Process is used to adjudicate *only* allegations of sexual misconduct and harassment.  All other alleged violations are subject to the Hearing Process. (Am. Compl., Ex. C, Section 3.0, at 6; Section 7.0, at 12; Section 22.6, at 42).  In its response, Brandeis points to one sentence in Section 22.6:  "In cases where the [Department of Student Rights and Community Standards] receives a report and determines that <u>one or more</u> possible violations of Section 3 (Sexual Responsibility) or Section 7 (Equal Opportunity, Non-Discrimination, and Harassment) exist, <u>the case will be adjudicated by the Special Examiner's Process</u>."  (Def. Mem. at 25) (Brandeis underscore).  Because J.C. alleged several violations of Sections 3 and 7, Brandeis argues the allegations of physical harm and invasion of privacy were properly adjudicated by the Special Examiner's Process.  But, the same general language appears in Section 19.1 pertaining to the Hearing Process:  "In cases where the Department of Student Rights and Community Standards decides that there is evidence of a violation that warrants referral to the Conduct Process the Accused will be contacted to schedule the Preliminary

Meeting . . . . This meeting will serve to inform the student of the details of the charges and educate the Accused about the Conduct Process."  (Am. Compl., Ex. C, at 28).  These provisions merely state that the Department of Student Rights and Community Standards determines whether allegations should be adjudicated through the Special Examiner's Process or the Hearing Process.  They do not state that the Special Examiner's Process trumps the Hearing Process when allegations involve both Processes.

**(g)      Brandeis Breached Its Contractual Obligation to Maintain the Confidentiality of John's Education Record.**

John has alleged that upon information and belief Brandeis violated its contractual obligation to maintain the confidentiality of John's education record either by deliberately leaking the Special Examiner's findings to third parties or by not adequately safeguarding the disciplinary record from being disclosed to third parties.  (Am. Compl. ¶¶ 26g., 28, 174, 188, 199-202 & Ex. C to Am. Compl., at 26, 30, 32, 47 "Records")).  In its response, Brandeis acknowledges that records generated by the Special Examiner's Process are subject to the same confidentiality provisions in the R&R Handbook as records generated by the Hearing Process, providing that "such records are confidential."  (Def. Mem. at 26; Ex. C, *supra*).  But, Brandeis argues that John only alleges leaks of confidential "information" about his disciplinary proceeding, not "confidential documents."  A reasonable Brandeis student would ***not*** read the confidentiality provisions to mean that Brandeis is free to leak information contained in confidential documents so long as it does not leak the actual documents.

**(h)      Brandeis Breached Its Contractual Obligation to Ensure the Special Examiner's Findings Were Based on a Preponderance of the Evidence and Were Not Arbitrary and Capricious.**

The Special Examiner's findings of responsibility were based on novel notions of consent, sexual harassment, and physical harm that cannot be reconciled with the language in the

R&R Handbooks and that are at odds with traditional cultural norms.  The Special Examiner completely ignored the context of a romantic, dating relationship and elevated commonplace, everyday interactions in a nearly two-year consensual relationship into serious sexual transgressions.  (Am. Compl. ¶¶ 18, 33).

For example, the Special Examiner concluded that in the course of their nearly two-year relationship, when John awakened J.C. in the morning with a kiss but J.C. told him to "stop" so that he could go back to sleep, John had sexually assaulted J.C. on the basis that sleep is a "state of incapacitation," the wake-up kiss therefore lacked "consent," and John was thus taking advantage of J.C.'s incapacitation.  (*Id.* ¶¶ 19, 111-114).  The Special Examiner found that, on those occasions when John looked at J.C.'s private parts when the two shared the dorm's same-sex communal bathrooms, John invaded J.C.'s personal privacy, even though the two were in a nearly two-year sexually intimate relationship, routinely shared communal facilities, and J.C. could have used a private stall but chose not to.  (*Id.* ¶¶ 20, 119-121).  The Special Examiner also found that, when John made the "first move" on J.C. while the two were in their pre-dating "flirting" stage by placing J.C.'s hand on John's crotch over his clothing, John had sexually assaulted J.C. because J.C. had not explicitly consented to the act.  The Special Examiner made this finding even though it was undisputed the two had been flirting, J.C. had indicated to John just prior to the contact that John would have to initiate the first move sexually, within a day of the incident the two began a 21-month, sexually-active relationship, and the R&R Handbook permitted consent to be "communicated verbally or through actions."  (*Id.* ¶¶ 21, 102-109).

