```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3

 4   JOHN DOE,                       )
                                     )
 5                  Plaintiff        )
                                     )
 6                                   )  No. 15-11557-FDS
     vs.                             )
 7                                   )
     BRANDEIS UNIVERSITY,            )
 8                  Defendant        )

 9

10    BEFORE:   THE HONORABLE F. DENNIS SAYLOR, IV

11

12                        MOTION HEARING

13

14

15          John Joseph Moakley United States Courthouse
                         Courtroom No. 3
16                       1 Courthouse Way
                         Boston, MA 02210
17

18                       October 5, 2015
                          11:00 a.m.
19

20

21

22

23             Valerie A. O'Hara, FCRR, RPR
                     Official Court Reporter
24      John Joseph Moakley United States Courthouse
               1 Courthouse Way, Room 3204
25                   Boston, MA 02210
                 E-mail: vaohara@gmail.com
```

1   APPEARANCES:

2   For The Plaintiff:

3       Conrad, O'Brien, Gellman & Rohn, P.C.,
    by PATRICIA M. HAMILL, ATTORNEY,
4   1515 Market Street, Philadelphia, PA 19102-1916;

5       Good, Schneider, Cormier, by MICHAEL R. SCHNEIDER,
    ESQ., 3rd Floor, 83 Atlantic Avenue, Boston,
6   Massachusetts 02110;

7   For the Defendant:

8       Rose, Chinitz & Rose, by ALAN D. ROSE, SR. and
    ANTONIO MORIELLO, ESQ., One Beacon Street, 23rd Floor,
9   Boston, MA 02108.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2          THE CLERK:  All rise.  Thank you.  Please be

3   seated.  Court is now in session in the matter of

4   John Doe vs. Dean of Academic Services, Civil Action

5   Number 15-11557.

6          Will counsel please identify themselves for

7   the record.

8          MS. HAMILL:  Good morning, your Honor, my

9   name is Patricia Hamill, and I'm here for Plaintiff

10  John Doe.

11         THE COURT:  Good morning.

12         MR. SCHNEIDER:  Michael Schneider also for

13  John Doe.

14         MR. ROSE:  Good morning, your Honor,

15  Alan Rose here for the Defendant Brandeis University.

16         MR. MORIELLO:  Good morning, your Honor,

17  Anthony Moriello, also for Brandeis University.

18         THE COURT:  Good morning.  This is a hearing

19  on defendant's motion to dismiss.  Mr. Rose, are you

20  going to take the lead?

21         MR. ROSE:  Thank you, your Honor, and may it

22  please the Court, we're here on Brandeis University's

23  motion to dismiss under Rule 12(b)(6).  There is a

24  substantial record before the Court owing to the fact

25  that the complaint in the case is very long, very

         1    detailed, refers to a large number of documents, which

         2    we have submitted as attachments to affidavits from

         3    Mr. Moriello, and those include three documents which

         4    are particularly important, a 25-page report by the

         5    special examiner hired by Brandeis University to

         6    interview the witnesses and to prepare a summary and to

         7    make certain findings.

         8                 That report of the special examiner is

         9    Exhibit B to the first affidavit filed by Mr. Moriello.

11:03AM  10    The document 2013-2014 *Rights and Responsibilities* is

        11    Exhibit A to that same affidavit.  There's also referred

        12    to in the complaint a summary of the special examiner's

        13    report prepared by Dean Boes.

        14                 That summary is at Exhibit A to the second

        15    Moriello affidavit, and the third Moriello affidavit

        16    includes as Exhibit B the final and anonymous decision

        17    of the University Appeals Board.

        18                 THE COURT:  Let me stop you there.

        19                 MR. ROSE:  Yes, your Honor.

11:03AM  20                 THE COURT:  Ms. Hamill, is there any dispute

        21    that I can consider those four documents properly as

        22    part of the record?

        23                 MS. HAMILL:  There is not, your Honor.

        24                 THE COURT:  Okay.  Thank you.  Mr. Rose.

        25                 MR. ROSE:  Now, your Honor, this case is

1   similar to another case which our office handled and

2   which is not cited in Ms. Hamill's brief but is cited

3   prominently in our papers.  That's the case of *Schaer*

4   *vs. Brandeis University* in which also arose on

5   Rule 12(b)(6), motion to dismiss, and the SJC affirmed

6   the superior court's dismissal of the complaint on

7   Rule 12(b)(6).

8            The case had been taken by the SJC on

9   further appellate review from a decision that was

11:04AM  10   adverse to Brandeis by the Appeals Court, but the SJC

11   took the case on further appellate review, considered

12   the arguments, reviewed an earlier, obviously, decision,

13   reviewed an earlier version, I should say, of *Rights and*

14   *Responsibilities*.

15            *Rights and Responsibilities*, which is the

16   governing document, the handbook, the student handbook

17   between Brandeis University and its students, which may

18   be modified from year to year, as I said, is Exhibit A

19   to the Moriello affidavit.

11:05AM  20            And the courts uniformly say that in

21   considering disciplinary matters, disciplinary conduct

22   decisions made by universities, the courts are very

23   reluctant to interfere in university decision-making.

24            That said, the courts have also said that in

25   instances where the university does have a handbook with

1    rules, those rules obviously must be followed, but the

2    review by courts seems limited in the sense that

3    universities are owed substantial deference into how

4    they interpret and apply their decisions and also with

5    respect to the ultimate outcomes that are made in those

6    cases.

7           I should also mention another case, *Driscoll*

8    *vs. Milton Academy*, although that arises in the private

9    school context, the Appeals Court's decision by

11:06AM   10    Justice Kafker cites with approval the *Schaer vs.*

11    *Brandeis decision*, so what do we have here?

12           We have a situation where the plaintiff,

13    John Doe, and his accuser were both former students at

14    Brandeis.  After a 21-month relationship, which

15    obviously went sour, the accuser, who's identified in

16    the complaint as J.C. filed what's called a community

17    standards report alleging that Doe had sexually harassed

18    and assaulted him at times during their relationship.

19           Under the 2013-2014 version of *Rights and*

11:07AM   20    *Responsibilities,* Brandeis because of the fact that

21    there was a claim under the community standards report

22    of sexual assault or sexual harassment hired a

23    third-party special examiner.

24           That's a process which is used in any case

25    arising out of the community standards report in which

1    any of the allegations concern sexual assault or sexual

2    harassment.

3                 So that special examiner process went

4    forward.  The special examiner, Ms. --

5                 THE COURT:  I'm sorry to interrupt.

6                 MR. ROSE:  Yes.

7                 THE COURT:  Is it true, Mr. Rose, I may have

8    the detail wrong here, but my understanding is the

9    initial accusation was two sentences, 29 words long,

11:08AM  10   there was a more detailed accusation that came later,

11   and the plaintiff, John Doe, was not permitted to see

12   that accusation?

13                MR. ROSE:  He did not see the more detailed

14   report.  The way --

15                THE COURT:  Can I just say as an aside,

16   we're all lawyers here, I'm a Judge, the case is

17   probably going to rise and fall on what the contract

18   said, but I don't understand how a university, much less

19   one named after Louis Brandeis, could possibly think

11:08AM  20   that that was a fair procedure to not allow the accused

21   to see the accusation.  I mean, Mr. Rose, surely that

22   gives you some pause.

