# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **15-11557-FDS** |
| | ) | |
| **BRANDEIS UNIVERSITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____)

## MEMORANDUM AND ORDER ON
## <u>DEFENDANT'S MOTION TO DISMISS</u>

**SAYLOR, J.**

This is a civil action arising out of an investigation conducted by a university into alleged sexual misconduct.  Jurisdiction is based on diversity of citizenship.

Plaintiff "John Doe" was an undergraduate student at defendant Brandeis University.  For nearly two years, he and another male Brandeis student, "J.C.," were engaged in a romantic and sexual relationship.  After they broke up, J.C. alleged that John had engaged in sexual misconduct during the relationship.  The university conducted an investigation and concluded that John was guilty of sexual misconduct and, among other things, made such a notation in his permanent educational record.

John has brought suit against Brandeis, asserting causes of action for (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) estoppel and reliance; (4) negligence; (5) defamation; (6) invasion of privacy; (7) intentional infliction of emotional distress; and (8) negligent infliction of emotional distress.

Brandeis has moved to dismiss all of the claims against it.  For the following reasons, the

motion to dismiss will be granted in part and denied in part.

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| I. | | INTRODUCTION | 6 |
| II. | | FACTUAL BACKGROUND | 13 |
| | A. | The Relationship between John and J.C. | 13 |
| | B. | The Accusation against John | 15 |
| | C. | Changes to the Handbooks | 16 |
| | D. | The Process under the 2011-12 Handbook | 17 |
| | E. | The Process under the 2012-13 Handbook | 20 |
| | F. | The Process under the 2013-14 Handbook | 21 |
| | | 1.   The Statements Phase | 22 |
| | | 2.   The Fact-Finding Phase | 23 |
| | | 3.   The Discussion Phase | 25 |
| | | 4.   The Responsibility Findings Phase | 26 |
| | | 5.   The Deliberations Phase | 26 |
| | | 6.   The Outcome Notification Phase | 26 |
| | | 7.   The Appeal Phase | 26 |
| | | 8.   Access to Records | 27 |
| | G. | Sexual Misconduct Policies under the 2013-14 Handbook | 28 |
| | | 1.   Physical Harm (§ 2.1.d) | 28 |
| | | 2.   Invasion of Personal Privacy (§ 2.1.e) | 29 |
| | | 3.   Sexual Misconduct (§§ 3.1, 3.2, 3.3) | 29 |
| | | 4.   Sexual Harassment (§ 7.2) | 29 |
| | H. | The Special Examiner's Investigation | 30 |
| | I. | The Reading of the "Summary" | 31 |
| | J. | The Three-Person Panel and the Sanction | 32 |
| | K. | The Appeal | 33 |
| | L. | The Special Examiner's Report | 33 |
| | | 1.   Allegations Not Sustained by Special Examiner | 34 |

|  |  | a. | "Unwanted Touching While Walking" | 34 |
|  |  | b. | "Pornography Incident" | 35 |
|  |  | c. | "Text Messaging Incident" | 35 |
|  |  | d. | "Post-Movie Conduct" | 35 |
|  |  | e. | "Decision to Begin Dating" | 35 |
|  |  | f. | "Post-Shower Conduct" | 36 |
|  |  | g. | "Mandating that J.C. Sleep Naked" | 36 |
|  |  | h. | "Attempts to Have J.C. Perform Oral Sex" | 37 |
|  | 2. | Allegations Sustained by Special Examiner | | 37 |
|  |  | a. | "Movie Incident" | 37 |
|  |  | b. | "Bathroom Incident" | 38 |
|  |  | c. | "Sexual Conduct While Sleeping" | 38 |
|  |  | d. | "Performing Oral Sex on J.C." | 39 |
|  | 3. | The Special Examiner's Conclusions as to the End of the Relationship and J.C.'s Decision to Bring Charges | | 41 |
|  | 4. | The Special Examiner's Credibility Findings | | 41 |
|  | 5. | The Special Examiner's Conclusions | | 43 |
| M. | Subsequent Developments | | | 44 |
| N. | Recent Changes to the Process | | | 46 |

III. PROCEDURAL BACKGROUND .......................................................................... 46

IV. LEGAL STANDARD ........................................................................................... 46

V. ANALYSIS ........................................................................................................... 47

| A. | Breach of Contract | | | 47 |
|  | 1. | "Reasonable Expectation" of the Student | | 48 |
|  |  | a. | Elimination of the "Statements Phase" | 48 |
|  |  | b. | Elimination of the "Deliberations Phase" | 49 |
|  |  | c. | Breach of Express Representation as to Conflicts of Interest on Appeals Board | 52 |
|  |  | d. | Failure to Use the Hearing Process as Described in the 2011-12 Handbook | 53 |

e.      Failure to Use the Hearing Process as to Charges
        of Physical Harm and Invasion of Privacy ......................... 55

f.      Failure to Provide a Copy of the Special Examiner's
        Report ................................................................... 56

g.      Failure to Maintain Confidentiality of Educational
        Record .................................................................. 57

h.      Arbitrary and Capricious Findings ...................................... 59

2.      "Basic Fairness" .................................................................. 60

a.      Procedural Fairness ............................................................ 63

        (1)     No Right to Notice of Charges ................................ 64

        (2)     No Right to Counsel ................................................ 65

        (3)     No Right to Confront Accuser ................................ 66

        (4)     No Right to Cross-Examine Witnesses ................... 67

        (5)     No Right to Examine Evidence or
                Witness Statements ................................................. 67

        (6)     Impairment of Right to Call Witnesses
                and Present Evidence................................................ 68

        (7)     No Access to Special Examiner's Report .............. 69

        (8)     No Separation of Investigatory, Prosecution,
                and Adjudication Functions ..................................... 69

        (9)     No Right to Effective Appeal ................................. 70

        (10)    Burden of Proof ...................................................... 70

        (11)    Conclusion .............................................................. 71

b.      Substantive Fairness ..................................................……... 72

        (1)     The Significance of the Delay in Reporting ........... 73

        (2)     The Significance of the Relationship ...................... 75

        (3)     The Significance of J.C.'s Abuse of Alcohol .......... 77

        (4)     Conclusion .............................................................. 78

3.      Summary of Breach of Contract Claims .......................................... 78

B.      Breach of the Implied Covenant of Good Faith and Fair Dealing .............. 78

C.      Estoppel and Reliance ................................................................... 80

| | | | |
|---|---|---|---|
| D. | | Negligence ............................................................................................. | 81 |
| | 1. | Negligent Retention and Supervision .............................................. | 81 |
| | 2. | Negligent Failure to Prevent Conflict of Interest ............................ | 83 |
| | 3. | Breach of Duty to Maintain Confidentiality of Educational Record........................................................................... | 84 |
| E. | | Defamation ............................................................................................. | 84 |
| | 1. | Defamation Generally ..................................................................... | 84 |
| | 2. | Aiding and Abetting Defamation ..................................................... | 86 |
| F. | | Invasion of Privacy ................................................................................ | 87 |
| G. | | Intentional Infliction of Emotional Distress................................................. | 87 |
| H. | | Negligent Infliction of Emotional Distress ................................................ | 89 |
| VI. | CONCLUSION | ....................................................................................................... | 89 |

I.     **Introduction**

This matter arises from a Brandeis University disciplinary proceeding against plaintiff "John Doe" concerning alleged sexual misconduct.  The lawsuit is at a preliminary stage.  At this point of the proceeding, the issue for the Court is not whether John actually engaged in any form of sexual misconduct; indeed, the Court is in no position to make such a factual determination.  The Court is simply deciding whether John's claims against Brandeis are sufficiently plausible to survive a motion to dismiss.  However, the parties appear to agree on a wide range of facts, including the nature of the procedures employed by Brandeis, the manner in which Brandeis reached its decision, and at least the basic parameters of the relationship between John and J.C., his former boyfriend.

John Doe and J.C. entered Brandeis University as freshmen in the fall of 2011.  Both were then approximately 18 years old.  In September, they began to have sexual relations.  By October, they considered each other boyfriends, and for the next 21 months they were in a romantic and sexual relationship.  Their friends believed that they were "happy" and "comfortable" together.

In the summer of 2013, between their sophomore and junior years, J.C. broke up with John.  The two remained friends for about four months, but over time their relationship began to deteriorate.  At some point, J.C. began to abuse alcohol.  He also attended two sessions of university-sponsored "sexual assault training," which began (in his words) to change his "thinking" about his relationship with John.

Eventually, in January 2014—two years and four months after they began dating—J.C. filed a complaint of sexual assault against John with Brandeis.  That complaint was two sentences long.  In its entirety, it read as follows:

> Starting in the month of September, 2011, the Alleged violator of Policy [John] had numerous inappropriate, nonconsensual sexual interactions with me. These interactions continued to occur until around May 2013.

Like most universities, Brandeis has a process for addressing claims of student misconduct. In 2011, when J.C. and John began at Brandeis, that process involved a variety of steps, including a hearing before a panel of students and administrators to determine whether the misconduct occurred and to recommend a sanction to the university. Among other things, that process involved what Brandeis termed a student's "rights to fairness," such as the right to call witnesses and the right to question one's accuser.

After 2011, however, Brandeis changed its procedures for cases involving alleged sexual misconduct. It retained its normal processes, including the "rights to fairness," for handling matters such as student theft, vandalism, physical violence, hazing, and academic dishonesty. As to sexual misconduct cases, however, Brandeis removed a variety of protections for accused students.

By 2014, Brandeis's policy in sexual misconduct cases had eliminated a hearing of any kind. Instead, it had instituted a procedure under which a "Special Examiner" was appointed to conduct an investigation and decide the "responsibility" of the accused. That procedure was essentially a secret and inquisitorial process. Among other things, under the new procedure,

- the accused was not entitled to know the details of the charges;

- the accused was not entitled to see the evidence;

- the accused was not entitled to counsel;

- the accused was not entitled to confront and cross-examine the accuser;

- the accused was not entitled to cross-examine any other witnesses;

- the Special Examiner prepared a detailed report, which the accused was not

permitted to see until the entire process had concluded; and

- the Special Examiner's decision as to the "responsibility" (that is, guilt) of the accused was essentially final, with limited appellate review—among other things, the decision could not be overturned on the ground that it was incorrect, unfair, arbitrary, or unsupported by the evidence.

The filing of the complaint by J.C. triggered a "Special Examiner" process at Brandeis. As John eventually learned, J.C. had made twelve sets of allegations against him. The Special Examiner found John "responsible" for four of the twelve claims. None involved claims of rape or other violent sexual assault, or anything like it. Instead, John was found to have committed sexual misconduct in the following ways:

First, at the very beginning of their relationship, John placed J.C.'s hand on John's (clothed) groin while they were watching a movie in a dormitory room. J.C. now contends that the sexual contact was unwanted. John denies that the contact was non-consensual, and contends that it was simply the first step in their sexual relationship. Among other things, he notes that the two of them had sexual relations for the first time the very next day, and that they continued to have such relations for most of the next two years. He also contends that J.C. afterward recounted the episode in a humorous manner to friends, although the university would not accept his evidence of that fact.

Second, John and J.C. frequently slept together in the same bed during their relationship. According to J.C., John would occasionally wake him up by kissing him, and sometimes persisted when J.C. wanted to go back to sleep.

Third, during the relationship, the two used a communal bathroom in the dormitory, including a communal shower. According to J.C., John would look at his private areas when

they were showering together.

Fourth, in May 2013, after they had been dating for about a year and a half, J.C. and John visited J.C.'s father's house in North Adams, Massachusetts.  During the trip, J.C. contends that John attempted to perform oral sex on him when he did not want it.  The two got in a fight, and John wound up leaving the bed and lying on the floor.  The two then made up, and J.C. apologized to John.

The Special Examiner concluded, based on those incidents, that John had engaged in sexual misconduct, sexual harassment, and invasion of privacy in violation of Brandeis policies.  She also concluded that he had committed "violence" against J.C., based on a definition of "sexual violence" that encompassed virtually any form of unwanted sexual activity.  Among other things, the Special Examiner based her findings on the following assumptions:

- that the long delay in reporting the alleged misconduct, and the failure to make any contemporaneous complaint, had no bearing at all on J.C.'s credibility;

- that the existence of a 21-month-long relationship was irrelevant to any of the issues in the case, including the issue of consent;

- that John's kissing of J.C. while he was asleep constituted sexual misconduct, because a person who is sleeping is incapacitated and therefore not capable of giving express consent; and

- that J.C.'s abuse of alcohol after the relationship ended bolstered his credibility, on the ground that victims of sexual assault may abuse substances as a consequence of the assault.

As a result of the Special Examiner Process, John received a "Disciplinary Warning" from the university.  That sanction, among other things, carries with it a permanent notation on

the student's educational record; according to the complaint, John's record will forever state that

he committed "serious sexual transgressions," without any explanation of the actual conduct

involved.  In the words of the complaint, John has been "effectively labeled" as a "predatory

sexual offender," which is a "lifetime liability" for admission to graduate school or obtaining

employment.  (Am. Compl. ¶¶ 24-25).  The complaint also alleges that Brandeis did not keep the

process confidential, and that J.C. and other students have referred to John as an "attacker" and a

"rapist" in social media postings and in comments to national and local media.

Again, at this point of the proceeding, the Court is not deciding whether John actually

engaged in any form of sexual misconduct.  But the parties agree on many of the critical facts,

including the process Brandeis used to resolve the matter and the contents of the Special

Examiner's Report.  And even the agreed-upon facts are sufficient to raise serious and

substantial concerns as to whether John was treated fairly.

Brandeis, of course, is not a governmental entity, or even a public university.  It is not

bound by the requirements of the Sixth Amendment, such as an accused's right to be informed of

the nature of the charges, the right to counsel, or the right to confront and cross-examine one's

accuser.  Its proceeding was not a criminal prosecution; the university had no power to

incarcerate John or deprive him of his property.  And it is not generally the role of the federal

courts to tell a private university how to conduct its affairs.

Nonetheless, Brandeis's authority to discipline its students is not entirely without limits.

Although the relationship between the university and its students is essentially contractual, the

university's disciplinary actions may also be reviewed by the courts to determine whether it

provided "basic fairness" to the student.  While that concept is not well-defined, and no doubt

varies with the magnitude of the interests at stake, it is nonetheless clear that the university must

provide its students with some minimum level of fair play.

When considering the issues presented in this case, it is impossible to ignore entirely the full context in which they arose.  In recent years, universities across the United States have adopted procedural and substantive policies intended to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response.  That process has been substantially spurred by the Office for Civil Rights of the Department of Education, which issued a "Dear Colleague" letter in 2011 demanding that universities do so or face a loss of federal funding.  *See* Russlynn Ali, Office for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter:  Sexual Violence (Apr. 4, 2011), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf ("Dear Colleague Letter").  The goal of reducing sexual assault, and providing appropriate discipline for offenders, is certainly laudable.  Whether the elimination of basic procedural protections—and the substantially increased risk that innocent students will be punished—is a fair price to achieve that goal is another question altogether.

Because the changes to the process were impelled in large part by the federal government, the issues presented here are not entirely unique, and not confined to a single campus.  *See Doe v. Brown Univ.*, 2016 WL 715794, at *1 (D.R.I. Feb. 22, 2016); Jacob E. Gersen & Jeannie Suk, *The Sex Bureaucracy*, 104 Cal. L. Rev. (forthcoming) at 15-16.  For example, in July 2014, Harvard University adopted a new university-wide policy on sexual harassment and sexual violence that appears to have substantial similarities to the Brandeis policy at issue here.  *See Rethink Harvard's Sexual Harassment Policy*, Boston Globe (Oct. 15, 2014), https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html.  In response, 28 members of the Harvard

Law School faculty issued a statement voicing their "strong objections" to the policy. *Id.*
Among other things, the statement concluded that "Harvard has adopted procedures for deciding
cases of alleged sexual misconduct which lack the most basic elements of fairness and due
process, are overwhelmingly stacked against the accused, and are in no way required by Title IX
law or regulation." *Id.* It called upon Harvard to "begin the challenging project of carefully
thinking through what substantive and procedural rules would best balance the complex issues
involved in addressing sexual conduct and misconduct in our community." *Id.*

> The goal must not be simply to go as far as possible in the direction of preventing
> anything that some might characterize as sexual harassment. The goal must
> instead be to fully address sexual harassment while at the same time protecting
> students against unfair and inappropriate discipline, honoring individual
> relationship autonomy, and maintaining the values of academic freedom.

*Id.*

Like Harvard, Brandeis appears to have substantially impaired, if not eliminated, an
accused student's right to a fair and impartial process. And it is not enough simply to say that
such changes are appropriate because victims of sexual assault have not always achieved justice
in the past. Whether someone is a "victim" is a conclusion to be reached at the end of a fair
process, not an assumption to be made at the beginning. Each case must be decided on its own
merits, according to its own facts. If a college student is to be marked for life as a sexual
predator, it is reasonable to require that he be provided a fair opportunity to defend himself and
an impartial arbiter to make that decision.

Put simply, a fair determination of the facts requires a fair process, not tilted to favor a
particular outcome, and a fair and neutral fact-finder, not predisposed to reach a particular
conclusion. The principal question for the Court is whether the complaint plausibly alleges that
Brandeis denied John the "basic fairness" to which he was entitled. For the reasons set forth

below, the Court concludes that it does.

## II.     Factual Background

The facts are set forth as alleged in the amended complaint and in documents submitted

as exhibits to the amended complaint.  In addition, the Court has also taken certain facts from

documents submitted whose authenticity is not disputed and that are central to plaintiff's claim.

*See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) (explaining that documents whose

authenticity is "not disputed by the parties" and "documents sufficiently referred to in the

complaint," among other categories, may be considered on a motion to dismiss).[1]

### A.     The Relationship between John and J.C.

Brandeis University is a private university located in Waltham, Massachusetts.  (Am.

Compl. ¶ 37).  It is named for Louis D. Brandeis, a former Associate Justice of the United States

Supreme Court and one of the most distinguished judges in the history of the United States.  (*See

id.*).

Plaintiff "John Doe" and "J.C." met in August 2011 on the first day of orientation before

their freshman year at Brandeis.  (*Id.* ¶¶ 2, 43).  At the time, John was 17 years old; J.C. was 18.

(*Id.* ¶ 43).