J.C.'s charges were frivolous on their face and lacked a shred of evidentiary support; the Special Examiner ignored witnesses and 32-pages of social media documentation indicating that John and J.C had a normal, healthy relationship that ran its course, and that J.C.'s accusations

were actuated by jealousy, malice, and a deteriorating emotional state triggered by his severely

dysfunctional family history and family events, not by unwanted sexual activity with John.  (*Id.*

¶¶ 5-6, 32-33, 56-59, 125-128).

In attempting to defend the Special Examiner's findings, Brandeis argues that John

"appears to allege in his Amended Complaint that, because he and J.C. had a dating relationship,

consent to any and all sexual activity must be assumed."  (Def. Mem. at 17).  That is wrong.

John alleges that the duration, quality, and apparent harmony of the dating relationship as

evidenced by witnesses, social media documentation, and the subsequent fallout after the

breakup, were important considerations for the Special Examiner to weigh in assessing the

alleged lack of consent.  Instead, the Special Examiner analyzed each of J.C.'s 12 "incidents" in

isolation, completely ignoring the context of the relationship, including the fact that J.C.

continued to engage in consensual activity after each of the alleged incidences, and applying a

definition of consent and taking advantage of incapacitation that would make sexual misconduct

among couples in a long-term relationship an everyday occurrence.  (Am. Compl. ¶¶ 101, 114).

Brandeis also argues that the Special Examiner applied the correct definition of physical

harm.  Brandeis is wrong.  (Def. Mem. at 19-20).  The applicable R&R Handbooks state:  "[t]he

University will not tolerate any behavior that[] physically harms.  (some examples: hitting,

pushing, or physical altercations/violence of any kind.)  (Def. Mem. at 19; *see also* Am. Compl.

¶ 129 & Ex. A, Section 2, at 3; Ex. B, Section 2, at 4).  The Special Examiner focused on the

phrase "violence of any kind" and decided to rely on the definition of "***sexual violence***"

contained in the Office of Civil Rights's 2011 Dear Colleague Letter to interpret the word

"violence" in the R&R Handbooks.  (Def. Mem. at 19-20 & Moriello Aff. Ex. B at 21).  But,

"***sexual***" violence is not included in the "physical harm" Section of Brandeis's R&R Handbooks

(Section 2).  The R&R Handbooks expressly state that allegations involving sexual misconduct and harassment are defined and dealt with in Sections 3 and 7.  The R&R Handbooks explicitly ***exclude*** sexual misconduct violations from physical harm violations.  Thus, John correctly alleges that the definition of "physical harm" under which he was charged refers exclusively to ***physical*** batteries in Section 2 that are distinct from ***sexual*** batteries in Sections 3 and 7.

In any event, Brandeis's efforts to defend the Special Examiner's Report on a motion to dismiss are improper.  John has pleaded sufficient facts demonstrating a plausible claim that the Special Examiner failed to apply the correct standards of conduct, issued findings that on their face were unreasonable, arbitrary, and capricious, and that Brandeis knew the findings were flawed but failed to take appropriate steps to rectify them.

### C.    John Has Alleged Plausible Claims of Breach of the Covenant of Good Faith and Fair Dealing and Estoppel and Reliance.

Brandeis's conduct throughout the Special Examiner's Process breached the covenant of good faith and fair dealing implied in its contract with John.  *See Warner Ins. Co. v. Commissioner of Ins.*, 406 Mass. 354, 362, 548 N.E.2d 188, 192 n.9 (1990) ("Every contract implies good faith and fair dealing between the parties to it."); *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 472, 583 N.E.2d 806, 820 (1991) (implied covenant of good faith and fair dealing "provides that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.").  As explained in Section II.B.2(e), John was entitled to have his case decided through the Hearing Process, but even if Brandeis had a contractual right to radically change its procedures and to adjudicate his case through the Special Examiner's Process, it was obligated to ensure that the Process was conducted fairly and in good faith.  Brandeis breached the covenant of good faith and fair dealing and deprived John of the fruits of his contract by among other things eliminating the