23                MR. ROSE:  No, your Honor, it does not,

24   certainly does not, and the reason it does not is

25   because one must look at the entire record of this case,

1    and the entire record reflects that John Doe was

2    interviewed four times, his accuser was interviewed four

3    times.

4            THE COURT:  But does Doe know precisely what

5    the accuser says because he has a chance to be

6    interviewed, but, you know, our Constitution -- I'm

7    telling you things you already know.  Our Constitution

8    provides for a right of confrontation, a public

9    proceeding in which you confront your accuser, the right

11:09AM   10   of cross-examination.

11           It's carved on the walls of this building

12   how important the right of cross-examination is, and

13   part of that, of course, is knowing the charge, knowing

14   precisely what it is you're responding to, and I just

15   don't understand.  It's not just Brandeis, it's, you

16   know, most of these schools have this one-sided

17   procedure.

18           I don't understand how a college could set

19   this up.  I don't understand it.  Again, I'm not going

11:09AM   20   to decide the case, -- I'm going to decide the case on

21   the law, and if it's contractual provisions that govern

22   and the contract wasn't violated or there's no tort,

23   then that's that, but I just find it astonishing that

24   you could set up a procedure like this.  I don't

25   understand it.  I don't understand how lawyers could

1    allow this to happen.

2            MR. ROSE:  If I could explain, your Honor.

3            THE COURT:  Yes.

4            MR. ROSE:  The reason that the special

5    examiner process was set up was in reaction to and in

6    response to and in conformity to the various guidance

7    letters and policy statements.

8            THE COURT:  Dear Colleague letters?

9            MR. ROSE:  Yes, in April of 2011, and I will

11:10AM 10   -- the only confession, if you will, that I will make is

11   that when lawyers, and I'm one of them, saw the Dear

12   Colleague letter and saw the various pronouncements

13   issued by the Department of Education, the Office of

14   Civil Rights, we were indeed surprised at some of the

15   provisions.

16           THE COURT:  I mean, it's closer to Salem

17   1792 than Boston, 2015.

18           MR. ROSE:  Well, I won't acknowledge that,

19   your Honor, given the array of procedural rights that

11:11AM 20   John, you know, that John Doe and all accused students

21   at Brandeis are given, but, again, the reason that this

22   special examiner process was created in which you set up

23   a special examiner and the special examiner interviews

24   by himself or herself the accused, the accuser, again,

25   it's in response to the Dear Colleague letter and the

1   other guidance issued by the Office for Civil Rights.

2   That's the reason that there is a special examiner

3   process.

4               THE COURT:  If we had a time machine, I

5   would be interested in Justice Brandeis' view of that

6   procedure, but go on, Mr. Rose.

7               MR. ROSE:  Well, your Honor, I think I might

8   have been --

9               THE COURT:  A man famous for talking about

11:12AM 10   sunshine and how it's both enlightening and a

11   disinfectant.

12               MR. ROSE:  A disinfectant, the best

13   disinfectant.

14               THE COURT:  Yes.

15               MR. ROSE:  But here, after all, your Honor,

16   it's not as if the allegations are made and the special

17   examiner goes off and simply speaks to the accuser and

18   never gives the accused a chance.  In fact, in the

19   opinion, I'm sorry, in the complaint, John Doe says that

11:12AM 20   the first time that he found out what the allegations

21   were was when he was interviewed by the special

22   examiner, and the complaint goes on to say that after

23   being interviewed initially by the special examiner, the

24   special examiner interviewed both the accused and the

25   accuser two or three more times, so this was clearly an

1    evolving process in which the accused at the time that

2    he's interviewed by the special examiner learns all

3    about the allegations that have been made against him,

4    and, in fact, if you read the 25-page single-spaced

5    report issued by Ms. Singhavi, it's very clear that

6    John Doe not only learned what the allegations were, he

7    was able to provide his side of the story, and the

8    report accepts his version of events as to many of the

9    incidents that happened during the course of this

11:13AM    10    21-month long relationship.

11             THE COURT:  I think it's Felix Frankfurter,

12    I may have that wrong, but I think it's

13    Justice Frankfurter who said that there's never been a

14    method better devised for ascertaining the truth than

15    cross-examination, and there was no cross-examination of

16    the accuser, correct, that's not what the rules provide?

17             MR. ROSE:  My understanding was that under

18    the special examiner process, there is no

19    cross-examination of the accuser by -- of the accuser by

11:14AM    20    the accused, yes, that is certainly true, and that's the

21    way it's set up under the special examiner process in

22    the governing document, and, as I said, that's the way

23    it was done in response to the guidance from the Office

24    for Civil Rights in these kinds of cases, so one of the

25    many allegations that is made is that after the special

1    examiner made her report, which is, as I said, is in the

2    record, 25 pages, single=spaced, the matter then went to

3    Dean Boes and under Brandeis's procedure, it's in the

4    record, the next thing that happened was that Dean Boes

5    prepared a summary, her own summary of the findings that

6    have been made by the special examiner.

7           The complaint reflects that Dean Boes met

8    with John Doe and read to him from the summary of those

9    findings and invited him to make any further submission

11:15AM  10   that John Doe wanted, and the record reflects that in

11   response to that, according to the amended complaint,

12   John Doe provided an affidavit and the names of certain

13   witnesses.

14          He had also given the names of witnesses to

15   the special examiner, and I think that at least three of

16   those witnesses were people whom the special examiner

17   interviewed.

18          So it appears that John Doe not only had a

19   chance to say his peace to whatever he wanted to say to

11:16AM  20   the special examiner, had the chance to provide the name

21   of witnesses, those witnesses were also interviewed by

22   the special examiner, and he was then given a chance to

23   respond to the summary of the findings of the special

24   examiner.

25          Now, one of the allegations in the complaint

```
 1   is that Brandeis allegedly breached the provisions of

 2   Rights and Responsibilities by going to what's called

 3   the deliberations phase, and since this provision of

 4   Rights and Responsibilities is so prominently mentioned

 5   in the complaint in the case, I would just like to, if I

 6   could, walk the Court through the language in Rights and

 7   Responsibilities.

 8             THE COURT:  Hold on.

 9             MR. ROSE:  That is in the --

10             THE COURT:  I didn't print out everything.

11   I may not have that here, hold on.

12             MR. ROSE:  That's in the affidavit of

13   Mr. Moriello, the first affidavit, which is Docket

14   Number 21.  It's contained in the 2013-2014 Rights and

15   Responsibilities.

16             THE COURT:  I don't have that with me here,

17   but that's fine, why don't you walk me through it.  I

18   have read it.

19             MR. ROSE:  All right.  This is in

20   Section 22.6 of Rights and Responsibilities, and it

21   discusses the special examiner's report, the special

22   examiner's report according to Rights and

23   Responsibilities, it says, Upon conclusion of all

24   interviews and collection of all known documents, the

25   special examiner will assemble a report that summarizes
```

1    undisputed and disputed facts, offers conclusions about

2    the credibility of testimony and makes a findings about

3    whether the accused is responsible or not responsible

4    for any or all charges.