The complaint alleges that John was "unsure of his sexual orientation, and had never

engaged in sexual activity with another man."  (*Id.*).  J.C. was "openly gay and sexually

---

[1] On a motion to dismiss, the court may properly take into account four types of documents outside the complaint without converting the motion into one for summary judgment:  (1) documents of undisputed authenticity; (2) documents that are official public records; (3) documents that are central to plaintiff's claim; and (4) documents that are sufficiently referred to in the complaint.  *Watterson*, 987 F.2d at 3; *see also Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 879 n.3 (1st Cir. 1991) (considering securities-offering documents submitted by defendants with motion to dismiss for claim of securities fraud); *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1014-15 (1st Cir. 1988) (considering allegedly libelous article submitted by defendants with motion to dismiss).  Here, the parties have submitted a variety of undisputed documents that are central to plaintiff's claims and specifically referred to in the complaint, including, among other things, the principal Brandeis policies at issue and the Special Examiner's Report.

experienced"; John was neither.  (*Id.*).  The two quickly became "close friends"; J.C. "knew that John was attracted to him, and they began to flirt with each other."  (*Id.* ¶ 44).

John and J.C. began having sexual relations in mid-September 2011.  (*Id.* ¶¶ 45-47).  "In October 2011, John 'came out of the closet' to his parents, and he and J.C. revealed to their Brandeis friends that they were boyfriends."  (*Id.* ¶ 46).

For a period of 21 months, between September 2011 and July 2013, John and J.C. were in an "intimate, sexually active, and . . . exclusive dating relationship."  (*Id.* ¶ 47).  The period in question, in substance, included their entire freshman and sophomore years.

During that entire time, J.C. never complained to John, their friends, their relatives, any Brandeis administrator, any member of campus police, or any member of the law enforcement community about John's conduct.  (*Id.* ¶¶ 10, 51).  Specifically, J.C. never complained that John had performed any sexual act without his consent, had invaded his privacy, had sexually harassed him, or had caused him physical harm.  (*Id.*).

In July 2013, J.C. broke up with John.  (*Id.* ¶ 55).  J.C. did so because he "felt they had lost a connection" and because "John was not strong-willed enough"; he wanted a "more forceful" partner who would "stand up to him more."  (*Id.*).

After the relationship ended, the two remained cordial for a period of about four months.  (*Id.* ¶ 56).  They had dinner with friends, worked together on campus projects, and exchanged friendly e-mail messages.  (*Id.*).

Near the end of 2013, however, their friendship deteriorated.  (*Id.* ¶ 57).  John was "put off because J.C. . . . had started drinking alcohol to excess, which John perceived as hypocritical

given J.C.'s insistence during the [r]elationship that John not drink alcohol." (*Id.*).[2]

**B.      The Accusation against John**

In January 2014, J.C. "observed that a gay male student seemed to be attracted to John." (*Id.* ¶ 58). J.C. was also attracted to the student, and John believed that J.C. was jealous of his interest in the other man. (*Id.* ¶¶ 58, 127). On January 13, 2014, J.C. sent the student a Facebook "friend request," which the student declined. (*Id.* ¶ 58).

The next day, January 14, 2014—more than six months after their relationship ended, and approximately 28 months after their first sexual contact—J.C. accused John for the first time of sexual misconduct. (*Id.* ¶ 59). He did so by filing a formal complaint, called a "community standards report" ("CSR"), with Brandeis. (*See id.*).

That CSR, in its entirety, stated as follows: "Starting in the month of September 2011, the Alleged Violator of Policy [John] had numerous inappropriate, nonconsensual sexual interactions with me. These interactions continued to occur until around May 2013." (*Id.*).

According to the complaint, on the same day the report was filed, Brandeis's Dean of Students, Jamele Adams, took "punitive action" against John "without giving [him] an opportunity to explain his side of the story." (*Id.* ¶ 60). Adams banned John from his residence, classes, paid campus job, community advisor position, and "high-ranking student-elected position on a University Board," and "sequestered him in a campus facility." (*Id.*). Adams did so based only on the two-sentence allegation contained in J.C.'s report. He had "no knowledge of any facts" underlying the allegation, and "had no information remotely suggesting John was a danger to J.C. or the Brandeis community." (*Id.*).

---

[2] According to the Special Examiner's Report, during this period J.C. underwent two sessions of "sexual assault training," which began, in his words, to change his "thinking" about his relationship with John. (Def. Mem. Ex. B, Special Examiner's Report at 13).

Two days later, on January 16, 2014, Brandeis notified John that J.C.'s accusations raised six potential violations of Brandeis's "Rights and Responsibilities" booklet:  (1) sexual misconduct; (2) taking sexual advantage of incapacitation; (3) lack of consent to sexual activity; (4) sexual harassment; (5) causing physical harm to another; and (6) invasion of privacy.  (*Id.* ¶ 61).  Brandeis did not further elaborate or "inform John of any of the alleged acts that formed those claims."  (*Id.*).  Brandeis also notified John that his case would be handled through its new "Special Examiner's Process."  (*Id.* ¶ 62).

### C.    Changes to the Handbooks

When John entered Brandeis as a freshman in August 2011, the university's method of handling claims of student misconduct was through a process called the Student Conduct Hearing Process.  That process was set forth in detail in the 2011-12 edition of the "Rights and Responsibilities" Handbook (the "2011-12 Handbook"), which functions as Brandeis's student handbook.  (Am. Compl. Ex. A, 2011-12 Handbook §§ 18.0-23).[3]  John acknowledges that he agreed to be bound by the rules and regulations contained in the 2011-12 Handbook as a condition of his enrollment.  (Am. Compl. at ¶ 169).

As set forth below, the process set forth in the Handbook for claims of sexual misconduct changed each year that John was at Brandeis.  It appears that many of the changes were implemented as a result of a "Dear Colleague" letter issued in April 2011 by the United States Department of Education, Office for Civil Rights, that purported to interpret Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulations, 34

---

[3] For ease of reference, the Court will refer to each edition of the "Rights and Responsibilities" booklet simply as the Brandeis student handbook for that academic year.

C.F.R. Part 106.  *See* Dear Colleague Letter.[4]

According to the complaint, because the alleged incidents occurred during the 2011-12

and 2012-13 academic years, the procedures set forth in those Handbooks should have been used

in the course of the investigation.  (Am. Compl. ¶ 69).  Instead, Brandeis applied the 2013-14

Handbook to govern the procedures to be used in the Special Examiner Process, ostensibly

because J.C. filed the charges in the 2013-14 academic year.  (*Id.*).

Because the central claim of the complaint is for breach of contract, and because the

student handbooks comprising the contract changed each year, a detailed examination of each

handbook is warranted.

### D.   The Process under the 2011-12 Handbook

Both John and J.C. entered Brandeis as freshmen in the fall of 2011.  In the 2011-12

Handbook, a student accused of serious misconduct was given the right, among other things, to

be informed of the charges against him in detail:

> In cases where [the University] decides that there is evidence of a violation that
> warrants referral to the conduct system the accused student will be contacted to
> schedule a preliminary meeting with the appropriate administrator . . . .  This
> meeting will serve to inform the student of the details of the charges and educate
> the student about the conduct system.  The student will have the opportunity to
> ask questions and make statements.  After this preliminary meeting the student
> will receive written charges.

(2011-12 Handbook § 19.1).[5]

Under the 2011-12 Handbook, a student accused of misconduct had a right to request a

hearing before a Student Conduct Board.  (*Id.* § 19.1).  The Student Conduct Board consisted of

---

[4] Brandeis does not, however, defend its procedures or conduct on the ground that they were required by federal law.  Indeed, Brandeis refers to Title IX only in passing, and only mentions the April 2011 "Dear Colleague Letter" in a footnote.  (Def. Mem. 25 n.6).

[5] In addition, if the matter proceeded to a hearing, the university's hearing administrator had to "be available prior to the hearing at the request of the accused student to provide information regarding the alleged violation . . . ."  (2011-12 Student Handbook § 19.6).

two students and two faculty members for academic violations, and three students and one faculty member for all other violations.  (*Id.* § 20.2).

Both the accused and the accuser were required to be present at the hearing.  (*Id.* § 19.9). The accused and the accuser had "the right to view and question all evidence and reports presented" during the hearing.  (*Id.* § 19.11).  They also both had the right "to question all witnesses appearing" at the hearing.  (*Id.*).

Unless "coexisting criminal charges" were pending against the accused, neither party was permitted "to employ professional legal counsel or other persons from outside the University community to present the case before the Board or to advise the student during the hearing."  (*Id.* § 19.8).  Both parties were, however, permitted to bring "an advisor of his or her choice from the University community to provide passive assistance during the hearing."  (*Id.*).

At the hearing, the chairperson was required to give a "statement of the student's rights to fairness under this process."  (*Id.* § 23).  Among the "rights to fairness" provided to the accused were as follows:

1.  To bring one adviser of the accused/accuser's choice from the University community to provide passive assistance during the hearing (the adviser may not serve as a witness)

2.  To present witnesses on their own behalf

3.  To question witnesses appearing against them

4.  To submit verbal arguments

5.  To remain silent and not testify against themselves. The accused/accuser should remember that if they remain silent, the Board is compelled to hear the case and render a decision based upon the evidence presented.

(*Id.*).

Both the accuser and the accused had the right to re-question each other after the other

witnesses had testified.  (*Id.*).  Board members were also permitted to question the parties and all

witnesses.  (*Id.*).

A footnote to the 2011-12 version of the Handbook stated as follows:

Hearing procedures may differ in cases involving allegations of sexual
misconduct, sexual harassment or sexual discrimination in accordance with
Title IX.

(*Id.* § 23.0 at 30 n.1).  The Handbook did not, however, indicate how those procedures might

"differ."  Among other things, the footnote does not indicate that the accused would not be

entitled to know the specific charges against him, to see and hear the evidence, or to confront and

cross-examine his accuser.

At the conclusion of the hearing, the Board was required to make one of three choices:  to

make a finding of "not responsible"; to make a finding of "responsible," with a recommendation

of a sanction; or to continue the case "to obtain additional information or for further

consideration."  (*Id.* § 19.13).

The 2011-12 Handbook further provided that "[i]n cases where the accused student

denies responsibility, the burden of proof shall rest upon the accuser."  (*Id.* § 19.12).  The

accuser was required to prove his or her allegations by "clear and convincing evidence."  (*See id.*

§ 19.13).  However, a "note" to the Handbook provided as follows:  "In hearings that involve

allegations of sexual misconduct, sexual harassment or sex discrimination . . . the standard of

evaluation shall be preponderance of the evidence, instead of clear and convincing evidence."

(*Id.* § 19.13).

The hearing administrator of the Student Conduct Board was required to prepare a

Hearing Report summarizing the evidence and its decision.  (*Id.* § 19.14).

The 2011-12 Handbook also provided for an appeal by the accused and (in sexual

misconduct cases only) by the accuser. (*Id.* § 19.16). Written appeals were considered by a University Appeals Board ("UAB") consisting of three voting members (one student and two faculty) and a tenured-faculty chairperson. (*Id.* §§ 20.7-8). The UAB had the authority to uphold the original finding, find the accused not responsible, or increase or decrease the sanction. (*Id.* § 19.16). No sanctions would take effect "until approved or modified by the Dean of Student Life (or designee) or the Director of Student Rights and Community Standards." (*Id.*). Appeals, however, were limited to certain narrow issues. (*Id.*).

### E.    The Process under the 2012-13 Handbook

Beginning in 2012-13, the university replaced the Hearing Process in some circumstances with a Special Examiner Process. (Am. Compl. ¶ 68). It did so, however, only for allegations involving sexual misconduct or discrimination (including sexual harassment and sex discrimination). (*Id.*; Am. Compl. Ex. B, 2012-13 Student Handbook § 22.6). All other matters involving alleged student misconduct remained subject to the Hearing Process. (*Id.* § 19).

The 2012-13 Special Examiner Process differed from the Hearing Process significantly.[6] It did not provide for a "hearing" in any sense of the word. Instead, the university would appoint a Special Examiner, who would investigate the claims and make a recommendation to the Dean of Student Life. The accused was given an opportunity to meet (separately) with the Special Examiner during the investigation and to submit his own evidence, but was provided little else in terms of procedural protection.

There was no requirement in the 2012-13 Handbook that the accused be informed of the "details of the charges." (*Compare* 2011-12 Handbook § 19.1). Instead, after receipt of a

---

[6] For the sake of simplicity, only a summary of some of the more significant changes is provided as to the 2012-13 Handbook.

complaint—titled a Community Standards Report ("CSR")—the Special Examiner would "meet in-person with the Accuser" and simply "request" that the accuser "compose in writing a thorough statement of the allegation(s) if the contents of the initial report do not represent a full account" of the events giving rise to the report.  (2012-13 Handbook § 22.6).  If such a statement were provided, it would eventually be shown to the accused, although not until after the accused had prepared a response to the allegations.  (*Id.*).

There was no requirement that copies of any "substantiating materials" submitted by the accuser, or the names of any witnesses, be shown or provided to the accused at any time.  The Special Examiner chose which, if any, witnesses to interview; what questions to ask of everyone interviewed; and what information, if any, the accused received during the process.  The accused was no longer informed of his or her "rights to fairness."  The accused had no right to confront or cross-examine the accuser, no right to call witnesses, and no right to confront or cross-examine the accuser's witnesses.  The accused had no right to review all of the evidence.  And the Special Examiner was required to use the "preponderance of the evidence" standard, rather than the "clear and convincing evidence" standard, "in evaluating the responsibility of the Accused."  (*Id.* § 22.6 at 36).

The Dean of Student Life, rather than the Special Examiner, rendered the final decision.  (*Id.* at 39).  The Dean might either find that the accused was responsible, and impose accompanying disciplinary sanctions, or that the accused was not responsible.  (*Id.*).  And the accused's right of appeal remained highly circumscribed.  (*See id.*).

F.      **The Process under the 2013-14 Handbook**

As noted, the procedures set forth in the 2013-14 Handbook were used to resolve John's matter.  The 2013-14 Handbook retained the Special Examiner Process for sexual misconduct

cases, but with significant revisions to the process as it was originally described in the 2012-13 Handbook, and with even fewer protections for the accused.  The revised Special Examiner Process consisted of seven "phases":  Statements, Fact-Finding, Discussion, Responsibility Findings, Deliberations, Outcome Notification, and Appeal.  (Am. Compl. Ex. C, 2013-14 Handbook § 22.6 at 43-47).

Among other changes, the Special Examiner would no longer "request" that the accuser provide a "thorough statement" or "full account" of the charges; instead, under the new procedures, an administrator would merely "suggest" that such a statement be submitted.  (*Id.* at 43).  Furthermore, the requirement that the accused would be shown any such statement was eliminated.  Under the new process, the Special Examiner was made the sole decision-maker as to "responsibility" (that is, guilt).  The "outcome" (that is, the penalty) would be recommended by a special panel of three university administrators, with the final decision to be made by an administrator.  Appeals were still narrowly circumscribed; furthermore, under the new process, no students were permitted to sit on the appeals board.

Because Brandeis employed the procedures in the 2013-14 Handbook to resolve the allegations against John, the Court will examine those procedures in some detail.

### 1.     The Statements Phase

The first phase of the 2013-14 Special Examiner Process was the "Statements Phase," in which the school would collect statements and information from both the accuser and the accused.  (*Id.* § 22.6 at 43-44).  After receipt of a CSR, the Director of the Department of Student Rights and Community Standards—not the Special Examiner—would "meet in-person with the accuser."  (*Id.*).  Instead of "request[ing]" that the accuser "compose in writing a thorough statement of the allegation(s) if the contents of the initial report do not represent a full account"

of the events giving rise to the report, the 2013-14 Handbook stated that the Director should "suggest" that the accuser do so.  (*Id.*).  "In addition to this statement, any other substantiating materials, such as e-mail, text messages, photographs, records, names of witnesses, names, etcetera, should be submitted [by the accuser] to the Director . . . ."  (*Id.*).

The Director would then contact the accused by e-mail and inform him that a CSR has been filed against him.  (*Id.*).  The Director would not, however, provide a copy of the CSR to the accused.  Within two business days, the accused would have an opportunity to "meet in person" with the Director.  The Director would "show" the accused the CSR and "suggest" that he or she "compose in writing a thorough response to the allegations" and submit documents and names of witnesses for consideration by the Special Examiner in the investigation.  (*Id.*).  The accused at that point was permitted to submit "any other substantiating materials, such as e-mail, text messages, photographs, records, names of witnesses, names, etcetera."  (*Id.*).

There was no requirement that the accuser actually provide a "thorough statement" or "full account" of the alleged offenses.  Even assuming that the accuser provided such a statement or account to the university, the accused had no right to see it.  Indeed, the accused was required to provide his or her own detailed response without an opportunity to see or know the details of the accusation.  There was likewise no requirement that copies of any "substantiating materials" submitted by the accuser, or the names of any witnesses, be provided to the accused at any time.

## 2.    The Fact-Finding Phase

The Fact-Finding Phase marked the initial appearance of the Special Examiner in the process.  The Special Examiner alone investigated the allegations.  (*Id.* § 22.6 at 44).  That same person was given complete authority to decide whether the accused was "responsible" for the alleged violations; in other words, the Special Examiner was simultaneously the investigator, the

prosecutor, and the judge who determined guilt.[7]

The Special Examiner was required to conduct interviews with the accuser and the accused "separately and in-person."  (*Id.* § 22.6 at 45).[8]  The Special Examiner could interview witnesses identified by the parties, "as well as those identified by the Special Examiner."  (*Id.*).  The Special Examiner could also consider documents and other physical evidence.  (*Id.*).  Those documents and physical evidence "deemed by the Special Examiner to be of material importance to the Deliberations Phase [would] be logged and shared equally with the parties to ensure the opportunity for response."  (*Id.*).

Again, the Special Examiner chose which, if any, witnesses to interview; what questions to ask of anyone interviewed; and what information the accused received during the process.  The accused had no right or opportunity to confront his accuser, or to cross-examine the accuser in any way.  The accused likewise had no right or opportunity to confront or cross-examine the witnesses against him.  And the accused had no right to examine or obtain copies of witness statements or any "substantiating materials."

There was no right to counsel under the 2013-14 Handbook.[9]  As before, the 2013-14 Handbook instructed the Special Examiner to use the "preponderance of the evidence" standard

---

[7] Furthermore, and as noted below, the ability of the accused to appeal or overturn that decision remained highly circumscribed.

[8] During the interviews with the accuser and the accused, the Special Examiner would "be joined at all times by an Observer, whose role is passive, with the exception of providing supplemental description of details regarding procedures and University services."  (2013-14 Handbook § 22.6 at 45).  In addition, the accuser and the accused were "entitled (though not required) to be joined by their Advisor, if one has been selected."  (*Id.*).  Advisors could be any current member of the Brandeis community, including students, faculty, administrators, and staff.  (*Id.* § 19.6.d).