28

Statements and Deliberations Phases, failing to provide John with the Special Examiner's Report, failing to ensure that the Special Examiner's findings were supported by a preponderance of the evidence and were not arbitrary and capricious, and failing to ensure an impartial, unbiased Appeals Board.  (Am. Compl. ¶¶ 26, 145-178, 222-225).[11]

John properly asserts an estoppel and reliance claim based on promises and representations that Brandeis made to him that are ***not*** contained in the R&R Handbook.  (Am. Compl. ¶¶ 226-231).  By way of example, Brandeis argues that John's conflict of interest allegation (*i.e.*, Brandeis promised to ensure that members of the Appeals Board had no conflicts of interest but breached that promise) fails to state a contract claim.  According to Brandeis, Lisa Boes's representation to John about conflicts of interest "is not contained in any R&R Handbook or any other document that could arguably constitute an enforceable contract."  (Def. Mem. at 22-23).  As explained in Section II.B.2(d), John disagrees with that contention, but in any event, Boes's representation to John, which was made outside of the R&R Handbook, states a claim for estoppel and reliance.

### D.    John Has Alleged a Plausible Negligence Claim.

Brandeis argues that John's negligence claims are "an improper end-run around his deficient contract and quasi-contract claims," that he "may not repackage his [breach of contract claim] as a negligence claim to avoid dismissal," and that it has "wide discretion" in conducting disciplinary proceedings.  (Def. Mem. at 30-33).  Brandeis misses the point.  In fact, John has alleged two grounds for his negligence claims that are independent of his contract claims.

---

[11]    Brandeis has implicitly acknowledged its handling of John's case was unfair by changing the subsequent R&R Handbook with respect to several of the most egregious flaws in implementing the Process in John's case.  (*Id.* ¶¶ 179-185).

First, John has alleged negligent retention and supervision.  Under Massachusetts law, Brandeis, as an employer, has a "duty to exercise reasonable care in the selection and retention of his employees."  *Foster v. The Loft, Inc.*, 26 Mass. App. Ct. 289, 290, 526 N.E.2d 1309, 1310 (1988).  Negligent retention occurs when "the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge or reassignment."  *Id.* at 291, 526 N.E.2d at 1311 (internal quotations omitted).  As John alleges, Brandeis breached its duty of care in selecting and supervising competent, trained, and unbiased faculty and administrators by appointing a final decision maker, Lisa Boes, who was not familiar with the Special Examiner's Process, had never served as a final decision maker before, and was selected for that role in spite of her inexperience because the Dean of Students who would normally serve in that capacity had recused himself.  (Am. Compl. ¶¶ 97, 233-234).  Boes failed to follow critically important procedures that resulted in an unfair and procedurally flawed Process.  (*Id.* ¶¶ 97, 235).  Boes was ill-prepared for her pivotal role, as evidenced by her discussion with John, in which she informed him that it was her job to read the Special Examiner's Report, but not to evaluate whether the Examiner's findings were supported by the preponderance of the evidence standard.  (*Id.* ¶ 235).[12]

Second, John has alleged that Brandeis breached a duty to keep John's education record confidential by violating FERPA in leaking information about John's disciplinary proceedings to third parties.[13]  Under Massachusetts law, "[a]lthough violations of a statute or regulations do not

---

[12]     The R&R Handbook does not contain any promise by Brandeis to properly train and supervise personnel involved in disciplinary proceedings.  Accordingly, John could not and has not alleged a contract claim on this ground.  His negligent supervision claim is independent of Brandeis's contractual obligations.