5                There is then a so-called discussion phase

6    which provides that this phase of the special examiner's

7    process provides the accuser and the accused with

8    separate meeting opportunities with the senior student

9    affairs officer to hear and respond to the findings made

11:18AM  10  by the special examiner, so we say that that process was

11   clearly followed in this case, but there is then

12   language which says, "The parties in separate meetings

13   will listen to the Brandeis' officials summary of

14   findings and engage in dialogue about these findings."

15   That occurred according to the amended complaint.

16                Each party will then have two business days

17   within which to provide new pertinent information.  That

18   was done according to the amended complaint, and then

19   22.6, Section 22.6 goes on to say that, "if the accused

11:19AM  20  is found responsible for one or more charges, a special

21   examiner's process will progress to the deliberations

22   phase."

23                Now, in the deliberations phase, it says,

24   "This involves a panel of three university

25   administrators and/or faculty appointed by the senior

1    student affairs officer who will receive the special

2    examiner's report and make recommendations."

3            Then it says, "The panel will consult the

4    special examiner's report and will be entitled to

5    interview the special examiner.  The panel will not,"

6    however, that word however is mine, "the panel will not

7    interview the parties', witnesses or other experts or

8    individuals."

9            It goes on to say that, "The senior student

11:20AM   10    affairs officer will render the final decision as to any

11    outcomes."

12            Now, their claim in the amended complaint is

13    that no deliberations panel was set up by Brandeis that

14    could act as an additional fact-finder, but that's not

15    what the deliberations phase language says.

16            In fact, the deliberations phase only arises

17    in the event that the special examiner believes that the

18    accused is "responsible for one or more charges."

19            THE COURT:  But does that mean that there is

11:21AM   20    no review of factual findings for error?  In other

21    words, putting aside sanctions or consequences, the

22    special examiner makes a finding and that's that, the

23    three-person panel has to accept those facts?  They

24    can't say no, no, no, we disagree, we think you've made

25    a clear error?

            MR. ROSE:  No, your Honor, it does not mean
that.  In fact, at the deliberations phase, it says the
SSAO, that's senior student affairs officer, will render
the final decision as to any outcomes, and beyond that
there is an appeals mechanism, so, yes, your Honor,
there is the opportunity for the senior special affairs
officer to consider the special examiner's report and to
make his or her own findings.

            Now, in this particular instance, the senior
special affairs officer did indeed accept the findings
by Ms. Singhavi, but we submit she was entitled to do so
under *Rights and Responsibilities*.

            There was then an appeal and the appeals
report found unanimously that the decision made by the
senior student affairs officer should be accepted, and
as a result of this entire procedure, John Doe was then
given the lightest possible sanction, which was a
disciplinary warning.

            So, your Honor, again, although the record
is long, we're talking about a long procedure here, we
do believe that when carefully scrutinized, Brandeis
followed its procedures and that the claims of breach of
those procedures alleged by Ms. Hamill on behalf of
John Doe simply do not carry water.

            I'm sensitive, your Honor, to the fact that

1    we're here on a 12(b)(6) motion, but, similarly, your

2    Honor, we were before the SJC on a 12(b)(6) motion with

3    an extensive record, and I point out that the only

4    criticism that the SJC leveled at Brandeis was that the

5    report there was a mere 13 lines long, and the SJC

6    suggested that the report should have been more

7    extensive.

8              Here we have a 25-page single-spaced report.

9    We have a 7- or 8-page single-spaced summary of the

10   findings by Dean Boes, and we have an extensive report

11   by the three member appeals panel, which was set up, so

12   I believe the record is very clear that John Doe was

13   granted extensive procedure in accordance with *Rights*

14   *and Responsibilities*, and we believe that given all

15   that, that the claims of breach of contract should be

16   dismissed.

17             There's also a claim in the case that one of

18   the members of the appeals panel was tainted by a

19   conflict of interest.  There's a reference to Brandeis'

20   general conflict of interest policy, however, our

21   position is that the complaint really does not

22   adequately set forth exactly what the conflict says.

23             The argument that's made on behalf of

24   John Doe is that because Dean Boes told John Doe that

25   the members of the appeals panel had been "vetted"

1  that that somehow becomes a contract right of his or

2  that Brandeis should be estopped because John Doe relied

3  on the statement that members of the appeals panel had

4  been vetted when, according to Ms. Hamill, one of the

5  members of the three-member appeals panel had a

6  conflict, the facts for which are not really set forth.

7           Your Honor, there are other claims in the

8  case including --

9           THE COURT:  Let me ask a question about the

11:26AM  10  tort claims taken as a whole.  In your view, does it

11  rise and fall on the contract claim?  In other words,

12  suppose Brandeis just got this 180 degrees wrong, the

13  student is just out of luck, there is no possible

14  procedure in which he can right the wrong, in which he

15  could file a claim of any kind against anyone?  I know

16  they're not a state actor, they're not a government

17  actor, but he would just be out of luck?

18           MR. ROSE:  If the procedures are followed,

19  and if, and this is something which the courts, it's a

11:26AM  20  bit unusual, but the courts also say should be done, the

21  courts also review the record for fairness.  That's

22  something which the courts do, you know, in reviewing

23  these cases.

24           The SJC did it in the *Coveney* case, it did

25  it in the *Schaer* case, I believe it did it in one other

1    case, the *Morris v. Brandeis* case which is also cited in

2    the papers.  I think it's also done in the *Driscoll vs.*

3    *Milton Academy* case, so, yes, the courts do review for

4    what the courts call fairness.

5            THE COURT:  Is it a contract doctrine, a

6    tort doctrine?  Where does that doctrine come from?

7            MR. ROSE:  The courts don't cite.  In other

8    words, you can review, it's one of those situations

9    where you can review those statements and try to find

11:27AM  10   the origin of it, and, frankly, the trail disappears,

11   but it is something which the courts have done, and, as

12   I said, they did it in the *Schaer* vs. Brandeis case.

13           Having in mind that courts are reluctant to

14   intrude into the affairs of universities, and that's a

15   doctrine which comes down, the Court mentioned

16   Justice Frankfurter, I don't know if it was he or some

17   other justice who said what the Court said, but

18   Justice Frankfurter in his opinion in *Sweezy vs.*

19   *New Hampshire* was I think one of the first Justices of

11:28AM  20   the Supreme Court to recognize what became known as sort

21   of the universities for rights of academic freedom, the

22   right to decide on academic grounds who may teach, how

23   it will be taught, and who may attend, and the Courts

24   routinely cite that case and some of the other due

25   process cases, the *Ewing* case, the *Horowitz vs.*

1   *University of Michigan* case, which arises in the medical

2   school context.

3            There's a long line of cases where the

4   Supreme Court and Court of Appeals and U.S. District

5   Courts and State Courts have all recognized this

6   principle that Courts need to be reluctant, need to be

7   "cheery" is the word that some courts use in intruding

8   into the internal affairs of universities, and I suggest

9   that this Court in reviewing *Rights and Responsibilities*

11:29AM   10   and reviewing the entire record of the case, including

11   the outcome, the lightest possible sanction possible

12   under *Rights and Responsibilities* should have in mind

13   Brandeis' right to make its own decisions about how its

14   students should be punished.