[9] In the 2011-12 and 2012-13 Handbooks, there was no right to counsel, even to provide advice, unless criminal charges were pending.  (2011-12 Handbook § 19.8; 2012-13 Handbook § 19.8).  The 2013-14 Handbook continued that policy in cases not involving sexual misconduct.  (2013-14 Handbook § 19.6.d).  The section concerning the Special Examiner's Process did not specifically address the issue; both parties, however, appear to agree that there was no right to counsel under that process.

"in evaluating the responsibility of the Accused."  (*Id.* § 22.0 at 43).

After completing the investigation, the Special Examiner was required to prepare a Report.  (*Id.* § 22.6 at 45).  The Special Examiner's Report would "summarize[] undisputed and disputed facts [and] offer[] conclusions about the credibility of testimony."  (*Id.*).  The Special Examiner also made "a finding about whether the Accused is responsible for any or all charges." (*Id.*).  The Report was submitted to the Senior Student Affairs Officer or his or her designee (the "SSAO") "in support of the Responsibility Findings and/or Deliberations Phase of the process." (*Id.* § 22.6 at 42).

A copy of that Report was not provided to the accused at any point in the investigation, even to permit the accused to prepare an appeal.

### 3.    The Discussion Phase

Under the 2013-14 Handbook, the SSAO "conduct[ed] the Discussion Phase conversations with the parties and communicate[d] findings to the parties made by the Special Examiner."  (*Id.* § 22.6 at 43).

During the Discussion Phase, the accuser and the accused were provided separate opportunities to meet with the SSAO "to hear and respond to the findings made by the Special Examiner" and "to offer rebuttal or new information to the [SSAO] based on the findings."  (*Id.* § 22.6 at 45).  The accuser and the accused, in separate meetings, would "listen to the [SSAO's] summary of findings and engage in dialog with the [SSAO] about these findings."  (*Id.* § 22.6 at 46).  Each party had two business days within which to provide "new, pertinent information or names of witnesses for the [SSAO's] consideration."  (*Id.*).  If after the meetings and after submission of new information or witness names, the SSAO sought "additional fact-finding," the SSAO would request the Special Examiner "to make any and all necessary inquiries."  (*Id.*).

### 4.      **The Responsibility Findings Phase**

In the Responsibility Findings Phase, if the accused was found "not responsible," the

SSAO would contact the parties; if he was found "responsible," the process would move to the

Deliberations Phase.  (*Id.*).

### 5.      **The Deliberations Phase**

In the Deliberations Phase, a panel of three University administrators or faculty members,

appointed by the SSAO, would "receive the Special Examiner's report and make

recommendations as to the outcome(s) for the Accused."  (*Id.* § 22.6 at 46).

> The panel will consult the Special Examiner's report and will be entitled to
> interview the Special Examiner.  The panel will not interview the parties,
> witnesses, or other experts or individuals.  Upon voting, the panel will
> communicate its recommendations about the outcome(s) for the Accused to the
> [SSAO].

(*Id.*).  Again, the three-person panel could review the Report, but the accused could not.  The

SSAO would then "render the final decision as to any outcomes."  (*Id.*).  However, the Special

Examiner's verdict was final; there was nothing in the policy that permitted either the panel or

the SSAO to reverse or modify a finding that the accused was "responsible."

### 6.      **The Outcome Notification Phase**

In the Outcome Notification Phase, the SSAO would communicate the final decision to

the accused and the accuser.  (*Id.*).  Any sanction would take effect immediately, regardless of

any appeal.  (*Id.*).

### 7.      **The Appeal Phase**

In the Appeal Phase, both the accused and the accuser were "entitled to appeal the final

decision by the panel in the Special Examiner's Process" to the UAB.  (*Id.*).  (As noted, the panel

actually made no "final decision" of any kind, but only a recommendation to the SSAO.)  Unlike

26

in the 2012-13 incarnation of the Handbook or the normal appeal process for non-sexual misconduct cases, only faculty members, and not students, could serve as UAB members in appeals of Special Examiner matters.  (*Id.*).

As before—and despite the consolidation of the powers of investigation, prosecution, and adjudication in the Special Examiner—the accused's right of appeal was narrowly limited. Appeals could not be based upon "dissatisfaction with an imposed sanction," but "based only on specific evidence, presented in writing" of claims of "fraud," "denial of rights under this process," "procedural error," or "the claim of new evidence not previously available, which would have materially affected the decision."  (*Id.* § 22.6 at 46-47).

There was no right of appeal on the grounds that there was insufficient evidence to sustain the findings; that the Special Examiner was mistaken as to any factual issue; that the Special Examiner acted arbitrarily or capriciously; or that the Special Examiner was biased. Moreover, the accused was expected to prepare his appeal without access to the Report on which the finding of responsibility was based.

Regardless of the UAB's conclusions, the SSAO retained the discretion "to amend or uphold the original final decision."  (*Id.* § 22.6 at 47).

### 8.    Access to Records

The 2013-14 Handbook states that "[d]ocuments generated from the Special Examiner's Process will be retained pursuant to the rules in Sections 17.4, 19.5, 19.6.j."  (*Id.*).  Section 19.5 states that "[a] record of the Administrative Action, compris[ing] of a summary of the evidence presented and decision rendered, shall be made by the administrator"; that any such records shall be maintained for seven years; and that "[a]ccess to such records is governed by the University Records Policy (see sections 17.4 and 19.6.j)."  (*Id.* § 19.5).  Section 19.6.j is similar to section

19.5, except that it applies to a "Written Hearing Report," which is not prepared during the

Special Examiner's Process (because no hearing takes place).  (*Id.* § 19.6.j).

> Section 17.4, in turn, provided as follows:
>
> The Federal Family Educational Rights and Privacy Act of 1974 (FERPA) gives each enrolled student at Brandeis certain rights, including access to the student's educational records, the right to request amendment of those records where the student believes a record is inaccurate or misleading, and the right to add a statement presenting the student's view if the records are not amended.  A detailed statement of the rights and responsibilities of a student under the Act, the location of all records pertaining to a student, and the procedures for requesting access are contained in the Brandeis University Records Policy.  The policy is available from the University Registrar and at: www.brandeis.edu/registrar/bulletin/EducRecordsPolicy.html.

(*Id.* § 17.4).  The records policy and FERPA state that students may have access to their

educational records within 45 days after making a request.  (Am. Compl. ¶ 154).

### G.    Sexual Misconduct Policies under the 2013-14 Handbook

The Brandeis Student Handbooks for 2011-12, 2012-13, and 2013-14 set forth a series of

"standards" applicable to Brandeis students.  As set forth below, the Special Examiner applied

the substantive policies (but not the procedures) for the academic year in which the alleged

misconduct occurred.  The policies relevant to this matter are the following, which remained the

same each year except as noted.

### 1.    Physical Harm (§ 2.1.d)

Section 2.1.d provided:  "The University will not tolerate any behavior that . . . physically

harms or is considered unwanted physical contact (some examples:  hitting, pushing, or physical

altercations/violence of any kind)."  (2013-14 Handbook § 2.1.d).[10]

---

[10] The 2012-13 Handbook added the phrase "or is considered unwanted physical contact."  (2012-13 Handbook § 2.1.d).

### 2.      Invasion of Personal Privacy (§ 2.1.e)

Section 2.1.e addressed invasion of privacy:  "The University will not tolerate any

behavior that . . . invades personal privacy . . . ."  (*Id.* § 2.1.e).[11]

### 3.      Sexual Misconduct (§§ 3.1, 3.2, 3.3)

The policies concerning sexual misconduct were principally set forth in Sections 3.1

through 3.3:

> 3.1.  Students are prohibited from engaging in sexual misconduct.  Sexual contact
> that occurs without the explicit consent of each person involved may be
> considered sexual misconduct.  Consent must be clearly and affirmatively
> communicated, mutual, noncoercive, and given free of force or threat of force.  A
> person who is physically or mentally incapacitated by drugs, alcohol, or other
> circumstances is not capable of giving consent.  Physical or mental incapacity
> means the lack of ability to appreciate the fact that the situation is sexual, and/or
> the inability to rationally and reasonably appreciate the nature and extent of that
> situation. . . .
>
> 3.2. . . . [T]aking advantage of someone's incapacitation or intoxication for the
> purpose of engaging in sexual activity is considered sexual misconduct.
>
> 3.3.  Consent or lack of consent may be communicated verbally or through
> actions but if a refusal to engage in sexual activity is communicated at any time
> then the activity must cease immediately.  Lack of consent may also be inferred
> from the use of force, threat, physical intimidation, or advantage gained by the
> Accuser's mental or physical incapacity or impairment of which the Accused was
> aware or should have been aware.  Prior sexual activity or an existing
> acquaintanceship, friendship, or other relationship that has been sexual in nature
> does not constitute consent for the continuation or renewal of sexual activity.

(*Id.* §§ 3.1, 3.2, 3.3).

### 4.      Sexual Harassment (§ 7.2)

The 2013-14 Handbook prohibited sexual harassment, and provided a list of examples,

including "[u]nwelcome sexual conduct" and "pressure to engage in sexual activity of an implied

or explicit nature."  (*Id.* § 7.2).  The Handbook provided that such conduct is "regarded as

---

[11] The 2012-13 Handbook added the phrase "or constitutes stalking of any type . . . ."; the 2013-14
Handbook addresses stalking in a separate subparagraph.  (2012-13 Handbook § 2.1.e; 2013-14 Handbook § 2.1.h).

harassment when the conduct has the purpose or effect of unreasonably interfering with a

person's education or work performance by creating an intimidating, hostile or offensive

environment in which to work, study or live; or otherwise adversely affects a person's

employment or educational opportunities." (*Id.* § 7.1).

### H.     The Special Examiner's Investigation

Brandeis hired an outside lawyer to serve as the "Special Examiner" for John's case.

(Am. Compl. ¶ 90).  The Special Examiner then began to interview witnesses and prepare a

report.

The complaint alleges that immediately after receiving notice of the charges against him

on January 14, 2014, and for weeks thereafter, John repeatedly asked university officials to

inform him of the factual bases for the charges against him.  (*Id.* ¶ 87).  He had not been

provided with anything more than J.C.'s vaguely worded accusation.  According to the

complaint, John "still had no idea what he was alleged to have done wrong during his nearly

two-year [r]elationship with J.C." (*Id.*).  The university refused his requests.  (*Id.* ¶ 88).

According to the complaint, within days of the filing of the CSR, Brandeis's General

Counsel told John that the Dean's office had received "substantially more information" as to

J.C.'s accusations.  (*Id.* ¶ 148).  However, during the "Statements Phase" of the investigation, no

additional information was ever provided to John.  (*Id.*).

According to the complaint, it was not until February 2014, when John had his first

interview with the Special Examiner, that he began to learn of the factual allegations behind the

charges.  (*Id.* ¶ 89).  Even then, John was forced to speculate based on the particular questions

the Special Examiner asked him about certain incidents.  (*Id.*).  The Special Examiner questioned

John about John and J.C.'s use of the communal bathrooms, about "wake-up morning kisses,"

and whether John had slept on the floor during a visit to J.C.'s father's house.  (*Id.* ¶ 93).  Based on those questions and others, John believed that certain incidents must have been brought up during J.C.'s two interviews with the Special Examiner in January and February.  (*Id.* ¶ 89).

Over the next three months, the Special Examiner interviewed John three more times, and interviewed J.C. two more times.  (*Id.* ¶ 91).  The Special Examiner also interviewed two Brandeis administrators, one of whom was identified by John; two other witnesses identified by John; and four additional witnesses identified by J.C.  (*Id.*).  According to the complaint, none of the witnesses were actual eyewitnesses to any of the alleged incidents.  (*Id.*).[12]

At no point was John allowed to question J.C. or otherwise to confront his accuser.  Nor was he allowed to confront any of the other witnesses or conduct any kind of cross-examination.  Furthermore, John was never informed what J.C.'s witnesses told the Special Examiner.  (*Id.* ¶¶ 94-95).

As set forth below, the Special Examiner ultimately concluded that John was responsible for a variety of charges arising out of four separate incidents.  (*Id.* ¶ 98).

## I.      The Reading of the "Summary"

According to the complaint, Lisa Boes, Brandeis's Dean of Academic Services, was chosen to act as Brandeis's "final decision maker" in John's case.  (*Id.* ¶ 96).  (Presumably, she was the designee of the SSAO selected to conduct the Discussion Phase and any subsequent phase.)  According to the complaint, she was chosen because the Brandeis administrator who would have normally presided over the process had recused himself; it further alleges that she was inexperienced and "ill-prepared" for the role.  (*Id.* ¶ 97).

John met with Boes on April 24, 2014.  (*Id.* ¶ 96).  At their meeting, Boes refused to give

---

[12] The 2013-14 Handbook defines "witness" to mean "[a]ny person who was present during the alleged incident(s) or who has direct knowledge of the incident."  (2013-14 Handbook § 22.6 at 42).

John a copy of the Special Examiner's Report.  (*Id.* ¶ 98).  Instead, she simply read aloud a summary that she had prepared of the Special Examiner's findings.  (*Id.* ¶ 96).  John was likewise not given a copy of the summary.

According to the complaint, John was "stunned" by the reading of the summary.  (*Id.* ¶ 30).  On May 2, 2014, John responded to the summary by supplying additional facts, names of witnesses, and a sworn affidavit.  (*Id.* ¶ 131).  According to the complaint, Boes refused to accept at least some of that evidence.  (*See id.* ¶ 110).

On May 12, 2014, Boes notified John that on the basis of her review of the Report and John's response to the summary, she concurred with the Special Examiner's findings on all charges.  (*Id.* ¶ 132).  Boes accepted the findings unilaterally and without the recommendation of any panel.  (*Id.* ¶ 133).

## J.      The Three-Person Panel and the Sanction

After accepting the findings of the Special Examiner, Boes convened a three-member panel to recommend a sanction.  (*Id.* ¶ 134).  The panel did not consider the merits of the Special Examiner's finding that John was responsible for the charges.

The panel either gave or recommended that John receive a "disciplinary warning."  (*See id.* ¶ 135).[13]  According to the complaint, the warning was "the lightest sanction possible."  (*Id.*).  The complaint further alleges that "[t]hrough this sanction, the Panel members clearly signaled that they did not agree with the findings or concluded that the conduct [at] issue was not serious and did not warrant the labels put on it by the Special Examiner."  (*Id.*).

The disciplinary warning required John to undergo sensitivity training.  More

---

[13] The complaint alleges that the Panel actually imposed the sanction.  (*See id.* ¶ 135).  However, under the 2013-14 Handbook, the panel would only "make recommendations as to the outcome(s) for the Accused," and that the "final decision" as to "any outcomes" would be rendered by an administrator (here, Boes).  (2013-14 Handbook § 22.6 at 46).

importantly, it resulted in the addition of a notation in John's permanent education record, stating that he was found responsible for sexual misconduct, lack of consent, taking advantage of incapacitation, sexual harassment, physical harm, and invading personal privacy. (*Id.* ¶ 136). The notation did not provide any explanation for the conduct underlying the charges for which John was found responsible. (*Id.*).

When John received notice of the sanction, he again asked Brandeis for a copy of the Special Examiner's report for use in his appeal. (*Id.* ¶ 138). He also asked for the Special Examiner's witness interview notes. (*Id.*). Once again, Boes refused, as did Brandeis's General Counsel, Chief Legal Officer, and Senior Vice President of Students and Enrollment. (*Id.* ¶ 140).

### K.   The Appeal

John appealed the Special Examiner's findings on grounds of procedural error, denial of rights, and fraud. (*Id.* ¶ 141). On June 17, 2014, Boes informed John that three faculty members had been selected to serve on the appeals board, and that "members of the [board] do not interact with either party or their advisors about the process or appeal materials." (*Id.* ¶ 160). She also assured John that the members of the board had been "vetted for potential conflicts prior to being selected." (*Id.*). According to the complaint, John later learned that the chair of the appeals board and J.C.'s advisor for the Special Examiner process had collaborated on a Brandeis-sponsored Subcommittee on Sexual Violence during the pendency of that process. (*Id.* ¶ 161).

On June 20, 2014, the appeals board rejected John's appeal. (*Id.* ¶ 142).

### L.   The Special Examiner's Report

In July 2014—after Brandeis had denied his appeal and closed his case—Brandeis finally gave John a copy of the Special Examiner's report. (*Id.* ¶ 154). The Special Examiner's Report is dated April 16, 2014. (Def. Mem. Ex. B, Special Examiner's Report). It is 25 pages long,

single-spaced, without exhibits.  (*Id.*).

The Report analyzed twelve separate sets of claims made by J.C. against John.  (*Id.* at 5-12).  Six of those claims allegedly occurred during the "pre-dating relationship," and six allegedly occurred during the relationship itself.  (*Id.*).  The Special Examiner organized the claims as follows:

> A.  August 2011 through Approximately October 18, 2011 (Pre-Dating Relationship)
>
> 1.  Unwanted Touching While Walking
> 2.  Pornography Incident
> 3.  Text Messaging Incident
> 4.  The Movie Incident
> 5.  Post-Movie Conduct
> 6.  Decision to Begin Dating
>
> B.  Dating Relationship
>
> 1.  Bathroom Incidents
> 2.  Post-Shower Conduct
> 3.  Mandating that J.C. Sleep Naked
> 4.  Sexual Conduct While Sleeping
> 5.  Attempts to Have J.C. Perform Oral Sex
> 6.  Performing Oral Sex on J.C.

 (*Id.*).  As set forth below, the Special Examiner found that the evidence was insufficient, and that John was therefore "not responsible" as to eight of the twelve alleged claims.

### 1.  <u>Allegations Not Sustained by Special Examiner</u>

#### a.  <u>"Unwanted Touching While Walking"</u>

J.C. alleged that John occasionally touched J.C. "in a sexual manner" while they were walking, such as bending over and forcing J.C. "to walk into his butt."  (*Id.* at 5, 18).  None of their friends had ever witnessed any such conduct, and John denied that it had occurred.  The Special Examiner concluded that the evidence was "insufficient to indicate that these incidents occurred."  (*Id.* at 18).

### b.      **"Pornography Incident"**

J.C. alleged that John sometimes asked him if he wanted to watch pornography on his laptop computer.  (*Id.* at 6, 22).  If J.C. did not want to, John would sometimes move the laptop so "it was in front of [his] face," and J.C. would then protest or threaten to leave the room.  (*Id.* at 6).  Again, no friends had witnessed such conduct, and John denied that it occurred.  (*Id.* at 22).  The Special Examiner found the evidence was insufficient as to that claim.  (*Id.*).