[13]     This basis for John's negligence claim is not to be confused with his contractual claim alleging that Brandeis incorporated FERPA rights regarding a student's access to education records into the R&R Handbook, and thus contractually obligated itself to comply with FERPA.  (*See* Section II.B.2(b), *supra*).

constitute negligence per se, they may provide evidence of negligence." *Berish v. Bornstein*, 437 Mass. 252, 273, 770 N.E.2d 961, 979 (2002).  One of the intended purposes of FERPA is "[t]o protect the privacy of students . . . ."  20 U.S.C. § 1232g.  Under FERPA, educational institutions such as Brandeis must comply with certain prescribed procedures, such as restricting access to the student's education record, in order to receive federal funding.  20 U.S.C.S. § 1232g(b)(1).  The harm that FERPA protects against is the dissemination of the student's education record, which could lead to an invasion of the student's privacy.  *Miami Univ.*, 294 F.3d at 806 ("Congress enacted FERPA to protect [parents' and students'] rights to privacy by limiting the transferability of their records without their consent.") (internal quotations omitted) (citing Joint Statement, 120 Cong. Rec. 39858, 39862 (1974)).  Disciplinary records, including investigative reports and witness statements held in the investigative file, are education records.  *Miami Univ.*, 294 F.3d at 812-15.  As alleged, Brandeis breached its duty of care to keep John's education record confidential when, upon information and belief, it leaked information about John's disciplinary proceeding to John's internship employer and prospective employer, resulting in his immediate dismissal by his current employer and loss of prospective employment.  (Am. Compl. ¶¶ 28, 188, 200-202).

Brandeis also contends that John's allegations are "erroneous" and "rank speculation." (Def. Mem. at 32-33).  That argument is legally improper on a motion to dismiss, where the well-pleaded factual allegations of the complaint must be accepted as true and where John alleges specific facts in support of all of his grounds for negligence.  (Am. Compl. ¶¶ 232-238).

---

Although John also alleges that Brandeis incorporated FERPA obligations to maintain the confidentiality of John's disciplinary records into the R&R Handbook and breached that provision (*see* Section II.B.2(g), *supra*), Brandeis denies it had any FERPA contractual obligation.  In that case, Massachusetts case law recognizes that violation of a statute can be an independent basis for a negligence claim.  *Berish*, 437 Mass. at 273, 770 N.E.2d at 979.

### E.       John Has Alleged a Plausible Defamation Claim.

Brandeis argues the Amended Complaint does not allege a plausible claim for defamation or aiding and abetting defamation.  (Def. Mem. at 34-35).  John disagrees.  To prevail on a defamation claim, the plaintiff must establish that the defendant "published a false statement about him to a third party that either caused him economic loss or was of the type that is actionable without proof of economic loss."  *Phelan v. May Dep't Stores Co.*, 443 Mass. 52, 55-56, 819 N.E.2d 550, 553 (2004).  "A false statement that would tend to hold the plaintiff up to scorn, hatred, ridicule or contempt in the minds of any considerable and respectable segment in the community would be considered defamatory, and the imputation of a crime is defamatory per se, requiring no proof of special damages.  The element of publication is satisfied when the defamatory communication is transmitted to even one person other than the plaintiff."  *Id*. at 56, 819 N.E.2d at 553-54 (internal quotations and citations omitted).

The Amended Complaint sufficiently alleges defamation and aiding and abetting defamation based on the following factual allegations:

- J.C. defamed John by repeatedly making public accusations on social media and to the press that John was his "attacker" and subjected J.C. to "multiple forms of rape."  (Am. Compl. ¶ 27).  Brandeis knew those public accusations were false because J.C. had explicitly told the Special Examiner John had never raped him and because there was no accusation and no finding of responsibility for either "rape" or physical "attacks," but Brandeis did nothing to publicly correct the record.  (*Id*. ¶¶ 27, 186-187, 192-194, 240).

- Upon information and belief, Brandeis leaked information about John's disciplinary proceeding to his then-current and prospective employers (one of whom told John she had been "made aware" of his situation at Brandeis from "several sources").  (*Id*. ¶¶ 28, 188).  This conduct resulted in John's being fired from his internship position working for a high-ranking public official, the withdrawal of employment offers, and the withdrawal of employment references.  (*Id*. ¶¶ 28, 188, 199-202).

- University administrators knew that the Special Examiner's findings could not be squared with the preponderance of the evidence.  Two University administrators voiced their belief the case should be re-opened, but Brandeis's General Counsel denied the request.  (*Id*. ¶¶ 204, 242).

- As a direct, proximate, and foreseeable consequence of Brandeis's aforementioned conduct, John's reputation has been severely harmed, affecting his academic and career prospects, his earning potential, and causing him severe emotional distress.  (*Id*. ¶¶ 205-206, 245).