15            THE COURT:  I certainly, excuse me, I

16   certainly understand and accept the principle, you know,

17   that the Courts should be cherry of interfering with the

18   affairs of a university, and I certainly understand the

19   reasons for the rule.

11:30AM   20            Having said that, there's also a -- well,

21   there's now been a recent and sorted history of

22   universities just fouling this up considerably, the *Duke*

23   *Lacrosse* case, and, you know, multiple cases thereafter

24   of universities committing injustice in the name of --

25   for reasons of political correctness or who knows why

 1   but universities not getting it right with real life

 2   consequences for young men and women, and it may be that

 3   the Courts have no role, as you say, other than to make

 4   sure the contract was enforced or that it was followed

 5   rather, but it's troubling.

 6          It's quite troubling, and I think any parent

 7   of college-aged students would be nervous about this,

 8   about what happens if your child is falsely accused, how

 9   do you defend yourself?

11:31AM 10          MR. ROSE:  I don't doubt any of what the

11   Court has said, and, indeed, there is an ongoing

12   national dialogue about the handling of these cases.  I

13   was reading an article in *The Chronicle of Higher*

14   *Education* just last week where people seem to be split

15   50-50 about whether police departments, you know, local

16   police departments or universities should be the ones

17   who are, you know, adjudicating these, and, of course,

18   that's an overly simplistic way of defining the problem

19   because society has its own way of dealing with criminal

11:31AM 20   cases, obviously.

21          THE COURT:  That developed over centuries

22   with many protections for the accused.

23          MR. ROSE:  No question.  I mean, there was a

24   day, your Honor, when the justice that was meted out for

25   students was so-called dean's justice, the dean would

1    hear what the allegation was, he might or might not

2    invite the student in for a chat and then make a

3    decision, and, you know, that was it, no hearing, no

4    nothing.

5         And I can tell you as someone who has been

6    advising colleges and universities for a long, long time

7    that colleges and universities across the country are

8    struggling with how to deal with just these kinds of

9    issues, and, to boot, while they're struggling with it,

11:32AM  10   along comes OCR and says here's how we think all

11   allegations on your campus concerning sexual assault

12   should be handled procedurally, and the big stick, of

13   course, is that if colleges and universities are not

14   seen as the OCR, Office of Civil Rights, the Department

15   of Education, if they're seen as noncompliant, the big

16   stick is you're out of luck on federal financial aid and

17   student loans, and what university wants to be caught

18   into, you know, into that kind of a problem, and so,

19   uniformly, they are trying to revamp their procedures to

11:33AM  20   deal with all the guidance that comes from the Office

21   for Civil Rights from the Department of Education.

22        To go back to a question the Court raised

23   earlier I think about the negligence claim, all the

24   other claims in the case, your Honor, we believe should

25   be dismissed for the reasons which are set forth in our

1   35- or 36-page memorandum, I appreciate the chance to be

2   given so many extra pages, and also in our reply

3   memorandum.

4      I think that the leading count in the case

5   now before there was a Title 9 claim, the Title 9 claim

6   has been dismissed.  There's a certain irony in the fact

7   that when the case was first brought, there was a

8   Title 9 claim because Title 9, as interpreted by the

9   Office for Civil Rights, demands the special examiner

10  process.

11     That claim is now out of the case, so we're

12  dealing with various breach of contract claims, but the

13  negligence claim, the intentional affliction of

14  emotional distress claim, negligent infliction claim,

15  defamation claim, they all are found either on the fact

16  that there are insufficiently pled facts in support or a

17  lack of any case law support in Massachusetts for these

18  claims or both.

19     Your Honor, I'm happy to answer any other

20  questions.

21     THE COURT:  All right.  Let me hear

22  Ms. Hamill, are you taking the lead?

23     MS. HAMILL:  Thank you, your Honor.

24     THE COURT:  Before you get too excited,

25  Ms. Hamill, it seems to me you have a steep uphill climb

11:34AM (line 10)

11:34AM (line 20)

1    here for breach of contract, so let me hear from you.

2          MS. HAMILL:  I appreciate that, your Honor,

3    and I figured you'd ask me some tough questions, too.

4    Before I began, I did before the argument, I gave

5    Mr. Rose a binder that I'd like to hand up to you as

6    well, which I think might help us get through the breach

7    of contract discussion.

8          MR. ROSE:  I welcome that submission, your

9    Honor.  I think it helps the Court.

11:35AM   10          THE COURT:  Okay.

11          MS. HAMILL:  And, your Honor, obviously from

12    what has already been said here today, we all understand

13    that this case involves serious consequences to a real

14    life situation for a young man, and that's certainly why

15    we're here on behalf of John Doe.

16          We believe we've alleged plausible claims

17    all across the board.  Obviously, the breach of contract

18    is a core claim, but we believe that we've alleged

19    plausible claims as to everything that we've brought

11:35AM   20    forward today.

21          What we have here is a process that was

22    inherently unfair, that was applied unfairly, that

23    replaced a process that allowed for cross-examination

24    for greater notice, for greater participation that was

25    not simply a tweak, and, even so, the process that was

1 put into place through the *Rights and Responsibilities*

2 handbook in 2013 and 2014 was not followed by Brandeis.

3     One of the things that I think we need to

4 start with, and this is where I'll get into the binder

5 that I handed up to your Honor, I'm going to go through

6 the --

7     THE COURT:  Let me, if I can interject.

8     MS. HAMILL:  Sure.

9     THE COURT:  I'm assuming the student was at

10 Brandeis for four years, and there are multiple

11 iterations of the handbook.  Isn't it the case that if

12 you're there for a particular year that particular

13 handbook governs what happens that year?  In other

14 words, if it is a contractual relationship, you

15 re-enroll as a sophomore, as a junior, whatever it is,

16 and aren't you bound by or isn't the governing

17 contractual document that year's *Rights and*

18 *Responsibilities*?

19     MS. HAMILL:  I think there's two responses

20 to that, your Honor.  One is that the conduct that was

21 alleged occurred over the course of several handbook

22 iterations, so our argument is that when you have to

23 look at what procedures were in place at the time the

24 alleged conduct occurred, and the other is that Brandeis

25 took upon itself in its handbook to say it would only

1    tweak, not wholesale replace, not radically change

2    through their own contract.

3              THE COURT:  That's a word I hope I don't

4    have to define, but maybe I do, what "tweak" is supposed

5    to mean.  Go ahead.

6              MS. HAMILL:  And then I think the --

7              THE COURT:  Well, I'm sorry, before you go

8    ahead, so if two handbooks apply to an ongoing course of

9    conduct, which one is the university supposed to apply,

11:38AM  10    the one that's most favorable to the student, the one

11    that's most lenient, the one that comes first or last?

12    How does the university decide what to do?

13              MS. HAMILL:  I think in this instance, the

14    university, because there is such a radical change

15    between the procedures that would have been followed

16    under the former handbook, which would have allowed a

17    hearing, which would have allowed cross-examination,

18    which would have allowed a whole panoply of rights, that

19    it was incumbent upon the university to apply the

11:38AM  20    procedures that were in place at the time the accused

21    student -- the conduct is alleged to have occurred, and

22    otherwise you're abrogating his rights.