### c.      **"Text Messaging Incident"**

J.C. alleged that in the fall of 2011, John texted him 10 or 12 sexually explicit messages.  (*Id.* at 6, 22).  J.C. asked him to stop.  (*Id.* at 6).  Neither party preserved any of the texts messages.  (*Id.*).  The Special Examiner found the evidence was insufficient as to that claim.  (*Id.* at 22).

### d.      **"Post-Movie Conduct"**

As set forth below, J.C. alleged that in mid-October 2011, John put J.C.'s hand on John's (clothed) groin while watching a movie in a friend's room.  J.C. further alleged that during some period after the "movie incident," John was occasionally naked in J.C.'s room, occasionally tried to kiss him, and once put his hand on his groin.  (*Id.* at 7, 19).  When J.C. objected, John "sulked" and was "moody."  (*Id.* at 19).  None of the witnesses observed any such behavior.  (*Id.*).  The Special Examiner found the evidence was insufficient as to that claim.  (*Id.*).

### e.      **"Decision to Begin Dating"**

The Special Examiner's report as to this claim reads as follows:

> After the Movie Incident, [J.C.] and [John] began "quietly hooking up" according to [John] but did not immediately begin dating.  According to [J.C.], he was unsure whether he wanted to begin dating someone who was not out of the closet.  [John] recalled that he was conflicted about whether he wanted to "come out" as

he believed that this could ruin his future in politics.

> [J.C.] stated that he felt coerced into starting a dating relationship with [John] because [John] stated that he only would come out if [J.C.] promised to be in a relationship with him.  According to [J.C.], this put him in an awkward position.  [J.C.] and [John] had multiple conversations about this.  According to [J.C.], [John] was very persistent and [J.C.] finally stated that he might consider being his boyfriend if [John] came out.  Approximately a week before [John] and [J.C.] began dating, they went to a performance at Chums Coffeehouse.  [J.C.] commented that one of the performers was attractive and [John] became jealous.  This led to discussions between [John] and [J.C.] regarding their relationship.  On or around October 17, 2011, [John] told his parents and his best friends from home that he had a boyfriend.  Both Parties agreed that they began dating after this.

(*Id.* at 7-8).  It is unclear what, if any, sexual misconduct was alleged as to those matters.  In any event, the Special Examiner made no finding as to any of J.C.'s claims concerning the decision to begin dating.

The report goes on to note that "[s]everal friends commented that [J.C.] and [John] got along well, with one stating that they were happy and 'cuddly' with each other, and had high opinions of each other."  (*Id.* at 8).  They continued to have a romantic relationship until July 2013.  (*Id.* at 12).

### f.      "Post-Shower Conduct"

J.C. alleged that during the course of their relationship, John would stare at him "when he returned to his dorm room after taking a shower and was trying to dress," and occasionally would compliment him and say how attractive he was.  (*Id.* at 9).  The Special Examiner found the evidence was insufficient as to that claim.  (*Id.* at 22).

### g.      "Mandating that J.C. Sleep Naked"

J.C. alleged that in the course of their relationship, John "required" him to sleep naked when he slept over at John's room.  (*Id.* at 10, 22-23).  The Special Examiner found that evidence was insufficient as to that claim.  (*Id.* at 23).

### h.       **"Attempts to Have J.C. Perform Oral Sex"**

J.C. alleged that approximately five to ten times in the course of their relationship, John

attempted to get J.C. to perform oral sex in a way that J.C. thought was forceful or pressuring.

John denied the allegations.  (*Id.* at 11, 20).  The Special Examiner found that the evidence was

insufficient as to that claim.  (*Id.* at 23).

### 2.       **Allegations Sustained by Special Examiner**

As noted, the Special Examiner found John "responsible" for four acts of sexual

misconduct.

### a.       **"Movie Incident"**

J.C. alleged that on approximately September 17 or 18, 2011, he and John were watching

a movie in a friend's room, sitting on the friend's bed.  (*Id.* at 6).  The friend was sitting in a

chair next to them.  (*Id.*).  J.C. and John were not yet boyfriends.  According to J.C., John put

J.C.'s hand on John's groin, which was covered by his pants.  (*Id.*).  J.C. contends that he

"froze," but removed his hand after some period of time.  (*Id.* at 6-7).

John agreed that he had moved J.C.'s hand, but said that J.C. did not object.  (*Id.* at 7).

John also told the Special Examiner that the two of them had sex together the very next day,

which J.C. did not deny (although he said he did not remember).  (*Id.*).  According to John, he

had put J.C.'s hand on his groin as the initial step in their sexual relationship.  J.C. had told him

that he would never make the "first move on a straight guy."  (Am. Compl. ¶ 45).  John

interpreted that as a "clear signal that he would have to initiate any sexual activity."  (*Id.*).  John

characterized the incident as his "first move," and said that it led almost immediately to sexual

relations and a 21-month romantic relationship.  (*Id.*).

The Special Examiner found John responsible for sexual misconduct based on the "movie

incident." (Special Examiner's Report at 18).  After the summary was read to him, John submitted to Boes the names of witnesses who "would have attested to the fact that J.C. humorously recounted the Movie Incident to mutual friends throughout the relationship." (Am. Compl. ¶ 110).  According to the complaint, Boes refused to forward those names on to the Special Examiner.  (*Id.*).

### b.    "Bathroom Incident"

J.C. alleged that during the course of the relationship, John would look at his private areas when the two were using the communal bathrooms in the dormitory.  (Special Examiner's Report at 8, 22).  John told the examiner that J.C. "never expressed any discomfort" with his actions, and that looking at J.C. was "a joke" or "a humorous situation because they were in a same sex relationship and could use the bathroom together." (*Id.* at 8).[14]

The Special Examiner found John responsible for the sexual misconduct based on that behavior.  (*Id.* at 22).  The Special Examiner concluded that John "does not effectively distinguish between a joke and inappropriate behavior that invades other's [sic] personal privacy." (*Id.*).

### c.    "Sexual Conduct While Sleeping"

J.C. alleged that on approximately twelve occasions during the course of the relationship, while they were sleeping together, John would awaken him by trying to initiate sexual activity. (*Id.* at 10, 19).  John denied that he ever woke J.C. up with sexual activity, but stated that he sometimes woke him up by kissing him.  (*Id.* at 10).[15]

---

[14] According to the complaint, the Special Examiner found that John had invaded J.C.'s privacy "even though the two were in a nearly two-year sexually intimate relationship, routinely slept together naked, and shared communal facilities, and even though J.C. could have used a private stall but chose not to." (Am. Compl. ¶ 20; *see id.* ¶ 121).

[15] According to the complaint, "on occasion, J.C. stated he wished John would surprise him more and reciprocate more sex acts than he did." (Am. Compl. ¶ 51).

According to the Special Examiner, John gave inconsistent responses concerning the wake-up kisses, which substantially undermined his credibility.  (*Id.* at 19).  In her words:

> During one interview, [John] stated that he did sometimes wake [J.C.] up by kissing him, but that he did this in the morning, not in the middle of the night. [John] reported that if [J.C.] said that he wanted to go back to sleep, sometimes [John] said, "Seriously?" and continued kissing [J.C.] unless [J.C.] indicated again that he really did want to go back to bed.  [John] altered his recollection during another interview, by stating twice that [J.C.] never stated that he wanted to go back to bed when [John] woke him up by kissing him.  After being informed of the inconsistency with his previous interview, [John] commented that he meant that [J.C.] might have stated that [he] wanted to go back to bed if [John] woke him up at about 8:00 AM, but not if he woke him up at 10:00 AM.

(*Id.*).

The Special Examiner concluded that John had "altered his story" and was not credible. (*Id.*).  She concluded that because "[s]leep is a state of incapacitation," and because "a student who is incapacitated cannot give consent to sexual activity," John had committed non-consensual sexual misconduct by kissing J.C.  (*Id.*).[16]  She also concluded that because John did not always stop kissing J.C. when J.C. said he wanted to go back to sleep, John had committed a sexual assault by failing "to stop immediately after an individual has indicated a refusal to engage in the activity."  (*Id.*).

### d.      "Performing Oral Sex on J.C."

J.C. alleged that John had attempted to perform oral sex on him during a visit to J.C.'s father's house in North Adams, Massachusetts.  (*Id.* at 11-12, 20-21).  The incident allegedly occurred in May 2013, at which point the two had been in a romantic relationship for about a year and a half.  (*Id.*).

J.C. alleged that John tried to perform oral sex on J.C. when he did not want it; that he asked John "whether he understood that this was sexual assault"; that John "became upset by this

---

[16] She did not make a specific finding as to any sexual misconduct while sleeping other than kissing.

accusation and wound up lying on the floor." (*Id.* at 20).  J.C. stated that

> . . . [John] became very upset, got out of bed and lay on the floor, stated that he
> loved [J.C.] too much to assault him, and commented that he could not believe
> that [J.C.] was accusing him of assault.  [J.C.] stated that [John] convinced [J.C.]
> that he was wrong.  [J.C.] asked that [John] forget about the conversation and
> apologized to [John].  According to [J.C.], the logical part of his brain was not
> sorry for raising the issue, but he wondered how he could accuse someone who he
> loved of such a horrible thing.

(*Id.* at 12).

Again, the Special Examiner gave great weight to what she perceived to be John's

inconsistent responses:

> During one interview for this investigation, [John] stated that he did not recall
> anything unusual occurring during the North Adams trip, and denied that [J.C.]
> ever brought up the fact that he felt sexually assaulted.  However, in subsequent
> interviews, [John] offered inconsistent responses, initially stating that he did not
> remember if he slept on the floor, then stating that he thought he was on the
> ground due to heat, not an argument.  [John's] lack of memory regarding whether
> he wound up on the floor is not credible.  During this investigation, in the many
> conversations regarding sleeping arrangements in [John] and [J.C.'s] relationship,
> [John] had never previously mentioned moving to or sleeping on the floor.  Even
> when, as part of this investigation, [John] was asked specifically what he did
> when he was hot when sleeping with [J.C.] he did not mention that he moved to
> the floor.  Rather, he stated that he stopped cuddling, rolled over to an adjoining
> bed, or went on top of the sheets.  It is likely, therefore, that moving to the floor
> due to [a] temperature control issue was an unusual event and that, therefore,
> [John] would have remembered if he did move to sleep on the floor during the
> North Adams visit.  The inability of [John] to recall whether he moved to [the]
> floor during his North Adams visit, weakens [John's] credibility regarding his
> response to [J.C.'s] allegation that [John] performed oral sex on him without
> consent.

(*Id.* at 20).

The Special Examiner concluded that J.C.'s version was more credible than John's.  (*Id.*).

She then concluded that John had committed a sexual assault because J.C. "never clearly

communicated that he wanted [John] to perform oral sex." (*Id.* at 21).

### 3.     The Special Examiner's Conclusions as to the End of the Relationship and J.C.'s Decision to Bring Charges

J.C. broke up with John over the telephone in July 2013.  The Special Examiner concluded that J.C. "felt physically repelled" by John; that John "called too often"; that he "did not stand up enough for his beliefs"; and "was not strong-willed or forceful enough."  (Special Examiner's Report at 12).  Their friends "were surprised by the break up."  (*Id.*).

At the beginning of the fall semester 2013, J.C. received "sexual assault training" as part of a Brandeis program.  (*Id.* at 13).  According to J.C., that training "forced him," for the first time, to "start thinking about what he viewed as sexual harassment within his relationship" with John.  (*Id.*).

Throughout the fall of 2013, John and J.C. "tried to stay friends," but over time their friendship began to deteriorate.  (*Id.*).  Among other things, J.C. started to drink alcohol, sometimes to excess.  John thought that was hypocritical, because J.C. had not allowed him to drink during their relationship.  (*Id.*).[17]

At the beginning of the spring semester 2014, J.C. received another round of "sexual assault training."  (*Id.* at 14).  J.C. "became concerned around this time" that John had become friendly with another male student.  (*Id.*).  According to J.C., "based on the sexual assault training and because he wanted to make sure that [John] would not treat anyone else the way that [J.C.] believed [John] had treated him," he "decided to file a CSR."  (*Id.*).

### 4.     The Special Examiner's Credibility Findings

The Special Examiner also made general observations as to the credibility of both J.C.

---

[17] According to the complaint, at some point, J.C. told John that J.C.'s mother had a history of alcohol abuse; that she had neglected J.C. and his siblings; and that she had attempted suicide, all of which led to J.C.'s placement in foster care.  (Am. Compl. ¶ 52).  In light of his family history, J.C. did not drink alcohol during the relationship and insisted that John did not drink alcohol as well.  (*Id.* ¶ 53).

and John. She noted that both students "agree on the basic timeframe of their relationship, and both recall many of the same incidents that occurred during their relationship." (*Id.* at 15). However, she also noted that the two "do not agree on many of the details important to this investigation (e.g. facts regarding whether consent was given)" and "completely disagree about whether some incidents actually occurred (e.g. the North Adams Incident)." (*Id.*).

As to J.C., the Special Examiner concluded that his statements had been "consistent" from his "initial description," and that there was a "consistent theme linking many of the alleged incidents," including "the pressure he felt in the relationship" and "the belief that it was easier to placate John by engaging in [sexual] activities than to continue to object." (*Id.*). She gave substantial weight to J.C.'s use of alcohol after he and John broke up:

> Further, [J.C.'s] allegation that he experienced unwanted sexual activity was credible, given his behavior after he broke up with [John]. Specifically, [J.C.] began drinking after he broke up with [John] which he had not done previously. A study of physical and sexual abuse found that past or recent occurrence of assault is associated with significantly increased rates of reported alcohol abuse. . . . [Several] Interviewees reported that although [J.C.] had not used alcohol before the break up with [John], after the break up [J.C.] began drinking. [J.C.] reported that he now feels like he "needs a drink" and sometimes drinks in order to fall asleep. In addition, he reported that on the weekends he "drinks too much," having 12 to 14 drinks. In addition, [J.C.] began seeing a mental health professional in January 2014 for treatment related to sexual assault. [J.C.'s] new use of alcohol and mental health services strengthens his credibility that he experienced unwanted sexual contact.

(*Id.* at 15-16) (citation omitted).[18]

As to John, the Special Examiner concluded that "[i]n general" he was a "credible participant" in the interviews, "based on his demeanor and consistency," but with "significant exceptions." (*Id.* at 16). She substantially discounted the importance of the fact that the two students were in a romantic relationship for 21 months; that they appeared happy and

---

[18] According to the complaint, the study in question was a single study from the 1990s that reported increased rates of alcohol use by women after recent occurrences of sexual assault. (Am. Compl. ¶ 125).

comfortable together; and that J.C. had never reported any sexual misconduct to anyone during

that period.  In her words:

> Several Interviewees implied that [John] was more credible than [J.C.] because
> the Parties seemed happy and comfortable together.  To support this, [John]
> presented documentation including pictures in which [John] and [J.C.] appeared
> to be happy and Facebook comments that suggested a normal, happy dating
> relationship. . . . Note, however that sexual misconduct does occur in dating
> relationships and that such conduct can occur for years. . . . Further, studies have
> noted that individuals likely underreport incidents of intimate partner violence to
> friends and family due to a number of reasons, including shame and
> embarrassment, and may underreport because they do not perceive unwanted
> sexual contact with an intimate partner as coercive. . . . The fact that [John] and
> [J.C.] were in what appeared to be a happy dating relationship and [J.C.] did not
> inform friends about his allegations during the relationship, therefore, does not
> bolster [John's] credibility or weaken [J.C.'s] credibility.

(*Id.*) (citations and footnote omitted).

### 5.      The Special Examiner's Conclusions

The Special Examiner concluded that John had violated section 3.1 of the Handbook

(sexual conduct without consent) as to the movie incident, the sleeping incidents, and the North

Adams incident; section 3.2 (taking advantage of incapacitation) as to the sleeping incidents; and

section 3.3 (failing to cease sexual activity after refusal) as to the sleeping incidents and the

North Adams incident.  (*Id.* at 17-20).  She also concluded that he violated section 2.1.e

(invasion of privacy) as to the bathroom incidents.  (*Id.* at 21-23).

The Special Examiner also concluded that John had committed acts of "violence"

against J.C. in violation of section 2.1.d.  (*Id.* at 21).  As noted, section 2.1.d prohibits behavior

that "physically harms" another student or "is considered unwanted physical contact," and gives

as examples, "hitting, pushing, or physical altercations/violence of any kind."  (2012-13

Handbook § 2.1.d).  Her reasoning was as follows:

> The Rights and Responsibilities handbooks do not define violence.  Therefore,
> this report uses the definition of sexual violence provided by the U.S. Department

of Education, Office for Civil Rights in its April 4, 2011 Dear Colleague Letter. The Dear Colleague Letter defines sexual violence as "physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent due to the victim's use of drugs or alcohol."

(Special Examiner's Report at 21) (citation omitted).

There was no evidence that John had actually committed an act of physical violence, as that term is commonly understood. There is no evidence, for example, that he physically struck J.C. or perpetrated a forcible rape, at least in any ordinary sense of the term.

Finally, the Special Examiner concluded that John had also committed acts of sexual harassment against J.C. by adversely affecting J.C.'s education. (*Id.* at 23-24). That finding was based, in part, on J.C.'s claim that he had to drop a course in the Spring of 2013 "as a result of stress related to [John's] conduct." (*Id.* at 24). The Special Examiner also based her finding on the fact that J.C. felt "pressured" on occasion to engage in sexual activity, and that John would sometimes get "moody and sulky" if J.C. declined to do so. (*Id.* at 23).

### M.     Subsequent Developments

According to the complaint, during the appeals process and after John's case was closed, J.C. continued to file additional "frivolous" reports against John. (Am. Compl. ¶ 186). J.C. filed three additional claims accusing John of "stalking, sexual harassment, retaliation, and intimidation." (*Id.* ¶ 189). None of those accusations were found credible. (*Id.*). J.C. also sent multiple letters to Brandeis administrators calling John an "attacker" and "a threat to the safety and well-being of the entire campus." (*Id.* ¶ 190).

In June 2014, J.C. posted Brandeis's final outcome letter in John's case to Facebook; although he redacted John's name, J.C. identified him by name to students and media reporters off-line. (*Id.* ¶ 191). J.C. also added a comment to his Facebook post characterizing John as his "attacker" and accusing him of "multiple forms of rape." (*Id.* ¶ 192). According to the

complaint, those accusations were "false and malicious."  (*Id.* ¶ 193).