Brandeis argues these allegations are deficient because John did not identify the specific information that was leaked or the Brandeis administrators who leaked it, and in any event, the Special Examiner's findings were true.  (Def. Mem. at 34 & n.10).  To the contrary, these allegations set forth facts and circumstances strongly supporting John's defamation claim:  (1) he was told by his employer that "*several* sources" leaked information about John's case (which means that the source was not just J.C.); (2) the prospective employer had close ties to Brandeis; (3) Brandeis therefore knew about the prospective employer; (4) the leaked information was so inflammatory that John was immediately fired by his current employer and suddenly cut off from all contact with his prospective employer; (5) two Brandeis officials were so dubious about the accuracy of the Special Examiner's findings that they were in favor of re-opening the case; (6) Brandeis knew J.C.'s public accusations were false and aided and abetted J.C. not only by standing idly by but by allowing J.C. to create such a hostile environment for John that he accelerated his graduation.  (Am. Compl. ¶¶ 28-30, 205).

### F.    John Has Alleged aPlausible Invasion of Privacy Claim.

Brandeis argues that John's privacy claim should fail because it is of the false light variety and John has not alleged that Brandeis disseminated private information.  (Def. Mem. at 36).  John disagrees.  "A person shall have a right against unreasonable, substantial, or serious interference with his privacy."  M.G.L. c. 214, § 1B.  The Supreme Judicial Court of Massachusetts "has interpreted § 1B to proscribe the required disclosure of facts about an individual that are of a highly personal or intimate nature when there exists no legitimate, countervailing interest."  *Bratt v. Int'l Bus. Machs. Corp.*, 392 Mass. 508, 518, 467 N.E.2d 126,

133-34 (1984).  Contrary to Brandeis's contention, the Amended Complaint does not rest its privacy claim solely on allegations that the Special Examiner's findings "defied common sense," "could not be squared with the evidence," and were "arbitrary and capricious."  (Def. Mem. at 36).  The Amended Complaint alleges that Brandeis unreasonably, substantially, and seriously interfered with John's privacy by disclosing facts of a highly personal and intimate nature to his then-employer and prospective employer, including sexually intimate facts that were disclosed in the course of the confidential Special Examiner's Process.  (Am. Compl.  ¶¶ 28, 188, 199-202, 247-251).   Brandeis had no legitimate or countervailing interest in divulging this private information, especially since John's then- employer and prospective employer were not directly affiliated with the University and had no need to know the information.

### G.    John Has Alleged a Plausible Claim of Intentional Infliction of Emotional Distress.

To succeed on a claim of intentional infliction of emotional distress, the plaintiff must establish four elements:  (1) defendant intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of its conduct; (2) the conduct was "extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilized community"; (3) defendant's actions were the cause of the plaintiff's distress; and, (4) plaintiff's emotional distress was "severe and of a nature that no reasonable man could be expected to endure it."  *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144-45, 355 N.E.2d 315, 318-19 (1976) (internal quotations omitted).  John's well-pleaded factual allegations satisfy all four elements. Brandeis should have known that the deeply flawed Special Examiner's findings would result in emotional distress.  The Special Examiner's findings elevated benign, reciprocal, everyday activities between two sexually-intimate partners (wake-up morning kisses, John's "first move" in the "flirting" stage that led to the couple's 21-month dating relationship, looking

at J.C.'s private parts in the dorm's same-sex communal bathrooms) into extremely serious sexual transgressions.  Brandeis should have known that leaking information related to these findings to John's then-employer and prospective employer would result in John's further emotional distress.  Brandeis argues that John's claim is deficient because Brandeis did not engage in "extreme" and "outrageous conduct."  (Def. Mem. at 37).  But, Brandeis effectively stigmatized John as a ***sexual predator*** and deliberately failed to take corrective action even when two Brandeis officials expressed their belief his case should be re-opened.  (Am. Compl. ¶¶ 136-137, 203-204, 254-255).  The deliberate spreading or publication of false statements can constitute actionable "outrageous conduct" to sustain a cause for intentional infliction of emotional distress.  *See Tech Plus, Inc. v. Ansel*, 59 Mass. App. Ct. 12, 26, 793 N.E.2d 1256, 1268 (2003) (false and defamatory statements were sufficient to constitute extreme and outrageous conduct); *Zajac v. Zajac*, 2007 Mass. Super. LEXIS 336, at *13-14 (Mass. Super. Ct. Aug. 16, 2007) (false statements to police were sufficient to survive motion to dismiss claims of intentional and negligent infliction of emotional distress).  Finally, John alleges severe emotional distress.  He is deeply depressed and anxious; he has lost weight; he is no longer able to sleep through the night; and he has had serious suicidal ideation.  (Am. Compl. ¶ 256).