23              This is a different situation.  A lot of

24    these situations arise with, you know, a single

25    instance, a drunken encounter, but this is a unique

case, and I think that permeates the entire case is the

fact that this was a 21-month relationship, the fact

that when a community standards report is 29 words long

and says over the course of 21 months, there were

numerous unconsented to sexual contacts, it started this

whole process rolling that is tainted from the very

beginning, as your Honor was pointing out with asking

Mr. Rose, the fact that the university got more

information than those 29 words and then declined to

share that information with Mr. Doe, who then goes into

this special examiner's process at a distinct

disadvantage.

He's trying to figure out because as far as

he was concerned and as far as their friends were

concerned, this was a relationship that was happy, that

certainly ran its course, but he's left to dig himself

out of a hole by walking into this special examiner's

process without full notice of what he's really being

alleged to have done.

And I know Mr. Rose has said a lot about the

OCR and being force into this special examiner's

process, and I guess I have a couple of responses to

that, and then I do want to get to the contract

provisions, but for one thing, one of the most

significant changes about the Dear Colleague letter is

1    that it changed the standard of proof to preponderance

2    of the evidence, reducing it from clear and convincing,

3    and there are many colleges around the country who have

4    figured out ways to build in more protections for the

5    accused as a result of that diminished standard of proof

6    than what Brandeis put in place.

7              A special examiner's process is not mandated

8    by OCR, it's what Brandeis decided to put in place in

9    part in response to that, but that doesn't mean that

11:40AM  10   they can't build into it various protections for the

11   accused, and, in fact, we think the language of the

12   *Rights and Responsibilities* handbook from 2012-2013 did

13   have an extra layer of protection at deliberations phase

14   where the panel could have looked at the underlying

15   findings, and that's one of the things I want to talk to

16   you about with respect to the contract provisions.

17              THE COURT:  All right.

18              MS. HAMILL:  So, your Honor, taking up the

19   binder of what we think are the key provisions with

11:41AM  20   respect to the breach of contract, which I've handed up

21   to your Honor, and I'm just going to go through this in

22   order because I think it's somewhat logical, but we

23   start with tab 1, which is just a basic proposition

24   that -- and this is at page 42 of the *Rights and*

25   *Responsibilities* handbook, which is a basic proposition

1    that Brandeis is committed to acknowledging and

2    preserving the *Rights and Responsibilities* of all its

3    students through all of its disciplinary procedures, so

4    that's a general guiding principle.

5              We then get to tab 2, and this is the

6    statements phase of the process that's put in place, and

7    this gets started because J.C. filed a community

8    standards report.  We've already talked about the fact

9    that it's just 29 words, and it encompasses a long

11:42AM   10    21-month relationship.

11             With respect to tab 3, that is the

12    statements phase as set forth in the *Rights and*

13    *Responsibilities* handbook, it says that if the accuser

14    does not -- basically if the contents of the initial

15    report do not represent a full account, then the

16    university encourages that student or suggests that

17    student to basically flesh out the initial allegation.

18             As we've alleged in your complaint, in this

19    instance, the university itself got a fuller explanation

11:42AM   20    by J.C. filling out those 29 words, giving detail that

21    then the college did not share with Mr. Doe, and the

22    statements phase allows the respondent to fully respond

23    to the accusation, but if you're not told, if Mr. Doe in

24    this case wasn't told what is the full accusation, what

25    is really at issue here, he had no opportunity to

respond other than to say, "I did nothing wrong" or to

ask, "What is it that I did wrong," and that information

was not given to him, and the school violated this

provision of the *Rights and Responsibilities* handbook by

not giving him that fuller explanation.

The next part of this, your Honor, and this

is a little bit out of order, but I'm going to go

through it because it's in the order of the handbook, is

the breach with respect to not providing the full

report, the full special examiner's report to Mr. Doe.

Your Honor has talked about the fact that

this process with a single person investigating the

matter where the respondent, Mr. Doe, he never gets to

hear what any of the witnesses are saying, he never gets

to hear what J.C. is saying.

All he has at the end of this process

possibly is a report written by the special examiner,

and I do want to address Mr. Rose said he was

interviewed four times, but the reality is he started

out in that process without a clue as to what he was

being accused of, and from there he had to dig himself

out of a hole.

The special examiner found several

inconsistent statements he made over the course of four

interviews because, frankly, she didn't say to him,

 1    "J.C. says you did this" right from the start, "What do

 2    you say to that," he had to try to figure out what it

 3    was he was being accused of, and then at the end of this

 4    whole process, the school denied him when he requested

 5    under FERPA, which is in their handbook, they say, "We

 6    are guided by FERPA," and FERPA allows a student to

 7    request an educational record, and Mr. Doe, in the whole

 8    course of this process, once the special examiner's

 9    report was out and realized he wasn't getting a copy of

11:45AM 10    it, he made a request through the proper procedures to

11    get the report.

12              It was never provided to him, and instead

13    what he got was a summary which initially was just read

14    to him, so, in other words, you're not even hearing what

15    witnesses are saying, now you're getting this diluted

16    summary of a summary of witness statements that you've

17    never even heard yourself.

18              THE COURT:  So the FERPA point is you say

19    once the document is created, once the accusation is

11:45AM 20    submitted to the special examiner, that then becomes an

21    educational record, and the student has the right to

22    obtain it, is that the idea?

23              MS. HAMILL:  Yes, the special examiner's

24    report is an educational record.

25              THE COURT:  Okay.

1          MS. HAMILL:  And, in fact, today it is

2     provided in the process, but that wasn't clear at the

3     time.

4          Then, your Honor, this is I think crucial

5     with respect to the deliberations phase where we

6     probably have the biggest disagreement perhaps with

7     Brandeis over this, but, again, Brandeis, and what we're

8     guided by here is the drafter of this policy, Brandeis,

9     is they are the ones who have to be -- if there's any

11:46AM   10     ambiguity, it's got to be construed against them, and

11     also as the drafter of this, they have to basically make

12     manifest what would be the reasonable expectation of

13     someone who reads this policy, this contract, as to what

14     his rights would be.

15          THE COURT:  Why would that be so?  I mean,

16     ordinarily -- I mean, it's peculiar to call this a

17     contract because it's by no means clear there's any kind

18     of meeting of the minds, but what is the source of that

19     principle that the university has to consider the

11:47AM   20     reasonable expectations of the person reading it?

21          MS. HAMILL:  It's very well -- it's in the

22     cases that we cited, it's in *Schaer*, *Coveney*, *Cloud*.

23     It's a very well-accepted principle in the case law.

24          So the basic point here is that Brandeis is

25     saying that this panel that was convened after the

1    special examiner's report is done, it gets handed off to

2    the SSAO/D, who then has the discussion phase, and then

3    if there's a finding of responsibility, and in this

4    case, Ms. Singhavi found responsibility, it then goes to

5    the deliberations phase, and that's what the tabs 5

6    through 15 are in this binder that I've handed up.