> As John learned when he finally received the Special Examiner's Report in July 2014, J.C. specifically told the Special Examiner that John never "raped" him (which J.C. defined as penetration without consent), and nowhere in the Special Examiner's Report is there an allegation or a finding that John ever "attacked" or "raped" J.C.

(*Id.*).

In June 2014, J.C. spoke to a national publication regarding his story, referring to John as his "attacker."  (*Id.* ¶ 194).  Although a Brandeis administrator publicly stated that J.C.'s story contained "factual errors," the university did nothing more to identify or correct those errors. (*Id.*).

In September 2014, a reporter for NPR station WBUR told John that J.C. claimed John had "anally raped" J.C.  (*Id.* ¶ 195).  J.C. also made that claim to other Brandeis students.  (*Id.* ¶ 196).  According to the complaint, J.C.'s claims were false.  (*Id.*).

In September 2014, "J.C. posted on his Facebook page a photograph of himself wearing a poster board with the handwritten notation that he had been sexually assaulted."  (*Id.* ¶ 197). According to the complaint, J.C. "vowed he would wear the poster board around campus every day until he graduated, whether or not his 'attacker' was expelled."  (*Id.*).

According to the complaint, as a result of J.C.'s campaign, Brandeis students "publicly taunted and accused John of rape."  (*Id.* ¶ 198).  His reputation in the Brandeis community has been ruined, severely harming his employment prospects.

In October 2014, John received a call from his internship employer, a "highly-ranked public official."  (*Id.* ¶ 200).  The employer had been "made aware" of John's situation at Brandeis from "several sources," and fired John.  (*Id.*).  Another prospective employer, who has

"ties to Brandeis," also "stopped responding to John's e-mails after promising to hire him for the fall semester." (*Id.* ¶ 202).

John graduated from Brandeis *magna cum laude* with a 3.8 grade point average. (*Id.* ¶ 143). According to the complaint, his career options have been severely harmed because he now has to explain and defend himself to every graduate school, employers, and friends who discover what happened. (*Id.* ¶ 144).

### N.       Recent Changes to the Process

After John's case was closed, Brandeis made several changes to the Special Examiner Process. (*Id.* ¶ 179). It now requires a "co-examiner" in the fact-finding phase, and provides that the Special Examiner's Report should be provided to the parties during the process. (*Id.* ¶¶ 180-81). Brandeis also now requires the accuser to give a detailed description of the alleged conduct in the initial report, and requires the Director of the Department of Student Rights and Community Standards to determine that there is sufficient evidence of a violation before beginning formal adjudication of the complaint. (*Id.* ¶¶ 182-83).

## III.   Procedural Background

On April 9, 2015, John filed the original complaint in this action. On June 23, 2015, John filed an amended complaint. Brandeis has moved to dismiss all claims against it under Fed. R. Civ. P. 12(b)(6).

## IV.   Legal Standard

On a motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its

face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  That is, "[f]actual allegations must

be enough to raise a right to relief above the speculative level, . . . on the assumption that all the

allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555 (citations omitted).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if the complaint fails to set

forth "factual allegations, either direct or inferential, respecting each material element necessary

to sustain recovery under some actionable legal theory."  *Gagliardi v. Sullivan*, 513 F.3d 301,

305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1,

6 (1st Cir. 2005)).

## V.  <u>Analysis</u>

### A.  <u>Breach of Contract</u>

Count One of the amended complaint asserts a claim for breach of contract based on

eight specific alleged violations of the Handbook.[19]

It is well-established that the student-college relationship is contractual in nature.  *See,*

*e.g.*, *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998) ("The student-college relationship

is essentially contractual in nature.  The terms of the contract may include statements provided in

student manuals and registration materials." (internal citations omitted)); *see also Guckenberger*

*v. Boston Univ.*, 957 F. Supp. 306, 317 (D. Mass. 1997) ("Universities are capable of forming

legally cognizable contractual relationships with their students.  Brochures, policy manuals, and

---

[19] John has withdrawn his original Count One, which was a cause of action for discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).  *Compare Doe v. Brown Univ.*, 2016 WL 715794 (D.R.I. Feb. 22, 2016); *Bleiler v. College of the Holy Cross*, 2013 WL 4714340 (D. Mass. Aug. 26, 2013).

other advertisements can form the basis of such contractual agreements.").[20]

"Under Massachusetts law, interpretation of a contract is ordinarily a question of law for the court."  *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1122 (1st Cir. 1995) (internal quotations omitted).  The standard for interpreting the terms of a student-university contract is that of "reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it."  *Schaer v. Brandeis Univ.*, 432 Mass. 474, 478 (2000) (quoting *Cloud v. Trustees of Boston Univ.*, 720 F.2d 721, 724 (1st Cir. 1983) (citing *Coveny v. President & Trs. of the Coll. of the Holy Cross*, 388 Mass. 16, 20 (1983))).

In addition, the Court must "examine the hearing" afforded to the student "to ensure that it was conducted with basic fairness."  *Cloud*, 720 F.2d at 725 (footnote omitted); *Schaer*, 432 Mass. at 481.

### 1.    **"Reasonable Expectation" of the Student**

### a.    **Elimination of the "Statements Phase"**

Doe first alleges that Brandeis breached the terms of the 2013-14 Handbook by "effectively eliminating" the Statements Phase of the Special Examiner Process.  (Pl. Mem. 7-10).  As noted, the complaint alleges that J.C. provided "substantially more information" to the university beyond the vague allegations in the CSR, and that university officials refused to provide it to John.  According to John, a reasonable student would have expected to have been provided with that information in order to prepare his defense.

In this context, of course, the Court must assume the truth of the allegation that Brandeis had in fact obtained a thorough statement of the charges made by J.C., and refused to provide it

---

[20] For the purposes of this motion, Brandeis concedes that the Handbook created an enforceable contract.

to John.  Such a refusal was unfortunate, at best; the most rudimentary concepts of fairness would seem to require that an accused be advised of the charges against him.  Nonetheless, that refusal did not breach the express terms of the Handbook.

The language of the Handbook does not require that Brandeis provide the accused with *any* information provided by the accuser other than the "community standards report."  The Handbook merely states that the director should "suggest" that the accuser prepare a thorough statement if the CSR does not "represent a full account" of the alleged incident.  (2013-14 Handbook § 22.6 at 43-44).  Thus, the Handbook does not even require that the accuser provide a "full account," much less that Brandeis obtain such an account and provide it to the accused.  Because the Handbook does not mandate the creation of any such statement, it would be unreasonable for a student to expect one to be provided to him as of right, at least according to the express language of the Handbook.

The Handbook also provides that "any other substantiating materials, such as e-mail, text messages, photographs, records, names of witnesses, names, etcetera," "should" be provided by the accuser to the school.  (*Id.*).  While such information—the basic corroborating evidence, if it exists—"should" be provided, it is by no means clear that the accuser is required to do so, or that there is any consequence for failing to do so.  And there is nothing in the Handbook that requires the university to share that evidence with the accused.

Thus, based on the language of the Handbook alone, a Brandeis student in the position of the accused would have no objectively reasonable expectation of being shown anything more than the CSR.

**b.**     **Elimination of the "Deliberations Phase"**

John next asserts that Brandeis also breached the terms of the Handbook by eliminating

the "Deliberations Phase" of the process.  The Handbook provides that if the accused is found "responsible" by the Special Examiner, a panel of three administrators would then "make recommendations as to the outcome(s)" for the accused.  (*Id.* § 22.6 at 46).  The panel would vote and "communicate its recommendations about the outcome(s) for the Accused" to the SSAO, who would "render the final decision as to any outcomes."  (*Id.*).

The gist of John's contention is that the panel's duty to "make recommendations as to the outcome(s) for the Accused" necessarily includes a recommendation as to whether the accused should be found "responsible" for the charges alleged.  John contends that Boes, however, convened the panel solely for the purpose of determining a sanction and that the panel was not allowed to deliberate on the issue of whether, in fact, John should be found responsible.  Brandeis contends that the panel's responsibility to determine "outcomes" extends only to recommending whether or not an accused should face sanctions, and, if so, what the sanctions should be.

The dispute between the parties is thus whether (as John contends) "outcomes" means "finding of responsibility plus sanctions," or whether (as Brandeis contends) "outcomes" means only "sanctions."

The Handbook is no model of clarity.  It does not define the terms "responsibility" or "outcome."  Furthermore, it uses the term "sanction" in its "outcome notification" section:

> The [SSAO] will communicate the final outcome(s) decision in writing (hand-delivered paper copy) to the Accuser and the Accused within 7 days under usual circumstances. The Accuser will be informed of any sanctions that relate to them in accordance with applicable laws.
>
> Any and all sanctions, including suspension or dismissal, will be in effect immediately, regardless of any appeal that may be submitted by the parties.

(*Id.*).  Thus, during "outcome notification," a "final outcome[] decision" is communicated "in

writing (hand-delivered paper copy)" to the accuser, whereas the accuser is informed of "any sanctions" that relate to them "in accordance with applicable laws." (*Id.*)

Furthermore, in describing the "Appeals Procedures," section 22.6 states that "[t]he Accuser and the Accused are entitled to appeal the *final decision* by the panel in the Special Examiner Process to the University Appeals Board . . . Appeals shall not be based upon, or granted due to, dissatisfaction with an imposed sanction." (*Id.* § 22.6 at 46-47) (emphasis added). According to that language, the panel actually makes a "final decision," and again the term "sanction," rather than "outcome," is used.

In general, "any uncertainty in the meaning of the document's terms" is to be construed against the drafter. *See New Bedford Gas & Edison Light Co. v. Maritime Terminal, Inc.*, 380 Mass. 734, 735-36 (1980) (citing *Merrimack Valley Nat'l Bank v. Baird*, 372 Mass. 721, 724 (1977)); *see also PhoneDOCTORx, LLC v. Healthbridge Mgmt., Inc.*, 58 F. Supp. 3d 152, 160 (D. Mass. 2014) (citing *Nadherny v. Roseland Prop. Co., Inc.*, 390 F.3d 44, 49 (1st Cir. 2004)). However, "[i]n interpreting contractual language," courts must "consider the contract as a whole." *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 785 (1st Cir. 2011) (quoting *Nicolaci v. Anapol*, 387 F.3d 21, 26 (1st Cir. 2004)); *see also Starr v. Fordham*, 420 Mass. 178, 190 (1995) ("[N]o part of the contract is to be disregarded.").

Here, the Handbook clearly delineates between a finding of "responsibility" on the one hand and an "outcome" and/or "sanction" on the other. The finding of "responsibility" is entrusted entirely to a single person—the Special Examiner—and the panel is provided no authority to re-examine or revise that determination. To the extent the Handbook is ambiguous, it concerns (1) whether "outcome" and "sanction" are the same thing, or "sanction" is a subset of "outcome," and (2) whether the panel makes a "recommendation" or a "final decision." Neither

ambiguity, however resolved, addresses the finality of the Special Examiner's "responsibility" finding.  Accordingly, Brandeis did not breach the express terms of the contract by eliminating the Deliberations Phase.

**c.**     **Breach of Express Representation as to Conflicts of Interest on Appeals Board**

John next contends that Brandeis also breached an express representation that the members of the appeals board had been screened for potential conflicts of interest.  That claim is based on an e-mail from Boes to John on June 17, 2014, in which she stated that "members of the [appeals board] do not interact with either party or their advisors about the process or appeal materials," and that the three members "have been vetted for potential conflicts."  (Am. Compl. ¶ 160).  The complaint alleges that Brandeis breached Boes's express representation because the chair of the appeals board that decided John's case did, in fact, interact with J.C.'s advisor during the pendency of Doe's appeal, in a manner that rendered the appeal unfair.  (*Id.* ¶ 161). Specifically, it alleges that the chair of the appeals board served on a University Subcommittee on Sexual Violence with J.C.'s advisor for the Special Examiner Process; that the Subcommittee issued its report one week after the appeal decision; and that therefore the two individuals must have discussed details of John's case.  (*Id.* ¶ 26e).

The Handbook does not contain any provision that members of the appeals board will be screened to prevent a conflict of interest.  John, however, contends that Boes's statement is an enforceable contract because it was made during the course of the Special Examiner Process and was a communication in furtherance of that process.

"'Extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them.'" *Coffin v. Bowater Inc.*, 501 F.3d 80, 98 (1st Cir. 2007) (discussing latent ambiguities) (quoting *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir. 1993)

52

(en banc)).  Here, the Handbook is "plausibly complete" with respect to how members of the

appeals board will be selected and how they are to interact with one another.  Therefore, Boes's

subsequent representation to John that those members would be free of any conflicts of interest

does not constitute an additional enforceable term of the Handbook.

### d. Failure to Use the Hearing Process as Described in the 2011-12 Handbook

John next contends that Brandeis committed a breach of contract because it used the

Special Examiner Process (as set forth in the 2013-14 Handbook) instead of the "Hearing

Process" outlined in the 2011-12 Handbook.  John contends that the procedures in the 2011-12

Handbook should have been employed in his case, because that was the Handbook he signed as a

condition of his enrollment at Brandeis.

As noted, the Handbook for each relevant academic year was different.  The conduct in

question occurred during the 2011-12 and 2012-13 academic years; for that reason, the Special

Examiner applied the substantive policies in the 2011-12 and 2012-13 Handbooks.  However, the

university used the procedures set forth in the 2013-14 Handbook in order to investigate and

adjudicate the allegations.

In general, a student does not have a contractual right to have disciplinary proceedings

conducted under the specific procedures in effect at the time of the student's matriculation.  *See*

*Coveney*, 388 Mass. at 22.  "A college is 'clearly entitled to modify [its rules and regulations] so

as to properly exercise its educational responsibility.'"  *Id.* (quoting *Mahavongsanan v. Hall*, 529

F.2d 448, 450 (5th Cir. 1976)).

Brandeis notes that the 2011-12 Handbook states that the process used to handle

violations of campus policy is "constantly evaluated and tweaked by the [Brandeis] community

every year." (2011-12 Handbook at 1).[21]   John acknowledges that reservation of rights, but maintains that the substitution of the Special Examiner Process for the Hearing Process in cases of sexual misconduct was beyond what a reasonable student would reasonably expect to qualify as a "tweak."

Although the matter is not entirely free from doubt, Brandeis appears to have the better argument.   The 2011-12 Handbook expressly reserved the right of the school to change its procedures each year; whether this was a "tweak" or not is certainly debatable, but John had no reasonable expectation that the procedures under the Handbook would be frozen for all four years.[22]   It is also likely that each academic year created a new contractual relationship.[23] Furthermore, it would be impractical and unwieldy to use different procedures in a single adjudicative process.

Accordingly, Brandeis did not breach the express terms of the contract by using the procedures set forth in the 2013-14 Handbook to adjudicate matters that arose in the 2011-12 and

---

[21] The 2011–12 Handbook includes the following statement:

*Rights and Responsibilities* also contains the procedures the University employs when a member of the community believes that a student has violated a campus policy.  This process . . . is ultimately a Brandeis-grown and nurtured one that is constantly evaluated and tweaked by the community every year.

(2011-12 Handbook at 1).

[22] The year-to-year changes may have been less significant than they appear at first blush; as outlined above, Brandeis did state in the 2011–12 Handbook that its procedures might be different for sexual misconduct cases (although it did not state how).

[23] The precise basis of the student-university contractual relationship is uncertain at best.  It appears that the basic theory is that (1) a student who accepts an offer of admission to a university, enrolls, and pays tuition, and (2) a university that permits the student to enroll, thereby agree to a contractual relationship.  As noted, the terms of the contract may include statements in student handbooks and registration materials.  *Mangla*, 135 F.3d at 83.  It is unclear whether there is a single four-year contract; a series of annual contracts, based on the academic year; a series of contracts based on each semester or quarter of registration; or some combination of those alternatives.  In this context, at least, the most sensible reading appears to be that John and Brandeis entered into a new contractual relationship each academic year.

2012-13 academic years.

### e.   Failure to Use the Hearing Process as to Charges of Physical Harm and Invasion of Privacy

John also contends that even if it was appropriate to use the Special Examiner Process for the sexual misconduct charges, Brandeis nonetheless breached the terms of the 2013-14 Handbook by failing to use the normal process for the physical harm and invasion of privacy charges.  Thus, in substance, John argues that where the evidence or allegations concern both sexual and non-sexual misconduct, the Handbook gives the student a contractual right to two separate proceedings—the Special Examiner Process for charges of sexual misconduct, and the Hearing Process for non-sexual misconduct charges—even where, as here, the same conduct is at issue.

The basic premise of that argument—that part of the proceeding involved non-sexual misconduct—is incorrect.  All of the alleged incidents referred to are conduct reasonably characterized as sexual in nature, even those that the Special Examiner labeled "violent."

Furthermore, and in any event, the language of section 22.6 plainly contemplates that a "case" may include one or more possible violations.[24]  It further states that where violations of section 3 and section 7 are at issue, "the case" will be adjudicated by the Special Examiner

---

[24] The relevant portions of the 2013-14 Handbook are as follows:

Section 19.1

In cases where the Department of Student Rights and Community Standards decides that there is evidence of a violation that warrants referral to the Conduct Process the Accused will be contacted to schedule the Preliminary Meeting . . . .  This meeting will serve to inform the student of the details of the charges and educate the Accused about the Conduct Process.

Section 22.6

In cases where the [Department of Student Rights and Community Standards] receives a report a determines that one or more possible violations of Section 3 (Sexual Responsibility) or Section 7 (Equal Opportunity, Non-Discrimination, and Harassment) exist, the case will be adjudicated by the Special Examiner's Process.

Process.  (2013-14 Handbook § 22.6 at 42).  Based on that language, no reasonable Brandeis student could expect that he had a contractual right to have the case split such that some of the alleged violations would be handled by the Hearing Process, especially where all violations were based on common incidents.

### f.    Failure to Provide a Copy of the Special Examiner's Report

John next contends that Brandeis breached the terms of the Handbook by refusing to give him a copy of the Special Examiner's Report during the "Discussion" and "Appeals" phases of the Special Examiner Process.[25]  That claim is based on section 22.6 of the Handbook, which states that "[d]ocuments generated from the Special Examiner's Process will be retained pursuant to the rules in sections 17.4, 19.5, and 19.6.j."  (2013-14 Handbook § 22.6 at 47).