### H.    John Has Alleged a Plausible Claim of Negligent Infliction of Emotional Distress.[14]

To succeed on a claim of negligent infliction of emotional distress, the plaintiff must prove the following: "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case."  *Payton v. Abbott Labs.*, 386 Mass. 540, 557, 437 N.E.2d 171, 181 (1982).  The Amended Complaint sufficiently pleads this claim.

---

[14]     Brandeis seeks dismissal of the negligent infliction of emotional distress claim solely on the basis that John has not stated a claim for negligence.  (Def. Mem. at 30-33).

First, for the reasons discussed in the previous section on negligence, John has stated a negligence claim.  Second, John has alleged sufficient facts demonstrating that he has suffered emotional distress caused by Brandeis's negligence.  John has suffered from panic attacks, anxiety, and depression of such a magnitude that he has sought psychological counseling for among other things suicidal ideation.  (Am. Compl. ¶¶ 29, 206, 263).  Third, John has sufficiently alleged that he has suffered physical harm caused by Brandeis's negligence.  John has lost weight and appetite, is deeply depressed and anxious, cannot sleep through the night, and has experienced panic attacks leading to suicidal ideation.  (*Id*. ¶¶ 29, 263).  *See Pratt v. Martineau*, 69 Mass. App. Ct. 670, 679, 870 N.E.2d 1122, 1129 (2007) (finding that "symptoms commonly classified as mental or emotional in nature (insomnia, impaired concentration, uncontrollable crying, gastrointestinal distress, headaches, feelings of despair, anxiety, depression)" may establish physical harm.).  Fourth, Brandeis's negligence in implementing the Special Examiner's Process led to findings by the Special Examiner that effectively branded John as a sexual predator; these circumstances would have caused any similarly situated individual severe emotional distress.  Brandeis had reason to believe the findings against John were suspect, as evidenced by the light sanction given him by the Sanctions Panel and by the fact that two University Administrators requested unsuccessfully that the University re-open John's case.  (*Id*. ¶¶ 157, 203-204).  Upon information and belief, the University leaked information from John's disciplinary record to his internship employer and prospective employer, leading to his immediate firing, loss of promised employment, and loss of employment references.  (*Id*. ¶ 188).  A reasonable person would have suffered emotional distress under these circumstances.

## III.   CONCLUSION

For the foregoing reasons, John respectfully requests that this Court deny Brandeis's Motion to Dismiss in its entirety.

36

Respectfully submitted,

/s/ *Michael R. Schneider*_____
Michael R. Schneider, Esq.
(Mass. Bar No. 446475)
Good Schneider Cormier
83 Atlantic Avenue
Boston, MA 02110-3711
Tel:  (617) 523-5933
Email:  ms@gscboston.com


*/s/ Patricia M. Hamill*_____
Patricia M. Hamill, Esquire
(PA Attorney I.D. No. 48416)
(Admitted *Pro Hac Vice*)
Jeannette M. Brian, Esquire
(PA Attorney I.D. No. 66169)
(Admitted *Pro Hac Vice*)
Conrad O'Brien PC
1500 Market Street
Centre Square – West Tower, 39th Fl
Philadelphia, Pennsylvania 19102-1921
Tel:  (215) 864-9600
Fax:  (215) 864-9620
Email:  phamill@conradobrien.com
            Jbrian@conradobrien.com

*Attorneys for Plaintiff John Doe*

Dated:  August 12, 2015

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent via email to those indicated as non-registered participants on August 12, 2015.

/s/ Michael R. Schneider_____
Michael R. Schneider, Esquire