7              With respect to -- and I'm going to parse

8    through the language here because this is a contract and

9    we have to look carefully at the language as to what

11:48AM   10   Brandeis should have expected someone who's going

11   through this process would have thought their rights

12   were and what the review would have been of these

13   findings of responsibility by Ms. Singhavi, so we start

14   at tab 5 with the roles and terms, and at the second

15   page of that tab, it talks about what the senior student

16   affairs officer, what that person's role is.

17              And it says, "The SSAO/D conducts the

18   discussion phase conversations with the parties and

19   communicates findings to the parties made by the special

11:48AM   20   examiner and the panel."  The SS -- so and the panel,

21   and I think that's very important, the panel is

22   referring to this deliberations phase panel.  "The

23   SSAO/D is also responsible for rendering the final

24   decision as to any outcome for the accused."  Again,

25   outcome is the final, final piece of this based on the

 1    recommendations of the panel.

 2            There's no limitation in terms of what this

 3    panel is going to be doing that says, oh, it's only

 4    sanctions.  What the clear meaning of this is that both

 5    the special examiner and the panel are going to be able

 6    to -- are contributing to the analysis of what the

 7    findings will be with respect to responsibility.

 8            At tab 6, with respect to the special

 9    examiner's report, it says, "Upon conclusion of all

11:49AM  10    interviews and the collection of all known documents,"

 11    et cetera, "the special examiner will assemble a report

 12    for the SSAO/D that summaries the undisputed and

 13    disputed facts, offers conclusions about the credibility

 14    of testimony and makes a finding about whether the

 15    accused is responsible or not responsible for any or all

 16    charges," so, again, the term "finding," and what we're

 17    discussing here is the difference between finding,

 18    sanction, outcome, and it's very clear that in this

 19    *Rights and Responsibilities* handbook, and this contract

11:50AM  20    has to be interpreted as a whole, that the word

 21    "finding" has a special meaning with respect to the

 22    conduct at issue, it's not a sanction.

 23            Then the next with respect to, let's see,

 24    tab 7 is the standard of evaluation, and, again, that

 25    talks about a preponderance of the evidence standard and

1    it talks about whether it supports a finding that the

2    conduct occurred.  So, again finding is linked to

3    conduct, it has nothing to do with the sanction.

4            Then we get to tab 8, and it talks about the

5    deliberations phase.  "This phase of the special

6    examiner's process involves a panel of three university

7    administrators and/or faculty appointed by the SSAO/D,

8    who will receive the special examiner's report and make

9    recommendations as to the outcomes for the accused."

11:51AM    10            Now, "Upon voting, the panel will

11    communicate --" and this is the highlighted language I'm

12    reading -- "Upon voting, the panel will communicate its

13    recommendations about the outcomes for the accused to

14    the SSAO/D, the SSAO/D will render the final decision as

15    to any outcomes."

16            So when you look at this part of the *Rights*

17    *and Responsibilities*, outcomes refers to both findings

18    and sanctions.  It's the entire, the end result of this

19    process, and so that what we think and what we believe

11:51AM    20    this language should have allowed for Mr. Doe is a layer

21    of review.  If you're going to have this very serious

22    finding of responsibility, it's not just the special

23    examiner who gets to unilaterally make this decision

24    with one other person at the university, there's a layer

25    of review through this deliberations panel.

1          Then with respect to tab 9 with the outcome

2     notification, the senior student affairs officer or

3     designee will communicate the final outcome decision in

4     writing to the accuser and the accused, and then the

5     accuser will be informed of any sanctions that relate to

6     them.

7          Again, there's a distinction here between

8     sanctions is not just generally outcome sanctions, it's

9     not findings, they have very distinct meanings, and it

11:52AM  10   matters here because Mr. Doe was denied under this

11    contract as written, as Brandeis should have put into

12    effect, was denied a layer of review by this

13    deliberations panel that frankly indicated its disbelief

14    with the special examiner's report and the findings, or

15    it certainly questioned it by just issuing a

16    disciplinary warning here, and we believe they should

17    have been able to review the underlying findings as

18    well.

19          If there can be any doubt as to whether the

11:53AM  20   deliberations phase should have allowed for the panel to

21    look at the findings, make recommendations as to whether

22    the Singhavi findings should have remained in effect.

23          If you look at the appeals procedures, and I

24    think this is very, very key here, it says, "The

25    accuser --" this is tab 10, "The accuser and the accused

1     are entitled to appeal the final decision by the panel

2     in the special examiner's process to the University

3     Appeals Board," and then it lists four areas which are

4     the bases for an appeal.

5          The next page says, "Appeals shall not be

6     based or granted due to dissatisfaction with an imposed

7     sanction."  So, if, as Brandeis is now arguing, the

8     deliberations panel was only to issue a sanction or make

9     a recommendation about a sanction and allows you to

11:54AM  10    appeal from a panel decision but tells you you can't

11    complain about the sanction, it makes no sense, and,

12    therefore, the way that this policy and procedure has

13    been drafted, what they were required to follow should

14    have allowed the deliberations phase panel to not just

15    issue a sanction or decide not to issue a sanction, but

16    to actually look at the underlying findings, and I think

17    that's one of the key breaches here with respect to

18    Mr. Doe's rights through this disciplinary process.

19          I know you can kind of get a headache from

11:54AM  20    looking at all of this.  Do you have any questions?

21          THE COURT:  No, I followed your argument.

22    Thank you.

23          MS. HAMILL:  Okay.  Thank you, your Honor.

24    Then I think the other part with respect to the breach

25    is the conflict of interest on the university Appeals

Board, and those are -- that's at tab 16 and 17 of the
binder that I handed up.

The amended complaint alleges that the panel
chair, who was the only tenured faculty member on the
three-person university Appeals Board had a -- basically
had contact with J.C.'s advisor while this SEP process
and the appeals were going on.

They also served on a committee together
regarding sexual assault and violent procedures at
Brandeis, and the university, first of all, Mr. Doe was
not advised of this relationship between the chair and
J.C.'s advisor.

The university in a letter, an e-mail from
Lisa Boes to Mr. Doe stated that the panel had been
vetted for conflicts prior to being selected and also
said that the members of the UAB do not interact with
either party or their advisors about the process or
appeal materials.

Now, Brandeis is saying that's not in the
contract, it's a signed e-mail.  I think whatever way
you look at it, first of all, the handbook does say that
the university will communicate about the procedures
through university e-mail.  This is a university e-mail.
They're using the e-mail system.

The second is whether you determine that

1    that is part of the contract, and certainly there are

2    cases, and I think your Honor, you have Bloomer vs. I

3    can't remember the defendant in that case, but your

4    Honor did find that handbooks, brochures, things like

5    that can form a contract between a university and its

6    students, but, regardless, we've either got a promissory

7    estoppel, detrimental reliance claim or a breach of

8    contract based on this language.

9              What we have alleged is that if you look at

11:57AM   10   what the Appeals Board referenced in their decision,

11   they make a reference to the issue of minimum sanctions

12   having to be imposed as well as they talk about a

13   completely unrelated manner having to do with no contact

14   orders that wasn't even before them, and certainly we

15   have alleged it's plausible that J.C.'s advisor spoke

16   with the panel chair through the course of their work on

17   this other committee, and, frankly, discussed this case,

18   which then found its way into this Appeals Board

19   decision.