Sections 19.5 and 19.6.j do not directly address the issue of a student's access to records.  Section 17.4, in turn, has three components.  First, it notes that FERPA "gives each enrolled student at Brandeis certain rights, including access to the student's educational records, the right to request amendment of those records where the student believes a record is inaccurate or misleading, and the right to add a statement presenting the student's view if the records are not amended."  (*Id.* § 17.4).  Second, it provides that "[a] detailed statement of the rights and responsibilities of a student under the Act, the location of all records pertaining to a student, and the procedures for requesting access are contained in the Brandeis University Records Policy."  (*Id.*).  Third, it provides that "[t]he policy is available from the University Registrar and at: www.brandeis.edu/registrar/bulletin/EducRecordsPolicy.html."  (*Id.*).  The policy itself allegedly provides, among other things, that a student is entitled to access to his or her records within 45

---

[25] John also seeks to obtain copies of the interview notes taken by the Special Examiner and the Observer. (Am. Compl. ¶ 155).

days of a request.  (*See* Am. Compl. ¶ 154).

A student reading those provisions could reasonably expect that the Special Examiner's Report was part of his "educational record," and that he could obtain access to it within 45 days after a request.[26]  The complaint alleges that John requested a copy of the Special Examiner's Report when Lisa Boes read him the summary of that report and again after receiving notice of his sanction in order to prepare his appeal.  (Am. Compl. ¶¶ 130, 138-39).

The timing of those events is not entirely clear.  The Special Examiner's Report is dated April 16, 2014; the summary (which was read aloud to John) is dated April 24; John responded to the summary on May 2; Boes notified John that she concurred with the Special Examiner's findings on May 12; and John's appeal was rejected on June 20.  (Special Examiner's Report at 1; Sec. Moriello Aff. Ex A, Boes Summary of Special Examiner's Report at 1; Am. Compl. ¶¶ 131-32, 142).  If John requested a copy of the Report on April 24, during the reading of the summary, Brandeis would have been obligated to provide him access within 45 days, or by June 14, six days before the appeal was decided.

Although the issue is not free from doubt, it is at least plausible that the failure of Brandeis to provide John access to the Report within 45 days was a material breach of contract that prevented him from effectively appealing the Special Examiner's findings.  Accordingly, the complaint states a claim upon which relief can be granted as to that issue.

### g.     Failure to Maintain Confidentiality of Educational Record

John next contends that Brandeis breached the terms of the Handbook by failing to maintain the confidentiality of his disciplinary record.  He alleges that Brandeis either

---

[26] An accused student might not necessarily be permitted to *retain* a copy of the Report, as opposed to simply having "access" to it, but that is not a question that the Court needs to resolve at this stage.

intentionally leaked the Special Examiner's findings to third parties, or failed to provide

adequate safeguards to prevent his disciplinary record from being disclosed.[27]

Again, section 22.6 of the 2013-14 Handbook states that "[d]ocuments generated from

the Special Examiner's Process will be retained pursuant to the rules in Sections 17.4, 19.5, and

19.6.j."  Section 19.5 provides in part as follows:

> A record of the Administrative Action, comprised of a summary of the evidence
> presented and decision rendered, shall be made by the administrator.  Such
> records are confidential and shall be retained . . . for seven years from the date on
> which this record was written, after which it will be destroyed . . . .

(2013-14 Handbook § 19.5).[28]

Brandeis first argues that because the Handbook expressly refers to "records," its

obligation of confidentiality covered only John's records themselves, and did not extend to the

*information* contained in those records.  But that interpretation is clearly incorrect—that is, a

Brandeis student would not reasonably expect to read the provisions in the same way.  Mere

protection of a disciplinary record only would be entirely pointless if administrators were free to

disclose the information the record contained.  No reasonable Brandeis student would expect that

Brandeis would be free to broadcast his confidential information as long as the actual records

themselves were not leaked.

Brandeis further contends that the allegation in the complaint that it leaked information

"about" the Special Examiner's findings is not specific enough to state a claim.  According to

Brandeis, there are numerous facts it could have released "about" the findings that would not

---

[27] John also alleges that Brandeis breached its obligations under the Handbook by allowing J.C. to disclose the findings to third parties.  The Court agrees with Brandeis that the Handbook imposes no responsibility on Brandeis for any disclosures of John's confidential information made by J.C. that were made without its knowledge.

[28] It is not at all clear how §19.6.j applies to the Special Examiner Process, notwithstanding the explicit reference in § 22.6 to that section.  Section 19.6.j, by its terms, applies to a "Written Hearing Report"; under the Special Examiner Process, there is no hearing and therefore no Hearing Report is prepared.

involve information actually contained in the Special Examiner's Report.

On a motion to dismiss, the Court must "accept as true all well-pleaded factual averments in the plaintiff's amended complaint and indulge all reasonable inferences therefrom in his favor." *Deniz v. Municipality of Guaynabo*, 285 F.3d 142, 144 (1st Cir. 2002) (citing *Valentin v. Hospital Bella Vista*, 254 F.3d 358, 365 (1st Cir. 2001)). The complaint alleges that after information "about" the Special Examiner's findings was disclosed, John was fired by one employer and had his job offer withdrawn by a second employer. (Am. Compl. ¶¶ 200-02). These allegations are more than sufficient to support a reasonable inference that the "information" allegedly disclosed included specific information from the Special Examiner's findings, such as the finding that John was responsible for the charges.

### h.        Arbitrary and Capricious Findings

Finally, John contends that, under Massachusetts law, Brandeis breached its contract with him because the Special Examiner's findings were arbitrary and capricious, and because Brandeis subjected him to a disciplinary process that was fundamentally unfair.

Massachusetts courts have held that a private university may not act "arbitrarily or capriciously" in disciplining a student. *See Coveney*, 388 Mass. at 19 (citations omitted); *Catalan-Aguilar v. R3 Educ., Inc.*, 2015 WL 6043598, at *2 (D. Mass. Oct. 15, 2015). However, it is unclear whether the "arbitrary and capricious" standard applies to school disciplinary proceedings that are also governed by the express terms of a student-university contract. *Compare Coveney*, 388 Mass. at 19 (applying arbitrary and capricious standard in the absence of a contractual right to a disciplinary hearing), *and Schaer*, 432 Mass. at 482 ("*Coveney* . . . applies in cases where there is no contractual relationship."), *with DMP v. Fay Sch. ex rel. Bd. of Trs.*, 933 F. Supp. 2d 214, 223 (D. Mass. 2013) ("[T]he [school's] decision to expel [plaintiff] was

neither arbitrary nor capricious . . . .  The question thus becomes whether [the school] violated a contractual right by expelling [plaintiff].").  Further, at least one Massachusetts court has considered whether the school's decision was arbitrary and capricious under the umbrella of "basic fairness."  *See Driscoll v. Board of Trs. of Milton Acad.*, 70 Mass. App. Ct. 285, 295 (2007).

As set forth below, the Court concludes that the complaint plausibly alleges that Brandeis did not provide "basic fairness" to John.  Accordingly, at this stage, the Court does not need to reach the issues of whether the "arbitrary and capricious" standard is applicable under the circumstances of this case, or whether there is a meaningful distinction between the questions of whether Brandeis's procedures afforded John "basic fairness" and whether Brandeis's actions were "arbitrary and capricious."

### 2. "**Basic Fairness**"

School disciplinary hearings must be "conducted with basic fairness."  *Cloud*, 720 F.2d at 725 (citing *Coveney*, 388 Mass. at 20); *Schaer*, 432 Mass. at 481.  Brandeis's obligation to provide basic fairness in its proceedings is separate from and in addition to its contractual obligation to follow the rules it set forth in the Handbook.  *Id.*

"Basic fairness" is an uncertain and elastic concept, and there is little case law to serve as guideposts in conducting the fairness inquiry.  Nonetheless, the concept must be given some meaning, and the requirement that a university provide some level of "fairness" clearly suggests that there is such a thing as an unfair proceeding, and that a failure to provide such a proceeding may be actionable under certain circumstances.

There is, however, no one-size-fits-all answer to the question what of constitutes the "basic fairness" that a student is due.  The case law appears to indicate, and common sense and

experience would likewise suggest, that the answer may vary depending upon the competing interests at stake, include such factors as the magnitude of the alleged violation, the likely sanctions and other consequences of a finding of guilt, and the university's experience and aptitude in resolving disputes of that nature.  *See Goss v. Lopez*, 419 U.S. 565, 579 (1975) (addressing requirements for disciplinary process in a public high school:  "the timing and context of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved").

Here, the charges made by J.C. involved a serious subject matter:  a claim of repeated acts of alleged sexual assault—indeed, purported sexual "violence"—over a period of nearly two years.  The consequences of a finding of "responsibility" for those offenses are substantial indeed.

As an initial matter, sanctions for violations of Brandeis's community standards include ineligibility for campus housing, loss of the opportunity to participate in campus activities or employment, suspension, and expulsion.  (2013-14 Handbook § 21.1).[29]

A finding of responsibility for sexual misconduct can also have significant consequences off-campus.  Post-graduate educational and employment opportunities may require disclosure of disciplinary actions taken by a student's former educational institution.  In addition, Brandeis also reserves the power to disclose records of disciplinary actions to other educational institutions without the consent of the student.  *See* Brandeis University Education Records: Statement of Policy and Procedures, BRANDEIS UNIVERSITY,

---

[29] A Brandeis student may be suspended prior to any hearing on the merits.  (2013-14 Handbook § 22.2). The complaint alleges that upon receipt of J.C.'s report of sexual misconduct, but before an investigation or hearing, "the University banned John from his residence, classes, paid University job, position as community advisor, student-elected position on a prominent University Board, and sequestered him in a campus facility."  (Am. Compl. ¶¶ 7, 9).

http://www.brandeis.edu/registrar/bulletin/EducRecordsPolicy.html (last visited Mar. 31, 2016).

Finally, a Brandeis student who is found responsible for sexual misconduct will likely face substantial social and personal repercussions.  It is true that the consequences of a university sanction are not as severe as the consequences of a criminal conviction.  Nevertheless, they bear some similarities, particularly in terms of reputational injury.  Certainly stigmatization as a sex offender can be a harsh consequence for an individual who has not been convicted of any crime, and who was not afforded the procedural protections of criminal proceedings.

There are, however, other substantial interests at stake.  Courts must be "chary about interfering with academic and disciplinary decisions made by private colleges and universities." *Schaer*, 432 Mass. at 478 (quotation and citations omitted).  A private university is not a state or local government, and the courts must recognize and respect the strong interest of a private university in managing its own affairs.  Furthermore, "ensuring allegations of sexual assault on college campuses are taken seriously is of critical importance, and there is no doubt that universities have an exceedingly difficult task in handling these issues."  *Brown Univ.*, 2016 WL 715794, at *4.

With that framework in mind, the Court turns to the question of whether the complaint alleges a plausible claim that Brandeis failed to provide the "basic fairness" to which its students are entitled.  In this context, at least, there are two principal threads to the "fairness" inquiry.  The first is procedural fairness—that is, whether the process used to adjudicate the matter was sufficient to provide the accused student a fair and reasonable opportunity to defend himself.  The second is substantive fairness—that is, even if the procedure was fair, whether the decision was unduly arbitrary or irrational, or tainted by bias or other unfairness.

a.   **Procedural Fairness**

The first question is whether the procedures employed by Brandeis met the test of "basic

fairness."  When the school at issue is a public institution, the accused student must, at a

minimum, receive protections consistent with the Due Process Clause of the Fourteenth

Amendment.  *See, e.g.*, *Goss*, 419 U.S. at 574-85 (holding that due process requires notice and

opportunity for a hearing where public high school students face suspension of less than ten

days).  It is well-established, however, that a private university "is not required to adhere to the

standards of due process guaranteed to criminal defendants or to abide by rules of evidence

adopted by courts."  *Schaer*, 432 Mass. at 482; *Cloud*, 720 F.2d at 725; *see Rendell-Baker v.

Kohn*, 457 U.S. 830, 837-38 (1982).  However, courts may refer to those rules in evaluating the

fairness of a particular disciplinary hearing.  *Cloud*, 720 F.2d at 725.

In *Cloud*, a third-year law student was charged with misconduct for looking under the

skirts of female students in the school's library.  720 F.2d at 723.  In a subsequent civil suit,

Cloud challenged the fairness of the process used in his case.  *Id*. at 724.  Under the university's

rules, Cloud was afforded a hearing in front of an impartial panel at which he was represented by

counsel, and had the opportunity to cross-examine the witnesses against him.  *Id*. at 723.  The

First Circuit found that the process afforded Cloud comported with basic fairness but did not

attempt to identify which procedures, if any, were necessary to a finding that the process was

"fair."

Similarly, in *Walker v. President & Fellows of Harvard College*, 82 F. Supp. 3d 524, 532

(D. Mass. 2014), the court found that the disciplinary process used in the case of a law student

charged with plagiarism comported with basic fairness where the charged student "had notice of

and understood the charges," had a hearing before a board, and was represented by an attorney

who was allowed to call witnesses, present evidence, cross-examine witnesses, and argue on the student's behalf.  Again, however, the Court did not attempt to identify any specific individual protections that must be afforded the accused in order for a disciplinary to be considered fair.[30]

Here, Brandeis failed to provide a variety of procedural protections to John, many of which, in the criminal context, are the most basic and fundamental components of due process of law.

### (1)  No Right to Notice of Charges

Brandeis did not require J.C. to provide a "full account" or "thorough statement" of the charges, and never provided such a statement to John.[31]  Instead, John was expected to defend himself against the vague and open-ended charge that he had "numerous inappropriate, nonconsensual sexual interactions" with J.C. from September 2011 to May 2013.[32]

Under the circumstances, the lack of specific notice of the charges may have been particularly prejudicial.  This was not a dispute about a single isolated event; it involved a lengthy and apparently tangled relationship that went on for nearly two years.  Brandeis's failure to inform John of the details of the charges appears to have had a significant adverse effect on his

---

[30] In *Bleiler v. College of the Holy Cross*, 2013 WL 4714340 (D. Mass. Aug. 26, 2013), a case involving the expulsion of a student who was found guilty of sexual assault, the court found that the university was not liable for breach of contract, but did not address the "basic fairness" prong of the analytical framework.

[31] As noted, the university's procedures required only that an administrator "suggest" that such a statement be prepared.  It is not clear, at this stage of the litigation, whether such a suggestion was made to J.C.  In any event, the complaint alleges that J.C. at some point provided "substantially more information" to university administrators, and that the additional information was not provided to John.

[32] The right to reasonable notice of the charges in a criminal proceeding is set forth in both the Sixth Amendment to the United States Constitution and the Massachusetts Declaration of Rights.  U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . ."); Mass. Const. Pt. 1, art. XII ("No subject shall be held to answer for any crimes or offence, until the same is fully and plainly, substantially and formally, described to him . . . .");  *see also In re Oliver*, 333 U.S. 257, 273 (1948) ("A person's right to reasonable notice of a charge against him . . . [is] basic in our system of jurisprudence"); Fed. R. Crim. P. 7 (requiring that an indictment contain "the essential facts constituting the offense charged").

ability to prepare a defense.  For example, the Special Examiner's findings were substantially influenced by her conclusion that J.C. was the more credible party.  According to the Report, J.C. provided "1) consistent statements regarding each alleged incident, not wavering from the initial description of the incidents; and 2) a consistent theme linking many of the alleged incidents." (Special Examiner's Report at 15).  In contrast, the Special Examiner found that John was inconsistent in his recollection of certain events.  Such a discrepancy, however, is exactly what one would expect where one party is fully informed of the subject matter of the inquiry and the other remains ignorant, and has to surmise the specifics of the charges over the course of the investigation.

In *Fellheimer v. Middlebury College*, 869 F. Supp. 238 (D. Vt. 1994), a student was charged with both rape and the separate offense of "disrespect of persons."  *Id.* at 245.  The student, however, was informed only of the rape charge, and was never informed of the existence of the disrespect charge or of the alleged conduct underlying that charge.  *Id.*  The court found that the disciplinary hearing was "fundamentally unfair" and that it was "impossible" for Fellheimer to defend himself against the charge.  *Id.* at 246-47.

There is little practical difference between a school failing to inform the accused of the charge against him or, as here, having informed him of the formal charge, refusing to provide him with the specific factual conduct alleged to have given rise to the charge.  At a minimum, it the failure to provide John with notice of the specific charges against him may have substantially impaired the fairness of the proceeding.

### (2)      No Right to Counsel

Brandeis did not permit John to have counsel in connection with the Special Examiner's investigation, either to participate actively or to render passive advice.  *Compare Cloud*, 720

F.2d at 723 (student permitted to be represented by counsel at university hearing); *Walker*, 82 F. Supp. 3d at 532 (same).[33]

The proceeding was not, of course, conducted in a court of law, according to the rules of procedure and evidence.  Nonetheless, Brandeis engaged an outside attorney, presumably with years of experience and training, to investigate and prosecute serious charges of sexual assault and other sexual misconduct.  But it expected a student, approximately 21 years old, with no legal training or background, to defend himself, alone, against those same charges.

### (3)      No Right to Confront Accuser

Brandeis did not permit John to confront or cross-examine J.C., either directly or through counsel.[34]  Presumably, the purpose of that limitation was to spare J.C. the experience of being subject to cross-examination.[35]  While protection of victims of sexual assault from unnecessary harassment is a laudable goal, the elimination of such a basic protection for the rights of the accused raises profound concerns.

---

[33] The right to counsel in a criminal proceeding is likewise set forth in both the federal and state constitutions.  U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."); Mass. Const. Pt. 1, art. XII (". . . every subject shall have a right . . . to be fully heard in his defence by himself, or his council, at his election."); *see also Powell v. Alabama*, 287 U.S. 45, 67-69 (1932) ("The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel"); *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963) ("The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours.").

[34] The right to confront one's accuser is likewise guaranteed in both the federal and state constitutions.  U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."); Mass. Const. Pt. 1, art. XII ("[E]very subject shall have a right . . . to meet the witnesses against him face to face . . . .");  *see generally Crawford v. Washington*, 541 U.S. 36, 43-45 (2004); *State v. Webb*, 2 N.C. 103, 104 (Super. L. & Eq. 1794) ("[I]t is a rule of the common law, founded on natural justice, that no man shall be prejudiced by evidence which he had not the liberty to cross examine.").

[35] Such a limitation is expressly set out in the April 2011 "Dear Colleague Letter":

OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing.  Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment.

(Dear Colleague Letter at 12).

In the famous words of John Henry Wigmore, cross-examination is "beyond any doubt the greatest legal engine ever invented for the discovery of truth."  3 Wigmore, Evidence § 1367, p. 27 (2d ed. 1923).  The ability to cross-examine is most critical when the issue is the credibility of the accuser.  *See Donohue v. Baker*, 976 F. Supp. 136, 147 (N.D.N.Y. 1997) ("[I]f a case is essentially one of credibility, the 'cross-examination of witnesses might [be] essential to a fair hearing.'") (quoting *Winnick v. Manning*, 460 F.2d 545, 550 (2d Cir. 1972)).