11:58AM   20             I think we've alleged enough certainly to

21   make a plausible claim that there is a violation here

22   and there was a conflict of interest.

23             THE COURT:  All right.

24             MS. HAMILL:  And then with respect to the

25   hearing process breach that we've alleged, that's tab 18

1    of the binder, and this is, you know, that we've been

2    talking about today that this is a Brandeis grown and

3    nurtured process that is constantly evaluated and

4    tweaked by the community every year, and we have

5    extensive briefing, both sides, on what the meaning of

6    "tweak" is, but I don't think anybody could say that a

7    wholesale supplanting of a hearing process with the

8    special examiner's process, a radically different

9    procedure, which curtails a lot of the due process

11:59AM   10   that's not a tweak at all, and, therefore, that's a

11   breach of contract as well.

12            THE COURT:  All right.

13            MS. HAMILL:  And then with respect to the

14   hearing process, the physical harm, invasion of privacy

15   breach, we believe, first of all, we've made the point

16   that we believe the hearing process should have applied,

17   this shouldn't have gone to the SEP process, but even if

18   it were to go, that way, first of all, the handbook does

19   not make clear, and at tab 19 we've included both

11:59AM   20   sections of the *Rights and Responsibilities* handbook,

21   one which talks about a 22.6, the special examiner's

22   process and one which talks about the procedural

23   standard in the student conduct process.

24            They both refer to cases.  Brandeis makes

25   the argument that if there's at least a couple of, one

 1    or two claims that relates to special conduct, then it

 2    automatically goes to the special examiner's process,

 3    but this is a case that involves three that were under

 4    this sexual misconduct policy and two that were not.

 5    There's nothing in the handbook that determines that the

 6    SEP process somehow trumps, that it must go to the SEP

 7    process.

 8              The other thing is at the very least, the

 9    two invasion of privacy and physical harm allegations

12:00PM 10    should have gone through the hearing conduct process,

11    which has a higher standard of proof.  It's clear and

12    convincing evidence.  At the very least, they should

13    have followed it for those two allegations if they

14    weren't going to allow the entire process to go through

15    with that.

16              Finally, your Honor, at tab 20, with respect

17    to the breach is the fact that we've alleged that there

18    was a leak of information regarding this process.  It

19    underpins the defamation claim, it underpins the

12:01PM 20    invasion of privacy claim, but it also has elements

21    which we believe constitute a breach of the contract

22    here, and that is that the university takes upon itself,

23    as it should, through its own rights and through FERPA

24    to keep educational records confidential.  That did not

25    happen here.

1          We had alleged that somehow, and, of course,

2    J.C. did some of his own trumpeting of what occurred

3    here, but we also have alleged credibly that Mr. Doe had

4    two job opportunities.  One was a current position on

5    which he was working where he had been -- had

6    expectation and promise that he would be hired after

7    graduation to continue on there.

8          It is alleged in our complaint there were

9    connections between Brandeis, and it was a political, a

12:02PM  10   candidate, political candidate, there were connections

11   between members of Brandeis administration and the

12   political candidate, and the second was an internship at

13   a company that also had close ties with Brandeis and the

14   one where he was currently working, they fired him and

15   said they had heard from numerous sources about the

16   situation at Brandeis and fired him, and the other

17   basically stopped responding and had been in very active

18   contact with him and stopped.

19          THE COURT:  What is the possibility that

12:02PM  20   Brandeis did that as opposed to J.C.?

21          MS. HAMILL:  The plausible allegation is

22   that there were connections between -- the two employers

23   had connections between the one was a PR firm that had,

24   that basically got Brandeis' account, and after that

25   time, Mr. Doe, even though they had been saying he had

1   an internship there previously and had said if we get

2   the Brandeis account, we'll consider hiring you, and

3   once the Brandeis account was gotten and these

4   allegations started to surface, they -- and when I say

5   started to surface, you have to remember, Mr. Doe's name

6   has not been out in the public record.

7        Even though J.C. has been blasting his

8   attacker, his rapist, he has not put Mr. Doe's name out

9   there, so there are students on campus certainly have

12:03PM   10   learned about this through J.C.'s trumpeting, but with

11   respect to these two outside entities, who are not

12   Brandeis, you know, entities but have Brandeis

13   connections, we believe it's plausible that there were

14   communications.  Somehow information leaked out either

15   through somebody's intrepid comments about Mr. Doe, and

16   we are entitled to, first of all, we think it's a breach

17   of the confidentiality provisions of the *Rights and*

18   *Responsibilities* handbook.

19        Mr. Rose will say, oh, it's just the

12:04PM   20   documents that get protected.  Well, it's absolutely the

21   entire process needs to be confidential, the information

22   that's contained in those records needs to be

23   confidential, FERPA requires that, and somehow, and we

24   believe we've plausibly at least articulated a way that

25   this could have been a Brandeis-connected leak, and

1    we're entitled to discovery to determine what really

2    happened here.

3                   Your Honor, I guess and you had talked

4    with -- so those are really, those are the key breach

5    provisions or breaches that we would be focusing on in

6    our breach of contract part of the case.

7                   Do you have specific questions?  I don't

8    just want to be necessarily going through the elements

9    of defamation, if you want me to, I certainly will, but

12:05PM   10   are there elements or something you'd like me to address

11   with respect to the tort claims that would help you make

12   your decision?

13                  THE COURT:  No, I think -- I don't think I

14   have any questions at this time.  Mr. Rose, do you want

15   to respond?

16                  MS. HAMILL:  Thank you, your Honor.

17                  MR. ROSE:  Just very briefly, your Honor,

18   taking them I think in reverse order, the Court inquired

19   of Ms. Hamill as to what is the plausible allegation

12:05PM   20   that Brandeis was the source of the leak?  I have not

21   heard anything by way of an allegation, plausible or

22   not, that Brandeis itself was responsible for any of the

23   publicity that occurred, and as the Court knows from the

24   litigation we engaged in over the pseudonym motion that

25   was filed, John Doe filed an affidavit with the Court on

1    June 2 of this year, and Exhibit A is a copy of the

2    letter which J.C. received from Brandeis on May 30, 2014

3    informing J.C. of the outcome of the claims that he had

4    made against John Doe, and the letter recites what the

5    allegations were.

6            It recites the allegations -- I'm sorry, the

7    letter, I'm sorry, the letter was the letter which was

8    directed -- may I have one moment, your Honor?

9            I'm sorry, the letter was the letter which

10   was directed to J.C. informing him of the outcomes, and

11   J.C. then took that letter and crossed out the names but

12   put it out on the Internet, I think on Facebook, along

13   with his commentary referring to John Doe as his

14   attacker and then writing a note which says:  "Is a

15   disciplinary warning proper punishment for multiple

16   forms of rape, sexual assault, invasion of privacy,

17   physical harm and harassment but would actually do

18   nothing to combat these issues on college campuses?  The

19   Brandeis administration seems to think so."

20           So my point is Brandeis had no control over

21   what J.C. did with that letter.  Once it went to J.C.,

22   as I said, it was out on the Internet, out on Facebook

23   using the term "rape," a term which Brandeis did not use

24   at all in connection with its handling of this matter.