Here, there were essentially no third-party witnesses to any of the events in question, and there does not appear to have been any contemporary corroborating evidence.  The entire investigation thus turned on the credibility of the accuser and the accused.  Under the circumstances, the lack of an opportunity for cross-examination may have had a very substantial effect on the fairness of the proceeding.

### (4)      No Right to Cross-Examine Witnesses

As noted, Brandeis prohibited John from confronting and cross-examining J.C. Brandeis, however, likewise did not permit the cross-examination of other witnesses, who presumably would not be traumatized by the experience.  While there were no actual third-party witnesses to any of the alleged acts of sexual misconduct, the Special Examiner nonetheless interviewed, and relied to some degree, on the testimony of witnesses other than J.C.  John was not provided an opportunity to cross-examine any of those witnesses, or indeed to be advised of the substance of their testimony.

### (5)      No Right to Examine Evidence or Witness Statements

It is unclear whether J.C. ever provided any corroborating evidence (such as, for example, contemporaneous texts or e-mails) to the Special Examiner.  If he did, Brandeis did not give John access to it, and there was nothing in the 2013-14 Handbook that permitted him such

access.[36]

The Special Examiner did interview third-party witnesses, four of whom were identified by J.C.  (Am. Compl. ¶ 91).  John had no opportunity to review any statements they may have provided.  It is unclear whether any witnesses gave statements that were formally transcribed or recorded, or whether the Special Examiner prepared any interview memoranda.  John requested copies of all the "interview notes taken by the Special Examiner and Observer," which Brandeis refused to provide.  (Am. Compl. ¶¶ 138-39).[37]

### (6)   Impairment of Right to Call Witnesses and Present Evidence

If John had received fair notice of the allegations, and if Brandeis had conducted a hearing, John would (presumably) have had an opportunity to present his own evidence in response to J.C.'s charges.  (*See* 2013-14 Handbook § 19.10 (in a normal student disciplinary process at Brandeis, the accused student has the right to "present witnesses on their behalf")).  Under the Special Examiner Process, however, John was not informed of the details of the case against him until after the Special Examiner had prepared her Report, when a summary of that Report was read aloud to him.  (Am. Compl. ¶¶ 96-101).

John then attempted, unsuccessfully, to submit additional evidence; the complaint alleges that after the reading of the summary, he supplied "additional facts, names of additional

---

[36] *See* Fed. R. Crim. P. 16 (requiring the government to provide a criminal defendant with documents obtained during discovery that are "material to preparing the defense").

[37] According to the complaint,

> John needed the full Report and underlying interview notes in order to be apprised of all of the facts contained in the Report, including exactly what it is that J.C. said about him, what J.C.'s witnesses said, the weight the Special Examiner gave to the parties' and witnesses' interview statements, and a full understanding of the factual and legal bases for the Special Examiner's findings. The Summary given to John lacked this information.

(Am. Compl. ¶ 139).

witnesses, and his sworn affidavit" to Boes, but that she "refused to refer any of John's additional facts, witnesses, or affidavit to the Special Examiner for further consideration."  (*Id.* ¶¶ 131, 133).  It specifically alleges that among the information John provided to Boes was "the names of witnesses who would have attested to the fact that J.C. humorously recounted the Movie Incident to mutual friends throughout the [r]elationship."  (*Id.* ¶ 110).

### (7)      No Access to Special Examiner's Report

Brandeis did not provide John with a copy of the Special Examiner's Report until the entire proceeding was concluded.  He was thus forced to defend himself in the sanctions phase of the proceeding, and to prepare his appeal, without access to the very document in which his guilt was determined.  During the sanctions and appeals part of the proceeding, the Special Examiner—and every administrator and faculty member who determined John's fate—had access to the Report.  John, however, did not.[38]

As noted, John has a plausible contractual claim under the Handbook that he had an enforceable right of access to that Report.  The Handbook, however, does not expressly address the issue, and certainly does not provide John with a right to timely access to that report in order to defend himself.

### (8)      No Separation of Investigatory, Prosecution, and Adjudication Functions

Under the Special Examiner Process, a single individual was essentially vested with the powers of an investigator, prosecutor, judge, and jury.  Furthermore, those decisions were not reviewable except as to certain narrowly defined categories.

---

[38] In a criminal proceeding, such secrecy would be at odds with the most basic principles of justice and fair play.  *See Oliver*, 333 U.S. at 257 (reversing contempt conviction where proceeding was conducted hastily and in secret, and defendant did not have a fair opportunity to be informed of the charge and refute the evidence against him).

The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious.[39]   No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions.  The dangers of such a process can be considerably mitigated if there is effective review by a neutral party, but here that right of review was substantially circumscribed.

### (9)      No Right to Effective Appeal

The Special Examiner process, as set forth in the 2013-14 Handbook permitted an appeal on only four grounds:  fraud, "denial of rights under this process," "procedural error," or "the claim of new evidence not previously available, which would have materially affected the decision."  (2013-14 Handbook § 22.6 at 33).  Conspicuously absent from that list is the ability to appeal on the ground that the Special Examiner's decision was not supported by the evidence, or that it was otherwise unfair, unwise, or simply wrong.  The Special Examiner, for all practical purposes, had the first and only say in determining John's guilt.

### (10)      Burden of Proof

The standard of proof in sexual misconduct cases at Brandeis is proof by a "preponderance of the evidence."  For virtually all other forms of alleged misconduct at Brandeis, the more demanding standard of proof by "clear and convincing evidence" is employed.  The selection of a lower standard (presumably, at the insistence of the United States Department of Education) is not problematic, standing alone; that standard is commonly used in civil proceedings, even to decide matters of great importance.  Here, however, the lowering of

---

[39] In a criminal proceeding, vesting a single person with such a great quantity of aggregated power would violate due process.  *See Oliver*, 333 U.S. at 278-79 (Rutledge, J. concurring) ("Michigan's one-man grand jury . . . combines in a single official the historically separate powers of grand jury, committing magistrate, prosecutor, trial judge and petit jury.  This aggregated authority denies to the accused not only the right to a public trial, but also those other basic protections secured by the Sixth Amendment . . . .").

the standard appears to have been a deliberate choice by the university to make cases of sexual misconduct easier to prove—and thus more difficult to defend, both for guilty and innocent students alike.  It retained the higher standard for virtually all other forms of student misconduct. The lower standard may thus be seen, in context, as part of an effort to tilt the playing field against accused students, which is particularly troublesome in light of the elimination of other basic rights of the accused.

### (11)   Conclusion

Again, this was not a criminal proceeding, and Brandeis is not a governmental entity. Nonetheless, the stakes were very high.  John was charged with serious offenses that carry the potential for substantial public condemnation and disgrace.  He was required to defend himself in what was essentially an inquisitorial proceeding that plausibly failed to provide him with a fair and reasonable opportunity to be informed of the charges and to present an adequate defense.  He was ultimately found "responsible," and received a penalty that may permanently scar his life and career.  Under the circumstances, the complaint plausibly alleges that the procedures employed by Brandeis did not provide him with the "basic fairness" to which he was entitled.

That decision is based on the entirety of the procedures employed by Brandeis, given the nature of the charges and the circumstances of the case.  It is not necessary for the Court to decide what the bare minimum might be—that is, how many procedural protections Brandeis could have removed and still provided "basic fairness" to the accused—or whether any particular procedural protection was required under the circumstances of this case.  Nor is it necessary to decide what procedures might be appropriate in a different type of university proceeding, with less serious charges and less substantial consequences, or involving matters more closely related to core academic functions.  *See Gabrilowitz v. Newman*, 582 F.2d 100, 104-05 (1st Cir. 1978)

(discussing right to counsel in public school disciplinary matters); *see also Gorman v. University of Rhode Island*, 837 F.2d 7, 16 (1st Cir. 1988) (same); *Winnick v. Manning*, 460 F.2d 545, 549-50 (2d Cir. 1972) (discussing right of cross-examination in school disciplinary matters).

Finally, and to repeat, the Court is not deciding the merits of the case—in particular, whether John in fact committed any form of sexual misconduct.  It is simply ruling that the complaint plausibly alleges a violation of the "basic fairness" to which John was entitled, and therefore states a claim upon which relief can be granted.

### b.    <u>Substantive Fairness</u>

Because the procedures employed by Brandeis did not afford the accused "basic fairness," the substantive result reached as a result of that process is open to serious doubt. However, the complaint also raises serious concerns as to the substantive result, even if one assumes that the process itself was otherwise procedurally fair.

One of the most basic components of fairness is an unbiased and neutral fact-finder. Accused students are entitled to have their cases decided on the merits—on the particular facts of the case, set in the proper context—and not according to the application of unfair generalizations or stereotypes or because of social or other pressures to reach a certain result.

The complaint alleges that the Special Examiner based her findings on "novel notions of consent, sexual harassment, and physical harm" that "are at odds with traditional legal and cultural norms and definitions."  (Am. Compl. ¶ 18).  It further alleges that her findings "ignored the context of a romantic, dating relationship, and were not supported by the evidence."  (*Id.*; *see also id.* ¶ 33 (alleging that the Special Examiner's findings "could not be squared with the evidence, and elevated commonplace, everyday interactions in a nearly two-year consensual relationship into serious sexual transgressions")).  And it further alleges that "[u]nlawful gender

and sexual orientation stereotyping infuses the Special Examiner's Report."  (*Id.* ¶ 215).  Finally, it alleges as follows:

> The Special Examiner approached the Relationship as if John was the Dominant Male Aggressor and J.C. was the Submissive Female Victim, stereotypes derived from heterosexual culture.  Those stereotypes would be inappropriate in any sexual misconduct investigation, but clearly they did not apply to John's and J.C.'s Relationship.  It was undisputed that J.C. was out of the closet and sexually experienced, but John had not had any sexual contact with a man and was not sure of his sexual orientation when they met; J.C. broke up with John for not being "forceful" enough with him; and John's alleged conduct involved commonplace sexual activity.  Nothing in the evidence suggested that J.C. was weak, passive, or dominated by John, but that female-male heterosexual stereotype was imposed on John throughout the Special Examiner's Report.  The Special Examiner should have known that closeted gay men are not in a dominant position to "pressure" openly gay men who are sexually experienced into an unwanted sexual relationship.

(*Id.* ¶ 216).

There are few things in life as complex as a long-term relationship.  It is perhaps impossible to expect anyone to plunge into the labyrinth of a lengthy emotional and sexual relationship between two young adults and hope to emerge with a clear understanding of what happened and why.  Here, however, there is reason to believe that the Special Examiner decided John's guilt to a substantial degree on unfair generalizations, stereotypes, or logical fallacies, and that the basic fairness of the proceeding was affected by that fact.  A few examples will suffice.

### (1)    The Significance of the Delay in Reporting

The first alleged sexual assault, the "movie incident," is alleged to have occurred in September 2011.  At the time, both J.C. and John were incoming freshmen; John was 17 years old and J.C. was 18.  J.C. did not report the "assault" at the time to anyone.  The two apparently had sexual relations the very next day, and soon thereafter embarked on a 21-month-long romantic relationship, during which they appeared, to their friends, to be happy and comfortable together.  The complaint alleges, and the Special Examiner's Report does not appear to dispute,

that J.C. never complained or reported any incidents of sexual misconduct at any point during that relationship.  (*See* Am. Compl. ¶ 11).

After they broke up, in July 2013, J.C. waited another six months to file his accusations. In the meantime, J.C. and John had undergone an unhappy deterioration of their friendship; J.C. had begun abusing alcohol; and J.C. had attended two sessions of "sexual assault training" that (J.C. contends) made him start "thinking" about whether he had been sexually abused.  (Special Examiner's Report at 13).  Finally, in January 2014—two and one-half years after the incident—J.C. alleged for the first time that he had been the victim of multiple sexual assaults.

It is true, of course, as the Special Examiner noted, that "sexual misconduct does occur in dating relationships and that such conduct can occur for years."  (*Id.* at 16).  It is also true, as she noted, that individuals may "underreport incidents of intimate partner violence to friends and family due to a number of reasons, including shame and embarrassment," or "because they do not perceive unwanted sexual contact with an intimate partner as coercive."  (*Id.*).  But surely "basic fairness" requires more than the rote recitation of generalizations about the way *some* victims of sexual misconduct *sometimes* react.

Why did J.C. enter into a sexual and romantic relationship with John immediately after the first alleged assault, and stay with him for 21 months?  Why did he not complain about, or report, any misconduct for that entire period?  It is certainly possible, of course, that the Special Examiner was correct, and J.C. did not report the misconduct out of shame or embarrassment.

But it is also possible that J.C. was not remembering matters accurately; that would hardly be surprising after the passage of two years.  Human memories are transient, and subject to substantial modifications and degradation over time.  Moreover, they are readily susceptible to such factors as hindsight bias (that is, the influence of one's current perceptions, knowledge, and

state of mind) and suggestibility (that is, the influence of suggestion, express and implicit, by

others).  It is possible that J.C.'s memories were colored by anger or hostility to John that arose

after the breakup.  It is possible that his sexual assault training had a suggestive effect on his

memory, causing him to subconsciously reinterpret his memories.[40]  Or it is possible that his

subsequent alcohol abuse affected his interpretation of events.

Those possibilities could neither be accepted nor rejected out of hand; they would need to

be carefully considered by a neutral fact-finder, not decided on the basis of unfair

generalizations.  If the Special Examiner considered those issues, it is not reflected in her

report.[41]

### (2)      The Significance of the Relationship

The central factual question in the Special Examiner's investigation was consent;

specifically, whether J.C. communicated consent to John "verbally or through actions."  (2011-

12 Handbook § 3.3).[42]  "Generally[,] sexual acts with consent are just sex.  Therefore, the

definition of sexual assault turns completely on the meaning of consent . . . ."  Jacob E. Gerson &

Jeannie Suk, *The Sex Bureaucracy*, 104 Cal. L. Rev. (forthcoming) at 10.

As noted, the Special Examiner's Report entirely dismissed the significance of the long-

term relationship in evaluating John's behavior, on the ground that "sexual misconduct does

---

[40] The Special Examiner noted that victims of sexual assault may not "perceive" unwanted sexual contact with a partner to be "coercive" at the time.  (Special Examiner's Report at 16).  That may well be true in some instances, but surely considerable caution should be exercised in applying that principle to make present-day judgments about past events.  If neither partner perceived the conduct to be improper at the time, the potential for unfairness is acute where one partner changes his perception, in hindsight, nearly two years after the fact.

[41] A lengthy delay in reporting could also adversely affect the ability of the accused to defend himself, as evidence (such as contemporaneous text messages) may not have been preserved.

[42] Thus, whether J.C. inwardly disliked a particular sexual interaction at the time, or regretted it afterward, is significant only to the extent that his feelings were communicated to John—in other words, whether John knew or reasonably should have known that J.C. consented.

occur in dating relationships and such conduct can occur for years."[43]  Of course, it is true that

rape or other forms of sexual assault *can* occur in the context of a long-term relationship, and it

*can* occur for years.  Of course, the existence of such a relationship is not a license to engage in

sexual misconduct.  But surely the question of consent is strongly affected by the nature of the

relationship between the parties; it is absurd to suggest that it makes no difference whatsoever

whether the other party is a total stranger or a long-term partner in an apparently happy

relationship.

Normally, over the course of a long relationship, the parties develop implicit and explicit

understandings that affect their behavior, including certain forms of non-verbal consent.  Actions

that might be inappropriate between strangers or casual acquaintances may be viewed entirely

differently by long-term partners.  Again, the existence of a relationship does not give someone

the right to commit sexual assault.  But neither is it meaningless and irrelevant when evaluating

the question of consent.

The Special Examiner's findings concerning the "kissing" incidents are particularly

noteworthy.  The Special Examiner concluded that John had occasionally awakened J.C. with

kisses, and had sometimes continued to try to kiss him after J.C. said he wanted to go back to

sleep.  She further concluded that those actions were acts of "violence."  To reach that result, she

essentially stitched together a series of broad generalizations—kissing is sexual activity; a

sleeping person is physically incapacitated and therefore cannot give consent; the existence of a

relationship is not relevant to consent; sexual activity without consent is sexual misconduct;

sexual misconduct is a form of violence—to reach a conclusion that seems at odds with common

---

[43] The 2011-12 Handbook provides that "[p]rior sexual activity or an existing acquaintance, friendship, or relationship that has been sexual in nature does not constitute consent for the continuation or renewal of sexual activity."  (2011-12 Handbook § 3.3).

sense and the ordinary meanings and definitions of words.

In short, the existence of a relationship was unquestionably a central issue in assessing John's behavior and resolving the issue of consent.  The existence of a relationship did not immunize John from the consequences of any improper behavior.  But neither should it have been dismissed out of hand simply on the basis of a broad generalization that sexual misconduct can, and sometimes does, occur in the context of a relationship.

### (3)    The Significance of J.C.'s Abuse of Alcohol

The Special Examiner concluded that J.C. had begun to abuse alcohol after he broke up with John, and that his use of alcohol "strengthen[ed] his credibility that he experienced unwanted sexual contact."  (Special Examiner's Report at 16).  Her stated basis for that conclusion was that "[a] study of physical and sexual abuse found that past or recent occurrence of assault is associated with significantly increased rates of reported alcohol use."  (*Id.* at 15).

According to the complaint, the Special Examiner "relied on a single, hearsay research study in the 1990s reporting significantly increased rates of alcohol use among women (not men) after recent occurrences of sexual assault as 'probative' that J.C. probably had experienced unwanted sexual conduct."  (Am. Compl. ¶ 125).

> The Special Examiner ignored the information supplied by one of John's witnesses that J.C. began drinking at his grandmother's funeral, two months after J.C. and John broke up, and the undisputed fact that J.C. grew up in a severely dysfunctional, alcoholic family, suggesting that J.C.'s resort to alcohol was triggered by *family* history and events, not by unwanted sexual activity with John.

(*Id.* ¶ 126) (emphasis in original).

Even assuming that the research study was valid, its use in this circumstance was certainly open to question.  The Special Examiner may have engaged in a classic *post hoc* fallacy, reasoning that because the alcohol abuse occurred after the breakup of the relationship, it

must have been caused by the relationship.  J.C.'s abuse of alcohol may have been a direct product of sexual misconduct by John, or it may have been the product of a variety of different factors.  It was an issue that should have been approached with considerable care, and not simply by the application of broad generalizations or *post hoc* reasoning.