25           But, again, your Honor, there's no

1    allegation I don't think, plausible or otherwise, about

2    any particular person at Brandeis who was responsible

3    for, you know, publication, you know, widespread

4    publication of anything about the disciplinary process.

5            Your Honor, as to the conflict point, the

6    rules say that appeals members are from the university

7    faculty, so it's not at all surprising that there would

8    be some level of contact between the students who were

9    involved in this process and university faculty members.

12:09PM    10            There's no indication in the rules that says

11    that faculty members will be disqualified from being

12    members of an appeal panel simply because they happen to

13    have had some discussions with the accused or the

14    accuser.

15            Your Honor, analogously, there are

16    situations where lawyers, for example, who practice

17    before the Court are put on panels.  They sometimes meet

18    with Judges.  Can an inference be drawn from the fact

19    that lawyers who appear before certain Judges in this

12:09PM    20    court are, you know, members of certain advisory panels?

21            I, for example, was on the First Circuit

22    Rules Advisory Panel consulting with Judges about rules.

23    Does that mean an inference can be drawn that I had a

24    discussion with a Judge about a particular case?  I

25    don't think so, your Honor, I don't think any plausible

1    inference like that can be drawn.

2            As to the deliberations argument that

3    Ms. Hamill makes, again, there is no such creature as a

4    deliberations panel.  It's an outcomes panel, which is

5    described in the language of *Rights and Responsibilities*

6    that deals with the so-called deliberations phase of the

7    case.

8            As to her point about FERPA, the Court will

9    note that the reference to FERPA in *Rights and*

12:10PM  10   *Responsibilities* appears at Section 17.4.  This is a

11   general statement about students' rights with regard

12   student records.

13           The next section of *Rights and*

14   *Responsibilities* is entitled "*The Student Conduct*

15   *Process*," which outlines what gets shown to people who

16   are accused of some type of student misconduct.

17           There's no -- in other words, there's no

18   reference in the very specific and detailed portions of

19   *Rights and Responsibilities* describing the student

12:11PM  20   conduct process to FERPA, and I believe that in *CSX*

21   *Transport, Inc. vs. ABC&D Recycling*, one of this Court's

22   opinions, the Court said in a case where there was a

23   similar claim that the contract, "The contract's

24   language must clearly communicate that the purpose of

25   the reference is to incorporate the referenced material

1   into the contract."

2         The contract we're talking about here, which

3   Ms. Hamill is complaining about certain breaches, is the

4   portion of the contract that is set forth in student

5   conduct process, which says nothing about FERPA.

6   Furthermore, as the Court knows, FERPA does not create

7   any kind of a private cause of action.

8         Finally, your Honor, with regard to the

9   issue about procedures which change over time, the SJC

12:12PM   10   said in the *Coveney* case is that universities are

11   entitled to modify their procedures in order to

12   discharge their educational responsibility.

13         It's very clear.  You know, each one of

14   these handbooks is labeled "Handbook 2011-2012,"

15   "2012-2013," et cetera, and, you know, what would the

16   university do in a situation whereas here, you have

17   allegations that spread over two or sometimes I suppose

18   conceivably could be even more academic years, the

19   university has to make a decision about which set of

12:13PM   20   rules it's going to apply, and what the university does

21   is very similar to what I suggest this Court would do in

22   the event that one of the Federal Rules of Civil

23   Procedure were changed during the course of a case, even

24   a case that's filed three, four, five, six, seven years

25   ago.

1              My understanding is the Court applies the

2      rule.  Substantive law may be different, there may be

3      issues about retroactivity, but when you're talking

4      about the procedure that the Court follows, I mean, for

5      example, take the expert disclosure rules, which if

6      memory serves me right, were radically changed in

7      December of I think it was 2013, it may have been 2012,

8      I can't recall which.

9              THE COURT:  I know we're both old enough,

12:13PM 10     Mr. Rose, to remember when there was no expert discovery

11     at all.

12              MR. ROSE:  Well, I'm of that age certainly,

13     your Honor, but my point is that the Court is certainly

14     familiar with the concept that when procedural rules

15     change, the Courts apply the procedural rules that are

16     in effect whenever the motion comes up, you know,

17     whenever the case is heard, whenever the case is tried.

18              THE COURT:  Although that asks then the

19     question is the burden of proof in your procedural rule

12:14PM 20     or not, should it be retroactive?  In other words, if

21     you've lowered the burden of proof, if Congress tomorrow

22     were to say the standard in criminal cases is no longer

23     proof but clear and convincing evidence, could that be

24     applied retroactively to crimes that occurred?  I don't

25     know the answer to that.

 1              MR. ROSE:  I don't know the answer, and

 2     there would be a further Supreme Court case as to

 3     whether or not -- that substantive change in the law, I

 4     would argue that's a substantive change as to the

 5     operative law.

 6              Here, as I understand the argument, your

 7     Honor, we're talking about a complaint about the

 8     procedure that was filed, whether it's going to be the

 9     special examiner process or the hearing board process

12:15PM  10     where there's cross-examination.

11              I don't hear any argument that the

12     definition of consent, the definition of harassment, the

13     definition of sexual assault, the definition of physical

14     harm is any different as between what happened in 2011

15     or the definition under the 2011 handbook and the 2013

16     handbook.  That's the point I'm simply trying to make.

17              If the Court has questions, I'm happy to try

18     to answer them.

19              THE COURT:  I'll let Ms. Hamill have the

12:15PM  20     last word if you want it.

21              MS. HAMILL:  Thank you, your Honor, and I

22     will be very brief.  I think Mr. Rose agreed you need to

23     be reviewing the record for fairness here and *Coveney*

24     and other decisions as well, and the issue of fairness

25     here is frankly if Brandeis took something on, and in

1  this case, they've established a procedure, they

2  certainly can't do it, they have to do it with due care,

3  they can't do it arbitrarily and capriciously, and they

4  certainly need to follow their own procedures, and they

5  did none of the above here, and we've aptly laid that

6  out in our amended complaint.  Thank you, your Honor.

7  THE COURT:  Thank you.  I'm going to take

8  the matter under advisement.  Thank you.  It was well

9  argued on both sides, as you can tell from my questions.

12:16PM  10  I don't view this as an easy set of issues by any means,

11  but thank you.

12  THE CLERK:  All rise.

13  (Whereupon, the hearing was adjourned at

14  12:16 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7           I do hereby certify that the foregoing

8    transcript, Pages 1 through 52 inclusive, was recorded

9    by me stenographically at the time and place aforesaid

10   in Civil Action No. 15-11557-FDS, JOHN DOE vs.

11   BRANDEIS UNIVERSITY and thereafter by me reduced to

12   typewriting and is a true and accurate record of the

13   proceedings.

14           Dated this October 19, 2015.

15

16                    s/s Valerie A. O'Hara

17                    _____

18                    VALERIE A. O'HARA

19                    OFFICIAL COURT REPORTER

20

21

22

23

24

25
```