### (4) <u>Conclusion</u>

The Court need not decide whether the substantive analysis of the Special Examiner, apart from any procedural shortcomings, denied John the "basic fairness" to which he was entitled.  It is sufficient for these purposes to note that the possible substantive shortcomings reinforce the conclusion that the procedures followed did not provide basic fairness, and that therefore Brandeis plausibly could be found liable for breach of contract.  Again, and to be clear, the Court is making no finding that the conclusions of the Special Examiner are incorrect as a factual matter.  The question at present is simply whether the complaint plausibly alleges that the fact-finding process and its result violated the contractual relationship.  Based on plausible allegations of a denial of "basic fairness," the answer to that question is in the affirmative.

### 3. <u>Summary of Breach of Contract Claims</u>

In summary, to the extent that Count One alleges breach of contract based on (1) Brandeis's alleged failure to provide John with a copy of the Special Examiner's Report; (2) its alleged failure to maintain the confidentiality of his educational record; and (3) its alleged failure to provide him with basic fairness in the disciplinary process, defendant's motion to dismiss will be denied.  The motion will be granted as to the remaining claims of breach of contract.

### B. <u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

Count Two asserts a claim for breach of the implied covenant of good faith and fair

dealing.   Under Massachusetts law, a covenant of good faith and fair dealing is implied in every

contract.  *UNO Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).  The

covenant provides that "neither party shall do anything that will have the effect of destroying or

injuring the rights of the other party to receive the fruits of the contract."  *Anthony's Pier Four,*

*Inc. v. HBC Assocs.*, 411 Mass. 451, 471 (1991) (quotations omitted).

The implied covenant may not be invoked to create rights and duties not contemplated by

the provisions of the contract or the contractual relationship.  *Uno Rests.*, 441 Mass. at 385;

*AccuSoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001).  However, a party may breach the

covenant of good faith and fair dealing without breaching any express term of that contract.  *See*

*Fortune v. National Cash Register Co.*, 373 Mass. 96, 101 (1977).  Otherwise, the implied

covenant would be a mere redundancy.  The essential inquiry is whether the challenged conduct

conformed to the parties' reasonable understanding of performance obligations, as reflected in

the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in

the course of performance.

The nature of the university-student relationship under Massachusetts law appears to be

somewhat unique and not necessarily tied to ordinary principles of contract law.  Among other

things, it is unclear whether the two-pronged test for analyzing a university-student contractual

relationship (that is, whether the "reasonable expectation" of the student was met and the

proceeding was conducted with "basic fairness") derives from the implied covenant or some

other source.

In any event, the allegations of the complaint here are sufficient to state a claim for

breach of the implied covenant.  The complaint alleges, in substance, that Brandeis did not

conform to the parties' reasonable understanding of the performance obligations, as reflected in

the overall spirit of the bargain, even if Brandeis technically complied with the letter of the Handbook.  Accordingly, Count Two states a claim for breach of the implied covenant of good faith and fair dealing.

### C.      Estoppel and Reliance

Count Three asserts a count for estoppel and detrimental reliance, essentially contending that (1) the "various standards, policies, and procedures" of Brandeis "constitute representations and promises that Brandeis expected or should have reasonably expected would induce action or forbearance by John."  (Am. Compl. ¶ 227).  In his memorandum, John contends that this count is based on representations and promises that are not contained in the Handbook, and gives a single example:  the alleged promise by Brandeis "to ensure that members of the Appeals Board had no conflicts of interest."  (Pl. Mem. 29).

Essentially, this count asserts a claim for promissory estoppel.  It is well-established that recovery under a quasi-contract theory is not available where there is a written contract governing the same subject matter.  *See, e.g.*, *Trent Partners & Assocs., Inc. v. Digital Equip. Corp.*, 120 F. Supp. 2d 84, 104-05 (D. Mass. 1999) ("[T]he Supreme Judicial Court [has] held as a matter of law that an oral statement made in the face of a written contract was not a 'promise' or 'commitment' for promissory estoppel purposes because the existence of a written contract demonstrated the parties' intention that it would govern their intricate transaction." (citing *Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 419 Mass. 841, 850 (1995))).  It is true that plaintiffs may plead causes of action in the alternative.  Here, however, John is seeking to use promissory estoppel to fill in one or more of the gaps in the contract itself, rather than asserting an alternative theory of liability.  Under the circumstances, that is not permitted.  *See Brown Univ.*, 2016 WL 715794, at *15.  Count Three accordingly fails to state a claim upon which relief can

be granted.

### D.    Negligence

Count Four asserts a claim for common-law negligence.  The complaint asserts that

Brandeis was negligent in (1) choosing Boes as the final decision-maker for John's case and

(2) failing to conduct a proper conflicts check with respect to the Appeals Board.   In his

memorandum, John alleges a third theory, that Brandeis negligently breached its "duty to keep

John's education record confidential by violating FERPA in leaking information about John's

disciplinary proceedings to third parties."  (Pl. Mem. 30) (footnote omitted).

### 1.    Negligent Retention and Supervision

Massachusetts recognizes a cause of action for negligent supervision or retention of an

employee.  "Negligent retention [or supervision] occurs when, during the course of employment,

the employer becomes aware or should have become aware of problems with an employee that

indicated his unfitness, and the employer fails to take further action such as investigating,

discharge or reassignment."  *Foster v. Loft, Inc.*, 26 Mass. App. Ct. 289, 291-92 (1988) (quoting

*Garcia v. Duffy*, 492 So. 2d 435, 438-39 (Fla. Dist. Ct. App. 1986)).

Although the case law sometimes describes negligent retention and negligent supervision

as two separate torts, it is more accurate to think of negligent retention as falling under the

umbrella of negligent supervision.  *See Great No. Ins. Co. v. Paino Assocs.*, 364 F. Supp. 2d 7,

20 (D. Mass. 2005) ("'Negligent supervision' is probably a more accurate label for the tort of

negligent retention, because in some situations the appropriate course of action for an employer

is to dismiss an employee and in other situations it may be more appropriate to reassign that

employee or take some other course of action.")

Brandeis first contends that the claim must be dismissed because John, by virtue of his

student status, had a private contractual relationship with the school.  "The torts of negligent

hiring, retention, and supervision ordinarily relate to situations where 'employees are brought

into contact with members of the public in the course of an employer's business.'"  *Vicarelli v.*

*Business Int'l, Inc.*, 973 F. Supp. 241, 246 (D. Mass. 1997) (quoting *Foster*, 26 Mass. App. Ct. at

290).   Brandeis's position is that because John was a Brandeis student and had a private

contractual relationship with the school, he is not properly considered a member of the public.

The existence of a private contractual relationship between the parties, however, does not

necessarily mean that the plaintiff is no longer a member of the "public" for the purposes of a

negligent retention or supervision claim.  *See, e.g.*, *Copithorne v. Framingham Union Hosp.*, 401

Mass. 860 (1988) (holding defendant-hospital not entitled to summary judgment on plaintiff-

patient's claim for negligent retention of physician).  Thus John's status as a student does not

necessarily preclude his negligence claim.

Brandeis also contends that John's negligent retention and supervision claim should be

dismissed because it fails to allege any facts demonstrating that Brandeis knew, or should have

known, that Boes had a propensity to commit procedural errors in handling disciplinary

proceedings.  Brandeis relies on *Vicarelli v. Business International, Inc.*, which held that a

plaintiff must allege that an employer knew or should have known that the employee had a

"proclivity to commit the complained-of acts."  973 F. Supp. at 246-47 (citing *Foster*, 26 Mass.

App. Ct. at 291).  Brandeis's reasoning implies that because Boes had never overseen a Special

Examiner's Process before, she necessarily could not have made previous errors from which

Brandeis would have been put on notice of her "proclivity" to do so.

It is true that *Foster* held that a plaintiff may show that a defendant employer should have

foreseen an employee's negligence based on the employee's prior acts or omissions.  *See Foster*,

26 Mass. App. Ct. at 295.  But it is not true that, as Brandeis suggests, John *must* allege prior bad acts in order to bring his claim for negligent supervision.  Instead, under *Foster*, John needs only to allege facts that, if true, would show that Brandeis should have known there were "problems" with Boes indicating her "unfitness" to oversee John's case, but failed to take further action.  *Id.* at 291-92.

John alleges that Boes was unfit to oversee his case because she was unfamiliar with the Special Examiner's Process, had never served as a final decision-maker before, and was selected only because the Dean of Students (who would normally serve as the final decision-maker) had recused himself.  (Am. Compl. ¶¶ 233-34).  An employer may be negligent where it assigns employees to positions or duties with which they had no previous experience or training.  *See, e.g.*, *Grote v. Meyers Land & Cattle Co.*, 485 N.W. 2d 748, 756 (Neb. 1992) (ranch owner-employer's knowledge that 16-year-old boy had no experience in handling colts relevant to finding employer negligent where colt kicked boy in the head); *Welsh Mfg., Div. of Textron, Inc. v. Pinkerton's, Inc.*, 474 A.2d 436 (R.I. 1984) (jury could find employer negligent in failing to supervise or prepare employee for assigned task).

Even taking the facts in the complaint as true, that appears to be a dubious claim; placing a university administrator in the role of a decision-maker is a far cry from entrusting a complex or dangerous task to an untrained individual.  Nonetheless, for present purposes, it is at least plausible that Brandeis was negligent in appointing Boes as the final decision-maker in John's case.  Whether the evidence will support such a claim is a question for another day.

### 2. <u>Negligent Failure to Prevent Conflict of Interest</u>

The complaint also alleges that Brandeis breached its duty of care to John by failing to conduct a proper conflicts check with respect to the members of the Appeals Board.  Brandeis

contends that this claim fails because it had no specific duty to John; even if it did have such a duty, that there was no breach; and even if there was a breach, there is no basis to conclude that it caused the alleged injury.  John did not address those contentions in his memorandum in response, and accordingly has waived his rights with regard to that claim.

### 3.      Breach of Duty to Maintain Confidentiality of Educational Record

In his memoranda, John further contends that his negligence claim is based on the complaint's allegation that Brandeis leaked or allowed J.C. to leak confidential information about the Special Examiner's findings, which Doe contends Brandeis had a duty to protect under FERPA, 20 U.S.C. § 1232g.  That claim, however, is not set out in the amended complaint, and accordingly has not been properly asserted in this case.

### E.      Defamation

Count Five of the complaint asserts a claim for defamation on two separate grounds. First, the complaint alleges that Brandeis defamed John by leaking information regarding the Special Examiner's findings to third-parties.  Second, the complaint alleges that Brandeis aided and abetted J.C.'s defamation of John by failing to correct J.C.'s public accusations against John that Brandeis knew were false.

### 1.      Defamation Generally

To establish a defamation claim under Massachusetts law, a plaintiff must show (1) that the defendant made a statement concerning the plaintiff to a third party; (2) that the statement could damage the plaintiff's reputation in the community; (3) that the defendant was at fault in making the statement; and (4) that the statement either caused the plaintiff economic loss or is actionable without proof of economic loss.  *Shay v. Walters*, 702 F.3d 76, 81 (1st Cir. 2012) (citing *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 629-30 (2003) (quotations omitted)).

The complaint alleges that Brandeis intentionally leaked the Special Examiner's findings to two different third parties, John's then-current and prospective employers. (Am. Compl. ¶ 28). In support of that claim, the complaint asserts that the current employer told John that it had been "made aware" of his situation at Brandeis from "several sources." (*Id.* ¶ 200). The complaint does not further allege who or what the sources were, or the particular information of which the employer had been made aware.

John contends that the fact that the current employer identified "several" sources means that the information could not have come from just J.C. This does not mean, however, that Brandeis was one of the additional sources.[44] Although the complaint need not allege facts sufficient to show a probability that a Brandeis administrator was a source, it must still show "more than a sheer possibility" that Brandeis acted unlawfully. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

With regard to the prospective employer, the complaint states only that the prospective employer had "ties" to Brandeis and stopped responding to John's e-mails even though it had promised hire him. (Am. Compl. ¶ 202). The complaint does not include any facts attempting to identify exactly what "ties" the prospective employer had to Brandeis, nor does it describe how those ties plausibly lead to a conclusion that Brandies made an actual statement to that employer.[45] Again, although the existence of ties between the employer and Brandies make it

---

[44] Any additional sources also could have been any of the students or media to whom the complaint alleges J.C. identified John by name. (Am. Compl. ¶ 191).

[45] Although at oral argument plaintiff further clarified that the employer was a public relations firm that had won Brandeis's account, the Court is limited at this stage to evaluating the four corners of the complaint and certain undisputed or critical documents, not statements made at oral argument. *See Young v. Lepone*, 305 F.3d 1, 10-11 (1st Cir. 2002) ("The fate of a motion to dismiss under Rule 12(b)(6) ordinarily depends on the allegations contained within the four corners of the plaintiff's complaint.").

possible that Brandies leaked information to the prospective employer, "mere possibility is not enough to state a claim." *Penalbert-Rosa v. Fortuno-Burset*, 631 F.3d 592, 596 (1st Cir. 2011).

### 2.   Aiding and Abetting Defamation

The complaint further alleges that Brandeis aided and abetted J.C.'s alleged defamation of John by failing to correct J.C.'s public accusations against John that Brandeis knew were false.  Under Massachusetts law, a defendant may be liable for aiding and abetting a tort where (1) a third-party committed the relevant tort; (2) the defendant knew the third-party was committing the tort; and (3) the defendant actively participated in or substantially assisted in the commission of the tort.  *Go-Best Assets Ltd. v. Citizens Bank of Mass.*, 463 Mass. 50, 64 (2012) (citing *Arcidi v. National Ass'n of Gov't Employees*, 447 Mass. 616, 623-24 (2006); Restatement (Second) of Torts § 876(b) (1977)).

Brandeis does not contend that the complaint fails to allege facts that, if true, would establish a claim that J.C. committed defamation.  The complaint's allegations that Brandeis was aware of at least some of J.C.'s statements to the media are also sufficient to establish the second element of aiding and abetting liability.

However, the complaint alleges no facts at all indicating that Brandeis either "actively participated in or substantially assisted" J.C. in defaming John.  According to the complaint, it was J.C. who contacted a national publication with his story; J.C. who posted the final outcome letter on social media; and J.C. who told students and a WBUR reporter that John had "raped" him.  (Am. Compl. ¶¶ 191-96).  John argues that Brandeis "allowed J.C. to create a hostile environment," presumably by failing to intervene in what John describes as J.C.'s campaign to defame and harass him.  (Pl. Opp. 33).  Even if this is true, mere "allowance" of a tort certainly does not rise to the level of active participation or substantial assistance required under

Massachusetts law for aiding and abetting liability to attach.

Thus, because the amended complaint fails to allege facts that, if true, would give rise to liability either for defamation or aiding and abetting defamation, Count Five will be dismissed for failure to state a claim.

### F.   <u>Invasion of Privacy</u>

Count Six asserts a claim for invasion of privacy.  Massachusetts has never recognized a common-law cause of action for invasion of privacy.  *See Alberts v. Devine*, 395 Mass. 59, 70 (1985).  To the extent, therefore, that plaintiff's cause of action for invasion of privacy is based on state common law, it likewise fails as a matter of law.

The Massachusetts Privacy Act establishes "a right against unreasonable, substantial or serious interference with . . . privacy."  Mass. Gen. Laws ch. 214, § 1B.  The statute protects individuals from "disclosure of facts . . . that are of a highly personal or intimate nature when there exists no legitimate, countervailing interest."  *Dasey v. Anderson*, 304 F.3d 148, 153-54 (1st Cir. 2002) (quoting *Bratt v. International Bus. Machs. Corp.*, 392 Mass. 508, 518 (1984) (citations omitted)).

As with the defamation claim, John's claim for invasion of privacy is grounded in his allegation that Brandeis disclosed information, including the Special Examiner's findings, to his then-current and prospective employers.  For the reasons set forth above, the amended complaint does not allege facts giving rise to more than a mere possibility that, even if the findings were disclosed to John's employers, it was Brandeis that did so.  *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  Count Six will therefore be dismissed.

### G.   <u>Intentional Infliction of Emotional Distress</u>

Count Seven asserts a claim for intentional infliction of emotional distress.  In

Massachusetts, to state such a claim, a plaintiff must allege (1) that the defendant either intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the conduct caused the plaintiff emotional distress; and (4) that the emotional distress was severe and of a nature that no reasonable person could be expected to endure it.  *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144-45 (1976).

Specifically, the complaint alleges that Brandeis's conduct in employing the Special Examiner's Process to find John responsible for J.C.'s charges, "effectively labeling him as a sexual predator," was extreme and outrageous.  (Am. Compl. ¶¶ 254-55).[46]

Conduct is "extreme and outrageous" only if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Foley v. Polaroid Corp.*, 400 Mass. 82, 99 (1987) (quoting Restatement (Second) of Torts § 46, comment d).  Although Brandeis's actions in John's case may have been unreasonable and unfair, and a violation of its express or implied contractual obligations, the bar for asserting an IIED claim is considerably higher.  The facts set out in the complaint, even assuming that they are true, do not appear to constitute the sort of targeted, deliberate, and malicious conduct that is required for an IIED claim.  *See Fellheimer*, 869 F. Supp. at 247; *Harris v. St. Joseph's Univ.*, 2014 WL 1910242, at *11-12 (E.D. Pa. May 13, 2014); *see also Doyle v. Hasbro, Inc.*, 103 F.3d 186, 195 (1st Cir. 1996).  Count Seven will therefore be dismissed for failure to state a claim.

---

[46] In his memorandum, John contends that Brandeis intentionally inflicted emotional distress on him by defaming him to his employers.  (Pl. Opp. 35).  However, that claim is not set forth in the complaint; in any event, as set forth above, the complaint does not plead sufficient facts to state a claim for defamation.

**H.**      **Negligent Infliction of Emotional Distress**

Count Eight asserts a claim for negligent infliction of emotional distress.  To establish such a claim, a plaintiff must show "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case."  *Payton v. Abbott Labs*, 386 Mass. 540, 557 (1982); *Sullivan v. Boston Gas Co.*, 414 Mass. 129, 132 (1993).

Brandeis appears to challenge this claim solely on the ground that the complaint fails to state a claim for negligence.  For the reasons discussed above, the Court has rejected that challenge.  Accordingly, Brandeis's motion to dismiss with respect to Count Eight will be denied.

**VI.**      **Conclusion**

For the foregoing reasons, Brandeis's motion to dismiss is GRANTED as to Counts Three, Five, Six, and Seven; GRANTED as to Count Four, except insofar as it alleges a claim for negligent supervision; and otherwise DENIED.

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor IV
Dated: March 31, 2016                    United States District Judge